PREET BHARARA
United States Attorney for the
Southern District of New York
By: PIERRE G. ARMAND
    LAWRENCE H. FOGELMAN
    JAMES NICHOLAS BOEVING
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel:   (212) 637-2724/2719/2748
Fax:   (212) 637-2730/2686
Email: Pierre.Armand@usdoj.gov
       Lawrence.Fogelman@usdoj.gov
       James.N.Boeving@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

    Plaintiff,

    - v. -

THE BANK OF NEW YORK MELLON
CORPORATION,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JUDGE KAPLAN

ECF Case

11 Civ. 6969

**COMPLAINT**

Plaintiff, the United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, alleges upon information and belief as follows:

### INTRODUCTION

1. This is a civil fraud action by the United States against defendant The Bank of New York Mellon Corporation ("BNYM" or "Defendant"), one of the world's largest custodial banks, which from at least 2000 to the present has engaged a scheme to defraud custodial clients who use BNYM's foreign exchange services.

2. This action seeks civil penalties under the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA"), as well as injunctive relief under the Fraud Injunction Statute, 18 U.S.C. § 1345.

3. BNYM offers foreign exchange services to its custodial clients, for whom it holds domestic and international financial assets, including currency and securities. In particular, BNYM offers a "standing instruction" foreign exchange service pursuant to which BNYM automatically provides currency exchange on an as needed basis when, for example, the client buys or sells foreign securities or receives dividends on foreign securities that are repatriated to the United States.

4. BNYM provides its clients with very limited information about how it determines what currency exchange rates or prices will be used for standing instruction foreign exchange transactions. And what little information BNYM has provided to clients about pricing has been false, incomplete and/or misleading. Among other things, BNYM has represented to standing instruction clients that the service is free of charge and that transactions are executed according to "best execution standards" (i.e., suggesting that clients will be getting the best available rate at the time of execution), and that the transaction will fall within a specified daily price range.

5. In truth, BNYM's standing instruction service is far from free and, instead of providing clients with favorable rates within a specified daily range, BNYM waits until the end of the trading day to price standing instruction currency trades and consistently gives standing instruction clients virtually the worst rates of the day. At the same time, BNYM obtains more favorable prices for itself on the spot market, reaping large profits on the price differential or "spread."

6. The large spreads BNYM has obtained on standing instruction foreign exchange trades at the expense of its clients have accounted for the lion's share of BNYM's profits from

all foreign exchange channels. The size of the spread BNYM derives from its clients depends in large part upon volatility in currency prices; the greater the volatility, the greater the opportunity for a large spread. Indeed, during the financial crisis in 2008, when currency prices fluctuated dramatically, the profits BNYM generated at the expense of its custodial clients were enormous.

7. Because BNYM does not provide time stamps to its clients indicating when during the day the trades were executed, it is extremely difficult, if not impossible, for clients to determine whether the prices they received are fair and reasonable. When clients have made inquiries of BNYM about its pricing scheme, BNYM has consistently misled them by providing false and/or incomplete information.

8. As a result of this scheme, BNYM has collectively defrauded its custodial clients, which include federally insured financial institutions and/or their subsidiaries or affiliates, of hundreds of millions of dollars.

## PARTIES

9. Plaintiff is the United States of America.

10. Defendant BNYM is a Delaware corporation with headquarters at One Wall Street, New York, New York. BNYM is a global financial services company with approximately $1.2 trillion in assets under management and approximately $25 trillion in assets under custody and administration.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 12 U.S.C. §§ 1833a.

12. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions alleged in this Complaint

occurred within this District.  Venue also is proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts business within this District.

## BACKGROUND

### A.     FIRREA and the Fraud Injunction Statute

13.     In 1989, Congress enacted FIRREA as part of a comprehensive legislative plan to reform and strengthen the federal deposit insurance system. Pursuant to FIRREA, the United States can recover civil penalties, up to $1 million for each violation or up to $5 million for a continuing violation, from persons who "violate any provision of law to which this section is made applicable."  12 U.S.C. § 1833a(a)-(b).  Further, if a defendant "derives pecuniary gain from the violation, or if the violation results in pecuniary loss" to a person other than the defendant, FIRREA authorizes the United States to recover civil penalties in an amount greater than $1 million, but not to exceed the amount of gain or loss.  *Id*. § 1833a(b)(3)(A).

