PREET BHARARA
United States Attorney for the
Southern District of New York
By:   PIERRE G. ARMAND
        LAWRENCE H. FOGELMAN
        JAMES NICHOLAS BOEVING
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel:     (212) 637-2724/2719/2748
Fax:     (212) 637-2730/2686
Email:  Pierre.Armand@usdoj.gov
          Lawrence.Fogelman@usdoj.gov
          James.N.Boeving@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>- v. -<br><br>THE BANK OF NEW YORK MELLON,<br><br>Defendant. | ECF Case<br><br>11 Civ. 6969 (LAK)<br><br>**AMENDED COMPLAINT**<br><br>**Jury Trial Demanded** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff, the United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, alleges upon information and belief as follows:

## INTRODUCTION

1.      This is a civil fraud action by the United States against defendant The Bank of New York Mellon ("Defendant," "BNYM" or the "Bank"), one of the world's largest custodian banks, which from at least 2000 through 2011, engaged in a scheme to defraud custodial clients who use BNYM's foreign exchange services.  This action seeks civil penalties under the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA").

2.      BNYM offers foreign exchange services to its custodial clients, for whom it holds domestic and international financial assets, including currency and securities.  Clients may contact BNYM directly and negotiate currency trades at exchange rates or prices that the parties agree upon.  BNYM also offers clients a "standing instruction" foreign exchange service, pursuant to which BNYM automatically provides currency exchange on an as needed basis when, for example, the client buys or sells foreign securities or receives dividends on foreign securities that are repatriated to the United States.  Unlike directly negotiated currency trades, BNYM unilaterally determines the price its clients receive for standing instruction trades.

3.      Standing instruction is extremely profitable for BNYM, dwarfing the sales margins the Bank garners from directly negotiated trades and all other forms of currency exchange.  Indeed, from 2007 to 2010 alone, BNYM generated more than $1.5 billion in revenues -- just from its top 200 standing instruction clients.

4.      Standing instruction was so much more profitable to BNYM than any other foreign exchange service because it relied upon a fraudulent business model.  That model involved deliberately concealing the way BNYM was actually pricing standing instruction trades and affirmatively misleading customers into believing that they were receiving the best prices available, when that was not the case.  BNYM accomplished this fraud by knowingly hiding critical facts from clients and/or their investment managers, intentionally providing them confusing and misleading information about the service, and telling them outright lies.

5.      For years, the only substantive information that BNYM provided to standing instruction clients about pricing was that the clients' price would fall within a wide range of guaranteed rates reported each day.  What BNYM would hide is that the Bank would wait until the end of the trading day to price standing instruction trade requests and then assign prices to its clients that were the worst, or close to the worst, interbank rates reported during the trading day.

Because BNYM has never provided time stamps to its clients indicating when during the day the trades were "executed," it was extremely difficult for clients to determine whether the prices they received were fair and reasonable.

6.      At the same time, BNYM would obtain more favorable prices for itself, reaping large profits on the price differential or "spread."  The size of the spread that BNYM earned at the expense of its clients depended in large part upon volatility in currency prices; the greater the volatility, the greater the opportunity for a large spread.  Indeed, during the financial crisis in 2008, when currency prices fluctuated dramatically, the profits BNYM generated at the expense of its custodial clients were enormous.

7.      BNYM also repeatedly lied about its standing instruction service.  For example, BNYM represented to customers that the standing instruction service was provided according to "best execution" standards (which is commonly understood to mean that clients will be getting the best available rate at the time of execution), that customers would receive the "best rate of the day," and that BNYM's trade desk priced standing instruction trades at "the interbank market at the time the trade [was] executed."   All of these statements were knowingly false and/or misleading.  BNYM also represented to customers that the standing instruction service was "free," that it offered "netting" of trades, and that all standing instruction clients received the same pricing, which were likewise knowingly false and/or misleading.  BNYM made these false statements and omissions in oral and written communications with clients and/or their investment managers and on its website, to which clients were referred.  Indeed, when clients made direct inquiries to BNYM about its pricing scheme, BNYM intentionally misled them by providing "the party line," which consistently was false, incomplete and/or misleading information.

8.      BNYM knew it was making false and/or misleading statements and concealing material information from its standing instruction clients and/or their investment managers.  For example, BNYM knew that best execution meant the best available price and that it was not providing this to clients.  Indeed, BNYM repeatedly acknowledged internally that providing best execution and transparency on pricing would make standing instruction revenues disappear.

9.      When competitor custodian bank State Street was sued by the California Attorney General for similar conduct in October 2009, BNYM began receiving inquiries from customers about whether or not BNYM was engaging in the same conduct.  BNYM affirmatively misled them.  After the State Street lawsuit was made public, one BNYM employee commented in an internal email, "Oh No," and another former BNYM employee asked his former colleagues at the Bank whether it was "[t]ime to retire after raping the custodial accounts."  BNYM, however, continued to plunder the custodial accounts for many months.

10.     As a result of this fraudulent scheme, BNYM has collectively defrauded its custodial clients, which include public pension funds and federally insured financial institutions and/or their subsidiaries or affiliates, of more than $1.5 billion dollars.

## PARTIES

11.     Plaintiff is the United States of America.

12.     Defendant BNYM is a New York State chartered bank with approximately $1.2 trillion in assets under management and approximately $25 trillion in assets under custody and administration.  BNYM's deposits are insured by the Federal Deposit Insurance Corporation.  BNYM is headquartered at One Wall Street, New York, New York.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 1833a.

14.     Venue is proper in the Southern District of New York under 28 U.S.C.

§ 1391(b)(2) because a substantial part of the events and omissions alleged in this Amended

Complaint occurred within this District.  Venue also is proper pursuant to 28 U.S.C. § 1391(c)

because Defendant conducts business within this District.

## BACKGROUND

### A.     FIRREA

15.     In 1989, Congress enacted FIRREA as part of a comprehensive legislative plan to

reform and strengthen the federal deposit insurance system. Pursuant to FIRREA, the United

States can recover civil penalties, up to $1 million for each violation or up to $5 million for a

continuing violation, from persons who "violate any provision of law to which this section is

made applicable."  12 U.S.C. § 1833a(a)-(b).  Further, if a defendant "derives pecuniary gain

from the violation, or if the violation results in pecuniary loss" to a person other than the

defendant, FIRREA authorizes the United States to recover civil penalties in an amount greater

than $1 million, but not to exceed the amount of gain or loss.  *Id*. § 1833a(b)(3)(A).

16.     As relevant to this action, FIRREA authorizes the United States to recover civil

penalties for violations of, or conspiracies to violate, two provisions of Title 18 of the United

States Code:

- 18 U.S.C. § 1341 (Mail Fraud Affecting a Financial Institution):  which proscribes the use of "the Postal Service, or . . . private or commercial interstate carrier" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . .";

- 18 U.S.C. § 1343 (Wire Fraud Affecting a Financial Institution):  which proscribes the use of "wire . . . in interstate or foreign commerce" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ."

**B.**     **BNYM's Foreign Exchange Business**

17.     BNYM is a custodian bank, a financial institution that holds and safeguards financial assets of firms and individuals, such as stocks, bonds, and currency.  BNYM provides a variety of services to clients, including settlement of any purchases and sales of securities and currency, maintaining currency/cash bank accounts, effecting deposits and withdrawals and managing other cash transactions, and performing foreign exchange ("FX") transactions.

18.     BNYM is one of the largest custodian banks in the world, with approximately $25 trillion in assets under custody and administration.  BNYM's custodial clients include public and private pension funds, states, cities, colleges, universities, foundations, non-profit religious organizations, and financial institutions, including federally insured financial institutions (and/or subsidiaries or affiliates of these institutions).

19.     Many of BNYM's custodial clients invest in foreign securities, which must be purchased and sold in the currencies of the countries where the securities are issued.  Accordingly, to complete transactions involving the purchase or sale of foreign securities, BNYM's custodial clients who are based in the United States and invest in foreign securities must purchase and sell those foreign currencies.   In addition, such foreign securities earn dividends or other income in foreign currencies that clients often choose to repatriate into U.S. dollars or assets.  To facilitate these transactions, BNYM offers its clients FX services.

