PREET BHARARA
United States Attorney for the
Southern District of New York
By:   PIERRE G. ARMAND
        LAWRENCE H. FOGELMAN
        JAMES NICHOLAS BOEVING
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel:    (212) 637-2724/2719/2748
Fax:    (212) 637-2730/2686
Email:  Pierre.Armand@usdoj.gov
          Lawrence.Fogelman@usdoj.gov
          James.N.Boeving@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

       Plaintiff,

       - v. -

THE BANK OF NEW YORK MELLON and
DAVID NICHOLS,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ECF Case

11 Civ. 6969 (LAK)

**SECOND AMENDED
COMPLAINT**

**Jury Trial Demanded**

Plaintiff, the United States of America, by its attorney, Preet Bharara, United States

Attorney for the Southern District of New York, alleges upon information and belief as follows:

## INTRODUCTION

1.     This is a civil fraud action by the United States against defendant The Bank of

New York Mellon ("BNYM" or the "Bank"), which, from at least 2000 through 2011, engaged

in a scheme to defraud custodial clients who used BNYM's standing instruction foreign

exchange service.  The United States also brings this civil fraud action against David Nichols, a

Managing Director of BNYM, who from at least 2004 to 2011 ("Nichols"), fraudulently misled

customers about the foreign exchange service BNYM was providing them.  This action seeks

civil penalties under the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA").

2.     BNYM, one of the world's largest custodian banks, has offered foreign exchange services to its custodial clients, for whom it holds domestic and international financial assets, including currency and securities.  Clients may contact BNYM directly and negotiate currency trades at exchange rates or prices that the parties agree upon.  BNYM has also offered clients a "standing instruction" foreign exchange service, pursuant to which BNYM automatically provides currency exchange on an as needed basis when, for example, the client buys or sells foreign securities or receives dividends on foreign securities that are repatriated to the United States.  Unlike directly negotiated currency trades, BNYM unilaterally determines the price its clients receive for standing instruction transactions.

3.     The standing instruction service has been extremely profitable for BNYM, dwarfing the sales margins the Bank garners from directly negotiated trades and all other forms of currency exchange.  Indeed, from 2007 to 2010 alone, BNYM generated more than $1.5 billion in revenues -- just from its top 200 standing instruction clients.

4.     The standing instruction service was so much more profitable to BNYM than any other foreign exchange service because it relied upon a fraudulent business model.  That model involved deliberately concealing the way BNYM was actually pricing standing instruction transactions while affirmatively misleading customers into believing that they were receiving the best prices available, when that was not the case.  BNYM accomplished this fraud by knowingly hiding critical facts from clients and/or their investment managers, intentionally providing them confusing and misleading information about the service, and telling them outright lies.

5.     For years, the only substantive information that BNYM provided to standing instruction clients about pricing was that the clients' price would fall within a wide range of

guaranteed rates reported each day.  What BNYM would hide is that the Bank would wait until the end of the trading day to price standing instruction trade requests and then assign prices to its clients that were the worst, or close to the worst, interbank rates reported during the trading day. Because BNYM has never provided time stamps to its clients indicating when during the day the transactions were "executed," it was extremely difficult for clients to determine whether the prices they received were fair and reasonable.

6.      At the same time, BNYM would obtain more favorable prices for itself, reaping large profits on the price differential or "spread."  The size of the spread that BNYM earned at the expense of its clients depended in large part upon volatility in currency prices; the greater the volatility, the greater the opportunity for a large spread.  Indeed, during the financial crisis in 2008, when currency prices fluctuated dramatically, the profits BNYM generated through its standing instruction service at the expense of its custodial clients were enormous.

7.      BNYM also repeatedly lied about its standing instruction service.  For example, BNYM represented to customers that the standing instruction service was provided according to "best execution" standards (which is commonly understood to mean that clients will be getting the best available rate at the time of execution), that customers would receive the "best rate of the day," and that BNYM's trade desk priced standing instruction trades at "the interbank market at the time the trade [was] executed."   All of these statements were knowingly false and/or misleading.  BNYM also represented to customers that the standing instruction service was "free" and "minimized" costs, that it offered "netting" of trades, and that all standing instruction clients received the same pricing, which were likewise knowingly false and/or misleading. BNYM made false statements and omissions in oral and written communications with clients and/or their investment managers and on its website, to which clients were referred.  Indeed, when clients made direct inquiries to BNYM about its pricing scheme, BNYM intentionally

misled them by providing "the party line," which consistently was false, incomplete and/or misleading information.

8.      BNYM knew it was making false and/or misleading statements and concealing material information from its standing instruction clients and/or their investment managers.  For example, BNYM knew that best execution meant the best available price and that it was not providing this to its clients.  Indeed, BNYM repeatedly acknowledged internally that providing best execution and pricing transparency would dramatically reduce revenues for standing instruction transactions.

9.      When competitor custodian bank State Street Bank and Trust ("State Street") was sued by the California Attorney General for similar conduct in October 2009, BNYM began receiving inquiries from customers about whether or not BNYM was engaging in the same conduct.  BNYM affirmatively misled them.  After the State Street lawsuit was made public, one BNYM employee commented in an internal email, "Oh No," and another former BNYM employee asked his former colleagues at the Bank whether it was "[t]ime to retire after raping the custodial accounts."   BNYM, however, continued to plunder the custodial accounts for months.

10.      Defendant David Nichols was instrumental in perpetrating the fraud alleged herein.  Among other things, Nichols drafted and developed the false and misleading definition of "best execution," which included various misrepresentations as described below.  In addition, Nichols disseminated this false and misleading definition to BNYM custodial clients who used the Bank's standing instruction service, and encouraged other BNYM employees to do likewise in response to client inquiries.  Nichols also falsely represented to BNYM custodial clients that all standing instruction clients received the same pricing, and in fact knew that standing instruction clients who complained about pricing were switched to a different, more transparent,

standing instruction pricing model.  Nichols knew that his statements about the Bank's standing instruction service were false and/or misleading, but continued to make these statements in order to enhance BNYM's revenue, and, in turn, his own compensation and advancement at the Bank.

11.    As a result of this fraudulent scheme, BNYM and Nichols have collectively defrauded the Bank's custodial clients, which include public pension funds and federally insured financial institutions and/or their affiliates, of more than $1.5 billion dollars.

## PARTIES

12.    Plaintiff is the United States of America.

13.    Defendant BNYM is a New York State chartered bank with approximately $1.3 trillion in assets under management and approximately $26.6 trillion in assets under custody and administration.  BNYM's deposits are insured by the Federal Deposit Insurance Corporation. BNYM is headquartered at One Wall Street, New York, New York.

14.    Defendant David Nichols is a Managing Director and the head of Product Management at BNYM.  Nichols's office is located at One Wall Street, New York, New York.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 1833a.

16.    Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions alleged in this Second Amended Complaint occurred within this District.  Venue also is proper pursuant to 28 U.S.C. § 1391(c) because Defendants conduct business within this District.

## BACKGROUND

### A.  FIRREA

17.     In 1989, Congress enacted FIRREA as part of a comprehensive legislative plan to reform and strengthen the federal deposit insurance system. Pursuant to FIRREA, the United States can recover civil penalties, up to $1 million for each violation or up to $5 million for a continuing violation, from persons who "violate any provision of law to which this section is made applicable."  12 U.S.C. § 1833a(a)-(b).  Further, if a defendant "derives pecuniary gain from the violation, or if the violation results in pecuniary loss" to a person other than the defendant, FIRREA authorizes the United States to recover civil penalties in an amount greater than $1 million, but not to exceed the amount of gain or loss.  *Id.* § 1833a(b)(3)(A).

18.     As relevant to this action, FIRREA authorizes the United States to recover civil penalties for violations of, or conspiracies to violate, two provisions of Title 18 of the United States Code:

- 18 U.S.C. § 1341 (Mail Fraud Affecting a Financial Institution):  which proscribes the use of "the Postal Service, or . . . private or commercial interstate carrier" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . .";

- 18 U.S.C. § 1343 (Wire Fraud Affecting a Financial Institution):  which proscribes the use of "wire . . . in interstate or foreign commerce" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ."

### B.   BNYM's Foreign Exchange Business

19.     BNYM is a custodian bank, a financial institution that holds and safeguards financial assets of firms and individuals, such as stocks, bonds, and currency.  BNYM provides a variety of services to custodial clients, including settlement of any purchases and sales of securities and currency, maintaining currency/cash bank accounts, effecting deposits and

withdrawals and managing other cash transactions, and performing foreign exchange ("FX") transactions.

20.     BNYM is one of the largest custodian banks in the world, with approximately $26.6 trillion in assets under custody and administration.  BNYM's custodial clients include public and private pension funds, states, cities, colleges, universities, foundations, non-profit religious organizations, and financial institutions, including federally insured financial institutions (and/or affiliates of these institutions).

21.     Many of BNYM's custodial clients invest in foreign securities, which must be purchased and sold in the currencies of the countries where the securities are issued. Accordingly, to complete transactions involving the purchase or sale of foreign securities, BNYM's custodial clients who are based in the United States and invest in foreign securities must purchase and sell those foreign currencies.  In addition, such foreign securities earn dividends or other income in foreign currencies that clients often choose to repatriate into U.S. dollars or assets.  To facilitate these transactions, BNYM offers its clients FX services.

22.     BNYM generally offers two principal types of FX services, namely:  (1) directly negotiated FX; and (2) standing instruction FX.  Directly negotiated FX involves the custodial client or its investment manager negotiating directly with an FX trader at BNYM to purchase or sell currency at a particular price agreed upon by the parties.  Standing instruction FX, by contrast, does not involve any direct involvement between the custodial client and BNYM. Rather, under the standing instruction process, BNYM executes FX transactions automatically on an as needed basis and the price the client receives for the purchase or sale of the currency is determined by BNYM.

23.    BNYM's standing instruction clients have included federally insured financial institutions and/or the affiliates of these institutions.  BNYM is itself a federally insured financial institution.

24.    BNYM has generated substantial revenue from its standing instruction service from 2000 to 2011.  For example, according to BNYM, its estimated sales margins for its top 200 users of the standing instruction service alone totaled more than $1.5 billion during the period 2007 through 2010.  *See* Exhibit A (BNYM document reflecting largest sales margin standing instruction transactions from 2007 through 2010).  A significant portion of BNYM's sales margin from these years was derived from clients that are federally insured financial institutions (and/or affiliates of these institutions).  BNYM's estimated sales margin on standing instruction transactions for its top 20 federally insured financial institutions (and/or affiliates of these institutions) totaled more than $300 million during the period 2007 through 2010.[1]

25.    On January 13, 2012, BNYM and the Government entered into a stipulation of Partial Settlement and Dismissal (the "Stipulation") resolving the Government's injunctive claims under 18 U.S.C. § 1345 against the Bank concerning its disclosures to standing instruction clients.  The Stipulation, entered by the Court on January 17, 2012, required BNYM to, among other things, disclose the way it prices standing instruction transactions and change the way it describes the service to clients.

---

[1]    The top 20 financial institutions referenced includes entities that are themselves federally insured, *e.g.*, Fifth Third Bank ($17.6 million in sales margin), Bessemer Trust Co., N.A.  ($15.5 million in sales margin), Huntington National Bank ($8.7 million in sales margin); as well as affiliates of federally insured financial institutions, *e.g.*, Prudential Financial ($20.5 million in sales margin), Franklin Templeton Investments ($17.8 million in sales margin), ING U.S. ($50.2 million in sales margin).

## DEFENDANTS' SCHEME TO DEFRAUD STANDING
## INSTRUCTION FOREIGN EXCHANGE CLIENTS

**A.    BNYM Consistently Provided Its Standing Instruction Clients With Virtually the Worst Prices of the Day, While Obtaining More Favorable Prices For Itself**

26.    BNYM would receive standing instruction trade requests for various currencies throughout a given trading day, which requests were routed to an internal BNYM system called the Currency Management System ("CMS").  BNYM typically did not maintain inventories of currencies for use in CMS transactions.  Rather, BNYM's transaction desk instructed spot traders to purchase or sell whatever currencies may be necessary for aggregate standing instruction trades on the spot market.

27.    BNYM's transaction desk typically aggregated all of the standing instruction trade requests that came in throughout the day and waited until the afternoon (generally around 1:30 p.m. Eastern Time) to instruct spot traders to purchase or sell whatever currencies may be required on behalf of the CMS portfolio.  At that point, no further standing instruction trade requests would be taken that day.

28.    In response to a request from the trading desk, a spot trader would buy or sell on the spot market whatever currencies might be required and transfer them to the CMS portfolio.  Unlike the trades with BNYM's standing instruction clients, the intra-desk transactions between the spot traders and the CMS portfolio were time-stamped and the exchange rates were recorded.

29.    Later in the afternoon (approximately 4:00 p.m. Eastern Time) BNYM's transaction desk would determine the price to provide to standing instruction clients for each currency pair.  Typically, the transaction desk would look at the full range of reported interbank prices at which the currencies were trading during the day and select the worst possible interbank rates for the standing instruction clients – *i.e.*, the lowest rate for currency sales and the highest rate for currency purchases.  Although the price could not deviate by more than 3 percent from

the relevant interbank bid and ask rates, as BNYM stated in its FX procedures, currency prices rarely move outside of this price range. BNYM would frequently apply a slight modifier to the selected interbank rate, so that the ultimate price given to the client would not be the absolute worst interbank rate, but very close to the worst.

