UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x
                     :

UNITED STATES OF AMERICA,         :

        Plaintiff,                 :     ECF Case

               - v. -           :     11 Civ. 6969 (LAK)

THE BANK OF NEW YORK MELLON and  :
DAVID NICHOLS,             :

        Defendants.           :

--------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT DAVID NICHOLS' MOTION TO DISMISS

**SHEARMAN & STERLING LLP**
Stephen Fishbein
Daniel H.R. Laguardia
599 Lexington Avenue
New York, New York  10022
Telephone:  212-848-4000
Facsimile:  646-848-7179

*Attorneys for Defendant David Nichols*

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................... 1

STATEMENT OF FACTS ...................................................................... 2

      A.    Nichols' Background ................................................... 2

      B.    BNYM's Foreign Exchange Services ........................................ 2

      C.    Definition Of Best Execution................................................. 4

      D.    Procedural History And Allegations Against Nichols .............................. 6

APPLICABLE LEGAL STANDARDS ......................................................... 7

ARGUMENT .............................................................................. 8

    I.    The Government Fails To Plead With Particularity That Nichols Made A Material Misrepresentation ............................................................. 8

      A.    Nichols' "Best Execution" Description Accurately Described BNYM's Services ........................................................... 8

      B.    Nichols Never Stated That BNYM Provided Standing Instruction Clients The "Best Rate Of The Day" ....................................... 13

      C.    Nichols' Statement That BNYM's Trades "Generally Reflect The Interbank Market At The Time The Trade Is Executed" Was Accurate .............................................................. 17

      D.    Nichols' Statement That All Standing Instruction Clients Receive The Same Pricing Terms Was Accurate ................................... 19

    II.    The Government Fails To Plead With Particularity That Nichols Made A Material Omission .................................................................. 20

    III.    The Government Fails To Plead Facts That Give Rise To A Strong Inference Of Scienter By Nichols ..................................................... 21

      A.    The Government Has Not Alleged That Nichols Had A Motive To Commit Fraud .......................................................... 21

      B.    The Government Has Not Alleged That Nichols Acted With Conscious Misbehavior Or Recklessness ................................. 23

    IV.    The Government Fails To Plead That A Federally Insured Financial Institution Was Affected By Nichols' Alleged Fraud.......................................... 27

CONCLUSION............................................................................ 28

## TABLE OF AUTHORITIES

### CASES

*Anderson v. GMAC*, 476 F. Supp. 2d 624 (N.D. Miss. 2007),
    *aff'd*, 269 Fed. App'x 452 (5th Cir. 2008)...................................................................16

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192
    (S.D.N.Y. 2004) ............................................................................................................11

*Assoc. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*,
    941 F.2d 561 (7th Cir. 1991) .....................................................................................16

*Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46 (2d Cir. 1987) .....................................23

*Bettinger v. Doueck*, 2011 WL 2419799 (S.D.N.Y. June 3, 2011)...................................8

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) .......22, 23

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002).........................................2

*Chiarella v. United States*, 445 U.S. 222, 100 S. Ct. 1108 (1980) ...............................20

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) ...............................................................................15, 16

*Cohen v. Cohen*, 773 F. Supp. 2d 373 (S.D.N.Y. 2011)..................................................7

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) .............................2

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*,
    601 F. Supp. 2d 1201 (S.D. Cal. 2009)......................................................................16

*Crofton v. Bank of Am. Home Loans*, 2011 WL 1298747
    (E.D. Mich. Mar. 31, 2011) .......................................................................................16

*Cytyc Corp. v. Neuromedical Sys., Inc.*, 12 F. Supp. 2d 296 (S.D.N.Y. 1998) .......13, 18

*DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605 (S.D.N.Y. July 27, 2009) ..........12, 15

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).................................................................................21, 23

*Green v. Hanover Direct, Inc.*, 2007 WL 4224372 (S.D.N.Y. Nov. 19, 2007),
    *aff'd*, 326 Fed. App'x 57 (2d Cir. 2009)............................................................21, 22, 23

*Haw. Ironworkers Annuity Trust Fund v. Cole*, 2011 WL 3862206
    (N.D. Ohio Sept. 1, 2011) ..........................................................................................15

*Hubbard v. Gen. Motors Corp.*, 1996 WL 274018 (S.D.N.Y. May 22, 1996)............................15

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001)..................................................21, 23, 24

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ..............................................4

*Litwin v. Am. Express Co.*, 838 F. Supp. 855 (S.D.N.Y. 1993).....................................................20

*In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87 (S.D.N.Y. 2011) ..................................12, 13

*Newman v. L.F. Rothschild, Untergerg, Towbin*, 651 F. Supp. 160 (S.D.N.Y. 1986) .................16

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    135 F.3d 266 (3d. Cir 1998)........................................................................9

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)............................................................21

*Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225 (S.D.N.Y. 2000)....................9, 18, 23

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629 (2d Cir. 1996) .....................7, 21

*Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639
    (S.D.N.Y. 2001)........................................................................17

*Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231 (S.D.N.Y. 2006).............................15

*United States v. Alkins*, 925 F.2d 541 (2d Cir. 1991) ............................................................7

*United States v. Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010),
    *aff'd*, 441 Fed. App'x 798 (2d Cir 2011)...........................................................27

*In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)..............................12

**STATUTES AND RULES**

12 U.S.C. § 1833a(c)(2)..........................................................................27

18 U.S.C. § 1341 ..........................................................................7

18 U.S.C. § 1343 ..........................................................................7

Fed. R. Civ. P. 9(b) ........................................................................1, 7, 15

Fed. R. Civ. P. 12(b)(6)........................................................................1

SEC, Exchange Act Rel. No. 34-23170, 51 Fed. Reg. 16004 (Apr. 30, 1986)..........................10

**OTHER AUTHORITIES**

Sam Y. Cross, Federal Reserve Bank of New York, THE FOREIGN EXCHANGE MARKET
   IN THE UNITED STATES 21 (1998).........................................................................................3

The Chicago Manual of Style ¶ 7.58 (15th Ed. 2003) .................................................................15

Defendant David Nichols ("Nichols") respectfully submits this memorandum of law, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, in support of his motion to dismiss the Second Amended Complaint (the "SAC" or "Complaint").[1]

## PRELIMINARY STATEMENT

David Nichols is a mid-level executive in the Global Markets Division at Bank of New York Mellon ("BNYM").  Nichols' responsibilities are largely administrative; he is neither a salesman nor a trader, and he rarely had direct contact with customers.  He is not alleged to have conceived BNYM's foreign exchange pricing practices, nor is he alleged to have determined the pricing for a single foreign exchange transaction at issue in this lawsuit.  Indeed, Nichols is not alleged to have done anything until 2004, four years after the alleged fraud began.