14.     As relevant to this action, FIRREA authorizes the United States to recover civil penalties for violations of, or conspiracies to violate, two provisions of Title 18 of the United States Code:

- 18 U.S.C. § 1341 (Mail Fraud Affecting a Financial Institution):  which proscribes the use of "the Postal Service, or . . . private or commercial interstate carrier" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . .";

- 18 U.S.C. § 1343 (Wire Fraud Affecting a Financial Institution):  which proscribes the use of "wire . . . in interstate or foreign commerce" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ."

15.     The Fraud Injunction Statute authorizes the United States to commence a civil action to enjoin any "person" who is "violating or about to violate" (among other criminal

4

statutes) 18 U.S.C. §§ 1341 and 1343, from committing further violations of those statutes. 18 U.S.C. § 1345(a)(I)(B).

B.     **BNYM's Foreign Exchange Business**

16.    BNYM is a custodian bank, a financial institution that holds and safeguards financial assets of firms and individuals, such as stocks, bonds and currency. BNYM provides a variety of services to clients, including settlement of any purchases and sales of securities and currency, maintaining currency/cash bank accounts, effecting deposits and withdrawals and managing other cash transactions, and performing foreign exchange ("FX") transactions.

17.    BNYM is one of the largest custodian banks in the world, with approximately $25 trillion in assets under custody and administration. BNYM's custodial clients include public and private pension funds, states, cities, colleges, universities, foundations, non-profit religious organizations, and financial institutions, including federally insured financial institutions (and/or subsidiaries or affiliates of these institutions).

18.    Many of BNYM's custodial clients invest in foreign securities, which must be purchased and sold in the currencies of the countries where the securities are issued. Accordingly, to complete transactions involving the purchase or sale of foreign securities, BNYM's custodial clients who are based in the United States and invest in foreign securities must purchase and sell those foreign currencies. In addition, such foreign securities earn dividends or other income in foreign currencies that clients often choose to repatriate into U.S. dollars or assets. To facilitate these transactions, BNYM offers its clients FX services.

19.    BNYM generally offers two principal types of FX services, namely: (1) negotiated FX; and (2) standing instruction FX. Negotiated FX involves the custodial client or its investment manager negotiating directly with an FX trader at BNYM to purchase or sell currency at a particular price agreed upon by the parties. Standing instruction, by contrast, does

5

not involve any direct involvement between the custodial client and BNYM. Rather, under the standing instruction process, BNYM executes FX transactions automatically on an as needed basis and the price the client receives for the purchase or sale of the currency is determined by BNYM.

20. BNYM's standing instruction clients have included federally insured financial institutions and/or the subsidiaries or affiliates of these institutions.

21. BNYM generated substantial revenue from its standing instruction foreign exchange trading services. According to BNYM, its estimated sales margins on standing instruction foreign exchange trades for its top 200 users of standing instruction services alone totaled more than $1.5 billion during the period 2007 through 2010. A significant portion of BNYM's sales margin from these years was derived from federally insured financial institutions (and/or subsidiaries or affiliates of these institutions). BNYM's estimated sales margin on standing instruction FX trades for its top 20 federally insured financial institutions (and/or subsidiaries or affiliates of these institutions) totaled more than $312 million during the period 2007 through 2010.

## DEFENDANT'S FRAUDULENT FOREIGN EXCHANGE PRICING SCHEME

### A. BNYM Has Fraudulently Misled Clients About How Standing Instruction Foreign Exchange Transactions Would Be Priced

22. BNYM has affirmatively misled prospective customers, including its custodial clients, about its standing instruction FX services.

23. BNYM has marketed its standing instruction FX service as a "simple, flexible, and complete service that automates the capture of all types of custody-related foreign exchange, including securities trade settlement, income conversions, corporate actions, tax reclaims, interest postings and residual balances. Operationally simple, free of charge and integrated with the client's activity on the various securities markets, FX standing instruction is designed to help

6

clients minimize risks and costs related to the foreign exchange and concentrate on their core business."

24.  BNYM further represented that the standing instruction FX service provided many other "benefits" to its clients, including "FX execution according to best execution standards." Offering "best execution standards" is commonly understood to mean that the client receives the best available market price at the time that the currency trade is executed.

25.  In addition, BNYM has represented that standing instruction clients benefit from "aggregation and netting of trades based on guidelines tailored to clients needs." Aggregation and netting of trades means that, when a client executes multiple transactions requiring both the purchase and sale of a particular currency, the transactions are aggregated and netted so that, rather than engaging in multiple separate currency trades, the client will need to buy or sell only the net amount of currency needed for all of the transactions.