20.     BNYM generally offers two principal types of FX services, namely:   (1) negotiated FX; and (2) standing instruction FX.  Negotiated FX involves the custodial client or its investment manager negotiating directly with an FX trader at BNYM to purchase or sell currency at a particular price agreed upon by the parties.  Standing instruction FX, by contrast, does not involve any direct involvement between the custodial client and BNYM.  Rather, under the standing instruction process, BNYM executes FX transactions automatically on an as needed

basis and the price the client receives for the purchase or sale of the currency is determined by BNYM.

21.     BNYM's standing instruction clients have included federally insured financial institutions and/or the subsidiaries or affiliates of these institutions.  BNYM is itself a federally insured financial institution.

22.     BNYM has generated substantial revenue from its standing instruction foreign exchange trading services from 2000 to 2011.  For example, according to BNYM, its estimated sales margins on standing instruction foreign exchange trades for its top 200 users of standing instruction services alone totaled more than $1.5 billion during the period 2007 through 2010.  A significant portion of BNYM's sales margin from these years was derived from clients that are federally insured financial institutions (and/or subsidiaries or affiliates of these institutions).  BNYM's estimated sales margin on standing instruction FX trades for its top 20 federally insured financial institutions (and/or subsidiaries or affiliates of these institutions) totaled more than $312 million during the period 2007 through 2010.

23.     BNYM had a fiduciary relationship with at least some standing instruction clients.  For example, the Custodian Agreement entered into between the Virginia Retirement System and the predecessor of BNYM explicitly stated that the Bank "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims and responsibilities."  Similarly, BNYM represented to the Fairfax County Retirement Systems in Virginia that "all services and systems described are available, deliverable and performed by professionals abiding to the highest fiduciary standards."

24.     As explained below, BNYM also represented to clients that it understood the fiduciary obligations of investment managers working on behalf of the Bank's custodial clients, and expressly undertook to assist these investment managers in meeting their fiduciary obligations to obtain the best rates for their clients through BNYM's standing instruction service.

## DEFENDANT'S SCHEME TO DEFRAUD STANDING INSTRUCTION FOREIGN EXCHANGE CLIENTS

**A.      BNYM Consistently Provides Its Standing Instruction Clients With Virtually the Worst Prices of the Day, While Obtaining More Favorable Prices For Itself**

25.     BNYM receives standing instruction FX trade requests for various currencies throughout a given trading day.  Standing instruction trades are routed to an internal BNYM system called the Currency Management System ("CMS").  BNYM typically does not maintain inventories of currencies for use in CMS transactions.  Rather, BNYM's transaction desk instructs spot traders to purchase or sell whatever currencies may be necessary for aggregate standing instruction trades on the spot market.

26.     BNYM's transaction desk typically aggregates all of the standing instruction trade requests that come in throughout the day and waits until the afternoon (generally around 1:30 p.m. Eastern Time) to instruct spot traders to purchase or sell whatever currencies may be required on behalf of the CMS portfolio.  At that point, no further standing instruction FX trade requests will be taken that day.

27.     In response to a request from the trading desk, a spot trader buys or sells whatever currencies may be required on the spot market and transfers them to the CMS portfolio.  Unlike the trades with BNYM's standing instruction clients, the intra-desk transactions between the spot traders and the CMS portfolio are time-stamped and the exchange rates are recorded.

28.     Later in the afternoon (approximately 4:00 p.m. Eastern Time) BNYM's transaction desk will determine the price to provide to standing instruction clients for each

currency pair.  Typically, the transaction desk will look at the full range of reported interbank prices at which the currencies have been trading during the day and select the worst possible interbank rates for the standing instruction clients – *i.e.*, the lowest rate for currency sales and the highest rate for currency purchases.  Although the price cannot deviate by more than three percent from the relevant interbank bid and ask rates, as BNYM states in its FX procedures, currency prices rarely move outside of this price range.  BNYM may apply a slight modifier to the selected interbank rate, so that the ultimate price given to the client is not the absolute worst interbank rate, but very close to the worst.

29.     BNYM's gain from standing instruction FX trades is the difference between the price obtained by the spot trader and the worst or next-to-worst interbank price from the day provided to the client.  With this rigged pricing model, BNYM generally cannot lose money.  At best BNYM makes a huge spread and at worst breaks even.

30.     Volatility in currency prices allows BNYM to reap large trading gains at the expense of its clients.  The greater the volatility, the greater the difference between BNYM's price and the price given to standing instruction clients.

31.     BNYM's conduct in profiting at the expense of its custodial clients, many of which are pension funds and federally insured financial institutions (and/or subsidiaries or affiliates of these institutions), was at its most egregious during the financial crisis in 2008.  During the financial crisis, currency prices fluctuated widely.  This unprecedented volatility allowed BNYM to pass on extremely poor pricing to its clients while earning massive gains on the much better pricing BNYM was able to obtain for itself.

32.     The bulk of BNYM's FX profits are derived from standing instruction.  The spreads that BNYM obtains on negotiated FX transactions are typically modest, as two parties are negotiating a price based on prevailing market rates at the time of the trade.  By contrast, as

explained above, the spreads in standing instruction FX trades can be enormous because the clients always receive the worst or close to the worst interbank prices of the day.

33.     For example, internal BNYM documents indicate that in 2009, BNYM's standing instruction FX trades represented approximately 12 percent of BNYM's overall trading volume, but accounted for approximately 69 percent of BNYM's profits from FX.   Conversely, negotiated FX trades comprised approximately 88 percent of BNYM's trading volume, but amounted for only approximately 31 percent of BNYM's profits.

34.     BNYM's standing instruction transactions included trades involving substantial amounts of money.  For example, in 2007, a sample of 250 transactions provided by the Bank with the largest sales margins demonstrates that the average size of these transactions exceeded $51 million (or U.S. dollar equivalent).   Likewise, in 2008, a sample of 250 transactions provided by the Bank with the largest sales margins also demonstrates that the average size of these transactions exceeded $51 million (or U.S. dollar equivalent).  For 2009, a sample of 250 transactions provided by the Bank with the largest sales margins demonstrates that the average size of these transactions was over $30 million (or U.S. dollar equivalent).  Also, for 2010, a sample of 250 transactions provided by the Bank with the largest sales margins demonstrates that the average size of these transactions exceeded $41 million (or U.S. dollar equivalent).

**B.      BNYM Repeatedly and Knowingly Made False and Misleading Representations to Clients About Its Standing Instruction Service**

35.     From at least 2000 through 2011, BNYM affirmatively and fraudulently misled its customers, including its custodial clients, about the attributes of its standing instruction FX service.   BNYM's intentionally fraudulent statements and omissions about the standing instruction service include the following:

  a.      BNYM falsely represented that the standing instruction service was provided according to "best execution" standards and that clients received the "best rate of the day";

b.      BNYM falsely represented that BNYM's trading desk priced standing instruction trades at the interbank rate available at the time of execution, suggesting that clients received a price available at the time of the trade, rather than the worst price based on the entire range of the day;

c.      BNYM falsely represented that the standing instruction service was "free";

d.      BNYM falsely represented that it offered "netting" to standing instruction clients;

e.      BNYM falsely represented that all standing instruction clients receive the same pricing terms; and

f.      BNYM fraudulently failed to disclose that standing instruction clients would receive prices that were at or close to the worst reported interbank rates.

36.     BNYM made these fraudulent statements and omissions both orally and in writing (*e.g.*, in responses to client requests for proposal ("RFPs"), in responses to client inquiries by email, telephone and at meetings, and on its website, to which clients were referred).   BNYM knew that these representations were false, consciously avoided learning whether they were true or false, or recklessly disregarded whether they were true or false.

1)      **BNYM Fraudulently Represented That Standing Instruction Clients Received "Best Execution" and the "Best Rate of the Day"**

37.     BNYM repeatedly and falsely represented to clients that its standing instruction service provided clients "best execution" and the "best rates of the day."   BNYM made these fraudulent statements on its website, in response to RFPs from clients requesting information on BNYM's foreign exchange services, and/or in responses to inquiries from standing instruction clients about BNYM's pricing scheme.   Indeed, BNYM stated on its website until late 2009 that its standing instruction FX service provided many "benefits" to its clients, including "FX execution according to best execution standards."

38.     "Best Execution" is commonly understood to mean that the client receives the best available market price at the time that the currency trade is executed.  BNYM shared this understanding of "best execution," and made representations to clients falsely promising to provide best execution.