30.     BNYM could have executed trades at prevailing interbank market rates with its standing instruction customers instead of assigning them essentially the worst price of the day. BNYM has asserted that the "interbank rate" reflects trades "ordinarily in amounts with a value of more than $1,000,000," and suggested that standing instruction transactions could not have been executed at the prevailing interbank market rate because they involved amounts less than $1,000,000. However, BNYM executed numerous standing instruction trades for more than $1,000,000. *See infra* ¶¶ 149-153, 156-61, 163-71, 173-74.

31.     Further, BNYM was not restricted in executing trades on the interbank market for less than $1 million. For example, in response to a statement by BNYM that claimed there was a "$1 million minimum for the 'wholesale' interbank market," investment manager Capital Group Companies ("Capital Group") observed: "The statement below concerns me as it is NOT TRUE. [Capital Group] executes forex third party or direct with the custodian through the interbank market on trades under $1 [million] on a daily basis. There is NO minimum for wholesale interbank prices in forex . . . ." Indeed, in or around mid to late 2010, Nichols told representatives of Bessemer Trust ("Bessemer"), a federally insured financial institution, that there was no volume limit for BNYM to execute trades on Bessemer's behalf at interbank market rates, and that BNYM could aggregate Bessemer's trades with other clients' trades if necessary. Although this statement was not made in the context of standing instruction, BNYM made clear to Bessemer that volume was not an issue in order to obtain interbank market rates, even if it may take some additional time to execute the trade.

32.     In addition, because the standing instruction program already aggregated the standing instruction trades of its numerous clients, BNYM could have executed spot trades on the interbank market instead of assigning close to the worst price of the day reflecting the entire range of trading for that day.

33.     BNYM's gain from standing instruction transactions was the difference between the price obtained by the Bank for itself and the worst or next-to-worst interbank price from the day that BNYM would assign to the client.  With this rigged pricing model, BNYM generally could not lose money.  At best, BNYM would make a huge spread and, at worst, break even.

34.     Volatility in currency prices allowed BNYM to reap large trading gains at the expense of its clients.  The greater the volatility, the greater the difference between BNYM's price and the price given to standing instruction clients.

35.     BNYM's conduct in profiting at the expense of its custodial clients, many of which are pension funds and federally insured financial institutions (and/or affiliates of these institutions), was at its most egregious during the financial crisis in 2008.  During the financial crisis, currency prices fluctuated widely.  This unprecedented volatility allowed BNYM to pass on extremely poor pricing to its clients while earning massive gains on the much better pricing BNYM was able to obtain for itself.

36.     The bulk of BNYM's FX profits derived from standing instruction transactions. The spreads that BNYM obtained on negotiated FX transactions were typically modest, as two parties are negotiating a price based on prevailing market rates at the time of the trade.  By contrast, as explained above, the spreads in standing instruction transactions could be enormous because the clients would always receive the worst or close to the worst interbank prices of the day.

37.     For example, internal BNYM documents indicate that in 2009, BNYM's standing instruction service represented approximately 12 percent of BNYM's overall FX trading volume, but accounted for approximately 69 percent of BNYM's profits from FX.   Conversely, negotiated FX trades comprised approximately 88 percent of BNYM's trading volume, but amounted for only approximately 31 percent of BNYM's profits.

38.     BNYM's standing instruction transactions frequently involved substantial amounts of money.  For example, in 2007, a sample of 250 transactions provided by the Bank with the largest sales margins demonstrates that the average size of these transactions exceeded $51 million (or U.S. dollar equivalent).   Likewise, in 2008, a sample of 250 transactions provided by the Bank with the largest sales margins also demonstrates that the average size of these transactions exceeded $51 million (or U.S. dollar equivalent).  For 2009, a sample of 250 transactions provided by the Bank with the largest sales margins demonstrates that the average size of these transactions exceeded $30 million (or U.S. dollar equivalent).  Also, for 2010, a sample of 250 transactions provided by the Bank with the largest sales margins demonstrates that the average size of these transactions exceeded $41 million (or U.S. dollar equivalent).

**B.**     **Defendants Repeatedly and Knowingly Made False and Misleading Representations To Clients About BNYM's Standing Instruction Service**

39.     From at least 2000 through 2011, BNYM affirmatively and fraudulently misled its customers, including its custodial clients such as pension funds and federally insured financial institutions (or affiliates thereof), about the attributes of its standing instruction service. Defendants' intentionally fraudulent statements and omissions about the standing instruction service include the following:

      a.     BNYM and Nichols falsely represented that the standing instruction service was provided according to "best execution" standards and that clients received the "best rate of the day";

b.   BNYM and Nichols falsely represented that BNYM's trading desk priced standing instruction trades at the interbank rate available at the time of execution, suggesting that clients received a price available at the time of the trade, rather than the worst price based on the entire range of the day;

c.   BNYM falsely represented that the standing instruction service was "free" and "minimized" costs;

d.   BNYM falsely represented that it offered "netting" to standing instruction clients;

e.   BNYM and Nichols falsely represented that all standing instruction clients received the same pricing terms; and

f.   BNYM and Nichols fraudulently failed to disclose that standing instruction clients would receive prices that were at or close to the worst reported interbank rates.

40.   Defendants made these fraudulent statements and omissions both orally and in writing (*e.g.*, in responses to client requests for proposal ("RFPs"), in responses to client inquiries by email, telephone and at meetings, and on BNYM's website, to which clients were referred).  Defendants knew that these representations were false, consciously avoided learning whether they were true or false, or recklessly disregarded whether they were true or false. Defendants' fraudulent statements and omissions were material to the standing instruction transactions of its clients because they bore directly on the ultimate amounts BNYM's clients would receive for currency conversion.  Defendants did not differentiate between federally insured financial institution clients (or affiliates thereof) and other clients in systematically making these fraudulent statements and omissions.

### 1)   BNYM and Nichols Fraudulently Represented That Standing Instruction Clients Received "Best Execution" and the "Best Rate of The Day"

41.   Defendants repeatedly and falsely represented to clients that BNYM's standing instruction service provided clients "best execution" and the "best rates of the day."  Defendants made these fraudulent statements on BNYM's website, in response to RFPs from clients

requesting information on BNYM's foreign exchange services, and/or in responses to inquiries from standing instruction clients about BNYM's pricing scheme. Indeed, BNYM stated on its website until late 2009 that its standing instruction service provided many "benefits" to its clients, including "FX execution according to best execution standards." BNYM referred clients to its website that contained these false statements, including federally insured financial institutions and their affiliates, such as Fidelity.[2] Indeed, A.J. Quitadamo, the head of BNYM Business Development for Global FX Sales, in a 2007 document reflecting his proposed "standing responses" to common client questions, directed clients to review BNYM's FX website for a description of BNYM's "FX services and offerings," which included its standing instruction program. A similar 2008 email and attachment to Jorge Rodriguez included "what we are using in RFPs to describe Global Markets" and likewise referred clients to BNYM's FX website.

42.    "Best Execution" is commonly understood to mean that the client receives the best available market price at the time that the currency trade is executed. BNYM shared this understanding of "best execution," and made representations to clients falsely promising to provide best execution.

43.    BNYM's understanding of "best execution" as providing the best rates is demonstrated in the Bank's own documents. BNYM developed Question and Answer documents to guide employees in answering client inquiries about standing instruction pricing. For example, an August 2005 Question and Answer document, of which Nichols had a copy,

---

[2]    BNYM provided standing instruction service to multiple affiliates of FMR, LLC, certain of which are/were federally insured financial institutions, including Fidelity Management Trust Company and Pyramis. In addition, BNYM has custodian agreements with Fidelity Investments Money Management, Inc., and various '40 Act Investment Companies. These various Fidelity affiliates are referred to collectively as "Fidelity."

providing a response to client inquiries about best execution states that the Bank "ensures best execution" by offering the "best rates for our clients":

> The Bank of New York ensures best execution on foreign exchange transactions through the following mechanisms:  As a major market participant, the Bank is actively engaged in making markets and taking position in numerous currencies so that we can provide the best rates for our clients.

(emphasis added).   In response to a question addressing competitiveness and timeliness of BNYM's foreign current trading in this same document, BNYM also referenced the price provided as the "best rate of the day."  These statements were knowingly false.

44.   A June 2006 Question and Answer document, of which Nichols had a copy, offered the following sample false information:

> How do you ensure custody clients consistently receive fair prices for their trades?

> Clients benefit from our attractive rates because we aggregate all client income in any given currency to obtain the "best rate of the day."  That "best rate of the day" is applied to all of the income conversions that we execute for that day, regardless of the amount.

This document was intended to provide answers to questions concerning BNYM's standing instruction service, as evidenced by its reference to "income conversions" and aggregation of all client income in any given currency, which occur in the standing instruction context.  These statements are knowingly false.  As explained above, BNYM did not provide clients the "best rate of the day."  Quite the opposite:  standing instruction clients received the worst or close to the worst rate of the day.  Nichols provided this language to other BNYM employees for circulation to standing instruction clients.  For example, in April 2006, Nichols circulated this false language to other BNYM employees to be used as the Bank's "RFP boilerplate."  Before selecting BNYM as custodian, clients would frequently send BNYM a request for proposal, soliciting information about the services the Bank offers and the attendant costs and benefits.

The language described above was standard language that BNYM would provide to prospective clients in responses to their RFPs concerning, among other things, the standing instruction service.

45.      For example, in BNYM's responses to RFPs from the New York City Retirement Systems and Certain Other New York City Funds ("NYC Retirement Funds") in October 2003, and in a proposal made to the Policemen Retirement System of the City of Detroit ("Detroit Fund") in January 2003, BNYM falsely represented:  "As a major market participant, we actively engage in making markets and taking positions in numerous currencies to obtain the best rates for our clients."  BNYM's response to the NYC Retirement Funds' RFP likewise states that "[c]lients benefit from our attractive rates because we aggregate all client income in any given currency to obtain the 'best rate of the day.'  That 'best rate of the day' is applied to all of the income conversions that we execute for that day, regardless of amount."

46.      Similarly, in a February 2006 RFP response to KeyBank National Association, a federally insured financial institution, BNYM represented that standing instruction transactions would be: "Handled and executed according to best execution, following market regulations."

47.      BNYM represented that standing instruction transactions would be handled according to best execution standards in numerous other RFP responses, including RFP responses that BNYM sent to:  the Alabama Trust Fund in March 2006; the Resilient Floor Covering Pension Fund in July 2006; Avaya, Inc. in April 2004; and Old Mutual Advisors Funds in May 2006.

48.      In an RFP response to the Ohio Police and Fireman's Association concerning, among other things, standing instruction service, BNYM represented that "Best execution encompasses a variety of services designed to maximize the proceeds of each trade."

49.     The Pension Boards for the United Church of Christ and United Church Foundation were told in an RFP response by BNYM concerning, among other things, standing instruction service in August 2004 that: "The Bank of New York ensures best execution on foreign exchange transactions through the following mechanisms: As a major market participant, BNY is actively engaged in making markets and taking positions in numerous currencies so that we can provide the best rates for our clients."  As explained above, these statements were all knowingly false.

50.     Nichols drafted the Bank's definition of best execution for the standing instruction service.  He listed as an accomplishment in his Employee Self Assessment his drafting of a "working definition" of "best execution for our standing instruction activity," as well as providing "marketing content" for the Bank's website.

51.     By September 2005, the Bank settled on a working definition describing how the Bank assists "plan sponsors and their fund managers in achieving Best Execution in foreign exchange" that was intended for dissemination to standing instruction clients, including through RFP responses.  Specifically, the Defendants explained that "[b]est execution encompasses a variety of services designed to maximize the proceeds of each trade," and that BNYM recognized the "goal of maximizing the value of the client portfolio under the particular circumstances at the time."   This definition was described by BNYM employee Jerome Descamps in a November 25, 2008 email as how the Bank "define[s] best execution."  Nichols described this definition in 2007 as the Bank's "'standard' comment regarding how we approach best execution," and confirmed to other BNYM employees in November 2008 that the definition "still stands as our statement on the subject."  This document explicitly and falsely stated, *inter alia*, that BNYM would maximize the proceeds of its clients' standings instruction transactions.

52.     BNYM and Nichols developed this fraudulent "best execution" definition specifically for dissemination to the Bank's existing and prospective standing instruction clients for purposes of persuading them that BNYM's standing instruction service would maximize the proceeds and minimize the costs associated with its clients' FX trades, when that was not actually the case.  For example, in an October 26, 2009, internal email circulating the definition, Nichols stated:  "As discussed this morning, here are background materials developed over the past couple of years to address questions about the value of standing instruction execution."