Why, then, is Nichols the lone individual accused of fraud in the Government's Complaint?  The answer seems to be that Nichols was the draftsman of a short written description of BNYM's foreign exchange services.  Yet the Complaint and the documents referred to therein make clear that Nichols' written statement was accurate.  In particular, the use of the phrase "best execution" was not misleading because the written statement – as well as Nichols' repeated public statements and internal communications at the Bank – made absolutely clear that "best execution" referred to a variety of services associated with foreign exchange transactions, not simply best price.  And there is no dispute that BNYM's customers were informed of the precise exchange rates at which their foreign currency transactions were processed.  Indeed, Nichols himself saw to it that customers were offered post-trade analysis disclosing the exchange rates used in customer transactions compared to an accepted industry benchmark so that customers could evaluate the prices BNYM provided.  In short, the customers

---

[1]       Nichols incorporates by reference the arguments made in Bank of New York Mellon's Memorandum of Law in Support of Its Motion to Dismiss the Second Amended Complaint dated August 6, 2012 ("BNYM Mem."). References to BNYM include both The Bank of New York Mellon and The Bank of New York.

knew exactly the services they were receiving and exactly the prices they were paying.  That is not fraud.

## STATEMENT OF FACTS

### A.   Nichols' Background

Nichols is a mid-level executive in the Global Markets Division at BNYM, which is responsible for, among other things, foreign exchange services.  (SAC ¶¶ 1, 14.)[2]  Prior to joining Global Markets, Nichols worked in unrelated divisions at BNYM, such as corporate banking and cash management, and had no prior experience with foreign exchange services.[3]

In Global Markets, Nichols was the head of the Products Management group, which was responsible for developing certain products and services offered by the Global Markets Division, such as an electronic trading platform for foreign exchange transactions.[4] Nichols is not a foreign exchange trader or salesman and rarely has direct contact with BNYM's foreign exchange clients.  Nichols is not alleged to have established BNYM's foreign exchange pricing mechanics or to have determined the pricing of any of the foreign exchange transactions at issue in this lawsuit.  In fact, Nichols is not alleged to have done anything until 2004, four years after the alleged fraud started.  (SAC ¶ 1.)

### B.   BNYM's Foreign Exchange Services

BNYM is a large custodial bank that offers a variety of foreign exchange services to its custodial clients.  (SAC ¶ 2.)  Custodial clients generally use BNYM's foreign exchange

---

[2]     *See also* Declaration of Daniel H.R. Laguardia, dated August 6, 2012, Exhibit 1 ("Ex.") at BNYM-SDNY-0437745.  The Court can consider the exhibits to the Laguardia Declaration on a motion to dismiss because the documents were incorporated by reference in the SAC, relied upon by the Government in formulating the SAC, or are public documents of which the Court can take judicial notice.  *See Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).

[3]     Ex. 1 at BNYM-SDNY-0437745.  Exhibit 1 is a copy of Nichols' "Employee Self Assessment" for the 2006 review period, which is cited in paragraph 50 of the SAC.

[4]     SAC ¶ 14; Ex. 1 at BNYM-SDNY-0437745-46 (Nichols' Employee Self-Assessment).

services so that they can buy and sell securities denominated in different currencies and convert income (*e.g.*, stock dividends) to a chosen currency.  (*Id.* ¶ 21.)  For example, when a client purchases a security in a foreign currency, BNYM will arrange to pay for the security in the foreign currency while charging the client in U.S. dollars and handling the purchase of the currency.  Such currency transactions do not occur on an exchange; they occur primarily on the over-the-counter market, *i.e.*, in bi-lateral transactions between parties.[5]

       BNYM provides foreign exchange through different arrangements, including standing instruction, negotiated, and benchmarking services.  Through BNYM's standing instruction service, "BNYM automatically provides currency exchange on an as needed basis when, for example, the client buys or sells foreign securities or receives dividends on foreign securities that are repatriated to the United States."  (SAC ¶ 2.)  In this arrangement, BNYM handles the entire foreign exchange transaction from beginning to end.[6]  Through its negotiated service, clients "contact BNYM directly and negotiate currency trades at exchange rates or prices that the parties agree upon."  (SAC ¶ 2.)  In this arrangement, clients must devote time and operational resources to complete such transactions.  Clients can also request a different pricing model known as "benchmarking", whereby clients and BNYM negotiate "a specific price spread for standing instruction transactions."  (*Id.* ¶ 86.)

       Many fund managers and asset owners choose to use BNYM's standing instruction services because they do not have the knowledge, operational infrastructure, or

---

[5]     *See generally* Sam Y. Cross, Federal Reserve Bank of New York, THE FOREIGN EXCHANGE MARKET IN THE UNITED STATES 21 (1998), *available at* http://www.newyorkfed.org/education/addpub/usfxm/chap3.pdf (hereinafter, "The Foreign Exchange Market").

[6]     SAC ¶¶ 2, 21; Ex. 2 at BNYM-SDNY-0012872-73 (Nichols' standing instruction presentation).  Exhibit 2 is an October 26, 2009 email and attachments from Nichols regarding the value of standing instruction execution and foreign exchange services, which is cited in paragraph 52 of the SAC.

personnel to negotiate and manage foreign exchange transactions.[7]  As a result, fund managers effectively outsource to BNYM the operational tasks associated with foreign exchange transactions, such as identifying the transaction requirements, executing the trade, assuring settlement, and reporting all relevant transaction details to the client accounting systems.[8]  In addition, by outsourcing to BNYM, fund managers avoid having to learn local market regulations and settlement practices in emerging market currencies, and instead rely on BNYM's expertise in this area and thereby mitigate operational risks in an environment where the failure to settle can be very costly.[9]  BNYM generally prices such transactions within the interbank range, which is a range of prices paid by banks for large transactions with other banks.  (*See* SAC ¶ 60.)[10]  Thus, by outsourcing the foreign exchange responsibilities to BNYM, fund managers shift the administrative burden and trading risk to BNYM and obtain the benefit of interbank pricing that would not always be available for their transactions.[11]

### C.   Definition Of Best Execution

During the relevant time period (2004 to 2011), BNYM faced changing market conditions and pricing pressures in the foreign exchange industry.[12]  One of Nichols' job responsibilities was to develop materials that described the value of BNYM's foreign exchange services.[13]  As part of this task, Nichols was asked to draft a description of "best execution" as an

---

[7]   Ex. 2 at BNYM-SDNY-0012873 (Nichols' standing instruction presentation).

[8]   SAC ¶ 2; Ex. 2 at BNYM-SDNY-0012872-73 (Nichols' standing instruction presentation).

[9]   Ex. 2 at BNYM-SDNY-0012873, Ex. 3 at BNYM-SDNY0250659.  Exhibit 3 is an October 11, 2007 email and attachment from Nichols regarding a 2007 survey submission to *Global Finance* magazine, which is cited in paragraphs 57 and 62 of the SAC.

[10]   The interbank market refers to the rates at which highly rated financial institutions, including BNYM, trade with other highly rated banks in bilateral transactions.  *See Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1300 (S.D. Fla. 2005).

[11]   SAC ¶ 22; Ex. 2 at BNYM-SDNY-0012872-73 (Nichols' standing instruction presentation).