26.  The foregoing representations of BNYM concerning its standing instruction FX service were all false. BNYM knew that these representations were false, consciously avoided learning whether they were true or false, or recklessly disregarded whether they were true or false.

27.  First, BNYM's standing instruction FX service was not "free of charge." BNYM's pricing scheme permitted it to earn a substantial and yet undisclosed fee, namely the spreads or differences between the worst prices provided to custodial clients and the better prices that BNYM was able to obtain for itself on the spot market. Indeed, in an email from David Nichols, a Managing Director of Global Markets for BNYM, dated August 1, 2006, he confirmed that BNYM's standing instruction was not free of charge: "We charge a premium for our services (i.e., we have the audacity to think we are entitled to a spread on every trade. How 1990's is that?)" BNYM was very protective of its revenues generated from standing instruction

7

clients. In an email addressing the disadvantages of switching to a flat fee methodology, Nichols wrote in June of 2004: "We have to protect this revenue source at the outset because if this flat fee methodology permeates the customer base, then the aggregate revenue over time could be substantial. This is currently our revenue and it should remain so; we all understand how the bonus pool funds."

28. Second, BNYM did not use "best execution standards." To the contrary, BNYM routinely and as a matter of practice gave its standing instruction clients virtually the worst possible price available during the trading day. BNYM understood that offering "best execution standards" meant obtaining the best available price at the time of the trade, and that BNYM was not doing this for its clients.

29. Third, BNYM did not aggregate and net trades to the benefit of its standing instruction clients who were both purchasing and selling a particular currency. Rather, BNYM provided its standing instruction clients with virtually the worst available prices on both the aggregated purchase amount and the aggregated sale amount, thus earning substantial spreads on each trade.

30. The more specific information that BNYM provided to its clients about standing instruction FX pricing was incomplete and misleading. BNYM informed standing instruction clients that the prices received for currency purchases and sales would fall within daily ranges for various currencies that BNYM published each morning at 9:30 eastern time. Specifically, BNYM stated that standing instruction trade requests on a given day "will be executed that day with BNYM on a principal basis at rates that will not deviate by more or less than three (3) percent from the relevant Interbank bid [i.e., purchase] or ask [i.e., sale] rates and will not be less favorable to the account than the corresponding rates indicated on the Daily Schedule for that day."

31. This pricing disclosure, buried within a packet of procedures and forms provided to clients, creates the misimpression, especially when read in conjunction with BNYM's marketing material, that clients will receive the best available rate within the range, or at least will have a chance of receiving the best rate within the range at which the currency is trading during the day. Indeed, in or around September 2005, BNYM generated a document explaining how BNYM assists plan sponsors and their fund managers in achieving best execution in foreign exchange. BNYM explained that its role specifically involved helping fund managers meet their fiduciary obligations to clients: "Understanding the fiduciary role of the fund manager, it is our goal to provide best execution for all foreign exchange executed in support of our clients' transactions." This document also did not state that the client would receive virtually the worst rate of the day, but rather: "we price foreign exchange at levels reflecting the interbank market at the time the trade is executed by the foreign exchange desk." Moreover, this document also demonstrated BNYM's commitment to maximize trade proceeds for its clients, stating that: "Best execution encompasses a variety of services designed to maximize the proceeds of each trade." BNYM likewise recognized the "goal of maximizing the value of the client portfolio under the particular circumstances at the time." BNYM repeated these same representations in a similar document generated in or around February of 2009.

32. But BNYM does not disclose to standing instruction clients that, in truth, they will <u>always</u> receive virtually the worst possible rate within the range posted on the Daily Schedule, regardless of when the trades are executed. If clients knew that this was the case, they would not do standing instruction FX business with BNYM.

33. After a standing instruction FX trade has been executed, the only pricing information clients receive from BNYM is the final exchange rate obtained. BNYM does not provide time stamps for the trades, which clients could use to verify whether they received a fair

9

and reasonable exchange rate. Because exchange rates fluctuate during the trading day, it is very difficult, if not impossible, to gauge whether a rate is favorable or unfavorable without a time stamp specifying when during the day the trade was executed.

B.  **BNYM Consistently Provides Its Standing Instruction Clients With Virtually the Worst Prices of the Day, While Obtaining More Favorable Prices For Itself on the Spot Market**

34.     BNYM receives standing instruction FX trade requests for various currencies throughout a given trading day. Standing instruction trades are routed to an internal BNYM system called the Currency Management System ("CMS"). BNYM typically does not maintain inventories of currencies for use in CMS transactions. Rather, for each standing instruction trade, BNYM's transaction desk instructs spot traders to purchase or sell whatever currencies are necessary for standing instruction trades on the spot market.