39.     BNYM's understanding of "best execution" as providing the best rates is demonstrated in the Bank's own documents.  For example, BNYM developed Question and Answer documents to guide employees in answering client inquiries about standing instruction pricing.  For example, an August 2005 Question and Answer document providing a response to client inquiries about best execution states that the Bank "ensures best execution" by offering the "best rates for our clients":

> The Bank of New York <u>ensures best execution</u> on foreign exchange transactions through the following mechanisms:  As a major market participant, the Bank is actively engaged in making markets and taking position in numerous currencies <u>so that we can provide the best rates for our clients</u>.

(emphasis added).   In response to a question addressing competitiveness and timeliness of BNYM's foreign current trading in this same document, BNYM also references the price provided as the "best rate of the day."  These statements were knowingly false.

40.     A June 2006 Question and Answer document offered the following sample false information:

> How do you ensure custody clients consistently receive fair prices for their trades?
>
> Clients benefit from our attractive rates because we aggregate all client income in any given currency to obtain the 'best rate of the day.'  That 'best rate of the day' is applied to all of the income conversions that we execute for that day, regardless of the amount."

These statements are knowingly false.  As explained above, BNYM did not provide clients the "best rate of the day."  Quite the opposite:  standing instruction clients received the worst or

close to the worst rate of the day.  In April 2006, David Nichols, a Managing Director of BNYM and head of Product Management, circulated this false language to other BNYM employees as the Bank's "RFP boilerplate."

41.     Indeed, this language was used in BNYM's responses to RFPs.  For example, in BNYM's responses to RFPs from the New York City Retirement Systems and Certain Other New York City Funds, and in a proposal made to the Policemen Retirement System of the City of Detroit, BNYM falsely represented:  "As a major market participant, we actively engage in making markets and taking positions in numerous currencies to obtain the best rates for our clients." The New York City RFP response likewise states that "[c]lients benefit from our attractive rates because we aggregate all client income in any given currency to obtain the 'best rate of the day.'  That 'best rate of the day' is applied to all of the income conversions that we execute for that day, regardless of amount."   As explained above, these statements were all knowingly false.

42.     Nichols drafted the Bank's definition of best execution.   He listed as an accomplishment in his Employee Self Assessment his drafting of a "working definition" of "best execution for our standing instruction activity," as well as providing "marketing content" for the Bank's website.  By September 2005, the Bank settled on a working definition describing how the Bank assists "plan sponsors and their fund managers in achieving Best Execution in foreign exchange" that was intended for client dissemination, including through RFP responses. Specifically, the Bank explained that "[b]est execution encompasses a variety of services designed to maximize the proceeds of each trade," and that BNYM recognized the "goal of maximizing the value of the client portfolio under the particular circumstances at the time."  This document was described by BNYM employee Jerome Descamps in a November 25, 2008 email as how the Bank "define[s] best execution."   Nichols described this document in 2007 as the

Bank's "'standard' comment regarding how we approach best execution," and confirmed in November 2008 that this document "still stands as our statement on the subject." This document explicitly and falsely stated that BNYM would maximize the proceeds of its clients' trades.

43.     Nichols explained in this definition of best execution that the Bank's "goal" was "maximizing the value of the client portfolio under the particular circumstances at the time," which was taken from the "industry standard definition[] of 'best execution.'"  In drafting the Bank's definition of best execution in May 2005, Nichols also invoked the SEC's statement that "best execution is trading 'in such a manner that the client's total cost or proceeds in each transaction is the most favorable under the circumstances,'" as well as the Association for Investment Management and Research's definition of best execution as "well informed trade execution decisions made with the intent of maximising [sic] the value of the client portfolio under the particular circumstances at the time."  Accordingly, Nichols and the Bank knew that the industry definition of best execution required maximizing the proceeds and value for clients.

44.     BNYM failed to give its standing instruction clients best execution by this definition, in direct contradiction of representations made to its clients.  To the contrary, BNYM routinely and as a matter of practice gave its standing instruction clients the worst or virtually the worst possible interbank rate available during the trading day, thereby minimizing rather than maximizing its clients proceeds from the trades.

45.     BNYM and Nichols also falsely represented in the "working definition" of best execution that the Bank was assisting investment managers in discharging their fiduciary obligations to their clients by maximizing the proceeds of each trade:  "Understanding the fiduciary role of the fund manager, it is our goal to provide best execution for all foreign exchange executed in support of our clients' transactions."  BNYM was in fact doing precisely

the opposite -- obtaining the best available prices for itself, and assigning less favorable prices for its clients.

46.     The Bank and its officers knew that actually providing "best execution" would lower the Banks' sales margins on trades, in contrast to the Bank's actual practice of pricing at the worst rates of the day.  For example, in November 2008, the Bank prepared a document analyzing the "channel mix" of foreign currency transactions.  The channel mix referred to the different modes of foreign currency trading conducted by the Bank, including standing instruction trades, trades conducted over the phone, and trades conducted through an e-commerce platform.  The Bank observed that "[m]argins have declined across all channels of distribution," due to among other reasons, "[e]fforts to achieve 'best execution,'" as well as "[g]eneral demands for price transparency."   In order to generate and maintain standing instruction revenues, the Bank and its officers lied to the Bank's clients about providing "best execution" and the "best rate of the day."

> **2)    BNYM Falsely Represented that BNYM's Trading Desk Priced Standing Instruction Trades at the Interbank Rate Available at the Time of Execution, Suggesting that Clients Receive a Price Available at the Time of the Trade, Rather than the Worst Price Based on the Entire Range of the Day**

47.     BNYM falsely stated to customers that:  "we price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk."   Nichols included this false statement in his definition of best execution provided to clients.  BNYM also included this misrepresentation in responses to RFPs from prospective clients.  For example, in a September 2006 response to an RFP from the Ohio Police and Fire Pension Fund and State Teachers Retirement System, BNYM falsely represented that "we price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk."

48.     These statements fraudulently suggested that BNYM's trading desk would be executing trades for clients at the prevailing interbank rate at the time the trade is executed.  As explained above, that is not what BNYM was doing.  In truth, BNYM's trading desk was not executing trades for standing instruction clients or obtaining prices for them that reflected the interbank market at the time a trade is executed.  BNYM was simply waiting until around the end of the trading day and then assigning prices to standing instruction orders that were at or near the high or low end of the interbank range for the day, whichever was against the client.  This pricing thus had nothing to do with the "time" of any trade, or when any trade was actually "executed."

49.     BNYM has also told clients who inquired about the price received for a standing instruction trade that the trade happened to occur at a time when the pricing was not favorable.  These representations were false, as timing has nothing to do with the pricing of BNYM's standing instruction trades.

50.     These statements were false and intentionally designed to mislead customers into thinking that they would be receiving the best available rate at the time the trade was executed, when this was not the case.  All of this was done to generate and maintain BNYM's standing instruction revenue.

### 3)     BNYM Fraudulently Represented That Standing Instruction Was "Free of Charge"

51.     BNYM also falsely described its standing instruction FX service, both on its website and in responses to RFPs, as "free of charge."

52.     Until late 2009, BNYM falsely described the standing instruction service on its website as:  "simple, flexible, and complete service that automates the capture of all types of custody-related foreign exchange, including securities trade settlement, income conversions, corporate actions, tax reclaims, interest postings and residual balances.  Operationally simple,

<u>free of charge</u> and integrated with the client's activity on the various securities markets, FX standing instruction is designed to help clients <u>minimize risks and costs</u> related to the foreign exchange and concentrate on their core business." (emphasis added).

53.      BNYM's standing instruction service was anything but free of charge.  Nor did it minimize clients' costs.  Rather, BNYM's pricing scheme enabled it to earn a substantial and undisclosed fee, namely the spreads or differences between the worst prices provided to custodial clients and the better prices that BNYM was able to obtain for itself.  Indeed, Nichols confirmed in an August 1, 2006 internal email that BNYM's standing instruction was not free of charge: "We charge a premium for our services (i.e. we have the audacity to think we are entitled to a spread on every trade.  How 1990's is that?)."   BNYM also published an "open letter" in the New York Times and Wall Street Journal in October 2011 following the initiation of this lawsuit admitting that its standing instruction service was not free.  Specifically, BNYM stated:  "They [BNYM's clients] also understand that no rational institution provides global FX services, and assumes the attendant principal risks, for free."

54.      BNYM made these false representations intentionally in order to protect its revenues generated from standing instruction clients.  In a June 2004 internal email addressing the disadvantages of switching to a flat fee methodology, Nichols wrote:  "We have to protect this revenue source at the outset because if this flat fee methodology permeates the customer base, then the aggregate revenue over time could be substantial.  This is currently our revenue and it should remain so; we all understand how the bonus pool funds."