53.     Nichols explained in this definition of best execution that the Bank's "goal" was "maximizing the value of the client portfolio under the particular circumstances at the time," which was taken from the "industry standard definition[] of 'best execution.'"  In drafting the Bank's definition of best execution in May 2005, Nichols also invoked the Securities and Exchange Commission's statement that "best execution is trading 'in such a manner that the client's total cost or proceeds in each transaction is the most favorable under the circumstances,'" as well as the Association for Investment Management and Research's definition of best execution as "well informed trade execution decisions made with the intent of maximising [sic] the value of the client portfolio under the particular circumstances at the time." Accordingly, Nichols and the Bank knew that there was an industry definition of best execution, and that this definition required maximizing the value their clients were to receive from standing instruction transactions.

54.     BNYM failed to give its standing instruction clients best execution by this definition, in direct contradiction of representations Defendants made to BNYM's clients.  To the contrary, BNYM routinely and as a matter of practice gave its standing instruction clients the worst or virtually the worst possible interbank rate available during the trading day, thereby minimizing rather than maximizing its clients' proceeds from the transactions.

55.     BNYM and Nichols also falsely represented in the "working definition" of best execution disseminated to standing instruction clients that the Bank was assisting investment managers in discharging their fiduciary obligations to their clients by maximizing the proceeds of each trade:  "Understanding the fiduciary role of the fund manager, it is our goal to provide best execution for all foreign exchange executed in support of our clients' transactions."  BNYM was in fact doing precisely the opposite -- obtaining the best rate available for itself, and assigning less favorable prices for its clients to maximize its revenue.

56.     Nichols and other BNYM employees frequently made Nichols' definition of best execution available to clients who inquired about it, including federally insured financial institutions.  For example, in 2009, U.S. Bank, N.A. ("U.S. Bank"), which is a federally insured financial institution, asked BNYM to provide "additional information to more explicitly define 'best execution.'"  BNYM sent U.S. Bank in 2009 the definition of "best execution" that Nichols prepared containing these false representations about BNYM's standing instruction service.  As discussed *infra* in paragraphs 117-122, these same false statements were likewise provided to T. Rowe Price Associates ("T. Rowe Price").

57.     BNYM and Nichols intended for the false statements about providing "best execution" to standing instruction clients to be disseminated as widely as possible.  For example, Nichols sent Global Finance magazine these same false statements in response to an annual survey of foreign exchange banks in an effort to further disseminate BNYM's false representations about its standing instruction service.  BNYM represented to the magazine that "it is our goal to provide best execution for all foreign exchange executed in support of our clients' transactions."   BNYM further falsely represented to the magazine, *inter alia*: "Understanding the fiduciary role of the fund manager, it is our goal to provide best execution for all foreign exchange executed in support of our clients' transactions;" "we price foreign

exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange;" and that "[b]est execution encompasses a variety of services designed to maximize the proceeds of each trade, while containing inherent risks and the total cost of processing."

58.     BNYM and Nichols knew that BNYM was not providing "best execution" to its standing instruction clients and that BNYM's actual pricing practice was to provide the worst or next-to-worst rates of the day.  BNYM and Nichols also knew that offering best execution would reduce BNYM's standing instruction revenues.  For example, in November 2008, the Bank prepared a document analyzing the "channel mix" of foreign currency transactions.  The channel mix referred to the different modes of foreign currency trading conducted by BNYM, including standing instruction transactions, trades conducted over the phone, and trades conducted through an e-commerce platform.  BNYM observed that "[m]argins have declined across all channels of distribution," due to among other reasons, "[e]fforts to achieve 'best execution," as well as "[g]eneral demands for price transparency."   In order to generate and maintain standing instruction revenues, the Bank and its officers lied to the Bank's clients about providing "best execution" and the "best rate of the day" as described in this complaint.  Numerous BNYM employees, including Nichols, received and were aware of the information in this document. Indeed, in April 2009, Nichols prepared an internal presentation containing this same language that "best execution" was reducing BNYM sales margins from standing instruction service.

59.     After the California Attorney General's lawsuit against State Street concerning its standing instruction practices was publicly disclosed in October 2009, BNYM attempted to scrub its definition of "best execution" to avoid any reference to best price or maximizing the value of the client's portfolio.   Specifically, in November 2009, Nichols authorized the following statement on best execution to be included on BNYM's website:  "We consider best execution,

as it relates to the Standing Instruction process, as providing a consistent, accurate and efficient means of facilitating pre-trade, trade and post-trade activities.  These activities include identification of trade requirements, pre-trade administration associated with regulated markets, arranging settlement, reconciling discrepancies, posting cash to accounts and reporting all relevant transaction details to investment accounting systems."  This definition of best execution simply listed the services that custodial clients would typically receive in the ordinary course of executing any foreign currency transaction with BNYM.  This revised definition contradicts the industry definition of best execution, and also contradicted BNYM's and Nichols's previous representations in connection with the Bank's standing instruction service that best execution meant maximizing the value of the clients' portfolios.

> **2)    BNYM and Nichols Falsely Represented that BNYM's Trading Desk Priced Standing Instruction Trades at the Interbank Rate Available At the Time of Execution, Suggesting that Clients Receive a Price Available at the Time of the Trade, Rather than the Worst Price Based on the Entire Range of the Day**

60.    Defendants falsely stated to customers that:  "we price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk."  Nichols included this false statement in his definition of best execution provided to standing instruction clients.  BNYM made this false representation to federally insured financial institutions and other standing instruction clients.

61.    For example, in or about March 2009, BNYM made this representation to U.S. Bank, which is a federally insured financial institution.  In addition, as set forth below, *see infra* ¶¶ 117-22, BNYM provided this language, authored by Nichols, to T. Rowe Price in November 2008.

62.    BNYM also included this misrepresentation in responses to RFPs from prospective clients.  For example, in a September 2006 response to an RFP from the Ohio Police

and Fire Pension Fund and State Teachers Retirement System, concerning among other things standing instruction, BNYM falsely represented that "we price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk."   BNYM and Nichols intended for this statement to be distributed to a much wider audience, as demonstrated by BNYM's and Nichols's inclusion of this same language in a survey submission provided to Global Finance magazine in 2007.

63.     These statements fraudulently suggested that BNYM's trading desk would be executing trades for clients at the prevailing interbank rate at the time trades were executed.  As explained above, that is not what BNYM was doing.  In truth, BNYM's trading desk was not executing trades for standing instruction clients or obtaining prices for them that reflected the interbank market at the time a trade was executed.  BNYM was simply waiting until around the end of the trading day and then assigning prices to standing instruction orders that were at or near the high or low end of the interbank range for the day, whichever was against the client. This pricing thus had nothing to do with the "time" of any trade, or when any trade was actually "executed."

64.     BNYM also told clients who inquired about the price received for a standing instruction transaction that the trade happened to occur at a time when the pricing was not favorable.   These representations were false, as timing had nothing to do with the pricing of BNYM's standing instruction trades.

65.     These statements were false and intentionally designed to mislead customers into thinking that they would be receiving the best available rate at the time the trade was executed, when this was not the case.  All of this was done to generate and maintain BNYM's standing instruction revenue.

### 3) BNYM Fraudulently Represented That Its Standing Instruction Service Was "Free of Charge" and Would "Minimize" Clients' Costs

66.     BNYM also falsely described its standing instruction service, both on its website and in responses to RFPs, as "free of charge" and that it would "minimize" clients' costs.

67.     Until late 2009, BNYM falsely described the standing instruction service on its website as:  "simple, flexible, and complete service that automates the capture of all types of custody-related foreign exchange, including securities trade settlement, income conversions, corporate actions, tax reclaims, interest postings and residual balances.  Operationally simple, free of charge and integrated with the client's activity on the various securities markets, FX standing instruction is designed to help clients minimize risks and costs related to the foreign exchange and concentrate on their core business." (emphasis added).

68.     BNYM also made this misrepresentation specifically to its federally insured financial institution clients.  For example, in February 2006 BNYM represented in a RFP response to KeyBank, a federally insured financial institution, that the standing instruction service was "free of charge" and "designed to help minimize risks and costs related to the foreign exchange."  BNYM made these same misrepresentations in RFP responses to numerous other entities, including: Memphis Light, Gas and Water Division in December 18, 2009; Alabama Trust Fund in March 2006; Resilient Floor Covering Pension Fund in July 2006; Avaya, Inc. in April 2004; Arizona State Retirement System in June of 2008, and Old Mutual Advisor Funds in May 2006.

69.     BNYM's standing instruction service was anything but free of charge.  Nor did it minimize clients' costs.  Rather, BNYM's pricing scheme enabled it to earn a substantial and undisclosed fee, namely the spreads or differences between the worst prices provided to custodial clients and the better prices that BNYM was able to obtain for itself.

70.     Indeed, Nichols confirmed in an August 1, 2006 internal email that BNYM's standing instruction was not free of charge: "We charge a premium for our services (i.e. we have the audacity to think we are entitled to a spread on every trade. How 1990's is that?)." BNYM also published an "open letter" in the New York Times and Wall Street Journal in October 2011 following the initiation of this lawsuit admitting that its standing instruction service was not free. Specifically, BNYM stated: "They [BNYM's clients] also understand that no rational institution provides global FX services, and assumes the attendant principal risks, for free."

71.     While the Bank was representing publicly that its standing instruction service was "free of charge," and that it was designed to minimize costs, Nichols revised a quotation in an article attributed to him stating that standing instruction and best execution played an important role in "controlling costs," by removing the reference to controlling costs. Explaining the reason for this deletion in a July 23, 2003 email, Nichols stated: "Under no circumstances do we want this article to appear to be all about controlling costs. That would be very counter-productive to our intent in sponsoring the Pensions Week FX supplement, as plan sponsor costs are our revenues." Although Nichols edited the quotation attributed to him in an article removing a reference to controlling costs, neither Nichols nor BNYM took steps to correct false disclosures made by the Bank in RFP responses and on BNYM's website stating that the standing instruction service "is designed to help our clients minimize risks and costs related to the foreign exchange."

72.     After State Street was sued by the California Attorney General in October 2009, BNYM instituted "Immediate changes to the Global Markets web site" on or around November 2, 2009. These changes included striking the language from the website promising clients that standing instruction was "free of charge" and that "FX standing instruction is designed to help clients minimize risks and costs related to the foreign exchange." The Bank, however, otherwise continued its deceptive pricing practices.

### 4)   BNYM Fraudulently Represented That It Offered "Netting"

73.   BNYM also has falsely stated to clients that BNYM offers "netting" of trades, although in many instances, it was not actually doing so.

74.   Until 2012, BNYM represented on its website that standing instruction clients benefited from "[a]ggregation and netting of trades based on guidelines tailored to clients needs." BNYM also directly referred clients to its website.  For example, in an email from October 2009, BNYM referred Fidelity to its "FX website."  Screen shots of the website printed by Fidelity in October 2009 specifically contain this representation regarding "[a]ggregation and netting of trades based on guidelines tailored to client needs."   As explained below, BNYM also represented that it offered netting in RFPs.  Prior to the merger of Bank of New York and Mellon Bank N.A. ("Mellon"), Mellon represented to customers in its "Foreign Exchange Procedures" that it offered "Netting," and provided that:  "Currency purchases and sales effected pursuant to these Procedures in the same currency and having the same trade and value date may be netted for pricing purposes within a customer account."

75.   Aggregation and netting of trades means that when a client executes multiple transactions requiring both the purchase and sale of a particular currency for the same value date, the transactions are aggregated and netted so that, rather than engaging in multiple separate currency trades, the client will need to buy or sell only the net amount of currency needed for all of the transactions.  Netting can result in a significant cost savings for the client.

76.   BNYM frequently did not aggregate and net trades to the benefit of its standing instruction clients who were both purchasing and selling a particular currency, in direct contradiction to its representations to clients.  Specifically, for those transactions handled by BNYM's Pittsburgh trading desk, BNYM did not perform netting.

77.     Instead of performing netting for buy and sell transactions in the same currency by the same client, BNYM priced the larger side of the transaction at or near the worst interbank price of the day, and the opposite side of the transaction at a different price at least half a percentage point apart.  For example, if a client was buying 10 euros against U.S. dollars, and selling 7 euros against U.S. dollars, BNYM would price the purchase of 10 euros against U.S. dollars – the larger leg of the transaction – at or near the worst interbank price of the day. BNYM would also price the sale of 7 euros against U.S. dollars – the smaller leg of the transaction – at least one half of one percent apart.  By contrast, if BNYM had actually netted the transactions, it would have simply used the same price for both the purchase and sale legs of the transaction, resulting in a net purchase of 3 euros against U.S. dollars.

78.     BNYM falsely represented to standing instruction clients, including federally insured financial institutions, that it offered "netting."  For example, in September 2004, the State Board of Administration of Florida received a response from BNYM predecessor Mellon Bank, N.A. (located in Pittsburgh) to its Invitation to Negotiate for global custody services on behalf of the Florida Retirement System Trust Fund ("FRSTF") representing that "[o]ur system automatically nets foreign exchanges when trades are routed to our trading desk."  An investigation undertaken on behalf of FRSTF in 2010, however, revealed that in contrast to this representation, BNYM and its predecessor actually had not been netting all of FRSTF's trades.