[12]   Ex. 2 at BNYM-SDNY-0012876 (Nichols' foreign exchange presentation).

[13]   SAC ¶ 50; Ex. 1 at BNYM-SDNY-0437746 (Nichols' Employee Self-Assessment).

answer to the question:  "How does The Bank of New York assist plan sponsors and their fund managers in achieving Best Execution in foreign exchange?"[14]  Best execution was a term that was often used in the equities market to refer to the duty of an agent to obtain the best price for its principal, but there was no regulatory or commonly understood definition of what it meant in the foreign exchange market.[15]  Indeed, a 2007 survey of 112 investment managers who utilized foreign exchange transactions revealed a "widespread rejection of a single definition of best execution."[16]

   In this context, Nichols drafted a three-paragraph description of "best execution" for BNYM.  The statement indicated that BNYM provided its customers with comprehensive services on a global platform with a goal toward (i) limiting the risk that the client's foreign exchange transactions would fail to settle, (ii) containing the costs of processing the transactions, and (iii) maximizing the proceeds from the transactions.[17]  Nowhere did the statement promise that BNYM would obtain the lowest price available for such transactions.  To achieve the goals set forth, BNYM stated that it offered a "variety of services," including "identification of trade requirements, aggregating or netting trades, warehousing foreign exchange risk, executing trades, assuring settlement, posting cash to accounts, and reporting all relevant transaction details to investment accounting systems."[18]

---

[14] Ex. 4 at BNYM-SDNY-0179665.  Exhibit 4 is a November 25, 2008 email and attachment from Nichols regarding the definition of best execution, which is cited in paragraphs 51 and 121 of the SAC.

[15] Ex. 2 at BNYM-SDNY-0012874, 76 (Nichols' standing instruction and foreign exchange presentations), Ex. 5 at BNYM-SDNY-0207075 (best execution article).  Exhibit 5 is a July 31, 2007 email and attachments from Nichols regarding best execution and pricing, which is cited in paragraphs 51, 87, and 116 of the SAC.

[16] Ex. 5 at BNYM-SDNY-0207075 (best execution article).

[17] Ex. 4 at BNYM-SDNY-0179665 (Nichols' best execution definition).

[18] SAC ¶¶ 51, 57; Ex. 4 at BNYM-SDNY-0179665 (Nichols' best execution definition).

Nichols considered the statement to be a standard "comment regarding how we approach best execution."[19]  Nichols was careful both internally and publicly to emphasize that "best execution" referred to a value proposition – significant services at good prices.  He never claimed that BNYM provided the best price available; instead, he focused on services provided and encouraged customers to take advantage of BNYM's "post-trade analysis" to compare the price that BNYM charged to "recognized industry benchmarks."[20]  The post-trade analysis provided customers with the price they received on their transactions, the Reuters high and low of interbank prices for the same currency that day,[21] and whether the price the customer received was within the Reuters range or outside of the range.[22]  The post-trade analysis, however, did not list the margin that BNYM earned on each transaction.

### D.   Procedural History And Allegations Against Nichols

On October 4, 2011, the Government filed suit against BNYM for alleged violations of Financial Institution Reform, Recovery and Enforcement Act ("FIRREA") and sought both civil penalties and injunctive relief.  On January 13, 2011, the parties stipulated to, and the Court subsequently approved, a partial settlement and dismissal of the Government's injunctive relief claim in exchange for BNYM making certain disclosures.  On February 16, 2012, the Government filed an amended complaint against BNYM for alleged violations of FIRREA that sought civil penalties only.  On March 28, 2012, BNYM moved to dismiss the amended complaint.

---

[19]      SAC ¶ 51.

[20]      Ex. 3 at BNYM- SDNY0250659 (Nichols' *Global Finance* survey submission), Ex. 4 at BNYM-SDNY-0179665 (Nichols' best execution definition).

[21]      Reuters is an industry benchmark that provides paying customers with the high and low prices for currency pairs for each trading day.  *See* Ex. 6 at BNYM-SDNY-0200051.  Exhibit 6 is a January 13, 2004 email from Nichols regarding negotiations with a foreign exchange client, which is cited in paragraph 88 of the SAC.

[22]      SAC ¶ 102; Ex. 2 at BNYM-SDNY-0012881 (foreign exchange presentation), Ex. 5 at BNYM-SDNY-0207068 (sample Reuters high-low report).

On June 6, 2012, before responding to BNYM's motion to dismiss, the Government filed the SAC that named both BNYM and Nichols as defendants and asserted claims against BNYM and Nichols for civil penalties under FIRREA.  The Government alleges that Nichols fraudulently misled BNYM's custodial clients about BNYM's standing instruction services in violation of FIRREA.  (SAC ¶¶ 187-91.)

<u>**APPLICABLE LEGAL STANDARDS**</u>

The Government's FIRREA claim against Nichols is based on Nichols' alleged violation of the mail and wire fraud statutes.  (*Id*. ¶ 187 (citing 18 U.S.C. §§ 1341, 1343).)  "A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of the interstate mails or transmission facilities in furtherance of the scheme."  *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996) (citation omitted).  Good faith is a complete defense to mail and wire fraud.  *See United States v. Alkins*, 925 F.2d 541, 549-50 (2d Cir. 1991).

Because the Government alleges that Nichols acted fraudulently, it must specify the circumstances constituting fraud "with particularity."  Fed. R. Civ. P. 9(b).  This standard requires the Government to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Cohen v. Cohen*, 773 F. Supp. 2d 373, 382 (S.D.N.Y. 2011) (citation omitted).  In addition, the Government must provide facts that "give rise to a strong inference of fraudulent intent" on the part of the defendant.  *S.Q.K.F.C.*, 84 F.3d at 634.  To meet this demanding requirement, the Government must allege facts to show either (1) a "motive and opportunity to commit fraud" or (2) "strong circumstantial evidence of

conscious misbehavior or recklessness." *Id.* In cases "with multiple defendants, a complaint must allege a factual basis for the scienter of each defendant." *Bettinger v. Doueck*, 2011 WL 2419799, at *3 (S.D.N.Y. June 3, 2011) (citation omitted).

## ARGUMENT

The Government's FIRREA claim against Nichols should be dismissed because it fails to plead with particularity that Nichols made a material misstatement or omission and fails to allege sufficient facts to raise any inference, let alone a strong inference, of scienter.