35.     BNYM's transaction desk typically aggregates all of the standing instruction trade requests that come until the afternoon (generally around 1:30 p.m. eastern time), at which point, no further standing instruction FX trade requests are taken that day. Later in the afternoon, the transaction desk instructs spot traders to purchase or sell whatever currencies are required on behalf of the CMS portfolio.

36.     In response to a request from the trading desk, a spot trader buys or sells whatever currencies are required on the spot market and transfers them to the CMS portfolio. Unlike the trades with BNYM's standing instruction clients, the intra-desk transactions between the spot traders and the CMS portfolio are time-stamped and the exchange rates are recorded.

37.     Later in the afternoon (approximately 4:00 p.m. eastern time) BNYM's transaction desk will determine the price to provide to standing instruction clients for each currency. Typically, the transaction desk will look at the full range of prices at which the currencies have been trading during the day and select the worst possible rates for the standing

10

instruction clients – <u>i.e.</u>, the lowest rate for currency sales and the highest rate for currency purchases. Although the price cannot deviate more than three percent from the relevant Interbank bid and ask rates, as BNYM states in its FX procedures, currency prices rarely move outside of this price range. BNYM applies a slight modifier to the selected rate, so that the ultimate price given to the client is not the absolute worst, but very close to the worst.

38.     BNYM's profit from standing instruction FX trades is the difference between the price obtained by the spot trader and the next-to-worst price from the day provided to the client. With this rigged pricing model, BNYM generally cannot lose money. At best BNYM makes a huge spread and at worst breaks even.

39.     Volatility in currency prices allows BNYM to reap large trading gains at the expense of its clients. The greater the volatility, the greater the difference between BNYM's price and the price given to standing instruction clients.

40.     BNYM's conduct in profiting at the expense of its custodial clients, many of which are pension funds and federally insured financial institutions (and/or subsidiaries or affiliates of these institutions), was at its most egregious during the financial crisis in 2008. During the financial crisis, currency prices fluctuated widely. This unprecedented volatility allowed BNYM to pass on extremely poor pricing to its clients while earning massive gains on the much better pricing BNYM was able to obtain on the spot market.

41.     The bulk of BNYM's FX profits are derived from standing instruction. The spreads that BNYM obtains on negotiated FX transactions are typically modest, as two parties are negotiating a price based on prevailing market rates at the time of the trade. By contrast, as explained above, the spreads in standing instruction FX trades can be enormous because the clients always receive the next-to-worst prices of the day.

11

42. For example, internal BNYM documents indicate that in 2009, BNYM's standing instruction FX trades represented approximately 12 percent of BNYM's overall trading volume, but accounted for approximately 69 percent of BNYM's profits from FX. Conversely, negotiated FX trades comprised approximately 88 percent of BNYM's trading volume, but amounted for only approximately 31 percent of BNYM's profits.

C. **BNYM Misleads Customers Who Inquire About Standing Instruction Pricing**

43. From time to time, BNYM custodial clients, including federally insured financial institutions (and/or subsidiaries or affiliates of these institutions), complained to BNYM about the pricing of particular FX standing instruction trades and ask BNYM to provide time stamps for the trade and/or explain how the transaction was priced.

44. BNYM, however, generally does not disclose to its clients that they had received the worst Interbank rate of the day with a slight modifier applied to it. Upon information and belief, BNYM has provided false pricing explanations to its clients. For example, BNYM told clients who inquired about the price received for a standing instruction trade that the trade happened to occur at a time when the pricing was not favorable. These representations were false. As explained above, timing has nothing to do with the pricing of BNYM's standing instruction trades. BNYM standing instruction clients receive the worst Interbank market rate of the day with a slight modifier, regardless of when the trade is executed.

45. BNYM made other misrepresentations to clients. For example, when representatives of the Los Angeles County Employees Retirement Association ("LACERA") asked for time stamps, BNYM stated that time stamps were not available because BNYM's traders agreed on prices earlier in the day, but did not close the transactions until hours later. In response to inquiries from LACERA about the extent to which BNYM marked up its currency trades, BNYM told LACERA that BNYM charged enough to cover its transaction costs.

46. As stated above, these representations were false. No time stamps were available for the prices given to standing instruction clients because BNYM simply gave its clients virtually the worst Interbank rate of the end of the trading day, regardless of where the currency market was trading at that particular time. Furthermore, the profits BNYM reaped from standing instruction trades at its clients' expense were far greater than BNYM's transaction costs.