55.      While the Bank was representing publicly that its standing instruction service was "free of charge," and that it was designed to minimize costs, Nichols revised a quotation in an article attributed to him stating that standing instruction and best execution played an important role in "controlling costs," by removing the reference to controlling costs.  Explaining the reason

for this deletion in a July 23, 2003 email, Nichols stated:  "Under no circumstances do we want this article to appear to be all about controlling costs.  That would be very counter-productive to our intent in sponsoring the Pensions Week FX supplement, as plan sponsor costs are our revenues."  Although Nichols edited the quotation attributed to him in an article removing a reference to controlling costs, neither Nichols nor BNYM took steps to correct false disclosures made by the Bank in RFP responses and on BNYM's website stating that the standing instruction service "is designed to help our clients minimize risks and costs related to the foreign exchange."

### 4)      BNYM Fraudulently Represented That It Offered "Netting"

56.      BNYM also has falsely stated to clients that BNYM offers "netting" of trades, although in many instances, it was not actually doing so.

57.      Until 2012, BNYM represented on its website that standing instruction clients benefited from "aggregation and netting of trades based on guidelines tailored to clients needs." As explained below, BNYM also represented that it offered netting in RFPs.

58.      Aggregation and netting of trades means that when a client executes multiple transactions requiring both the purchase and sale of a particular currency, the transactions are aggregated and netted so that, rather than engaging in multiple separate currency trades, the client will need to buy or sell only the net amount of currency needed for all of the transactions. Netting can result in a significant cost savings for the client.

59.      BNYM frequently did not aggregate and net trades to the benefit of its standing instruction clients who were both purchasing and selling a particular currency, in direct contradiction to its representations to clients.  Specifically, for those transactions handled by BNYM's Pittsburgh trading desk, BNYM did not perform netting.

60.      Instead of performing netting for buy and sell transactions in the same currency by the same client, BNYM priced the larger side of the transaction at or near the worst interbank

18

price of the day, and the opposite side of the transaction at a different price at least half a percentage point apart.  For example, if a client was buying 10 euros against U.S. dollars, and selling 7 euros against U.S. dollars, BNYM would price the purchase of 10 euros against U.S. dollars – the larger leg of the transaction – at or near the worst interbank price of the day. BNYM would also price the sale of 7 euros against U.S. dollars – the smaller leg of the transaction – at least half a percentage point away from the price of the purchase of 10 euros against U.S. dollars.  By contrast, if BNYM had actually netted the transactions, it would have simply used the same price for both the purchase and sale legs of the transaction, resulting in a net purchase of 3 euros against U.S. dollars.

61.     In September 2004, the State Board of Administration of Florida received a response from BNYM predecessor Mellon Bank, N.A. (located in Pittsburgh) to its Invitation to Negotiate for global custody services on behalf of the Florida Retirement System Trust Fund ("FRSTF") representing that "[o]ur system automatically nets foreign exchanges when trades are routed to our trading desk."  An investigation undertaken on behalf of FRSTF in 2010, however, revealed that in contrast to this representation, BNYM and its predecessor actually had not been netting all of FRSTF's trades.

62.     BNYM knew that its practice of pricing buy and sell transactions in the same currency for the same client at the Pittsburgh trading desk did not constitute netting.  For example, in a February 2010 internal email, BNYM Vice President John Bundy referred to this mechanism of pricing buy and sell transactions as a "bid/offer scheme," and observed that stopping this practice "would result in some revenue loss."  BNYM contemplated having other trading desks of BNYM, specifically the New York and Brussels trading desks, adopt this Pittsburgh bid/offer scheme as well.  However, one BNYM representative objected, stating that "any change from netting to a bid/offer spread will probably be met with resistance from some

Bru/NY customers who expect or who have become accustomed to netting." Thus, BNYM specifically differentiated the practice in Pittsburgh as a "bid/offer scheme," and contrasted it with other trading desks that in BNYM's view actually performed "netting."

63.    BNYM deliberately did not distinguish on its website or in RFP responses between trading performed at the Pittsburgh trading desk and the trading performed at the New York or Brussels trading desks so that it could continue to make undisclosed spreads from clients whose trades were performed at the Pittsburgh trading desk, instead claiming broadly that BNYM performed "netting."

> **5)**    **BNYM Fraudulently Represented That All Clients in the Standing Instruction Program Received the Same Rate**

64.    BNYM also represented that each standing instruction client would receive the same price. For example, in attempting to demonstrate to a client why it received a particular price, John Cipriani, a BNYM Managing Director, explained in a December 18, 2009 email: "The rate assigned to this type of transaction is a blended rate derived by a number of market trades executed throughout the day to offset the many client trades received during the session. This method is employed by our Brussels desk and the NY desk so that all clients in our SI program are executed at the same rate (We are required to do this to fulfill ERISA requirements)." (emphasis added). As discussed below, this representation was false, as certain standing instruction clients were given more favorable pricing deals than others.

65.    BNYM made this false representation systematically. Specifically, BNYM had a policy in place for the benefit of ERISA plans that the "terms of FX transactions with any [ERISA plan] shall not be less favorable to the [ERISA plan] than terms offered by BNY to unrelated parties in a comparable arm's length FX transaction." BNYM included the same representations in at least certain RFPs sent to potential clients that ultimately used standing instruction services through BNYM.

66.     BNYM did not provide the same standing instruction pricing to each client as it represented in its ERISA policy and RFP responses.  Rather, for the relatively few clients who successfully detected that standing instruction pricing was unfair and sought better pricing than the customary worst rate of the day, BNYM accommodated those clients by switching them to a benchmarking standing instruction practice.  Benchmarking involved agreeing to a specific price spread for standing instruction transactions as compared to a particular benchmark rate for any given day.  Indeed, in response to an inquiry regarding whether there is a "standard" document on how BNYM prices Standing Instruction trades in 2007, BNYM failed to make such a document available and instead, Nichols stated in a July 31, 2007 internal email to BNYM Managing Director Nathalie Jamin that, "if necessary, we can put the customer on a WM benchmark pricing arrangement and then provide post trade monitoring via the WM Benchmark Report."  In addressing internally the marketing strategy of standing instruction services, BNYM expressed its intent to "[r]espond pro-actively to clients interested in 'pre-negotiating' standing instruction pricing, which [sic] preserving existing revenue from clients satisfied with current arrangements," and to develop benchmarking "tailored to meet the needs of individual clients, recognizing that 'one size does not fit all.'"  BNYM did not advertise benchmarking as an alternative pricing mechanism to all its standing instruction clients.  Rather, the Bank would offer standing instructions with prices determined by benchmarking only when a client complained or pressed for details about the pricing of standing instructions.

67.     Indeed, Nichols specifically rejected for bankwide use an RFP response that offered benchmarking as a method of standing instruction pricing.  Nichols wrote in January 2004, in response to reviewing a proposed RFP response addressing benchmarking for a $2.5 billion U.K. pension fund:  "[W]e do not want to make the paragraph [in the attached RFP] describing our willingness to embrace transparency and accountability through a WM

benchmark pricing arrangement the standard RFP answer used bankwide.  However, in certain highly competitive cases where the prospect is a company of substantial market stature, or they are being guided by a consultant that is specifically focusing on benchmark execution, then we should express a willingness to engage the customer in discussions regarding transparency in standing instruction execution."  Nichols thus described benchmarking as a form of standing instruction trading, but a more transparent one.  However, with full knowledge that the Bank offered benchmark pricing to certain selected clients with "substantial market stature," Nichols nevertheless represented to Fidelity Mutual Funds, including as recently as May 2011, that "all clients receiv[e] the same spot price."  This was done intentionally to preserve BNYM's revenues generated by the more profitable and less transparent pricing scheme of standing instruction transactions.

68.     BNYM also manipulated standing instruction pricing on its own when it thought a company might be scrutinizing the standing instruction practice.  In September 2009, after determining that a client "hadn't hired anyone to specifically trade FX," A.J. Quitadamo, the head of Business Development for Global FX Sales, decided to "revert to traditional SI (internals) pricing."  Likewise, when investment manager BlackRock started to look more closely at BNYM's standing instruction service, BNYM Managing Director John Murray stated in a November 11, 2009 internal email that the "worse-case [sic] scenario" would be BlackRock initiating "a full and thorough review of our FX business."  To "protect" its standing instruction business with BlackRock, Murray recommended "a proposal to introduce standard pricing for SI book."