79.     BNYM knew that its practice of pricing buy and sell transactions in the same currency for the same client at the Pittsburgh trading desk did not constitute netting.  For example, in a February 2010 internal email, BNYM Vice President John Bundy referred to this mechanism of pricing buy and sell transactions as a "bid/offer scheme," and observed that stopping this practice "would result in some revenue loss" to the Bank.  BNYM contemplated having other trading desks of BNYM, specifically the New York and Brussels trading desks,

adopt this Pittsburgh bid/offer scheme as well.  However, one BNYM representative objected, stating that "any change from netting to a bid/offer spread will probably be met with resistance from some Bru/NY customers who expect or who have become accustomed to netting."  Thus, BNYM specifically differentiated the practice in Pittsburgh as a "bid/offer scheme," and contrasted it with other trading desks that in BNYM's view actually performed "netting."

80.     BNYM deliberately did not distinguish on its website or in RFP responses between trading performed at the Pittsburgh trading desk and the trading performed at the New York or Brussels trading desks so that it could continue to make undisclosed spreads from clients whose trades were performed at the Pittsburgh trading desk, instead claiming broadly that BNYM performed "netting."

81.     "Netting" as used by BNYM in the standing instruction context is not susceptible to different interpretations.  The plain language and industry-understood meaning of "netting" in this context means to execute a transaction for the net amount of foreign currency.  BNYM's statements such as "[o]ur system automatically nets foreign exchanges when trades are routed to our trading desk" would lead any reasonable market participant to understand that BNYM was committing to buy or sell the net amount of foreign currency on any given day.  For example, a reasonable market participant would have understood that if the client needed to buy 100,000 euros for dollars, and sell 40,000 euros for dollars, the net trade would be a purchase of 60,000 euros.  By contrast, BNYM's practice of separately buying the 100,000 euros and selling 40,000 euros at different prices, rather than executing a net trade of purchasing 60,000 euros, is not industry standard practice and does not conform to any recognized definition of netting.  Rather, this practice simply allowed BNYM to profit by affirmatively misleading its clients.

82.     The Bank did not differentiate between federally insured financial institution clients (or affiliates thereof) and other standing instruction clients in making fraudulent

misrepresentations and omissions.  Upon information and belief, many of BNYM's standing instruction clients who were legacy Mellon clients, including federally insured financial institutions and/or affiliates thereof (*e.g.*, Ameriprise and Fidelity), had standing instruction trade requests that were routed through the Pittsburgh trading desk and thus, contrary to BNYM's representations, were not actually netted.

### 5)   BNYM and Nichols Fraudulently Represented That All Standing Instruction Clients Received the Same Pricing Terms

83.   BNYM also represented that each standing instruction client would receive the same pricing terms.  For example, in attempting to demonstrate to a client why it received a particular price, John Cipriani, a BNYM Managing Director, explained in a December 18, 2009 email to BNYM's standing instruction client White Mountain Advisors:  "The rate assigned to this type of transaction is a blended rate derived by a number of market trades executed throughout the day to offset the many client trades received during the session.  This method is employed by our Brussels desk and the NY desk so that <u>all clients in our SI program are executed at the same rate</u> (We are required to do this to fulfill ERISA requirements)." (emphasis added).   As discussed below, this representation was knowingly false, as certain standing instruction clients were given more favorable pricing deals than others.

84.   BNYM made this false representation systematically.  Specifically, BNYM had a policy in place for the benefit of Employee Retirement Income Security Act ("ERISA") plans that the "terms of FX transactions with any [ERISA plan] shall not be less favorable to the [ERISA plan] than terms offered by BNY to unrelated parties in a comparable arm's length FX transaction."

85.   BNYM maintained this position in representations made to clients through emails such as the email cited above to White Mountain Advisors, as well as in BNYM's "Welcome Package," which provided information to clients and/or their investment managers about

BNYM's services, including the standing instruction service.  A form April 2007 Welcome Package specifically represented:  "The terms of FX transactions with any Plan shall not be less favorable to the Plan than terms offered by The Bank of New York to unrelated parties in a comparable arm's length FX transaction."  BNYM made exactly this representation to Fidelity, a federally insured financial institution or affiliate thereof, as part of its 2007 Welcome Package, and investment managers such as Capital Guardian in 2007, Acadian Asset Management in 2007, and Eagle Global Advisors in 2008.

86.     BNYM did not provide the same standing instruction pricing to each client as it represented in its ERISA policy and RFP responses.  Rather, when certain clients challenged the fairness of BNYM's standing instruction pricing, BNYM accommodated those clients by switching them to a benchmarking standing instruction practice.  Benchmarking involved agreeing to a specific price spread for standing instruction transactions as compared to a particular benchmark rate for any given day.

87.     For example, in response to an inquiry regarding whether there was a "standard" document on how BNYM priced standing instruction trades in 2007, BNYM failed to make such a document available and instead, Nichols stated in a July 31, 2007 internal email to BNYM Managing Director Nathalie Jamin that, "if necessary, we can put the customer on a WM benchmark pricing arrangement and then provide post trade monitoring via the WM Benchmark Report."  In addressing internally the marketing strategy of standing instruction services, BNYM expressed its intent to "[r]espond pro-actively to clients interested in 'pre-negotiating' standing instruction pricing, which [sic] preserving existing revenue from clients satisfied with current arrangements," and to develop benchmarking "tailored to meet the needs of individual clients, recognizing that 'one size does not fit all.'"  BNYM did not advertise benchmarking as an alternative pricing mechanism to all its standing instruction clients.  Rather, the Bank would

offer standing instructions with prices determined by benchmarking only when a client pressed for details about the pricing of standing instruction transactions.

88.     Indeed, Nichols specifically rejected for bankwide use an RFP response that offered benchmarking for standing instruction pricing.  Nichols wrote in January 2004, in response to reviewing a proposed RFP response addressing benchmarking for a $2.5 billion pension fund:  "[W]e do not want to make the paragraph [in the attached RFP] describing our willingness to embrace transparency and accountability through a WM benchmark pricing arrangement the standard RFP answer used bankwide.  However, in certain highly competitive cases where the prospect is a company of substantial market stature, or they are being guided by a consultant that is specifically focusing on benchmark execution, then we should express a willingness to engage the customer in discussions regarding transparency in standing instruction execution."  Nichols thus described benchmarking as a form of standing instruction trading in which the Bank would be more transparent to the customer about how it was pricing their transactions than it would be in typical standing instruction transactions where the Bank assigned the worst or next-to-worst rates of the day to the customer.  However, with full knowledge that the Bank offered benchmark pricing to certain selected clients with "substantial market stature," Nichols nevertheless represented to Fidelity, including as recently as May 2011, that "all clients receiv[e] the same spot price."  This was done intentionally to preserve BNYM's revenues generated by the more profitable and less transparent pricing scheme of standing instruction transactions.

89.     Likewise, in response to a request from standing instruction client Mars NL B.V. for more transparency in pricing, BNYM employee Kashif Darr sent an internal email that was circulated to Nichols and Cipriani among others asking for "some appropriate wording" to "prevent [the] client from asking us to benchmark their standing instruction transactions."

90.     BNYM also manipulated standing instruction pricing on its own when it thought a company was scrutinizing or might scrutinize standing instruction pricing.  For example, in 2008, after Fidelity had started doing an unusually high volume of large currency trades through standing instruction, BNYM unilaterally decided to provide Fidelity more favorable pricing, without discussing the matter with Fidelity.  Upon information and belief, this was done to prevent Fidelity from noticing and/or complaining that it was receiving such poor pricing.  Later, in 2009, when BNYM determined that Fidelity was starting to reduce the volume of its standing instruction trades, BNYM reverted to traditional standing instruction pricing.  Again, this was done without discussing the matter with Fidelity.

91.     Likewise, when investment manager BlackRock, Inc. ("BlackRock") started to look more closely at BNYM's standing instruction service, BNYM Managing Director John Murray stated in a November 11, 2009 internal email that the "worse-case [sic] scenario" would be BlackRock initiating "a full and thorough review of our FX business."  To "protect" its standing instruction business with BlackRock, Murray recommended "a proposal to introduce standard pricing for SI book."

92.     BNYM provided more favorable pricing to certain standing instruction clients.  As explained in a March 23, 2010 internal email from BNYM Executive Vice President Jorge Rodriguez, BNYM recognized that it had a subset of clients "who execute their trades via the 'standing instruction channel,' but have their business executed through a special arrangement."  The Bank thus again explicitly recognized that benchmarking was part of BNYM's standing instruction service, although it was limited to a select group of clients.  Nichols likewise observed in a March 19, 2010 internal email that there were "dozens of benchmarking agreements," and that he heard "through the grapevine that we plan to offer BlackRock a deal of 1.5 basis points for all their standing instruction business."

93.     By contrast, unlike the benchmark standing instruction pricing offered to BlackRock, A.J. Quitadamo, in a "collection of some of the more frequent responses to customer inquiries [that he had] used to date," stated that the standing instruction program "does not lend itself to 'time stamping' or 'benchmark' pricing nor do we promote it as such." This statement is directly contradicted by BNYM's practice of providing standing instruction benchmark pricing to select clients such as BlackRock.

94.     Because benchmark pricing cut into BNYM's sales margin and contradicted BNYM's representations that all standing instruction clients would receive the same price, BNYM deliberately offered benchmark pricing only to select standing instruction clients while the Bank intentionally and falsely told other standing instruction clients that all clients received the same rate. Indeed, Nichols admitted in a May 9, 2008 internal email circulated to Cipriani among others that he did not want to provide benchmark pricing to a particular pension client because "benchmark pricing limits our potential to take wider margins when intraday spreads in emerging market currencies widen."

95.     BNYM's so-called netting practices also resulted in standing instruction clients receiving different pricing terms. As explained above, standing instruction trade requests that were routed through the Pittsburgh trading desk were not netted, while those in New York were. As a result, standing instruction clients whose trades were handled by the New York trading desk received more favorable pricing. In 2007, A.J. Quitadamo advised Cipriani and Susan Pfister, who were involved in supervising the New York and Pittsburgh trading desks, respectively, that the "net pricing" practices used in New York and Pittsburgh were inconsistent and that the practices needed to be the same in order to comply with ERISA. Quitadamo was told that the practices would become consistent, but this never occurred.

6)    **BNYM Fraudulently Concealed Its Pricing Scheme From Standing Instruction Clients**

96.    Until 2011, BNYM actively concealed from its standing instruction clients that trades would be priced at or near the worst reported interbank rate of the day.

97.    The more specific information that BNYM provided to its clients about standing instruction FX pricing was incomplete and misleading.  BNYM informed standing instruction clients that the prices received for currency purchases and sales would fall within daily ranges for various currencies that BNYM published each morning at 9:30 eastern time.  Specifically, BNYM stated that standing instruction trade requests on a given day "will be executed that day with BNYM on a principal basis at rates that will not deviate by more or less than 3 percent from the relevant interbank bid [*i.e.*, purchase] or ask [*i.e.*, sale] rates and will not be less favorable to the account than the corresponding rates indicated on the Daily Schedule for that day."

98.    These representations provided effectively no information to clients about how BNYM determined prices for standing instruction transactions.  First, the representation that the price would not deviate by more or less than 3 percent from the relevant interbank bid or ask rates is, as BNYM acknowledged, an effort "to accommodate 'prohibited transaction' issues ERISA governed accounts may have."  Moreover, this 3 percent representation established only a floor and a ceiling of the price the client would receive, but did not advise the client how standing instruction prices would be determined.  Further, a 3 percent markup is so divergent from interbank pricing that this provided no benefit to the client.  Likewise, BNYM's representations that the rate would not be less favorable than the rates indicated on the Daily Schedule provided at most a floor and a ceiling for the price the client would receive.  This representation did not advise clients of how standing instruction prices would be determined. BNYM has also acknowledged that the guaranteed rates on the Daily Schedule are effectively meaningless, because the guaranteed rates of "each currency pair almost invariably exceed the

range of daily reported interbank rates for each currency pair."  *See* Memorandum of Law in Support of BNYM's Motion to Dismiss the Amended Complaint at 6 n.11.   Indeed, BNYM told investment manager Capital Group on or about March 7, 2011, that the rates on the guaranteed rate sheet were not realistic for trading, and are not useful in validating the reasonableness of rates.

99.     BNYM's representation that standing instruction prices would not deviate by more than 3 percent created the misimpression, especially when read in conjunction with BNYM's marketing materials that promised, among other things, "best execution" and that trades were "free of charge," that clients would receive the best available rate within the range, or at least would have a chance of receiving the best rate within the range at which the currency was trading during the day.  The Bank knew this was not true.

100.    After a standing instruction transaction was executed, the only pricing information clients received from BNYM was the final exchange rate obtained.  BNYM did not provide time stamps for the trades, which clients could use to verify whether they received a fair and reasonable exchange rate.  Because exchange rates fluctuate during the trading day, it is very difficult to gauge whether a rate is favorable or unfavorable without a time stamp specifying when during the day the trade was executed.  Without knowing the time of the trade, any bank client looking at a standing instruction transaction would be unable to determine if the price at which the trade was executed reflected the prevailing interbank rate.  Accordingly, a client had no way to determine if BNYM in fact executed any individual trade in a manner consistent with best execution.