**I.      The Government Fails To Plead With Particularity That Nichols Made A Material Misrepresentation**

The Government alleges that Nichols misled BNYM's clients by falsely representing that (1) standing instruction service was provided according to "best execution," (2) standing instruction "clients received the 'best rate of the day,'" (3) standing instruction trades were priced "at the interbank rate available at the time of execution," and (4) "all standing instruction clients received the same pricing terms." (SAC ¶ 39(a), (b), (e).) These statements cannot form the basis of a fraud claim against Nichols because they either are not materially misleading, were not made by Nichols, or are inactionable puffery.[23]

**A.      Nichols' "Best Execution" Description Accurately Described BNYM's Services**

The Government alleges that Nichols' description of "best execution" materially misled BNYM's standing instruction clients into thinking that they were receiving "the best available market price at the time that the currency trade is executed." (SAC ¶ 42; *see id.* ¶¶ 8, 10, 39.) This allegation should be rejected because it is directly contradicted by documents referenced in the SAC, misinterprets Nichols' definition of best execution, and ignores the

---

[23]      The Government does not allege that Nichols falsely represented that (i) standing instruction services were "free" or "minimized" cost or (ii) BNYM offered "netting to standing instruction clients." (SAC ¶ 39(c), (d).) Accordingly, we do not address those allegations in this motion to dismiss.

relevant context.  *See Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 241 (S.D.N.Y. 2000) (at the motion to dismiss stage, "the court need not adopt plaintiffs' subjective characterizations of documents properly before it").

      As a preliminary matter, the Government is mistaken that best execution in the foreign exchange industry is "*commonly understood* to mean that the client receives the best available market price at the time that the currency trade is executed."  (SAC ¶ 42) (emphasis added.)  Indeed, publicly available documents, and documents the Government cites in the SAC, expressly rejected the notion that there was a "commonly understood" meaning of best execution in the foreign exchange industry.  For example, *Global Investor* magazine, with the assistance of BNYM, published a survey of 112 investment managers in June 2007, which found that "there is no standard definition of best execution, with a steady three quarters of respondents rejecting the notion both this and last year."[24]

      The Government, without any support, attempts to import part of the regulatory definition of best execution that applies to U.S. registered broker-dealers trading in securities into the very different context of foreign exchange transactions.  While it may be commonly understood, based on regulations and case law, that U.S. registered broker-dealers have a duty of best execution that requires them to obtain the best available price under the circumstances for transactions in securities, *see Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 270-71 (3d Cir. 1998) (en banc), there is no similar regulatory framework or case law that defines best execution for foreign exchange transactions.  In addition, there is no justification for importing the regulatory framework because foreign exchange transactions are notably different from securities transactions.  For example, unlike securities transactions handled by broker-

---

[24]      Ex. 5 at BNYM-SDNY-00207075 (best execution article).

dealers, foreign exchange transactions are not exchange based, are negotiated between bi-lateral counterparties, and are subject to pre-trade administration requirements and difficult settlement conditions.[25]  Because of the lack of regulatory guidance and the inherent differences between securities transactions and foreign exchange transactions, the Government has no basis to use the definition of best execution that applies to U.S. broker-dealers in the unrelated context of foreign exchange.[26]

Indeed, even the SEC has recognized that the term "best execution" has different meanings in different contexts.  For example, in the context of investment advisors, SEC regulations provide that, in discharging its duty of best execution, money managers must consider not only a broker's price, but also "the full range and quality of a broker's services" including "the value of research provided as well as execution capability, commission rate, financial responsibility, and responsiveness to the money manager."  *See* SEC, Exchange Act Rel. No. 34-23170, 51 Fed. Reg. 16004 (Apr. 30, 1986).  Thus, contrary to the Government's allegations, there is no commonly understood definition of best execution.

The lack of a commonly understood definition was the reason that Nichols was asked to describe how BNYM assists fund managers in achieving "best execution" in foreign exchange.  In drafting his description, Nichols never stated that "best execution" required providing the best available market price.[27]  Instead, he stated that BNYM helped fund managers achieve best execution by providing "comprehensive foreign exchange services to meet the needs of global custody clients."[28]  Moreover, he warned customers that "[p]ricing practices vary

---

[25]     *See* The Foreign Exchange Market, *supra* fn. 5.

[26]     Ex. 5 at BNYM-SDNY-0207075 (best execution article).

[27]     SAC ¶ 51; Ex. 4 at BNYM-SDNY-0179665 (Nichols' best execution definition).

[28]     Ex. 4 at BNYM-SDNY-0179665 (Nichols' best execution definition).

depending on the nature of the transaction involved" and that "[t]rades for securities

purchase/sale, income conversion, tax events, corporate actions, redemptions and end of day

sweeps . . . all have distinct operational procedures and pricing parameters."[29]  Nichols further

explained that "pricing may be affected by such factors as trade size, market volatility or the

special handling required to support regulated and emerging market currencies."[30]  Thus, Nichols

emphasized that best execution was primarily focused on foreign exchange services and that

various factors may impact price.

        The "best execution" description Nichols drafted is consistent with Nichols'

explicit and repeated statements both internally at BNYM and externally in trade publications

that "best execution" encompasses more than price.[31]  For example, in July 2003, Nichols wrote

an article in *Pensions Week* magazine, in which he stated that "both the plan sponsor and the

custodian should understand that price is not the only consideration in achieving best execution

. . . ."[32]  In June 2007, *Global Finance* magazine published an interview with Nichols regarding

best execution, in which Nichols explained that "[w]hile price is one measure of best execution,

fund managers generally understand that lowering operating costs, assuring settlement and

maintaining control and accuracy of books and records are also important considerations."[33]

Nichols aptly noted that "the best price on a trade that does not settle is not best execution."[34]  In

October 2007, Nichols submitted BNYM's response to *Global Finance* magazine's annual

---

[29]     *Id.*

[30]     *Id.*

[31]     SAC ¶¶ 52, 57; Ex. 3 at BNYM- SDNY0250658-59 (Nichols' *Global Finance* survey submission), Ex. 2 at BNYM-SDNY-0012874 (standing instruction presentation).

[32]     Ex. 7 at 3.  Exhibit 7 is a copy of an article, dated July 28, 2003, that was written by Nichols and published in *Pensions Week* magazine.  *See In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 210 n.10 (S.D.N.Y. 2004) (considering news articles on a motion to dismiss).

[33]     Ex. 8 at 1.  Exhibit 8 is a copy of a June 2007 interview with Nichols published by *Global Finance* magazine.  *See In re AOL Time Warner*, 381 F. Supp. 2d at 210 n.10.

[34]     *Id.*

survey of foreign exchange banks and again stated: "While pricing is undeniably an important consideration in achieving best execution, assuring settlement of the trade is paramount."[35]  And in October 2009, Nichols emailed his colleagues "background material developed over the past couple of years to address questions about the value of standing instruction execution."[36]  Attached to the email was a PowerPoint presentation written by Nichols, which stated: "Best execution encompasses the entire securities settlement process, not simply the price of execution."[37]

Thus, contrary to the Government's conclusory allegation, Nichols never stated that best execution equaled lowest price and, in fact, he repeatedly emphasized internally and publicly that best execution encompassed considerations other than price.  *See In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 100 (S.D.N.Y. 2011) (granting motion to dismiss where the misstatement alleged by plaintiffs was contradicted by documents referenced in the complaint); *DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *25 (S.D.N.Y. July 27, 2009) (granting motion to dismiss where the alleged misstatement was "not supported by the documents upon which Plaintiffs rely"); *see also In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *22 (S.D.N.Y. Oct. 25, 2006) (alleged misrepresentation was immaterial as a matter of law because the subject of the alleged misstatement had already been conveyed to the market through news reports).