47. BNYM understood that using "best execution standards" and providing pricing transparency to its clients would eliminate the enormous spreads it was able to achieve at the expense of its clients. To compensate for that loss of revenue, BNYM believed that it would be necessary to increase the volume of its negotiated FX business.

48. For example, in an October 2009 email, BNYM's Director of Global FX Sales stated: "Bottom line is, its [sic] volume verses quality spread business. The friendly business we have built our reputation on is undergoing considerable change with increased regulatory demands on our client to achieve "Best Execution" and the growth in overall pricing transparency. For us to continually win, I feel we need to do a little of both recognizing that at the end of the day, it is all about profits."

49. On October 20, 2009, the California Attorney General brought a civil fraud action in California State Court against State Street Bank and Trust ("State Street"), another large custody bank. California alleged that State Street had charged state pension funds that were custodial clients of State Street fraudulent currency exchange rates in connection with its standing instruction FX service.

50. Shortly after the State Street lawsuit was reported by Reuters on or about October 20, 2009, BNYM's Director of FX Trading in New York emailed the Reuters report to all BNYM FX sales employees with the subject heading, "Oh No."

51. BNYM was immediately flooded with inquiries from custodial clients and/or their investment managers about whether BNYM was engaging in similar pricing conduct. In response to these inquiries, BNYM continued to hide its pricing scheme from its clients and simply referred them to BNYM's website, which provided a false, incomplete and misleading description of BNYM's standing instruction FX service.

52. For example, in Fall 2009, a representative from a BNYM custodial client inquired with BNYM about whether BNYM engaged in the same conduct as State Street and whether there were any extra fees to use BNYM's FX desk. According to BNYM documents, BNYM provided this client a link to BNYM's website, although the only information BNYM's website offered at this time about pricing was false, incomplete and misleading. In particular, BNYM's website at this time falsely represented that BNYM's standing instruction service afforded multiple benefits to clients, including the utilization of "best execution" standards.

53. Although other custodian banks, including State Street, have taken steps to disclose the way in which standing instruction FX trades will be priced, by offering fixed spreads and time stamping, BNYM has refused to do so, still attempting to pocket "quality spreads" at its clients' expense. Upon information and belief, BNYM does not currently provide price stamping for standing instruction FX trades.

54. For example, in a July 2010 email discussing how BNYM has maintained the largest FX market share among fiduciary banks, BNYM's Director of FX Sales in New York stated that "BNYM has been more successful in maintaining spreads in the SI [standing instruction] space compared to these peers," that "BNYM is 'late' to the transparency space," and that BNYM was "hearing from our clients that our competitors are offering time stamping and fixed spreads across all currencies."

14

55. BNYM also routinely takes advantage of custodial clients using standing instruction trading in currencies involving regulated capital markets.

56. For example, the Central Bank of China (Taiwan) ("CBC") presides over a managed float currency regime in which the CBC often intervenes in order to manage volatility and limit currency appreciation against the U.S. Dollar. In November of 2010, the CBC actively intervened in its capital markets creating currency distortions that affected the open, high, and close spot rate for the U.S. Dollar – Taiwan Dollar ("USD/TWD") currency pair. BNYM exploited these distortions to its benefit and to the detriment of its standing instruction clients.

57. The CBC restricted trading in USD/TWD at the opening 15 minutes and closing 15 minutes of the trading day, effectively raising the USD/TWD spot price to an artificial high during those periods. This created an artificial USD/TWD range for the day that grossly exceeded the range during the unrestricted portions of the trading day.

58. On days when BNYM provided standing instruction FX trading for its custodial clients, BNYM executed trades during the unrestricted portions of the trading day, securing a spot price for USD/TWD that was well below the artificial open, close, and high of the day; however, BNYM priced these currency trades for its custodial clients at, or near, the high and low of the USD/TWD spot price using the artificial range of the day. This scheme allowed BNYM to gain an extremely large spread at the expense of its clients which BNYM pocketed for itself. BNYM does not disclose to its standing instruction clients that it prices their trades in regulated currencies at the margins of the artificial ranges so that it can obtain massive spreads.

59. When one BNYM FX trader on the transaction desk recognized the manipulation in the USD/TWD currency market, and sought guidance from management on how to accurately price the USD/TWD currency pair for standing instruction clients, he was explicitly told to use the artificial range of the day.