69.     It is clear that certain clients received more favorable standing instruction pricing. As explained in a March 23, 2010 internal email from BNYM Executive Vice President Jorge Rodriguez, BNYM recognized that it had a subset of clients "who execute their trades via the

'standing instruction channel,' but have their business executed through a special arrangement." The Bank thus again explicitly recognized that benchmarking was part of BNYM's standing instruction service, although it was limited to a select group of clients. Nichols likewise observed in a March 19, 2010 internal email that there were "dozens of benchmarking agreements," and that he heard "through the grapevine that we plan to offer BlackRock a deal of 1.5 basis points for all their standing instruction business."

70.     Because benchmark pricing cut into BNYM's sales margin, benchmark pricing was deliberately offered only to select clients while other clients were intentionally and falsely told that all clients received the same rate. Indeed, Nichols admitted in a May 9, 2008 internal email that he did not want to provide benchmark pricing to a particular pension client because "benchmark pricing limits our potential to take wider margins when intraday spreads in emerging market currencies widen."

### 6)     BNYM Fraudulently Concealed Its Pricing Scheme From Standing Instruction Clients

71.     Until 2011, BNYM actively concealed from its standing instruction clients that trades would be priced at or near the worst reported interbank rate of the day.

72.     The more specific information that BNYM provided to its clients about standing instruction FX pricing was incomplete and misleading. BNYM informed standing instruction clients that the prices received for currency purchases and sales would fall within daily ranges for various currencies that BNYM published each morning at 9:30 eastern time. Specifically, BNYM stated that standing instruction trade requests on a given day "will be executed that day with BNYM on a principal basis at rates that will not deviate by more or less than three (3) percent from the relevant interbank bid [*i.e.*, purchase] or ask [*i.e.*, sale] rates and will not be less favorable to the account than the corresponding rates indicated on the Daily Schedule for that day."

73.     This pricing disclosure, buried within a packet of procedures and forms provided to clients, creates the misimpression, especially when read in conjunction with BNYM's marketing material, that clients will receive the best available rate within the range, or at least will have a chance of receiving the best rate within the range at which the currency is trading during the day.  The Bank knew this was not true.

74.     After a standing instruction FX trade has been executed, the only pricing information clients receive from BNYM is the final exchange rate obtained.  BNYM does not provide time stamps for the trades, which clients could use to verify whether they received a fair and reasonable exchange rate.  Because exchange rates fluctuate during the trading day, it is very difficult to gauge whether a rate is favorable or unfavorable without a time stamp specifying when during the day the trade was executed.

75.     Until recently, BNYM did not disclose to standing instruction clients that, in truth, they always receive virtually the worst possible daily reported interbank rate, regardless of when the trades are executed.  BNYM understood that if standing instruction clients knew that this was the case, they would not do standing instruction FX business with BNYM, and intentionally delayed disclosing its pricing practices as long as possible.

**C.     BNYM Intentionally Misled Its Standing Instruction Customers to Maintain Its Profit Margin**

76.     BNYM's standing instruction business model was premised upon intentionally concealing its pricing scheme from clients in order to generate and maintain the Bank's substantial revenue from standing instruction transactions.

77.     As Jorge Rodriguez bluntly explained in a February 1, 2008 internal email, standing instruction is extremely profitable to the Bank solely because of the lack of transparency with regard to how BNYM determines pricing, and that the profits disappear when the client achieves full transparency:

As we all know, Standing Instruction FX is the most profitable form of business.  It offers the traders a free intra-day option to time its currency execution in the marketplace knowing it does not have to get back to the customer immediately with the deal price.  Business of this type also allows us to take advantage of increased market volatility and wide intra-day trading ranges.  All these pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved.

78.     BNYM sought for years to withhold its pricing practices on standing instruction trades from its clients, instead preferring to tout its service as providing "best execution," and that its service was "free of charge."  BNYM believed that transparency would diminish its revenue, and profited from its deliberate failure to disclose its actual pricing practices.

79.     Rodriguez explained that when a standing instruction client converts to an e-commerce platform, "margins greatly decline as the free intra-day option feature previously enjoyed disappears."  Rodriguez went on to cite Alpine Investors as an example customer, noting that BNYM had generated revenue of approximately $12 million on business averaging a 7 basis point margin, but that the margin had compressed to 1 basis point after Alpine switched to direct negotiation, and could compress further.

80.     Another BNYM representative, Antonio Garcia, stated in an April 11, 2008 internal email:  "In general transparency adversely impacts our revenue stream and any product to distribute fee information would hurt us many times over in reduced revenue."  John Cipriani similarly observed in an October 28, 2009 internal email that "[o]nce pricing spreads are disclosed it will be a race to how quickly clients can work it down to zero."

81.     The Bank made substantially greater sales margin on its standing instruction trades than any other channel of foreign currency trading.  For example, an analysis prepared by the Bank in November 2009 demonstrates that based on the year to date, BNYM had a sales margin spread on standing instruction trades of 22.33 basis points, as compared to only a 2.80

basis point spread on trades arranged pursuant to a telephone call, and merely a 1.18 basis point spread through the Bank's e-commerce platform.

82.    From time to time, BNYM custodial clients complained to BNYM about the pricing of particular FX standing instruction trades and asked BNYM to provide time stamps for the trade and/or explain how the transaction was priced.

83.    BNYM, however, generally did not disclose to its clients that they had received the worst interbank rate of the day with a slight modifier applied to it.  Upon information and belief, BNYM has provided false pricing explanations to its clients and their investment managers.

84.    For example, in or around late 2005 or early 2006, when the New Jersey Department of the Treasury, Division of Investment discovered that BNYM consistently priced its trades at or near the worst price of the day, New Jersey confronted BNYM with this information, as BNYM had not previously disclosed its true pricing scheme.  In response, the relationship manager for the Bank falsely represented that the Bank obtained a price for the trade and then took a spread on top of the price.  New Jersey complained to the Bank that it seemed as though the Bank was price gouging, particularly since New Jersey already paid a fee for all transactions pursuant to its contract with the Bank.  At a subsequent meeting with the Bank, in contrast to representations made to clients on its website, in RFP responses, and in direct communications with clients, the Bank told New Jersey that the Bank does not guarantee best execution.  The Bank then reimbursed New Jersey approximately $100,000.  Nevertheless, the Bank continued to knowingly and fraudulently misrepresent to other clients that its standing instruction service offered best execution.

85.    In July 2007, Nichols received a request from a Bank employee for a "'standard' document stating what is the Bank's policy when pricing standing instructions [that BNYM

employees] can forward to customers inquiring on the margin/fee we take on them." Nichols referred the employee to the same 2005 "Best Execution" definition described above, which contained false and misleading information about BNYM's standing instruction program. Moreover, instead of actually disclosing pricing, Nichols stated that "[f]inally, if necessary, we can put the customer on a WM benchmark pricing arrangement and then provide post trade monitoring via the WM Benchmark Report."  In other words, instead of revealing how standing instruction pricing worked, the Bank would simply switch the customer to a different form of standing instruction pricing that was more beneficial than providing the worst rate of the day.

86.    Likewise, in November 2008, when a representative of T. Rowe Price Associates, an investment manager for BNYM's custodial client, the Virginia Retirement System, requested that BNYM explain how it provides best execution to its clients, the representative was told "we price foreign exchange at levels generally reflecting interbank market at the time the trade is executed by the foreign exchange desk," which is patently false.

87.    Specifically, on November 20, 2008, Hope Brown of T. Rowe Price sent an email to Jennifer Goerlich of BNYM inquiring "what processes BNYM has in place to monitor trade executions" and requesting that BNYM "provide us with periodic reports to evidence that you have provided us with best execution."

88.    That same day, Goerlich forwarded Brown's request on to Jorge Rodriguez stating, "Below is an inquiry from TRowe on best execution" and asking, "Who can I go to ask to get our talking points or party line on this."  Goerlich then commented, "I'm sure the second part of their request – to give them periodic reports to evidence this – is probably not feasible – so I can tell them no on that unless you say otherwise."

89.    On November 24, 2008, having not received a response, Goerlich again emailed Rodriguez and BNYM Managing Director Robert Near, explaining that "the client . . . asked us,

SSB and JPM to all respond on this and I wanted to get them a response back today if possible."
Near responded that "We have 'best execution' considerations articulated" and directed her to
BNYM employees William Filonuck or Marek Unger.  Filonuk referred Goerlich's request on to
Nichols and Jerome Descamps, noting "I know I've seen responses that we've given in the past"
and asking whether either of them had "our standard response."