101.    Until 2011, BNYM did not disclose to all standing instruction clients that, in truth, they <u>always</u> received virtually the worst possible daily reported interbank rate, regardless of when the trades are executed.  BNYM understood that if standing instruction clients knew that

this was the case, they would not do standing instruction FX business with BNYM, and intentionally delayed disclosing its pricing practices as long as possible.

102.   In addition, BNYM also lacked transparency in its reporting of standing instruction transactions.  BNYM sent monthly statements to clients providing information about foreign currency trading.  There was nothing in these written statements, however, that would indicate whether a particular transaction was executed through the standing instruction service or was a directly negotiated trade.  For example, when Capital Group in March of 2011 was discussing standing instruction transactions with BNYM, the Bank sent Capital Group a "report" that "consists of a 2010 summary / metrics type reporting by type and a Reuters High Low report."  The comparison to the Reuters rates received by Capital Group lumped together standing instruction and negotiated transactions.  Capital Group commented: "Those should not be in this as they are not the subject of conversation.  I am going to inquire as to why BNYMellon included those as to me it gives the appearance of skewing the numbers 'don't lump my trades in comp' with the standard instruction process to better your average."

103.   BNYM and its employees, including Nichols, had a duty to disclose to all standing instruction clients how pricing was determined.[3]  The Bank's revenues from standing instruction pricing were premised upon keeping its clients in the dark about how pricing was determined while at the same time providing them with false and misleading disclosures about the service and its pricing.  As explained herein, BNYM employees, including Nichols, discussed internally that providing best execution and pricing transparency would substantially reduce standing instruction profits, and routinely provided false and misleading representations to clients about standing instruction pricing, such as that the service offered "best execution," the

---

[3]   In addition, BNYM and its employees had a heightened duty of candor to certain standing instruction clients with whom the Bank shared a fiduciary relationship.

"best rate of the day," that BNYM was working to "maximize" clients' portfolios and "minimize" client costs, and that all standing instruction clients received the same pricing.

C.      **BNYM and Nichols Intentionally Misled Its Standing Instruction Customers to Maintain BNYM's Standing Instruction Revenue**

104.    BNYM's standing instruction business model was premised upon intentionally concealing its pricing scheme from clients in order to generate and maintain the Bank's substantial revenue from standing instruction transactions.

105.    As Jorge Rodriguez bluntly explained in a February 1, 2008 internal email circulated to Nichols and Richard Mahoney among others, standing instruction was extremely profitable to the Bank solely because of the lack of transparency with regard to how BNYM determined pricing, and that the profits would disappear when the client achieved full transparency:

> As we all know, Standing Instruction FX is the most profitable form of business.  It offers the traders a free intra-day option to time its currency execution in the marketplace knowing it does not have to get back to the customer immediately with the deal price.  Business of this type also allows us to take advantage of increased market volatility and wide intra-day trading ranges.  All these pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved.

106.    For years, it was BNYM's policy to withhold its pricing practices on standing instruction transactions from its clients, while at the same time touting the service as providing "best execution," and claiming that the service was "free of charge" and would "maximize" trade proceeds and "minimize costs."  BNYM believed that transparency would diminish its revenue, and profited from its deliberate failure to disclose its actual pricing practices.

107.    Rodriguez explained that when a standing instruction client converts to an e-commerce platform, "margins greatly decline as the free intra-day option feature previously enjoyed disappears."  Rodriguez went on to cite Alpine Investors as an example customer, noting that BNYM had generated revenue of approximately $12 million on business averaging a 7 basis

point margin, but that the margin had compressed to 1 basis point after Alpine switched to direct negotiation, and could compress further.

108.     Another BNYM representative, Antonio Garcia, stated in an April 11, 2008 internal email:  "In general transparency adversely impacts our revenue stream and any product to distribute fee information would hurt us many times over in reduced revenue."  John Cipriani similarly observed in an October 28, 2009 internal email circulated to A.J. Quitadamo, David Almeida, and Jorge Rodriguez, that "[o]nce pricing spreads are disclosed it will be a race to how quickly clients can work it down to zero."

109.     The Bank made substantially greater sales margin on its standing instruction transactions than any other channel of foreign currency revenue.  For example, an analysis prepared by the Bank in November 2009 demonstrates that based on the year to date, BNYM had a sales margin spread on standing instruction transactions of 22.33 basis points, as compared to only a 2.80 basis point spread on trades arranged pursuant to a telephone call, and merely a 1.18 basis point spread through the Bank's e-commerce platform.

110.     BNYM and Nichols made fraudulent misrepresentations and omissions to clients in order to protect its enormous standing instruction revenues.  Employees of BNYM, including Nichols, had an incentive to perpetuate this fraud in order to protect their own compensation, which was based, in part, on standing instruction revenues.  As discussed above, standing instruction revenues represented the lion share of BNYM's FX profits.  *See supra* ¶¶ 36-37. These revenues were included in the bonus pool for BNYM employees involved in FX, including Nichols.  Nichols understood that revenues from standing instruction impacted employee bonuses, including his own.  In a June 2004 internal email discussing a standing instruction flat fee methodology, Nichols wrote:  "This is currently our revenue and it should remain so; we all understand how the bonus pool funds."

111.     From time to time, BNYM custodial clients complained to BNYM about the pricing of particular standing instruction transactions and asked BNYM to provide time stamps for the transaction and/or explain how the transaction was priced.

112.     BNYM, however, generally did not disclose to its clients that they had received the worst interbank rate of the day with a slight modifier applied to it.  BNYM, as a matter of policy, generally would not disclose the way in which it priced standing instruction transactions or the spreads it generated.  It was not until November 2009, after the public disclosure of the lawsuit brought by the California Attorney General against State Street for similar conduct that Richard Mahoney, the Chairman BNYM's US FX Committee and head of BNYM's Global Markets and Capital Markets groups, finally allowed at least one employee to tell certain customers that BNYM "tended" to price standing instruction transactions at the margins of the daily interbank rage.

113.     Upon information and belief, in making fraudulent representations and omissions about the standing instruction service, BNYM and Nichols did not differentiate between standing instruction clients that were federally insured financial institutions (or affiliates thereof) and other standing instruction clients.  They made fraudulent representations and omissions to all manner of standing instruction clients and their investment managers.

114.     For example, as noted herein, Nichols provided false information about the standing instruction service to federally insured financial institutions, such as U.S. Bank, N.A., and other clients, such as T. Rowe Price.  *See supra* ¶ 56, *infra* ¶¶ 117-22.

115.     Further, in or around late 2005 or early 2006, when the New Jersey Department of the Treasury, Division of Investment ("New Jersey") discovered that BNYM consistently priced its trades at or near the worst price of the day, New Jersey confronted BNYM with this information, as BNYM had not previously disclosed its true pricing scheme.  In response, the

relationship manager for the Bank falsely represented that the Bank obtained a price for the trade and then took a spread on top of the price.  New Jersey complained to the Bank that it seemed as though the Bank was price gouging, particularly since New Jersey already paid a fee for all transactions pursuant to its contract with the Bank.  At a subsequent meeting with the Bank, in contrast to representations made to clients on its website, in RFP responses, and in direct communications with clients, the Bank told New Jersey that the Bank does not guarantee best execution.  The Bank then reimbursed New Jersey approximately $100,000.  Nevertheless, the Bank continued to knowingly and fraudulently misrepresent to other clients that its standing instruction service offered best execution.

116.    In July 2007, Nichols received a request from a Bank employee for a "'standard' document stating what is the Bank's policy when pricing standing instructions [that BNYM employees] can forward to customers inquiring on the margin/fee we take on them."  Nichols referred the employee to the same 2005 "Best Execution" definition described above, which contained false and misleading information about BNYM's standing instruction program.  Moreover, instead of actually disclosing pricing, Nichols stated that "[f]inally, if necessary, we can put the customer on a WM benchmark pricing arrangement and then provide post trade monitoring via the WM Benchmark Report."  In other words, instead of revealing how standing instruction pricing worked, the Bank would simply switch the customer to a different form of standing instruction pricing that was more beneficial than providing the worst rate of the day.

117.    Likewise, in November 2008, when a representative of T. Rowe Price, an investment manager for BNYM's custodial client, the Virginia Retirement System, requested that BNYM explain how it provided best execution to its clients, the representative was told "we price foreign exchange at levels generally reflecting interbank market at the time the trade is executed by the foreign exchange desk," which was patently false.

118.     Specifically, on November 20, 2008, Hope Brown of T. Rowe Price sent an email to Jennifer Goerlich of BNYM inquiring "what processes BNYM has in place to monitor trade executions" and requesting that BNYM "provide us with periodic reports to evidence that you have provided us with best execution."

119.     That same day, Goerlich forwarded Brown's request on to Jorge Rodriguez stating, "Below is an inquiry from TRowe on best execution" and asking, "Who can I go to ask to get our talking points or party line on this."   Goerlich then commented, "I'm sure the second part of their request – to give them periodic reports to evidence this – is probably not feasible – so I can tell them no on that unless you say otherwise."

120.     On November 24, 2008, having not received a response, Goerlich again emailed Rodriguez and BNYM Managing Director Robert Near, explaining that "the client . . . asked us, SSB and JPM to all respond on this and I wanted to get them a response back today if possible." Near responded that "We have 'best execution' considerations articulated" and directed her to BNYM employees William Filonuck or Marek Unger.  Filonuk referred Goerlich's request on to Nichols and Jerome Descamps, noting "I know I've seen responses that we've given in the past" and asking whether either of them had "our standard response."

121.     On November 25, 2008, Nichols forwarded BNYM's "definition of best execution" to Goerlich, noting that the statement had been prepared in 2005 and "still stands as our statement on the subject."   Indeed, Descamp commented on the same day that this "definition" had been "worked out . . . for an RFP some time ago."

122.     On November 26, 2008, Goerlich emailed this document to Brown at T. Rowe Price, with the statement "Attached is a documen[t] that defines our Best Execution Policy at BNY Mellon."  This document – entitled, "How does The Bank of New York Mellon assist plan sponsors and their fund managers in achieving Best Execution in foreign exchange?" --

contained the false and misleading statements described above (*e.g.*, "[u]nderstanding the fiduciary role of the fund manager, it is our goal to provide best execution for all foreign exchange executed in support of our clients' transactions"; "we price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk"; "[b]est execution encompasses a variety of services designed to maximize the proceeds of each trade"; "[w]e also support post-trade analysis . . . to assist the fund manager in demonstrating that the execution of each trade was consistent with the goal of maximizing the value of the client portfolio").

123. BNYM also told clients who inquired about the price received for a standing instruction transaction that the trade happened to occur at a time when the pricing was not favorable. For example, BNYM Vice President Paul Park, a trader on the Pittsburgh transaction desk, on occasion told clients that the price the client received was due to "bad timing" or the fact that the size of the transaction was small. These representations were knowingly false. As explained above, timing had nothing to do with the pricing of BNYM's standing instruction transactions. BNYM standing instruction clients received the worst interbank market rate of the day with a slight modifier, regardless of when the trade was executed. Furthermore, as explained above, BNYM would follow this procedure for large and small trades.

124. BNYM made other intentional misrepresentations to clients. For example, in March 2010, when representatives of the San Diego County Employees Retirement Association ("SDCERA") asked for time stamps, BNYM stated that time stamps were not available because BNYM's traders agreed on prices earlier in the day, but did not close the transactions until hours later. In response to inquiries from SDCERA about the extent to which BNYM marked up its currency trades, BNYM told SDCERA that BNYM charged enough to cover its transaction costs. SDCERA was told that the Bank was trying to get SDCERA a good price, and reassured

SDCERA that there was not a problem. SDCERA was also told that all standing instruction clients received the same currency pricing because of ERISA. When SDCERA confronted the Bank with its own analysis of trades using foreign currency rates on Bloomberg that showed that SDCERA was priced always near the high or low of the day, BNYM told SDCERA that SDCERA cannot compare it that way, and that Bloomberg was not definitive.

125. As stated above, these representations were false. No time stamps were available for the prices given to standing instruction clients because BNYM simply gave its clients virtually the worst interbank rate of the day, regardless of where the currency market was trading at that particular time. Furthermore, the profits BNYM reaped from standing instruction transactions at its clients' expense were far greater than BNYM's transaction costs, which BNYM knew.

126. BNYM understood that using "best execution standards" and providing pricing transparency to its clients would eliminate the enormous spreads it was able to achieve at the expense of its clients. The loss of these standing instruction revenues would also negatively impact the compensation of BNYM employees, including Nichols. To compensate for that loss of revenue, BNYM believed that it would be necessary to increase the volume of its negotiated FX business.

127. For example, Jorge Rodriguez stated in an October 15, 2009 internal email to Nichols and Mahoney among others: "Bottom line is, its [sic] volume verses quality spread business. The friendly business we have built our reputation on is undergoing considerable change with increased regulatory demands on our client to achieve 'Best Execution' and the growth in overall pricing transparency. For us to continually win, I feel we need to do a little of both recognizing that at the end of the day, it is all about profits."