The Government attempts to support its interpretation by misleadingly asserting that the Defendants (including Nichols) stated that "[b]est execution encompasses a variety of services designed to *maximize the proceeds of each trade*."  (SAC ¶ 51, emphasis added.)  This

---

[35]     Ex. 3 at BNYM- SDNY0250659 (Nichols' *Global Finance* survey submission).

[36]     SAC ¶ 52; Ex. 2 at BNYM-SDNY-0012870 (Nichols' email).

[37]     Ex. 2 at BNYM-SDNY-0012874 (standing instruction presentation).

quotation, however, is part of a longer sentence, which states:  "Best execution encompasses a variety of services designed to maximize the proceeds of each trade, *while containing inherent risks and total cost of processing.*"[38]  The concluding clause the Government omitted qualifies the first part of the sentence and explains that best execution encompasses a number of different services that are designed to achieve three competing goals:  (1) limiting the inherent risks associated with foreign exchange transactions, (2) containing the total costs of processing foreign exchange transactions, and (3) maximizing the proceeds of each trade.  The statement goes on to provide a list of the services that BNYM offers its clients to achieve these competing goals.  (*Id.*)  No customer, let alone a sophisticated fund manager, would read this definition and conclude that BNYM purported to provide the lowest price available in the market at the time of the trade.  Instead, when the full definition is read as a whole and in context, it is clear that best execution encompasses a variety of services on BNYM's global platform that are intended to ensure a successful trade while limiting the costs so that proceeds can be maximized.  As a result, the Government has not met its burden of pleading with particularity that Nichols misled BNYM's customers into thinking that best execution meant best price.  *See In re Manulife*, 276 F.R.D. at 101 (granting the motion to dismiss and ruling that the alleged misstatements was not misleading when read in context); *Cytyc Corp. v. Neuromedical Sys., Inc.*, 12 F. Supp. 2d 296, 300 (S.D.N.Y. 1998) (same).

    **B.**    **Nichols Never Stated That BNYM Provided Standing Instruction Clients The "Best Rate Of The Day"**

        The Government next alleges that Nichols made a material misstatement by purportedly informing standing instruction clients that they would receive the "best rate of the day."  (SAC ¶¶ 39(a), 41, 43, 44.)  This allegation should be rejected because the Government

---

[38]    Ex. 4 at BNYM-SDNY-0179665 (Nichols' best execution definition) (emphasis added).

has not provided any facts that Nichols drafted or sent this language to any customer, and even if he did, that it is anything other than inactionable puffery.

The Government has not pleaded with particularity that Nichols "made" the purportedly false and misleading statement that BNYM's clients would receive the "best rate of the day." Instead, the Government merely asserts that "Nichols had a copy" of some documents that included that phrase. (*Id*. ¶¶ 43, 44.) Moreover, the documents cited by the Government further reinforce that Nichols did not "make" the "best rate of day" statement. For example, one of the documents reflects that, in 2005, a vice president in BNYM's marketing department sent Nichols an email with RFP questions and potential answers that included the "best rate of the day" language.[39] The vice president stated in her email: "I have worked with Global Markets to come up with these answers" and asked Nichols if he had "any thoughts/opinions on this."[40] Nichols responded by stating "[t]ry this" and attached to the email a one page document with BNYM's best execution definition (which did not say "best rate of the day").[41] Nichols' response in no way adopts the "best rate of the day" language and, in fact, encouraged his colleague to use different language that did not include the "best rate of the day" formulation.

The Government cites another document from April 2006 that included the "best rate of the day" language, but this document appears to have been initially sent to Nichols in draft form because, at the end of the document, it states: "***Dave/Bill – needs to be customized for this bid."[42] Moreover, the Government does not provide any facts that Nichols sent this draft document to a client or proposed client, or that the final version (if it was ever

---

[39] SAC ¶ 43; Ex. 9 at BNYM-SDNY-0234555-60. Exhibit 9 is an October 13, 2005 email and attachment from Nichols regarding best execution, which is cited in paragraph 43 of the SAC.

[40] Ex. 9 at BNYM-SDNY-0234555.

[41] *Id*.

[42] SAC ¶ 44; Ex. 10 at BNYM-SDNY-0236813. Exhibit 10 is an April 12, 2006 email from Nichols regarding The Bank of New York Mellon's foreign exchange services, which is cited in paragraph 44 of the SAC.

finalized) ultimately included the "best rate of the day" language.  Because the Government has

not provided any facts that Nichols "made" the "best rate of the day" statement to any of

BNYM's customers, the Government has not met its heightened burden under Rule 9(b) to plead

with particularity a material misstatement by Nichols.  *See Sofi Classic S.A. de C.V. v. Hurowitz*,

444 F. Supp. 2d 231, 248 (S.D.N.Y. 2006) (granting motion to dismiss where complaint failed to

plead with particularity that an individual defendant made the alleged misrepresentation).  *Cf.*

*Haw. Ironworkers Annuity Trust Fund v. Cole*, 2011 WL 3862206, at *4-5 (N.D. Ohio Sept. 1,

2011) (granting the motion to dismiss where the corporate executives did not have "ultimate

authority" over the alleged misstatement and therefore did not "make" the statement for purposes

of a securities fraud claim).

       Even if Nichols did make the "best rate of the day" statement (which he did not),

it still could not form the basis of a fraud claim because the statement is inactionable puffery.

"Puffing has been described as making generalized or exaggerated statements such that a

reasonable consumer would not interpret the statement as a factual claim upon which he or she

should rely."  *See Hubbard v. Gen. Motors Corp.*, 1996 WL 274018, at *6 (S.D.N.Y. May 22,

1996) (citation omitted).  As one court in this district recently noted, "[t]he allegation that the

customer was told that the broker's primary purpose was to make profits for the customer is

nothing more than the common puff of a salesman and must be looked at from the point of view

of a reasonable person . . . .  The law does not give premiums for naivete."  *DeBlasio*, 2009 WL

2242605, at *23 (citation omitted).  Similarly, the phrase "best rate of the day", which in

BNYM's documents appeared in quotation marks,[43] is classic puffery and cannot form the basis

of the Government's fraud claim against Nichols.  *See, e.g., City of Monroe Employees Ret. Sys.*

---

[43]      The use of quotations marks around a term or phrase can signify that the term or phrase is not meant to be
taken literally.  *See* The Chicago Manual of Style ¶ 7.58 (15th Ed. 2003).