60.     BNYM continues to reap substantial profits by exploiting standing instruction clients in this fashion.

61.     The fraud described in this complaint has affected the custodial clients of BNYM that use standing instruction services for foreign exchange trades, including federally insured financial institutions(and/or subsidiaries or affiliates of these institutions), in that BNYM profited at the expense of these clients by effectively charging these clients an undisclosed fee for their foreign exchange trades.

**D.      BNYM Continues to Mislead Clients About Standing Instruction Pricing**

62.     In the wake of the increased public scrutiny of its FX pricing, BNYM has deleted from its website some, but not all, of the misrepresentations concerning its standing instruction FX service.  For example, BNYM's website no longer states that the service is "free of charge," and BNYM has added a vague definition for "best execution standards" that does not reference providing clients the best available price.

63.     Nevertheless, BNYM's website continues to claim that it provides "aggregation and netting" benefits to the client, which is not true.  When a standing instruction client has a purchase and sale of a particular currency, BNYM does not provide the client with an exchange rate for the net amount of currency being bought or sold.  Rather, BNYM applies the lowest bid price of the day and the highest ask price of the day (with the slight modifier) to both transactions.

64.     An employee at BNYM's Pittsburgh trading desk provided standing instruction clients with one price on their net aggregated transactions, so that BNYM's practice would be consistent with its representations to clients.  BNYM management, however, instructed this employee to stop doing so.

65. In or about April 2011, BNYM sent its custodial clients an "overview" of its standing instruction FX service stating that "we tend to purchase currencies from our clients towards the low end of the Interbank range and sell towards the high end." While this statement provided some additional information that had previously been hidden from clients, it is still incomplete and misleading. In fact, as described above, BNYM waits until the latter part of the trading day to select the lowest bid and highest ask rates for the day, which is then multiplied by a slight modifier.

## FIRST CLAIM FOR RELIEF

### FOR CIVIL PENALTIES UNDER FIRREA

66. Allegations in paragraphs 1 through 65 are realleged and incorporated in this paragraph by reference.

67. For purposes of fraudulently obtaining money from its clients and for continuing its fraudulent pricing scheme in connection with it standing instruction FX services, Defendant unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343. Further, this scheme to defraud has affected numerous federally insured financial institutions, as BNYM's estimated sales margin on standing instruction FX trades for its top 20 federally insured financial institutions (and/or subsidiaries or affiliates of these institutions) totaled more than $312 million during the period 2007 through 2010.

68. Accordingly, Defendant is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## SECOND CLAIM FOR RELIEF

### FOR AN INJUNCTION UNDER THE CIVIL FRAUD INJUNCTION STATUTE

69. Allegations in paragraphs 1 through 68 are realleged and incorporated in this paragraph by reference.

70. Defendant has been, and currently is, devising, and participating in, a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.

71. Defendant's ongoing fraudulent pricing scheme in connection with its standing instruction FX poses the prospect of a continuing and substantial injury to financial institutions, including, but not limited to federally insured financial institutions (and/or subsidiaries or affiliates of these institutions). It is highly probable that Defendant will continue this fraudulent conduct. Accordingly, Defendant's ongoing fraudulent conduct should be enjoined pursuant to 18 U.S.C. § 1345.

WHEREFORE, the United States requests judgment against Defendant as follows:

(a) With respect to the claim for civil penalties under FIRREA, a judgment imposing civil penalties against Defendant up to the maximum amount allowed by law;

(b) With respect to the Civil Fraud Injunction Claim, the entry of a permanent injunction against Defendant requiring Defendant and any of its employees, agents, assigns, or any persons acting on its behalf, to disclose to clients fully the manner in which it prices standing instruction foreign exchange transactions;

(c) For costs of suit;

(d) For reasonable attorneys fees; and,

(e) For such further relief that the Court deems just.

Dated: October 4, 2011
     New York, New York

                PREET BHAHARA
                United States Attorney
                Southern District of New York

By: _____
                PIERRE G. ARMAND
                LAWRENCE H. FOGELMAN
                JAMES NICHOLAS BOEVING
                Assistant United States Attorneys
                86 Chambers Street, 3rd Floor
                New York, New York 10007
                Tel:     (212) 637-2724/2719/2748
                Fax:    (212) 637-2730/2686
                Email:  Pierre.Armand@usdoj.gov
                            Lawrence.Fogelman@usdoj.gov
                            James.N.Boeving@usdoj.gov

                *Attorneys for Plaintiff the United States of America*