90.     On November 25, 2008, Nichols forwarded BNYM's "definition of best
execution" to Goerlich, noting that the statement had been prepared in 2005 and "still stands as
our statement on the subject."   Indeed, Descamp commented on the same day that this
"definition" had been "worked out . . . for an RFP some time ago."

91.     On November 26, 2008, Goerlich emailed this document to Brown at T. Rowe
Price, with the statement "Attached is a documen[t] that defines our Best Execution Policy at
BNY Mellon."  This document – entitled, "How does The Bank of New York Mellon assist plan
sponsors and their fund managers in achieving Best Execution in foreign exchange?" --
contained the false and misleading statements described above (*e.g.*, "[u]nderstanding the
fiduciary role of the fund manager, it is our goal to provide best execution for all foreign
exchange executed in support of our clients' transactions"; "we price foreign exchange at levels
generally reflecting the interbank market at the time the trade is executed by the foreign
exchange desk";  "[b]est execution encompasses a variety of services designed to maximize the
proceeds of each trade"; "[w]e also support post-trade analysis . . . to assist the fund manager in
demonstrating that the execution of each trade was consistent with the goal of maximizing the
value of the client portfolio").

92.     BNYM also told clients who inquired about the price received for a standing
instruction trade that the trade happened to occur at a time when the pricing was not favorable.
For example, BNYM Vice President Paul Park, a trader on the Pittsburgh transaction desk, on

occasion told clients that the price the client received was due to "bad timing" or the fact that the size of the trade was small.  These representations were knowingly false.  As explained above, timing has nothing to do with the pricing of BNYM's standing instruction trades.  BNYM standing instruction clients receive the worst interbank market rate of the day with a slight modifier, regardless of when the trade is executed.  Furthermore, as explained above, BNYM would follow this procedure for large and small trades.

93.     BNYM made other intentional misrepresentations to clients.  For example, in March 2010, when representatives of the San Diego County Employees Retirement Association ("SDCERA") asked for time stamps, BNYM stated that time stamps were not available because BNYM's traders agreed on prices earlier in the day, but did not close the transactions until hours later.  In response to inquiries from SDCERA about the extent to which BNYM marked up its currency trades, BNYM told SDCERA that BNYM charged enough to cover its transaction costs.  SDCERA was told that the Bank was trying to get SDCERA a good price, and reassured SDCERA that there was not a problem.  SDCERA was also told that all standing instruction clients received the same currency pricing because of ERISA.  When SDCERA confronted the Bank with its own analysis of trades using foreign currency rates on Bloomberg that showed that SDCERA was priced always near the high or low of the day, BNYM told SDCERA that SDCERA cannot compare it that way, and that Bloomberg was not definitive.

94.     As stated above, these representations were false.  No time stamps were available for the prices given to standing instruction clients because BNYM simply gave its clients virtually the worst interbank rate of the day, regardless of where the currency market was trading at that particular time.  Furthermore, the profits BNYM reaped from standing instruction trades at its clients' expense were far greater than BNYM's transaction costs, which BNYM knew.

95.     BNYM understood that using "best execution standards" and providing pricing transparency to its clients would eliminate the enormous spreads it was able to achieve at the expense of its clients.  To compensate for that loss of revenue, BNYM believed that it would be necessary to increase the volume of its negotiated FX business.

96.     For example, Jorge Rodriguez stated in an October 15, 2009 internal email: "Bottom line is, its [sic] volume verses quality spread business.  The friendly business we have built our reputation on is undergoing considerable change with increased regulatory demands on our client to achieve 'Best Execution' and the growth in overall pricing transparency.  For us to continually win, I feel we need to do a little of both recognizing that at the end of the day, it is all about profits."

97.     In an April 11, 2008 internal email, BNYM employee Antonio Garcia lamented that "[i]n general transparency adversely impacts our revenue stream and any product to distribute fee information would hurt us many times over in reduced revenue.  Nothing like a rock and a hard place."  A table attached to that email, entitled Transparency – Top 5 Impacts, explains the various negative repercussions that would result from providing truthful pricing information to its clients.  BNYM noted, among other things, that this purported "proprietary information can be used against us in negotiations and create conflicts with clients who may be charged more"; that "Trust and Custody clients could expect to reduce their fees and we could leave $3 mil[lion] or more on the table each year"; that "Global Markets clients can further reduce their fees from 20 BPS to 1 BPS"; and that BNYM would "need to generate more business to attain [the] same fee level," and "develop further revenue sources or charge clients on a more detailed fee schedule."

98.     On October 20, 2009, the California Attorney General brought a civil fraud action in California State Court against State Street Bank and Trust ("State Street"), another large

custodian bank.  California alleged that State Street had charged state pension funds that were custodial clients of State Street fraudulent currency exchange rates in connection with its standing instruction FX service.

99.     Within hours after the State Street lawsuit was reported by Reuters on or about October 20, 2009, BNYM Managing Director William Samela emailed the Reuters report to all BNYM FX sales employees with the subject heading, "Oh No."  The same day, Robert Donelan, a former Bank employee who had left BNYM in 2008, emailed his former BNYM colleagues, including A.J. Quitadamo, an article about "[State Street] being sued by [the State of California] for raping the public pension funds w/their internal trades for umpteen years/decades now." Donelan asked his former colleagues in the email, "Well, is the 'Game' over? . . . Time to retire after raping the custodial accounts, all 'Public Trust' money?"

100.    BNYM was immediately flooded with inquiries from custodial clients and/or their investment managers about whether BNYM was engaging in similar pricing conduct.  In response to these inquiries, BNYM, in its ongoing effort to hide its pricing scheme from its clients and maintain its "quality spread business," simply referred them to BNYM's website, which provided a false, incomplete and misleading description of BNYM's standing instruction FX service.

101.    For example, in Fall 2009, a representative from Alaska Permanent Fund inquired of BNYM whether BNYM engaged in the same conduct as State Street and whether there were any extra fees to use BNYM's FX desk.  According to BNYM documents, BNYM provided this client a link to BNYM's website, although the only information BNYM's website offered at this time about pricing was false, incomplete and misleading.  In particular, BNYM's website at this time falsely represented that BNYM's standing instruction service afforded multiple benefits to clients, including the utilization of "best execution" standards.

102.    On October 28, 2009, A.J. Quitadamo proposed that BNYM actually "fully disclos[e] a pricing schedule" to clients by providing "a defined [sales] margin above a benchmark." Quitadamo explained that the "[o]bjective would be to match current overall margin on fully passive SI [standing instruction]" and that BNYM would "have to understand current volume distribution and then determine what the margin scale would have to look like to achieve current overall margin (20 [basis points] or so)." He went on to say that BNYM could "achieve current overall margin and be a leader in price transparency."

103.    Quitadamo's proposal, however, was not favorably received. For example, John Cipriani stated in an October 28, 2009 internal email that he did "NOT like" the idea of providing pricing information to clients, arguing that "[o]nce pricing spreads are disclosed it will be a race to how quickly clients can work it down to zero."

104.    Ultimately, BNYM did not adopt Quitadamo's proposal, determining that it was much more profitable to mislead clients about how standing instruction transactions were being priced. Indeed, BNYM observed that this was the reason why BNYM was able to earn bigger profits than its competitors, who were more transparent with clients about how transactions would be priced. For example, in a July 21, 2009 internal email discussing how BNYM has maintained the largest FX market share among custodian banks, Robert Near stated that "BNYM has been more successful in maintaining spreads in the SI [standing instruction] space compared to these peers," that "BNYM is 'late' to the transparency space," and that BNYM was "hearing from our clients that our competitors are offering time stamping and fixed spreads across all currencies."