128.     In an April 11, 2008 internal email from BNYM employee Antonio Garcia to Nichols among others, Garcia lamented that "[i]n general transparency adversely impacts our revenue stream and any product to distribute fee information would hurt us many times over in reduced revenue.  Nothing like a rock and a hard place."  A table attached to that email, entitled "Transparency – Top 5 Impacts," explains the various negative repercussions that would result from providing truthful pricing information to its clients.  BNYM noted, among other things, that this purported "proprietary information can be used against us in negotiations and create conflicts with clients who may be charged more"; that "Trust and Custody clients could expect to reduce their fees and we could leave $3 mil[lion] or more on the table each year"; that "Global Markets clients can further reduce their fees from 20 BPS to 1 BPS"; and that BNYM would "need to generate more business to attain [the] same fee level," and "develop further revenue sources or charge clients on a more detailed fee schedule."

129.     On October 20, 2009, the California Attorney General brought a civil fraud action in California State Court against State Street, another large custodian bank.  California alleged that State Street had charged state pension funds that were custodial clients of State Street fraudulent currency exchange rates in connection with its standing instruction service.

130.     Within hours after the State Street lawsuit was reported by Reuters on or about October 20, 2009, BNYM Managing Director William Samela emailed the Reuters report to all BNYM FX sales employees with the subject heading, "Oh No."  The same day, Robert Donelan, a former Bank employee who had left BNYM in 2008, emailed his former BNYM colleagues, including A.J. Quitadamo, an article about "[State Street] being sued by [the State of California] for raping the public pension funds w/their internal trades for umpteen years/decades now."  Donelan asked his former colleagues in the email, "Well, is the 'Game' over? . . . Time to retire after raping the custodial accounts, all 'Public Trust' money?"

131.    BNYM was immediately flooded with inquiries from custodial clients and/or their investment managers about whether BNYM was engaging in similar pricing conduct with respect to their custodial accounts.  In response to these inquiries, BNYM, in its ongoing effort to hide its pricing scheme from its clients and maintain its "quality spread business," simply referred them to BNYM's website, which provided a false, incomplete and misleading description of BNYM's standing instruction service.

132.    For example, in Fall 2009, a representative from Alaska Permanent Fund inquired of BNYM whether BNYM engaged in the same conduct as State Street and whether there were any extra fees to use BNYM's FX desk.  According to BNYM documents, BNYM provided this client a link to BNYM's website, although the only information BNYM's website offered at this time about pricing was false, incomplete and misleading.  In particular, BNYM's website at this time falsely represented that BNYM's standing instruction service afforded multiple benefits to clients, including the utilization of "best execution" standards.

133.    BNYM referred a number of other standing instruction clients, including federally insured financial institutions, to its website, which contained the false and misleading disclosures described above, including Memphis Light, Gas and Water Division in December 18, 2009, Intel Corporation in April 2009, New York Life Insurance in March 2009, and Fidelity in October 2009.

134.    On October 28, 2009, A.J. Quitadamo proposed that BNYM actually "fully disclos[e] a pricing schedule" to clients by providing "a defined [sales] margin above a benchmark."  Quitadamo explained that the "[o]bjective would be to match current overall margin on fully passive SI [standing instruction]" and that BNYM would "have to understand current volume distribution and then determine what the margin scale would have to look like to

achieve current overall margin (20 [basis points] or so)."  He went on to say that BNYM could "achieve current overall margin and be a leader in price transparency."

135.    Quitadamo's proposal, however, was not favorably received by the Bank.  For example, John Cipriani stated in an October 28, 2009 internal email that he did "NOT like" the idea of providing pricing information to clients, arguing that "[o]nce pricing spreads are disclosed it will be a race to how quickly clients can work it down to zero."

136.    BNYM did not adopt Quitadamo's proposal, determining that it was much more profitable to mislead clients about how standing instruction transactions were being priced. Indeed, BNYM observed that this was the reason why BNYM was able to earn bigger profits than its competitors, who were more transparent with clients about how transactions would be priced.  For example, in a July 21, 2010 internal email to Nichols among others discussing how BNYM has maintained the largest FX market share among custodian banks, Robert Near stated that "BNYM has been more successful in maintaining spreads in the SI [standing instruction] space compared to these peers," that "BNYM is 'late' to the transparency space," and that BNYM was "hearing from our clients that our competitors are offering time stamping and fixed spreads across all currencies."

137.    In February 2011, representatives of custodial client Prudential[4] arranged a meeting with BNYM to obtain more information about, among other things, how BNYM determined pricing for standing instruction transactions.  BNYM representatives, including Robert Near and Jennifer Goerlich, stated that the Bank purchases or sells currencies one time per day for standing instruction purposes and that if BNYM received a standing instruction trade request before 3:00 p.m., it would be priced within the range of the day.  In addition, the BNYM

---

[4]    BNYM provided standing instruction services pursuant to custodial agreements with various Prudential '40 Act Investment Companies and Prudential Insurance funds, collectively referred to as "Prudential."  During the relevant time period, these entities were affiliates of Prudential Bank & Trust, FSB, a federally insured financial institution.

representatives stated that all of BNYM's standing instruction clients receive the same pricing terms.  These representations were false and misleading.  BNYM was not purchasing or selling currencies for standing instruction clients; it was actually just assigning prices to their standing instruction transactions.  Furthermore, BNYM did not disclose the fact that standing instruction prices would be assigned prices that were at or close to the high or low interbank range for the day, whichever was against the client.  Moreover, not all standing instruction clients received the same pricing; certain standing instruction clients received benchmark pricing.   These misrepresentations and omissions were made intentionally to mislead Prudential so that it would remain a standing instruction client.  Indeed, Prudential would have looked elsewhere for foreign exchange services had BNYM been truthful.

138.    As discussed above, in February 2011, Prudential approached BNYM concerning BNYM's pricing of Prudential's standing instruction transactions.  Subsequently, BNYM and Prudential engaged in several discussions regarding the disadvantageous pricing of Prudential's standing instruction transactions.  On August 19, 2011, in BNYM's answers to requests for information submitted by Prudential, BNYM admitted to generating over $28 million in imputed revenue from Prudential's standing instruction transactions during the period January 2006 through June 2011.  In September 2011, representatives of Prudential expressed dissatisfaction with the way Prudential's standing instruction transactions had been priced.  BNYM relationship manager Nancy Walcott responded that Prudential's message had been heard loud and clear.  In April 2012, Prudential and BNYM entered into a settlement agreement to resolve issues regarding the disadvantageous standing instruction pricing provided to Prudential.  Pursuant to the settlement, BNYM repaid more than half of the revenues it generated from Prudential's standing instruction transactions.

139.    In BNYM's efforts to gain the Massachusetts Pension Reserves Investment Management Board ("PRIM") as a custodial client, BNYM submitted multiple responses to PRIM's RFP in which BNYM repeatedly and falsely described its standing instruction service as "free of charge."   BNYM also described its standing instruction service as "one of the most competitive" in the industry.   As late as February 2011, BNYM represented to PRIM that its standing instruction service provided "a valuable service at competitive prices," and a fact sheet described the program as providing "competitive rates in a transparent market."   Indeed, while BNYM was internally touting its profits from lack of transparency, it baldly asserted that the market was transparent.

140.    After the lawsuit against State Street became public, PRIM made numerous inquiries to BNYM.   In one such inquiry, in February 2011, PRIM asked BNYM to identify the "mark up" on standing instruction trades.   The Bank, in its March 2011 response to PRIM, claimed that it did not "understand" what was meant by "mark up."   However, a June 14, 2011 study commissioned by PRIM revealed that the Bank earned a spread of approximately 33 basis points on PRIM's standing instruction transactions.

**D.    BNYM Used Artificial Prices Set by Governments in Assigning Prices**

141.    BNYM also routinely took advantage of custodial clients using standing instruction trading in currencies involving regulated foreign exchange markets.   As noted above, BNYM did not begin to inform clients of the "general" method of pricing its standing instruction business until late 2009. The Bank subsequently told clients that "BNY Mellon typically derives pricing for standing instruction trades (whether processed in the U.S. or elsewhere) from the respective currency's daily pricing range for directly executed, marketable size FX transactions between financial institutions [the interbank range of the day]; we tend to price our purchases of

currencies towards the low end of this range and our sales of currencies towards the high end, regardless of trade size."

142.    This representation was intentionally false and misleading.   What BNYM concealed from standing instruction clients is that it would not use the actual interbank rates at which certain restricted currencies were trading to assign prices, but instead would use a pricing range distorted by deal rates set by foreign regulators after interbank trading had ceased, thereby allowing BNYM to achieve enormous spreads, outside of the interbank range, at the expense of its clients.   The Bank did not differentiate between federally insured financial institution clients (or affiliates thereof) and other standing instruction clients in making fraudulent misrepresentations and omissions.

143.    For example, the Central Bank of China (Taiwan) (the "Central Bank") presides over a managed float currency regime in which the Central Bank often intervenes in order to manage volatility and limit currency appreciation against the U.S. dollar.   Beginning in November 2010, the Central Bank actively intervened in its capital markets creating currency distortions that affected the open, high, and close spot rate for the U.S. dollar – New Taiwan dollar ("USD/TWD") currency pair.   BNYM fraudulently exploited these distortions to its benefit and to the detriment of its standing instruction clients.

144.    The Central Bank restricted trading in USD/TWD at the opening 15 minutes and closing 15 minutes of the trading day, effectively raising the USD/TWD spot price to an artificial high during those periods.   This created an artificial USD/TWD range for the day that grossly exceeded the range during the unrestricted portions of the trading day.

145.    On days when BNYM provided standing instruction service to buy U.S. dollars against New Taiwan dollars for its custodial clients, BNYM executed trades during the unrestricted portions of the trading day, securing a spot price for USD/TWD that was well below

the artificially high opening price and closing price of the day; however, BNYM priced these U.S. dollar purchases against New Taiwan dollars for its custodial clients at, or near, the high of the USD/TWD spot price using the artificial range of the day.  This scheme allowed BNYM to gain an extremely large spread at the expense of its clients, which BNYM pocketed for itself. BNYM intentionally concealed from its standing instruction clients that it priced their trades in regulated currencies at the margins of the artificial ranges so that it could obtain massive spreads.

146.    When Paul Park recognized the manipulation in the USD/TWD currency market, and sought guidance from management on how to accurately price the USD/TWD currency pair for standing instruction clients, John Cipriani told him to use the artificial range of the day.

147.    BNYM knowingly misled its clients regarding the issue of standing instruction pricing for the USD/TWD currency pair. When the issue was pressed by one of the Bank's clients Wellington Management Co. ("Wellington") in October 2011, BNYM representatives represented that the Bank's practice was to use an "observable range" determined by BNYM's traders in order to derive the high and low rates for the range of the day.  In an October 26, 2011 email, a Wellington employee confronted Near with the fact that the USD/TWD trades done pursuant to standing instruction for Wellington "fall between 51 bps up to 2.75% out of the published ranges from BBerg and Reuters," and continued, "[w]e acknowledge your policy as it relates to your traders determining an 'observable range,' but we don't understand how BNYM's range can be so far away from the actual market ranges."  Near responded on October, 27, 2011, "[a]s we have stated Bloomberg and Reuters are only proxies for actual market ranges.  They are not dealing systems."  The explanation that an "observable range" of Interbank prices was used to derive pricing for these USD/TWD transactions was knowingly false and misleading.

148.    The Bank's internal documents characterize the Bank as a principal selling U.S. dollars to its clients and buying New Taiwan dollars from its clients.  Likewise, these documents

characterize the standing instruction clients as purchasing U.S. dollars from BNYM and selling New Taiwan dollars to BNYM.  The Bank's clients are charged a higher price for U.S. dollars than any price within the interbank spot range of the day reported by Bloomberg. The following are some specific examples derived from internal Bank documents.

149.    On November 4, 2010, the Bank traded New Taiwan dollars for U.S. dollars with its client, the State of Wisconsin Investment Board, with a value date of November 5, 2010.  The Bank sold $12,307,958.41, and bought 377,054,306.00 New Taiwan dollars, at a deal rate of 30.6350 New Taiwan dollars per U.S. dollar.  According to the Bank's own internal records, the Bank made a sales margin of $127,869.62 on the trade, an approximate 103.9 basis point spread. Bloomberg reported that the highest spot price in the interbank range of the day was 30.4180, and the low was 30.2450.  The Central Bank closing price was 30.5900, a price higher than the highest point in the spot interbank range of the day as reported by Bloomberg.  Accordingly, for this transaction, the client paid a price for the U.S. dollar that was both beyond the spot interbank range of the day as reported by Bloomberg, and also in excess of the Central Bank's artificially inflated closing price for U.S. dollars.