*v. Bridgestone Corp.,* 399 F.3d 651, 670-71 (6th Cir. 2005) (company's representation that

products were "the best . . . in the world" was inactionable puffery); *Assoc. in Adolescent*

*Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 570-71 (7th Cir. 1991) (bank's statement

that certain investments would earn the "highest" rate of return were inactionable puffery);

*Crofton v. Bank of Am. Home Loans*, 2011 WL 1298747, at *8 (E.D. Mich. Mar. 31, 2011)

(bank's representation that it was providing "the best rate" available on mortgages was

inactionable puffing); *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 601

F. Supp. 2d 1201, 1217 (S.D. Cal. 2009) (statements by lender that its loans were the "best

available" or "ideal" were inactionable puffery); *Anderson v. GMAC*, 476 F. Supp. 2d 624, 626-

27 (N.D. Miss. 2007) (statements from a salesperson that the interest rates were the "best they

could receive" were inactionable puffery), *aff'd*, 269 Fed. App'x 452 (5th Cir. 2008); *Newman v.*

*L.F. Rothschild, Untergerg, Towbin*, 651 F. Supp. 160, 163 (S.D.N.Y. 1986) (broker's statements

that "I'm the best in the business" and "I'll make money for you" were inactionable puffery).

      Moreover, the Government's interpretation of "best rate of the day" (*i.e.*, that

BNYM would provide foreign exchange services free and would not take a margin above

BNYM's own cost) does not make any sense, when read in context.[44]  Immediately after BNYM

states that it provides the "best rate of the day," it states that "[i]n order to judge whether foreign

exchange transactions are competitive, we supply a daily range of U.S. high-low foreign

exchange rates from Reuters, enabling [the client] *to compare our rates with others in the*

*industry*."[45]  In the next sentence, BNYM encourages clients to "periodically 'shop' a particular

transaction with several institutions to *compare the rates and services offered*."[46]  If, as the

---

[44]      SAC ¶¶ 43, 44; Ex. 10 at BNYM-SDNY-0236811-12.

[45]      Ex. 10 at BNYM-SDNY-0236811-12 (emphasis added).

[46]      *Id.* at BNYM-SDNY-0236812 (emphasis added).

Government alleges, the "best rates of the day" meant that customers were receiving the absolute best available exchange rate, then there would be no need to "compare our rates with others in the industry" or to evaluate BNYM's prices at all.[47]  Thus, when the statement is read in context, as it must, the Government has not met its heightened burden of pleading with particularity that Nichols made a material misstatement regarding "best rates of the day."[48]  *See Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639, 649 (S.D.N.Y. 2001) (granting the motion to dismiss and ruling that the statement was not misleading when read in context with the sentences around it).

> C.    **Nichols' Statement That BNYM's Trades "Generally Reflect The Interbank Market At The Time The Trade Is Executed" Was Accurate**

The Government next alleges that Nichols made another material misstatement in the "best execution" definition when he stated that BNYM prices "foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk."[49]  The Government claims that this statement is misleading because BNYM did not price customers' trades "at the prevailing interbank rate at the time trades were executed." (SAC ¶ 63.)  The Government, however, improperly omits words from Nichols' statement. Nichols did not state that BNYM priced each trade at the precise moment it was executed. Nichols stated that BNYM aggregated transactions and priced the transactions "at *levels generally reflecting* the interbank market at the time the trade is executed."[50]  This statement is

---

[47]     *Id.*

[48]     The Government's interpretation of "best rate of the day" also does not make sense because in an over-the-counter market like foreign exchange that involves tens of thousands of unique bi-lateral transactions each day, it is not possible to determine the "best rate."

[49]     SAC ¶ 60; Ex. 4 at BNYM-SDNY-0179665 (Nichols' best execution definition).

[50]     Ex. 4 at BNYM-SDNY-0179665 (Nichols' best execution definition) (emphasis added).

accurate and the Government has not provided any facts that BNYM did not generally price its foreign exchange trades within the daily interbank range.

To the extent there was any confusion (which there should not have been), the next two sentences made clear that BNYM's pricing reflected the interbank range on the date of the trade and did not reflect the exact price at the exact moment of the transaction.  Specifically, Nichols stated in the definition that "[t]he vast majority of our trades will be priced within the interbank range applicable on trade date."[51]  He continued by stating that "[i]n some instances, pricing may be outside the daily range, particularly for very small trades, *because of the additional spread to cover the cost of processing and currency risk management*."[52]  Thus, when these three sentences are read as a whole and in context, it is clear that Nichols was informing clients that BNYM generally priced transactions within the interbank range on the day of the trade (not at an exact price), but that sometimes for small trades, BNYM would have to go outside of the range and charge an additional margin in order to cover the cost of processing. Because the statement is accurate, it cannot support a fraud claim against Nichols.  *See Cytyc*, 12 F. Supp. 2d at 300 (granting the motion to dismiss and finding no misrepresentation where plaintiff "distorts many of [defendant's] statements through omitting crucial text, taking statements out of context or otherwise misleadingly excerpting them"); *Reeve*, 108 F. Supp. 2d at 241 (granting the motion to dismiss where plaintiffs' description of the alleged misstatements "distort their plain meaning").

---

[51]      *Id.*

[52]      *Id.* (emphasis added).

18

**D.    Nichols' Statement That All Standing Instruction Clients Receive The Same Pricing Terms Was Accurate**

The Government next alleges that Nichols falsely represented that all standing instruction clients received the same pricing terms.  (SAC ¶¶ 39(e).)  In fact, that statement was accurate.  Like the other alleged misstatements, the Government takes Nichols' statements out of context.

The Government acknowledges that, in a standing instruction arrangement, BNYM "unilaterally determines the price its clients receive for standing instruction transactions."  (*Id*. ¶ 2.)  In this "standard" arrangement, BNYM provides customers with the same prices and those prices are typically "within the interbank range applicable on trade date."[53] Like any other business, however, BNYM's clients sometimes attempt to negotiate a better deal.[54]  If successful, BNYM no longer "unilaterally determines the price its clients receive" and the arrangement is no longer characterized as a standard standing instruction transaction.  It becomes a negotiated agreement with individualized pricing and specifications.[55]

The Government cites a number of emails in which Nichols explains this very distinction.  For example, in January 2004, Nichols explained to his colleagues that in the standing instruction arrangement, all clients receive the same price, but that "in certain highly competitive cases where the prospect is a company of substantial market stature . . . then we should express a willingness to engage the customer in discussions" about different negotiated pricing arrangements.[56]  Importantly, Nichols did not view BNYM's flexibility in negotiating special arrangements outside of its standing instruction option as something nefarious or

---

[53]    *Id.* ¶ 87; Ex. 4 at BNYM-SDNY-0179665 (Nichols' best execution definition).

[54]    SAC ¶ 88; Ex. 6 at BNYM-SDNY-0200050 (Nichols' email).

[55]    Ex. 6 at BNYM-SDNY-0200050.

[56]    *Id.* at BNYM-SDNY-0200049 (Nichols' email); SAC ¶ 88.

misleading to customers.  He viewed it positively and told his colleagues in the next sentence:

"[O]ur capabilities in this area should be marketed as a material differentiating feature of our

custody service."[57]  Because the Government has not pleaded with particularity why the

statement about "the same pricing terms" is misleading, the Government's claim against Nichols

based on this alleged misstatement should be dismissed.  *See Litwin v. Am. Express Co.*, 838 F.