105.    In February 2011, representatives of custodial client Prudential Financial, a federally insured financial institution, arranged a meeting with BNYM to obtain more information about, among other things, how BNYM determined pricing for standing instruction

trades.  BNYM representatives, including Robert Near and Jennifer Goerlich, stated that the Bank purchases or sells currencies one time per day for standing instruction purposes and that if BNYM received a standing instruction trade request before 3:00 p.m., it would be priced within the range of the day.  In addition, the BNYM representatives stated that all of BNYM's standing instruction clients receive the same pricing terms.   These representations were false and misleading.  BNYM was not purchasing or selling currencies for standing instruction clients; it was actually just assigning prices to their standing instruction trades.  Furthermore, BNYM did not disclose the fact that standing instruction prices would be assigned prices that were at or close to the high or low interbank range for the day, whichever is against the client.  Moreover, not all standing instruction clients received the same pricing; certain standing instruction clients received benchmark pricing.  These misrepresentations and omissions were made intentionally to mislead Prudential so that it would remain a standing instruction client.  Indeed, Prudential would have looked elsewhere for foreign exchange services had BNYM been truthful.

106.    In BNYM's efforts to gain the Massachusetts Pension Reserves Investment Management Board ("PRIM") as a custodial client, BNYM submitted multiple responses to PRIM's request for proposals in which BNYM repeatedly and falsely described its standing instruction service as "free of charge."  BNYM also described its standing instruction service as "one of the most competitive" in the industry.  As late as February 2011, BNYM represented to PRIM that its standing instruction service provided "a valuable service at competitive prices," and a fact sheet described the program as providing "competitive rates in a transparent market." Indeed, while BNYM was internally touting its profits from lack of transparency, it baldly asserted that the market was transparent.

107.    After the lawsuit against State Street became public, PRIM made numerous inquiries to BNYM.  In one such inquiry, in February 2011, PRIM asked BNYM to identify the

"mark up" on standing instruction trades.  The Bank, in its March 2011 response to PRIM, claimed that it did not "understand" what was meant by "mark up."  However, a June 14, 2011 study commissioned by PRIM revealed that the Bank earned a spread of approximately 33 basis points on the trades BNYM executed on behalf of PRIM.

**D.**       **BNYM Used Artificial Prices Set by Governments in Setting Prices**

108.    BNYM also routinely took advantage of custodial clients using standing instruction trading in currencies involving regulated capital markets.

109.    For example, the Central Bank of China (Taiwan) (the "Central Bank") presides over a managed float currency regime in which the Central Bank often intervenes in order to manage volatility and limit currency appreciation against the U.S. dollar.  Beginning in November 2010, the Central Bank actively intervened in its capital markets creating currency distortions that affected the open, high, and close spot rate for the U.S. dollar – New Taiwan dollar ("USD/TWD") currency pair.  BNYM intentionally exploited these distortions to its benefit and to the detriment of its standing instruction clients.

110.    The Central Bank restricted trading in USD/TWD at the opening 15 minutes and closing 15 minutes of the trading day, effectively raising the USD/TWD spot price to an artificial high during those periods.  This created an artificial USD/TWD range for the day that grossly exceeded the range during the unrestricted portions of the trading day.

111.    On days when BNYM provided standing instruction FX trading to buy U.S. dollars against New Taiwan dollars for its custodial clients, BNYM executed trades during the unrestricted portions of the trading day, securing a spot price for USD/TWD that was well below the artificially high opening price and closing price of the day; however, BNYM priced these U.S. dollar purchases against New Taiwan dollars for its custodial clients at, or near, the high of the USD/TWD spot price using the artificial range of the day.  This scheme allowed BNYM to

gain an extremely large spread at the expense of its clients, which BNYM pocketed for itself. BNYM intentionally concealed from its standing instruction clients that it priced their trades in regulated currencies at the margins of the artificial ranges so that it could obtain massive spreads.

112.   When Paul Park recognized the manipulation in the USD/TWD currency market, and sought guidance from management on how to accurately price the USD/TWD currency pair for standing instruction clients, John Cipriani told him to use the artificial range of the day.

113.   The following are some specific examples derived from internal Bank documents. These documents characterize the Bank as a principal selling U.S. dollars and buying New Taiwan dollars.   Likewise, these documents characterize the standing instruction clients as purchasing U.S. dollars and selling New Taiwan dollars.   In the transactions described below, the client is charged a higher price for U.S. dollars than any price within the interbank spot range of the day reported by Bloomberg.

114.   On November 4, 2010, the Bank traded New Taiwan dollars for U.S. dollars on behalf of its client, the State of Wisconsin Investment Board, with a value date of November 5, 2010.  The Bank sold $12,307,958.41, and bought 377,054,306.00 New Taiwan dollars, at a deal rate of 30.6350 New Taiwan dollars per U.S. dollar.   According to the Bank's own internal records, the Bank made a sales margin of $127,869.62 on the trade, an approximate 104 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 30.4180, and the low was 30.2450.  The Central Bank closing price was 30.5900, a price higher than the highest point in the spot interbank range of the day as reported by Bloomberg. Accordingly, for this transaction, the client paid a price for the U.S. dollar that was both beyond the spot interbank range of the day as reported by Bloomberg, and also in excess of the Central Bank's artificially inflated closing price for U.S. dollars.

115.    On November 9, 2010, the Bank traded New Taiwan dollars for U.S. dollars on behalf of its client, Lincoln Financial Group, with a value date of November 9, 2010.  The Bank sold $9,262,035.74, and bought 284,539,000.00 New Taiwan dollars, at a deal rate of 30.7210 New Taiwan dollars per U.S. dollar.  According to the Bank's own internal records, the Bank made a sales margin of $162,906.29 on the trade, an approximate 176 basis point spread. Bloomberg reported that the highest spot price in the interbank range of the day was 30.2660, and the low was 30.1360.  The Central Bank closing price was 30.6300, a price higher than the highest point in the spot interbank range of the day as reported by Bloomberg.  Accordingly, for this transaction, the client paid a price for the U.S. dollar that was both beyond the spot interbank range of the day as reported by Bloomberg, and also in excess of the Central Bank's artificially inflated closing price for U.S. dollars.

116.    On November 26, 2010, the Bank traded New Taiwan dollars for U.S. dollars on behalf of its client, the West Virginia Investment Management Board, with a value date of November 26, 2010.  The Bank sold $12,979,691.40, and bought 399,774,495.00 New Taiwan dollars, at a deal rate of 30.8000 New Taiwan dollars per U.S. dollar.  According to the Bank's own internal records, the Bank made a sales margin of $155,662.47 on the trade, an approximate 120 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 30.4810, and the low was 30.3900.  The Central Bank closing price was 30.8300, a price higher than the highest point in the spot interbank range of the day as reported by Bloomberg.  Accordingly, for this transaction, the client paid a price for the U.S. dollar that was beyond the spot interbank range of the day as reported by Bloomberg, and only .0300 less than the Central Bank's artificially inflated closing price.

117.    Also on November 26, 2010, the Bank traded New Taiwan dollars for U.S. dollars on behalf of its client, "EMERG MKTS TORONTO," presumably Emerging Markets

Management based in Toronto, with a value date of November 26, 2010. The Bank sold $11,789,415.58, and bought 363,114,000.00 New Taiwan dollars, at a deal rate of 30.8000 New Taiwan dollars per U.S. dollar. According to the Bank's own internal records, the Bank made a sales margin of $141,387.77 on the trade, an approximate 120 basis point spread. Bloomberg reported that the highest spot price in the interbank range of the day was 30.4810, and the low was 30.3900. The Central Bank closing price was 30.8300, a price higher than the highest point in the spot interbank range of the day as reported by Bloomberg. Accordingly, for this transaction, the client paid a price for the U.S. dollar that was beyond the spot interbank range of the day as reported by Bloomberg, and only .0300 less than the Central Bank's artificially inflated closing price for U.S. dollars.

118.    On December 16, 2010, the Bank traded New Taiwan dollars for U.S. dollars on behalf of its client, the Pennsylvania Public School Employees' Retirement System, with a value date of December 16, 2010. The Bank sold $5,107,685.56, and bought 156,014,255.00 New Taiwan dollars, at a deal rate of 30.5450 New Taiwan dollars per U.S. dollar. According to the Bank's own internal records, the Bank made a sales margin of $117,172.29 on the trade, an approximate 229 basis point spread. Bloomberg reported that the highest spot price in the interbank range of the day was 29.9330, and the low was 29.8180. The Central Bank closing price was 30.5450, a price higher than the highest point in the spot interbank range of the day as reported by Bloomberg. Accordingly, for this transaction, the client paid a price for the U.S. dollar that was beyond the spot interbank range of the day as reported by Bloomberg, and that matched the Central Banks' artificially inflated closing price for U.S. dollars.