150.    On November 9, 2010, the Bank traded New Taiwan dollars for U.S. dollars with its client, Lincoln Financial Group, with a value date of November 9, 2010.  The Bank sold $9,262,035.74, and bought 284,539,000.00 New Taiwan dollars, at a deal rate of 30.7210 New Taiwan dollars per U.S. dollar.  According to the Bank's own internal records, the Bank made a sales margin of $162,906.29 on the trade, an approximate 175.89 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 30.2660, and the low was 30.1360.  The Central Bank closing price was 30.6300, a price higher than the highest point in the spot interbank range of the day as reported by Bloomberg.  Accordingly, for this transaction, the client paid a price for the U.S. dollar that was both beyond the spot interbank

range of the day as reported by Bloomberg, and also in excess of the Central Bank's artificially inflated closing price for U.S. dollars.

151.    On November 26, 2010, the Bank traded New Taiwan dollars for U.S. dollars with its client, the West Virginia Investment Management Board, with a value date of November 26, 2010.  The Bank sold $12,979,691.40, and bought 399,774,495.00 New Taiwan dollars, at a deal rate of 30.8000 New Taiwan dollars per U.S. dollar.  According to the Bank's own internal records, the Bank made a sales margin of $155,662.47 on the trade, an approximate 119.93 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 30.4810, and the low was 30.3900.  The Central Bank closing price was 30.8300, a price higher than the highest point in the spot interbank range of the day as reported by Bloomberg. Accordingly, for this transaction, the client paid a price for the U.S. dollar that was beyond the spot interbank range of the day as reported by Bloomberg, and only .0300 less than the Central Bank's artificially inflated closing price.

152.    Also on November 26, 2010, the Bank traded New Taiwan dollars for U.S. dollars with its client, "EMERG MKTS TORONTO," presumably Emerging Markets Management based in Toronto, with a value date of November 26, 2010.  The Bank sold $11,789,415.58, and bought 363,114,000.00 New Taiwan dollars, at a deal rate of 30.8000 New Taiwan dollars per U.S. dollar.  According to the Bank's own internal records, the Bank made a sales margin of $141,387.77 on the trade, an approximate 119.93 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 30.4810, and the low was 30.3900. The Central Bank closing price was 30.8300, a price higher than the highest point in the spot interbank range of the day as reported by Bloomberg.  Accordingly, for this transaction, the client paid a price for the U.S. dollar that was beyond the spot interbank range of the day as

reported by Bloomberg, and only .0300 less than the Central Bank's artificially inflated closing price for U.S. dollars.

153.    On December 16, 2010, the Bank traded New Taiwan dollars for U.S. dollars with its client, the Pennsylvania Public School Employees' Retirement System, with a value date of December 16, 2010. The Bank sold $5,107,685.56, and bought 156,014,255.00 New Taiwan dollars, at a deal rate of 30.5450 New Taiwan dollars per U.S. dollar.  According to the Bank's own internal records, the Bank made a sales margin of $117,172.29 on the trade, an approximate 229 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 29.9330, and the low was 29.8180.  The Central Bank closing price was 30.5450, a price higher than the highest point in the spot interbank range of the day as reported by Bloomberg.  Accordingly, for this transaction, the client paid a price for the U.S. dollar that was beyond the spot interbank range of the day as reported by Bloomberg, and that matched the Central Bank's artificially inflated closing price for U.S. dollars.

154.    Accordingly, in exchanging their New Taiwan dollars for U.S. dollars, each of these clients was charged a higher price for U.S. dollars than any price within the interbank range of the day reported by Bloomberg.  Further, the prices charged to these clients exceeded, equaled or was slightly less than the Central Bank's artificially inflated closing price for U.S. dollars.

### E.    BNYM Gained Significant Profits from Its Fraudulent Practices

155.    From 2000 to 2011, the Bank profited substantially from its standing instruction foreign exchange service.  For example, according to internal Bank records for the top 200 clients who utilized standing instruction services, in 2007, the Bank made approximately $278,210,185 in gross sales margin; in 2008, the Bank made approximately $548,820,478; in 2009, the Bank made approximately $394,575,576; and in 2010, the Bank made approximately $317,599,549.   In total, the Bank made approximately $1.539 billion in gross sales margin from

its top 200 standing instruction clients from 2007 to 2010 alone. BNYM did not provide best execution to its clients on these transactions, including pension funds, federally insured financial institutions and other custodial clients. These clients would have received more favorable rates, and the Bank in turn would have received less in gross sales margin, if BNYM honored its representation that clients would receive best execution.

156. The Bank performed countless standing instruction transactions for clients from 2007 to 2010, and profited substantially from those transactions. For example, according to the Bank's own internal records, on October 28, 2009, the Bank traded U.S. dollar ("USD") for Canadian dollar ("CAD") with its client, Fidelity, a federally insured financial institution or an affiliate thereof, with a value date of October 28, 2009. The Bank sold CAD 15,943,509.99 for USD 14,918,602.03, at the deal rate of 1.0687 CAD per USD. The Bank's records indicate that the Bank made a sales margin of $114,971.58 on the trade, an approximate 77.07 basis point spread. Bloomberg reported that the highest spot price in the interbank range of the day was 1.0813, and the reported low was 1.0638. Accordingly, this deal was priced by the Bank very close to the worst rate of the day. If the transaction had been performed according to best execution standards, per the Bank's representations, Fidelity would have received a more favorable rate.

157. According to the Bank's own internal records, on October 23, 2008, the Bank traded euros ("EUR") for USD with its client, Prudential, an affiliate of Prudential Bank & Trust, FSB, a federally insured financial institution, with a value date of October 24, 2008. The Bank sold USD 28,235,361.16 for EUR 22,166,243.65, at the deal rate of 1.2738 USD per EUR. The Bank's records indicate that the Bank made a sales margin of $144,080.58 on the trade, an approximate 51.03 basis point spread. Bloomberg reported that the highest spot price in the interbank range of the day was 1.2935, and the reported low was 1.2728. Accordingly, this deal

was priced by the Bank very close to the worst rate of the day.  If the transaction had been performed according to best execution standards, per the Bank's representations, Prudential would have received a more favorable rate.

158.    According to the Bank's own internal records, on November 30, 2007, the Bank traded USD for Brazilian reais ("BRL") with its client, Fidelity, a federally insured financial institution or an affiliate thereof, with a value date of December 4, 2007. The Bank provided to its client BRL 26,662,000 for USD 15,059,022.87 at a deal rate of 1.7705 BRL per USD. The Bank's records indicate that the Bank made a sales margin of $201,402.36 on the trade, an approximate 133.74 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day for USD/BRL was 1.8014, and the reported low was 1.7666. Accordingly, this deal was priced by the Bank very close to the worst rate of the day.  If the transaction had been performed according to best execution standards, Fidelity would have received a more favorable rate.

159.    According to the Bank's own internal records, on October 29, 2009, the Bank traded USD for BRL with its client, Fidelity, a federally insured financial institution or an affiliate thereof, with a value date of October 28, 2009.  The Bank sold BRL 8,128,316.33 for USD 4,773,780.66 at the deal rate of 1.7027 BRL per USD.  The Bank's records indicate that the Bank made a sales margin of $109,036.71 on the trade, an approximate 228.41 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 1.7784, and the reported low was 1.7252.  The trade was done at a rate that was 130 basis points lower than the lowest reported price of the day by Bloomberg.  If the transaction had been performed according to best execution standards, per the Bank's representations, Fidelity would have received a more favorable rate.

160.    According to the Bank's own internal records, on March 18, 2008, the Bank traded British pounds ("GBP") for USD with its client, U.S. Bank, a federally insured financial institution, with a value date of March 19, 2008.  The Bank sold USD 27,315,669.46 for GBP 13,620,378.69 at the deal rate of 2.0055 USD per GBP.  The Bank's records indicate that the Bank made a sales margin of $136,203.79 on the trade, an approximate 49.86 basis point spread. Bloomberg reported that the highest spot price in the interbank range of the day was 2.0274, and the reported low was 1.9955.  Accordingly, this deal was priced by the Bank very close to the worst rate of the day.   If the transaction had been performed according to best execution standards, per the Bank's representations, U.S. Bank would have received a more favorable rate.

161.    According to the Bank's own internal records, on March 12, 2007, the Bank traded GBP for USD with its client, the Royal Bank of Scotland, an affiliate of RBS Citizens, N.A., a federally insured financial institution, with a value date of February 28, 2007.  The Bank sold USD 901,159.88 for GBP 504,992.93 at the deal rate of 1.7845 USD per GBP.  The Bank's records indicate that the Bank made a sales margin of $74,486.46 on the trade, an approximate 826.56 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 1.9434, and the reported low was 1.9252.  The trade was done at a rate that was 731 basis points below the lowest price of the day reported by Bloomberg.  If the transaction had been performed according to best execution standards, per the Bank's representations, the Royal Bank of Scotland would have received a more favorable rate.

162.    According to the Bank's own internal records, on October 10, 2008, the Bank traded USD for South Korean won ("KRW") with its client, the Royal Bank of Scotland, an affiliate of RBS Citizens, N.A., a federally insured financial institution, with a value date of October 10, 2008.   The Bank provided to its client KRW 4,637,912,194.00 for USD 3,689,227.37 at the deal rate of 1257.15 KRW per USD.  The Bank's records indicate that the

Bank made a sales margin of $347,792.08 on the trade, an approximate 942.72 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day for USD/KRW was 1457.03, and the reported low was 1224.95.  Accordingly, this deal was priced by the Bank very close to the worst rate of the day.  If the transaction had been performed according to best execution standards, per the Bank's representations, the Royal Bank of Scotland would have received a more favorable rate.

163.    According to the Bank's own internal records, on October 30, 2008, the Bank traded USD for KRW with its client, Ameriprise Financial, an affiliate of Ameriprise Bank, FSB, a federally insured financial institution, with a value date of October 30, 2008.  The Bank sold KRW 7,534,325,619.00 for USD 5,955,988.63, at the deal rate of 1265.00 KRW per USD.  The Bank's records indicate that the Bank made a sales margin of $162,581.77 on the trade, an approximate 272.97 point basis spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 1379.10, and the reported low was 1246.50.  Accordingly, this deal was priced by the Bank very close to the worst rate of the day.  If the transaction had been performed according to best execution standards, per the Bank's representations, Ameriprise Financial would have received a more favorable rate.

164.    According to the Bank's own internal records, on May 24, 2010, the Bank traded CAD for KRW with its client, SEI Investments, an affiliate of SEI Private Trust Co., a federally insured financial institution, with a value date of May 25, 2010.  The Bank sold KRW 5,228,673,102.00 for CAD 4,653,086.32 at the deal rate of 1123.7 KRW per CAD.  The Bank's records indicate that the Bank made a sales margin of $80,539.22 on the trade, an approximate 183.39 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 1157.7523, and the reported low was 1122.5269.  Accordingly, this deal was priced by the Bank very close to the worst rate of the day.  If the transaction had been performed

according to best execution standards, per the Bank's representations, SEI Investments would have received a more favorable rate.

165.    According to the Bank's own internal records, on May 19, 2010, the Bank traded EUR for USD with its client, Citigroup Inc., an affiliate of Citibank, N.A., a federally insured financial institution, with a value date of May 21, 2010.  The Bank sold USD 8,797,928.75 for EUR 7,222,665.42, at the deal rate of 1.2181 USD per EUR.  The Bank's records indicate that the Bank made a sales margin of $136,508.38 on the trade, an approximate 155.16 point basis spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 1.2424, and the reported low was 1.2144.  Accordingly, this deal was priced by the Bank very close to the worst rate of the day.  If the transaction had been performed according to best execution standards, per the Bank's representations, Citigroup would have received a more favorable rate.

166.    According to the Bank's own internal records, on May 4, 2009, the Bank traded USD for South African rand ("ZAR") with its client, Bessemer Trust Co., a federally insured financial institution, with a value date of May 11, 2009.  The Bank sold ZAR 121,881,785.97 for USD 14,737,821.76 at the deal rate of 8.27 ZAR per USD.  The Bank's records indicate that the Bank made a sales margin of $88,568.64 on the trade, an approximate 60.10 basis point spread.  This represented .60% of the USD equivalent of the trade.  Bloomberg reported that the highest spot price in the interbank range of day for USD/ZAR was 8.4405, and the low was 8.2885.  The trade was done at a rate that was 22 basis points lower than the lowest reported price of the day by Bloomberg.  If the transaction had been performed according to best execution standards, per the Bank's representations, Bessemer would have received a more favorable rate.

167.    According to the Bank's own internal records, on July 29, 2009, the Bank traded Australian dollar ("AUD") for USD with its client, Bank of America, N.A., a federally insured

financial institution, with a value date of July 14, 2009.  The Bank sold USD 4,316,815.10 for AUD 5,525,000.00 at the deal rate of .7813 USD per AUD.  The Bank's records indicate that the Bank made a sales margin of $130,809.90 on the trade, an approximate 303.02 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day for AUD/USD was .8279, and the reported low was .8126.  The trade was done at a rate outside Bloomberg's indicated range of the day, 385 basis points lower than the lowest reported price of the day by Bloomberg.  If the transaction had been performed according to best execution standards, per the Bank's representations, Bank of America would have received a more favorable rate.