Supp. 855, 859 (S.D.N.Y. 1993) (ruling that it is not fraud for a bank to provide better pricing to

certain customers who negotiate a better deal).

## II.   The Government Fails To Plead With Particularity That Nichols Made A Material Omission

Perhaps recognizing that the case against Nichols for affirmative

misrepresentations is weak, the Government emphasizes that Nichols fraudulently misled

BNYM's clients by failing to tell them the margin or spread that BNYM earned on foreign

exchange transactions.  (SAC ¶ 39(f).)  Specifically, the Government asserts that apart from

disclosure of price (about which customers were clearly informed), Nichols "had a duty to

disclose to all standing instruction clients *how pricing was determined*."  (*Id*. ¶103, emphasis

added.)  It is well established, however, that "[w]hen an allegation of fraud is based on

nondisclosure, there can be no fraud absent a duty to speak."  *Chiarella v. United States*, 445

U.S. 222, 235, 100 S. Ct. 1108, 1118 (1980).  The "duty to disclose arises when one party has

information that the other [party] is entitled to know because of a fiduciary or other similar

relation of trust and confidence between them."  *Id.* at 228, 1114 (citation omitted).  As

explained in BNYM's Memorandum in support of its motion to dismiss, the Government has not

alleged any facts from which to infer that BNYM or Nichols had a fiduciary or confidential

relationship with BNYM's standing instruction clients or a duty to disclose anything more than

---

[57]      Ex. 6 at BNYM-SDNY-0200049.

price and service.  Absent a duty, BNYM and Nichols were under no obligation to disclose the

margin that BNYM earned.  Indeed, most commercial transactions involve an undisclosed

markup.  This is not fraud.  (BNYM Mem. at 24-25.)

**III.**   **The Government Fails To Plead Facts That Give Rise To A Strong Inference Of Scienter By Nichols**

Even assuming, *arguendo*, that the Government alleged an actionable

misstatement or omission by Nichols (and it has not), the Government's claim would still fail

because the SAC contains no facts that give rise to a strong inference that Nichols had the

"motive and opportunity to commit fraud" or that he acted with "conscious misbehavior or

recklessness."  *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir.

1996).

**A.**   **The Government Has Not Alleged That Nichols Had A Motive To Commit Fraud**

To satisfy the "motive" prong, the Government must allege that Nichols

"benefitted in some concrete and personal way from the purported fraud."  *ECA & Local 134*

*IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir.

2009) (citing *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  The Government attempts

to meet this requirement by alleging, in a conclusory manner, that Nichols was motivated to

commit fraud "in order to enhance BNYM's revenue, and, in turn, his own compensation and

advancement at the Bank."  (SAC ¶ 10.)  It is well established, however, that "an allegation that

defendants were motivated by a desire to maintain or increase executive compensation is

insufficient because such a desire can be imputed to all corporate officers."  *Kalnit v. Eichler*,

264 F.3d 131, 140 (2d Cir. 2001) (citation omitted); *see also ECA*, 553 F.3d at 201 (allegations

that individual defendants inflated corporate earnings through fraudulent transactions in order to

increase their bonuses are insufficient to plead motive); *Green v. Hanover Direct, Inc.*, 2007 WL

4224372, at *4 (S.D.N.Y. Nov. 19, 2007) (allegations that corporate officers fraudulently

overstated revenue data in order to maximize year-end bonuses are insufficient to plead motive),

*aff'd*, 326 Fed. App'x 57 (2d Cir. 2009); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d

549, 561 (S.D.N.Y. 2004) (allegations that individual defendants fraudulently overstated the

company's performance because it would positively impact their compensation is insufficient to

plead motive).

   The Government attempts to support its allegations of motive by citing an email

in which Nichols discusses his department's "bonus pool."[58]  Like many other documents

involving Nichols, the Government takes this email completely out of context.  In June 2004,

Nichols was copied on an email in which his colleagues discussed a recent conference call with a

client whose business was changing significantly.[59]  The colleagues discussed potential solutions

that were raised by the client, one of which was to charge a flat fee on all trades.[60]  Nichols

responded that, if the group decided to adopt the flat fee solution, they should make sure that the

fee was credited to Global Markets rather than another department within BNYM (*i.e.*, the

"Custody" department).[61]  He concluded by stating:  "This is currently our revenue and it should

remain so; we all understand how the bonus pool funds."[62]

   This email cannot possibly support a strong inference of scienter for at least two

reasons.  First, the discussion in the email has nothing to do with standing instruction foreign

exchange transactions; it merely concerns the internal allocation of revenue within departments

---

[58]  SAC ¶ 110; Ex. 11 at BNYM-SDNY-0229088.  Exhibit 11 is a June 8, 2004 email from Nichols regarding negotiations with a foreign exchange client, which is cited paragraph 110 of the SAC.

[59]  Ex. 11 at BNYM-SDNY-0229088.

[60]  *Id.* at BNYM-SDNY-0229088-89.

[61]  *Id.* at BNYM-SDNY-0229088.

[62]  *Id.*

at BNYM.  Therefore, it cannot, as a matter of law, demonstrate that Nichols had a motive to

commit the fraud alleged by the Government in the SAC.  *See ECA*, 553 F.3d at 199 (stating that

to plead motive, the plaintiff must allege that the defendant "benefitted in some concrete and

personal way *from the purported fraud*") (emphasis added); *Kalnit*, 264 F.3d at 139 (stating that

sufficient motive allegations "entail concrete benefits that could be realized by *one or more of*

*the false statements and wrongful nondisclosures alleged*") (emphasis added).  Second, there is

nothing fraudulent about an employee wanting to make sure that his department continues to get

credit for revenue that is generated by a client.  The Government has taken a harmless email

discussion and distorted it beyond recognition.  The Court should reject the Government's

unreasonable interpretation of this document.  *See Reeve*, 108 F. Supp. 2d at 241 (granting the

motion to dismiss where plaintiffs' description of the alleged misstatements "distort their plain

meaning"); *In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 558 (granting the motion to dismiss

where the plaintiffs' selective quotations distort the meaning of the defendant's statements).

   Because the Government has not alleged any facts that Nichols benefited in any

concrete way from the alleged fraud, it has not met its burden of pleading a strong inference of

scienter on that basis.  *See ECA*, 553 F.3d at 201 (granting motion to dismiss, in part, because

allegations that defendant committed a fraud in order to increase executive compensation were

insufficient to plead motive); *Kalnit*, 264 F.3d at 139 (same); *Green*, 2007 WL 4224372, at *4

(same); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 561 (same).

  **B.**  **The Government Has Not Alleged That Nichols Acted With Conscious**
     **Misbehavior Or Recklessness**

   Where a complaint fails to allege motive, the strength of the allegations of

conscious misbehavior or recklessness "must be correspondingly greater."  *Beck v. Mfrs.*

*Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987).  To plead "conscious misbehavior or

recklessness," a plaintiff must allege "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142 (citation omitted).  The Government's allegations against Nichols do not come close to meeting this exacting standard.