119.    Accordingly, in exchanging their New Taiwan dollars for U.S. dollars, each of these clients was charged a higher price for U.S. dollars than any price within the interbank range

of the day reported by Bloomberg.  Further, the prices charged to these clients exceeded, equaled or was slightly less than the Central Bank's artificially inflated closing price for U.S. dollars.

**E.**     **BNYM Gained Significant Profits from Its Fraudulent Practices**

120.     From 2000 to 2011, the Bank profited substantially from its standing instruction foreign exchange program. For example, according to internal Bank records for the top 200 clients who utilized standing instruction services, in 2007, the Bank made approximately $278,210,185 in gross sales margin; in 2008, the Bank made approximately $548,820,478; in 2009, the Bank made approximately $394,575,576; and in 2010, the Bank made approximately $317,599,549.   In total, the Bank made approximately $1.539 billion in gross sales margin from its top 200 standing instruction clients from 2007 to 2010 alone.

121.     The Bank performed countless standing instruction FX trades for clients from 2007 to 2010, and profited substantially from those trades.  For example, according to the Bank's own internal records, on October 28, 2009, the Bank traded U.S. dollars for Canadian dollars on behalf of its client, Fidelity Mutual Funds, with a value date of October 28, 2009.  The Bank sold 15,943,509.99 Canadian dollars, and bought $14,918,602.03, at a deal rate of 1.0687 Canadian dollars per U.S. dollar.  The Bank's records indicate that the Bank made a sales margin of $114,971.58 on the trade, an approximate 77 basis point spread.

122.     As a further example, according to the Bank's own internal records, on October 23, 2008, the Bank traded euros for U.S. dollars on behalf of its client, Prudential Financial, with a value date of October 24, 2008. The Bank sold $28,235,361.16, and bought 22,166,243.65 euros, at a deal rate of 1.2738 U.S. dollars per euro.  The Bank's records indicate that the Bank made a sales margin of $144,080.58 on the trade, an approximate 51 basis point spread.

123.     As a further example, according to the Bank's own internal records, on August 8, 2007, the Bank traded Brazilian reais for U.S. dollars on behalf of its client, Merrill Lynch, with

a value date of August 8, 2007.  The Bank sold $25,248,638.17, and bought 47,959,788.21 reais, at a deal rate of 1.8995 reais per dollar.  The Bank's records indicate that the Bank made a sales margin of $165,907.01 on the trade, an approximate 66 basis point spread.

**F.**  **BNYM's Fraud Affected Federally Insured Financial Institutions, Including the Bank Itself**

124.    The knowing and intentional fraud perpetrated by BNYM described herein has affected the custodial clients of BNYM that use standing instruction services for foreign exchange trades, including federally insured financial institutions (and/or subsidiaries or affiliates of these institutions) as reflected in Section E, in that BNYM profited at the expense of these clients by effectively charging these clients an undisclosed fee for their foreign exchange trades.  BNYM also promised these institutions best execution and best rates of the day, but instead provided them the worst interbank rates of the day to their detriment.

125.    BNYM, which is a federally insured financial institution, has also been affected by its intentionally fraudulent practices related to its standing instruction FX service.

126.    BNYM's fraudulent conduct has resulted in significant legal exposure, evidenced by the numerous suits now pending alleging that BNYM's standing instruction FX service was premised on false and misleading information, which suits collectively expose BNYM, a federally insured financial institution, to billions of dollars in potential liability, ongoing and mounting legal expenditures, as well as immediate and ongoing reputational harm which has and could continue to affect its stock price, thus significantly affecting BNYM:

    a.    *Commonwealth of Virginia v. The Bank of New York Mellon*, Case No. CL-2009-15377 (Fairfax County, VA);

    b.    *The State of Florida v. The Bank of New York Mellon Corporation*, Case No. 2009 CA 4140 (Leon County, FL);

    c.    *In the Matter of the Bank of New York Mellon Corporation*, Docket No. 2011-0044 (Mass. Sec. Div. Admin. Complaint);

d. *The State of New York v. The Bank of New York Mellon Corporation*, Index No: 09/114735 (N.Y. County, NY);

e. *Southeastern Pennsylvania Transportation Authority v. The Bank of New York Mellon Corporation*, 11 Civ. 1628 (E.D. Pa.);

f. *International Union of Operating Engineers, Stationary Engineers Local 39 Pension Trust Fund v. The Bank of New York Mellon Corporation, et al.*, 11 Civ. 3620 (N.D. Cal.);

g. *Bank of New York Mellon Corporation False Claims Act Foreign Exchange Litigation v. Bank of New York Mellon Corporation*, 11 Civ. 5683 (N.D. Cal.).

h. *Zucker v. Hassell, et al.*, Index No. 112133/2011 (N.Y. County, N.Y.);

i. *Sansano v. The Bank of New York Mellon Corporation, et al.*, 11 Civ. 1412 (W.D. Pa.);

j. *Terrazas v. The Bank of New York Mellon Corporation, et al.*, 11 Civ. 1461 (W.D. Pa.);

k. *Iron Workers Mid-South Pension Fund v. Hassell, et al.*, 11 Civ. 8471 (S.D.N.Y.);

l. *Clark v. Hassell, et al.*, 11 Civ. 8810 (S.D.N.Y.).

127.    BNYM's public filings confirm that the lawsuits, and BNYM's related legal exposure, have affected it.  For instance, in its 2009 10-K filed with the United States Securities and Exchange Commission, BNYM states that "[i]nvestigations by various federal and state regulatory agencies, the Department of Justice and state attorneys general, and any related litigation, could have an adverse effect on us."  Likewise, BNYM's 2010 Annual Report notes that judgments or settlements of legal matters "could have a material effect on net income in a given period," and discloses many of the suits identified above.  The litigation described above has also negatively impacted BNYM's stock price.

128.    BNYM's fraud also caused custodial clients who used the Bank's standing instruction FX service to become dissatisfied with BNYM's standing instruction practice and/or leave BNYM, thus further affecting BNYM.

129.    As set forth above, the Bank accomplished this scheme to defraud its custodial clients by developing and disseminating the fraudulent statements and representations alleged herein utilizing interstate mail carriers and interstate wires, including, but not limited to, emails, telephones, facsimiles and the internet.

## CLAIM FOR RELIEF

### FOR CIVIL PENALTIES UNDER FIRREA AGAINST BNYM

130.    The allegations in each of the foregoing paragraphs are realleged and incorporated in this paragraph by reference.

131.    For purposes of fraudulently obtaining money from its clients and for continuing its fraudulent pricing scheme in connection with it standing instruction FX services, from at least 2000 through 2011, BNYM unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.   BNYM has gained substantial profits from this unlawful fraud.   For example, BNYM's estimated sales margins on standing instruction foreign exchange trades for its top 200 users of standing instruction services alone totaled more than $1.5 billion during the period 2007 through 2010.

132.    This scheme to defraud has affected numerous federally insured financial institutions for at least the last ten years.   For example, BNYM's estimated sales margin on standing instruction FX trades for its top 20 federally insured financial institutions (and/or subsidiaries or affiliates of these institutions) totaled more than $312 million during the period 2007 through 2010.   Moreover, BNYM is itself a federally insured financial institution, and its fraudulent scheme alleged herein has had a substantial affect on BNYM.   BNYM is subject to FIRREA penalties for the reasons set forth herein, and faces additional exposure to clients that

have sued the Bank, including various states' Attorneys General on behalf of pension funds as well as private plaintiffs.

133.    Accordingly, Defendant BNYM is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

WHEREFORE, the United States requests judgment against Defendant as follows:

(a)    With respect to the claim for civil penalties under FIRREA, a judgment imposing civil penalties against Defendant up to the maximum amount allowed by law;

(b)    For costs of suit;

(c)    For reasonable attorneys fees; and,

(d)    For such further relief that the Court deems just.

Dated: February 16, 2012
       New York, New York

                         PREET BHAHARA
                         United States Attorney
                         Southern District of New York

By:      _____
                         PIERRE G. ARMAND
                         LAWRENCE H. FOGELMAN
                         JAMES NICHOLAS BOEVING
                         Assistant United States Attorneys
                         86 Chambers Street, 3rd Floor
                         New York, New York 10007
                         Tel:      (212) 637-2724/2719/2748
                         Fax:      (212) 637-2730/2686
                         Email:    Pierre.Armand@usdoj.gov
                                   Lawrence.Fogelman@usdoj.gov
                                   James.N.Boeving@usdoj.gov

                         *Attorneys for Plaintiff the United States of America*