168.    According to the Bank's own internal records, on June 5, 2009, the Bank traded AUD for USD with its client, Huntington National Bank, a federally insured financial institution, with a value date of June 11, 2009.  The Bank sold AUD 5,399,188.27 for USD 4,365,243.72 at the deal rate of .8085 USD per AUD.  The Bank's records indicate that the Bank made a sales margin of $82,067.66 on the trade, an approximate 188.00 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day for USD/AUD was .8123, and the reported low was .7918.  Accordingly, this deal was priced by the Bank very close to the worst rate of the day.  If the transaction had been performed according to best execution standards, per the Bank's representations, Huntington would have received a more favorable rate.

169.    According to the Bank's own internal records, on October 16, 2008, the Bank traded USD for KRW with its client, ING North America, at the time an affiliate of ING Bank, FSB, a federally-insured financial institution, with a value date of October 17, 2008.  The Bank sold USD 10,265,753.56 for KRW 14,114,384,573 at the deal rate of 1374.90 KRW per USD.  The Bank's records indicate that the Bank made a sales margin of $426,962.02 on the trade, an

approximate 415.91 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 1374.98, and the reported low was 1270.00.  Accordingly, this deal was priced by the Bank very close to the worst rate of the day.  If the transaction had been performed according to best execution standards, per the Bank's representations, ING would have received a more favorable rate.

170.   According to the Bank's own internal records, on February 21, 2007, the Bank traded AUD for USD with its client, the State of New Jersey, Department of the Treasury, Investment Division, with a value date of February 21, 2007.  The Bank sold USD 1,146,600.00 for AUD 1,575,000.00, at the deal rate of .728 USD per AUD.  The Bank's records indicate that the Bank made a sales margin of $96,075.00 on the trade, an approximate 837.91 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was .7922, and the reported low was .7854.  Accordingly, this deal was priced by the Bank at a rate outside of the Bloomberg reported range of the day.   If the transaction had been performed according to best execution standards, per the Bank's representations, the State of New Jersey, Department of the Treasury, Investment Division would have received a more favorable rate.

171.   According to the Bank's own internal records, on September 25, 2009, the Bank traded GBP for USD with its client, the State Board of Administration of Florida, with a value date of September 25, 2009.  The Bank sold USD 1,751,840.48 for GBP 1,183,676.00, at the deal rate of 1.4800 USD per GBP.  The Bank's records indicate that the Bank made a sales margin of $131,979.87 on the trade, an approximate 753.38 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 1.6067, and the reported low was 1.5918.  Accordingly, this deal was priced by the Bank at a rate outside of the Bloomberg reported range of the day.  If the transaction had been performed according to best

execution standards, per the Bank's representations, State Board of Administration of Florida would have received a more favorable rate.

172.     According to the Bank's own internal records, on May 6, 2010, the Bank traded CAD for KRW with its client, Sceptre Investment Council Ltd., with a value date of May 7, 2010.  The Bank sold CAD 555,375.01 for KRW 615,744,274.00, at the deal rate of 1,108.70 KRW per CAD.  The Bank's records indicate that the Bank made a sales margin of $127,531.79 on the trade, an approximate 2370.60 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 1113.5816, and the reported low was 1083.4589.  Accordingly, this deal was priced by the Bank very close to the worst rate of the day.  If the transaction had been performed according to best execution standards, per the Bank's representations, Sceptre Investment Council Ltd. would have received a more favorable rate.

173.     According to the Bank's own internal records, on January 7, 2009, the Bank traded USD for BRL with its client, the Virginia Retirement System, with a value date of January 9, 2009.  The Bank sold USD 7,784,833.63 for BRL 17,737,743.42, at the deal rate of 2.2785 BRL per USD.  The Bank's records indicate that the Bank made a sales margin of $151,516.90 on the trade, an approximate 194.63 basis point spread.  Bloomberg reported that the highest spot price in the interbank range of the day was 2.2785, and the reported low was 2.1697.  Accordingly, this deal was priced by the Bank at the worst rate of the day.  If the transaction had been performed according to best execution standards, per the Bank's representations, the Virginia Retirement System would have received a more favorable rate.

174.     According to the Bank's own internal records, on September 30, 2009, the Bank traded USD for TWD on behalf its client, the Iowa Public Employees' Retirement System, with a value date of September 30, 2009.  The Bank sold TWD 87,667,650.00 for USD 2,729,718.83, at the deal rate 32.116 TWD per USD.  The Bank's records indicate that the Bank made a sales

margin of $93,890.51 on the trade, an approximate 343.96 basis point spread. Bloomberg reported that the highest spot price in the interbank range of the day was 32.361, and the reported low was 32.114. Accordingly, this deal was priced by the Bank very close to the worst rate of the day. If the transaction had been performed according to best execution standards, per the Bank's representations, the Iowa Public Employees' Retirement System would have received a more favorable rate.

**F.     BNYM's Fraud Affected Federally Insured Financial Institutions, Including the Bank Itself**

175.    The knowing and intentional fraud perpetrated by BNYM and Nichols described herein has affected the custodial clients of BNYM that use standing instruction services for foreign exchange trades, including federally insured financial institutions (and/or affiliates of these institutions) as reflected in Section E, in that BNYM profited at the expense of these clients by effectively charging these clients an undisclosed fee for their foreign exchange trades. BNYM also promised these institutions best execution and best rates of the day, but instead provided them the worst interbank rates of the day to their detriment.

176.    BNYM, which is a federally insured financial institution, has also been affected by the defendants' intentionally fraudulent practices related to the Bank's standing instruction service.

177.    BNYM's fraudulent conduct has resulted in significant legal exposure, evidenced by the numerous suits[5] now pending alleging that BNYM's standing instruction service was premised on false and misleading information, which suits collectively expose BNYM, a federally insured financial institution, to billions of dollars in potential liability, ongoing and

---

[5]      Cases followed by an asterisk (*) have been consolidated into a multi-district litigation in the Southern District of New York. *See In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litig.*, 12 MD 2335 (LAK).

mounting legal expenditures, as well as immediate and ongoing reputational harm which has and could continue to affect its stock price, thus significantly affecting BNYM:

a.    *Commonwealth of Virginia v. The Bank of New York Mellon*, Case No. CL-2009-15377 (Fairfax County, VA);

b.    *The State of Florida v. The Bank of New York Mellon Corporation*, Case No. 2009 CA 4140 (Leon County, FL);

c.    *In the Matter of the Bank of New York Mellon Corporation*, Docket No. 2011-0044 (Mass. Sec. Div. Admin. Complaint);

d.    *The State of New York v. The Bank of New York Mellon Corporation*, Index No: 09/114735 (N.Y. County, NY);

e.    *Southeastern Pennsylvania Transportation Authority v. The Bank of New York Mellon Corporation*, 11 Civ. 1628 (E.D. Pa.)*;

f.    *International Union of Operating Engineers, Stationary Engineers Local 39 Pension Trust Fund v. The Bank of New York Mellon Corporation, et al.*, 11 Civ. 3620 (N.D. Cal.)*;

g.    *In re Bank of New York Mellon Corporation False Claims Act Foreign Exchange Litigation v. Bank of New York Mellon Corporation*, 11 Civ. 5683 (N.D. Cal.)*.

h.    *Zucker v. Hassell, et al.*, Index No. 112133/2011 (N.Y. County, N.Y.);

i.    *Sansano v. The Bank of New York Mellon Corporation, et al.*, 11 Civ. 1412 (W.D. Pa.)*;

j.    *Terrazas v. The Bank of New York Mellon Corporation, et al.*, 11 Civ. 1461 (W.D. Pa.)*;

k.    *Iron Workers Mid-South Pension Fund v. Hassell, et al.*, 11 Civ. 8471 (S.D.N.Y.)*;

l.    *Clark v. Hassell, et al.*, 11 Civ. 8810 (S.D.N.Y.).*

178.    BNYM's public filings confirm that the lawsuits, and BNYM's related legal exposure, have affected it.  For instance, in its 2009 10-K filed with the United States Securities and Exchange Commission, BNYM states that "[i]nvestigations by various federal and state regulatory agencies, the Department of Justice and state attorneys general, and any related

litigation, could have an adverse effect on us."  Likewise, BNYM's 2010 Annual Report notes that judgments or settlements of legal matters "could have a material effect on net income in a given period," and discloses many of the suits identified above.  The litigation described above has also negatively impacted BNYM's stock price.

179.    BNYM's fraud also affected it for the additional reason that, once uncovered, custodial clients left BNYM and/or switched to a defined spread or benchmarked pricing model, thus reducing BNYM's overall FX revenue (a majority of which was derived from standing instruction).  As a result of, *inter alia*, this reduction in FX revenue, BNYM's credit rating was recently downgraded by Moody's in March of 2012.

180.    BNYM's fraud also caused custodial clients who used the Bank's standing instruction service to become dissatisfied with BNYM's standing instruction practice and/or leave BNYM, thus further affecting BNYM.

181.    As set forth above, the Bank accomplished this scheme to defraud its custodial clients by developing and disseminating the fraudulent statements and representations alleged herein utilizing interstate mail carriers and interstate wires, including, but not limited to, emails, telephones, facsimiles, and the internet.

### CLAIMS FOR RELIEF

#### COUNT I:  FOR CIVIL PENALTIES UNDER FIRREA AGAINST BNYM

182.    The allegations in each of the foregoing paragraphs are realleged and incorporated in this paragraph by reference.

183.    For purposes of fraudulently obtaining money from its clients and for continuing its fraudulent pricing scheme in connection with it standing instruction service, from at least 2000 through 2011, BNYM unlawfully, willfully, knowingly, with deliberate ignorance of the truth, and/or recklessly executed a scheme and artifice to defraud, using interstate mail carriers

and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.  BNYM has gained substantial profits from this unlawful fraud.  For example, BNYM's estimated sales margins on standing instruction foreign exchange trades for its top 200 users of standing instruction services alone totaled more than $1.5 billion during the period 2007 through 2010.

184.    This scheme to defraud has affected numerous federally insured financial institutions for at least the last ten years.  For example, BNYM's estimated sales margin on standing instruction FX trades for its top 20 federally insured financial institutions (and/or affiliates of these institutions) totaled hundreds of millions of dollars during the period 2007 through 2010.  Moreover, BNYM is itself a federally insured financial institution, and its fraudulent scheme alleged herein has had a substantial affect on BNYM.  BNYM is subject to FIRREA penalties for the reasons set forth herein, and faces additional exposure to clients that have sued the Bank, including various states' Attorneys General on behalf of pension funds, as well as private plaintiffs.

185.    Accordingly, Defendant BNYM is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

### COUNT II:  FOR CIVIL PENALTIES UNDER FIRREA AGAINST DAVID NICHOLS

186.    The allegations in each of the foregoing paragraphs are realleged and incorporated in this paragraph by reference.

187.    Defendant David Nichols unlawfully, willfully, knowingly, with deliberate ignorance of the truth and/or recklessly devised and executed a scheme and artifice to defraud BNYM's custodial clients through BNYM's standing instruction service, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.

188.    For example, Nichols developed BNYM's fraudulent and misleading definition of "best execution," which included the misrepresentations described above.  When clients asked

the Bank the meaning of best execution, BNYM employees used the definition provided by Nichols, and were encouraged to do so by Nichols.  Nichols also participated in creating and disseminating the Bank's fraudulent RFP responses concerning best execution, which again relied on the misleading definition of best execution that he concocted.  As described above, Nichols knew, or acted with deliberate ignorance of the truth or recklessness of the fact, that his definition of best execution was false and misleading, and likewise knew, or acted with deliberate ignorance of the truth or recklessness of the fact, that BNYM did not execute standing execution transactions according to best execution.

189.    In addition, Nichols represented to BNYM clients that all standing instruction clients received the same pricing.  In fact, in one email to a client, Nichols stated with respect to standing instruction transactions in restricted currencies that "all clients receiv[e] the same spot price."  At a meeting with the same client, Nichols confirmed orally that all standing instruction clients received the same pricing.  As described above, Nichols knew that this representation was false, or acted with deliberate ignorance or reckless disregard for the truth or falsity of the information.

190.    Nichols made fraudulent statements and/or omissions in order to protect BNYM's standing instruction revenues, and in turn, his own personal compensation and career advancement, which was based in significant part on standing instruction revenues.

191.    Nichols's scheme to defraud has affected numerous federally insured financial institutions, including BNYM itself.  Nichols is subject to FIRREA penalties for the reasons set forth herein.

WHEREFORE, the United States requests judgment against Defendants as follows:

(a)    With respect to the claim for civil penalties under FIRREA, a judgment imposing civil penalties against Defendants up to the maximum amount allowed by law;

(b)    For costs of suit;

(c)    For such further relief that the Court deems just.

Dated: June 6, 2012
       New York, New York

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York

               By:   _/s/_____.
                     PIERRE G. ARMAND
                     LAWRENCE H. FOGELMAN
                     JAMES NICHOLAS BOEVING
                     Assistant United States Attorneys
                     86 Chambers Street, 3rd Floor
                     New York, New York 10007
                     Tel:      (212) 637-2724/2719/2748
                     Fax:      (212) 637-2730/2686
                     Email:    Pierre.Armand@usdoj.gov
                               Lawrence.Fogelman@usdoj.gov
                               James.N.Boeving@usdoj.gov