First, Nichols promoted BNYM's ability to provide customers with post-trade analysis that compared BNYM's prices to recognized industry benchmarks so that fund managers could determine for themselves whether BNYM was providing competitive prices and services.  For example, in response to a question from a colleague in July 2007 about pricing, Nichols responded that "we can offer the Reuters High/Low Report to provide a degree of post trade monitoring and transparency."[63]  Nichols attached to the email an example of a "Reuters High/Low Report" that BNYM provided to another client.[64]  In the report, BNYM provided, among other things, the transaction date, currencies traded, the price that the client received, the high price and the low price as reported by Reuters for that day, and whether the client's price was outside of that range.[65]  Clients could use this information to determine whether they were receiving good prices.

Nichols highlighted this service in his definition of "best execution" and in training materials he created for BNYM employees who interfaced with custodial clients.[66]  In his definition of best execution, Nichols informed readers that "we also support post-trade analysis comparing our trade execution to recognized industry benchmarks to assist the fund

---

[63]     Ex. 5 at BNYM-SDNY-0207065 (Nichols' email).

[64]     Ex. 5 at BNYM-SDNY-0207068 (Reuters high-low report).

[65]     *Id.*

[66]     Ex. 2 at BNYM-SDNY-0012881 (Nichols' foreign exchange presentation), Ex. 4 at BNYM-SDNY-0179665 (Nichols' best execution definition).

manager in demonstrating that the execution of each trade was consistent with the goal of maximizing the value of the client portfolio under the particular circumstances at the time."[67] Similarly, in training materials he developed in January 2006, Nichols encouraged BNYM employees to offer clients the "Reuter High/Low Report [that] compares execution price to the Reuters High and Low for the relevant trading day" and highlights "[t]rades executed outside of the range of the day."[68]

Thus, based on the documents that the Government used to draft the SAC, there is a clear and unequivocal record of Nichols promoting BNYM's ability to provide clients with pricing information so that they are able to compare BNYM's prices to the market and BNYM's competitors. It simply makes no sense that, if Nichols was trying to defraud BNYM's clients, he would encourage his colleagues to provide clients with the tools to figure out the fraud. Nichols' active promotion of this service negates any inference that he consciously or recklessly misled BNYM's clients about the prices BNYM charge for its standing instruction foreign exchange services.

Second, Nichols' repeated public statements about best execution and pricing undermine the Government's allegation that Nichols intended to mislead BNYM's clients by using the phrase "best execution." For example, in a July 2003 article he wrote for *Pensions Week* magazine, Nichols stated that "both the plan sponsor and the custodian should understand that price is not the only consideration in achieving best execution, a concept that applies equally to the entire securities execution and settlement cycle."[69] Similarly, in October 2007, Nichols submitted BNYM's response to *Global Finance* magazine's annual survey of foreign exchange

---

[67]     Ex. 4 at BNYM-SDNY-0179665 (Nichols' best execution definition).

[68]     Ex. 2 at BNYM-SDNY-0012882 (Nichols' foreign exchange presentation).

[69]     Ex. 7 at 3 (Nichols' *Pensions Week* article).

banks and stated "[w]hile pricing is undeniably an important consideration in achieving best execution, assuring settlement of the trade is paramount.[70]  Likewise, in October 2009, Nichols sent his colleagues a PowerPoint presentation, in which he stated:  "Best execution encompasses the entire securities settlement process, not simply the price of execution."[71]  Given Nichols' repeated statements for more than six years that best execution encompasses more than price, the Government cannot meet its burden of pleading that Nichols consciously or recklessness misled BNYM's clients into thinking that best execution equaled lowest price.

Finally, Nichols' role at BNYM further undermines any inference that he consciously or recklessly misled clients about BNYM's foreign exchange services.  Nichols ran the Product Management group and rarely interfaced with BNYM's existing or potential clients. At most, Nichols provided advice to his colleagues about how to respond to questions from clients.[72]  The Government does not provide any facts that his colleagues actually followed his advice or that he controlled what his colleagues told BNYM's clients.  Even with the definition of best execution, on which the Government relies heavily, Nichols did not view it as the final word on the subject and encouraged his colleagues to "modify it to meet your needs."[73]  Nichols' limited interaction with BNYM's clients and his lack of control over what his colleagues told clients is inconsistent with the Government's allegation that Nichols consciously and recklessly misled BNYM's clients.

Based on the lack of any facts that Nichols had a motive to commit fraud, as well as (i) Nichols' promotion of BNYM's ability to provide post-trade analysis of its standing

---

[70]  Ex. 3 at BNYM- SDNY0250659 (Nichols' *Global Finance* survey submission).

[71]  Ex. 2 at BNYM-SDNY-0012874 (Nichols' standing instruction presentation).

[72]  Ex. 4 at BNYM-SDNY-0179660 (Nichols' email), Ex. 5 at BNYM-SDNY-0207065 (Nichols' email).

[73]  Ex. 4 at BNYM-SDNY-0179660 (Nichols' email).

instruction services, (ii) his public statements that best execution encompassed more than price, and (iii) his limited interaction with actual or prospective clients, the Court should rule the SAC fails to allege facts that give rise to a strong inference that Nichols intentionally misled BNYM's clients.  Accordingly, the Government FIRREA claim against Nichols should be dismissed with prejudice.

**IV.     The Government Fails To Plead That A Federally Insured Financial Institution Was Affected By Nichols' Alleged Fraud**

Nichols incorporates by reference BNYM's argument that BNYM cannot be the "affect[ed]" institution under § 1833a(c)(2) and that the Government failed to allege that any other institutions were "affect[ed]".  (BNYM Mem. at 10-19.)  In addition, to the extent that the affected financial institution must be the victim rather than the perpetrator of the fraud (BNYM Mem. at 10-15), this argument applies equally to Nichols who did not harm anyone.[74]

---

[74]     *United States v. Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010) is distinguishable.  In *Ohle*, the individual defendants were accused and convicted of defrauding the institution of referral fees.  *Id.* at 226 ("the referral fees scheme's object" was "to fraudulently obtain fees from Bank A"), *aff'd*, 441 Fed. App'x 798, 800 (2d Cir. 2011). Here, by contrast, the Government alleges that Nichols acted within the scope of his employment and implemented BNYM's policies.  (SAC ¶ 50.)

## <u>CONCLUSION</u>

For the reasons set forth above, the Government's FIRREA claim against Nichols should be dismissed with prejudice.

Dated:  New York, New York
        August 6, 2012

           SHEARMAN & STERLING LLP


           By:     /s/ Stephen Fishbein       
                Stephen Fishbein
                Daniel H.R. Laguardia

           599 Lexington Avenue
           New York, New York  10022
           Telephone:  212-848-4000
           Facsimile:  646-848-7179
           E-Mail:  sfishbein@shearman.com
           E-Mail:  daniel.laguardia@shearman.com

           *Attorneys for Defendant David Nichols*