**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Case No. 11 Civ. 06969 (LAK) |
| | ) |
| v. | ) ECF Case |
| | ) |
| THE BANK OF NEW YORK MELLON and | ) |
| DAVID NICHOLS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**BANK OF NEW YORK MELLON'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................... 3

      A.      BNYM's Core Custodial and Foreign Exchange Services ........................ 3

      B.      The Allegations of the Complaint .............................................................. 7

      C.      Factual Allegations that Require Dismissal of the Government's Claim ......................................................................................................... 8

STANDARD OF REVIEW ......................................................................................... 9

ARGUMENT ............................................................................................................. 10

    I.      The Complaint Fails To State a Claim Against BNYM Under FIRREA § 1833a ........................................................................................................ 10

      A.      BNYM Itself Cannot Be Both the Perpetrator of the Fraud *and* the "Affect[ed]" Institution for Purposes of FIRREA § 1833a ...................... 10

      B.      The Complaint Fails to Allege that Any Other Federally Insured Financial Institution Was Affected by BNYM's Supposed Fraud .......... 15

    II.      The SAC's Own Allegations Negate Any Scheme to Defraud ..................... 19

      A.      BNYM's Accurate Disclosure of Its Standing Instruction Prices Negates Any Scheme To Defraud ............................................................ 19

      B.      BNYM's Statements Could Not Have Misled Its Customers Into Believing that Standing Instruction Rates Were More Favorable than Negotiated Rates ............................................................................. 22

      C.      BNYM Was Under No Duty to Disclose Its Pricing Methods or Profits ...................................................................................................... 24

    III.      BNYM's Representations to Custody Customers Were Not Materially False or Misleading ................................................................................... 25

      A.      "Free of Charge" ...................................................................................... 25

      B.      FX Prices "Generally Reflecting the Interbank Market Rate" ................. 26

      C.      "Best Rate" ............................................................................................... 27

      D.      "Best Execution" ...................................................................................... 28

E.      Netting..................................................................................................... 32

F.      Same Rate .............................................................................................. 33

IV.   The Complaint Fails to Allege Facts Supporting a Strong Inference of
      Fraudulent Intent ................................................................................................ 34

CONCLUSION............................................................................................................................ 35

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*American Hosp. Ass'n v. N.L.R.B.*, 499 U.S. 606, 111 S. Ct. 1539 (1991) ...................................11

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140 (2d Cir. Dec. 19, 2011) .....................10

*Anderson v. General Motors Acceptance Corp.*, 476 F. Supp. 2d 624 (N.D. Miss. 2007),
  *aff'd*, 269 F. App'x 452 (5th Cir. 2008)................................................................................28

*Archer v. Nissan Motor Acceptance Corp.*, 550 F.3d 506 (5th Cir. 2008)..................................28

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009)...............................................2, 9, 10, 24

*Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561 (7th Cir.
  1991) ...................................................................................................................................28

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007).......................................2

*Bernstein v. Misk*, 948 F. Supp. 228 (E.D.N.Y. 1997) .................................................................15

*Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410 (S.D.N.Y. 2004)...................................22

*BISYS Sec. Litig., In re*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005)....................................................35

*Capital Mgmt. Select Fund Ltd. v. Bennett*, 670 F.3d 194 (2d Cir. 2012)..............................23, 26

*Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955 (7th Cir. 1995) ...........................................35

*Chill v. General Elec. Co.*, 101 F.3d 263 (2d Cir. 1996).............................................................35

*Compania Sud-Americana de Vapores v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp.
  411 (S.D.N.Y. 1992)......................................................................................................22, 25

*Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990 (7th Cir. 2004).............................28

*Cresswell v. Sullivan & Cromwell*, 922 F.2d 60 (2d Cir. 1990)...................................................14

*Crofton v. Bank of Am. Home Loans*, No. 11-10124, 2011 WL 1298747 (E.D. Mich. Mar.
  31, 2011) ..............................................................................................................................28

*Defer LP v Raymond James Fin., Inc.*, 654 F. Supp. 2d 204 (S.D.N.Y. 2009) ............................35

*Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301 (S.D.N.Y. 1996)...................................15

*Dolan v. United States Postal Serv.*, 546 U.S. 481, 126 S. Ct. 1252 (2006) ...............................13

*Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612 (S.D.N.Y. 2006)........................................15

*Farmer v. Countrywide Fin. Corp.*, No. SACV08-1075, 2009 WL 1530973 (C.D. Cal.
    May 18, 2009)....................................................................................................................28

*Faulkner v. Beer*, 463 F.3d 130 (2d Cir. 2006)............................................................................3

*Filler v. Hanvit Bank*, 247 F. Supp. 2d 425 (S.D.N.Y.) *vacated in part on other grounds*,
    2003 WL 21729978 (S.D.N.Y. July 25, 2003), *aff'd*, 378 F.3d 213 (2d Cir. 2004).........16

*First Nat. Bank of Chicago v. Comptroller of Currency*, 956 F.2d 1360 (7th Cir. 1992) ............18

*General Dynamics Land System, Inc. v. Cline*, 540 U.S. 581, 124 S. Ct. 1236 (2004)................12

*Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571 (2d Cir. 2006) ..............................19

*Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410 (2d Cir. 2009).....................................................32

*Hemi Group, LLC v. City of New York, N.Y.*, 130 S. Ct. 983 (2010)...........................................17

*Hunt v. Enzo Biochem, Inc.*, 471 F. Supp. 2d 390 (S.D.N.Y. 2006).........................................156

*Inventorprise, Inc. v. Target Corp.*, 09-C 2009 WL 3644076 (N.D.N.Y. Nov. 2, 2009)..............14

*Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308 (11th Cir. 2000) .....................................24

*Last Atlantis Capital LLC v. AGS Specialist Partners*, (N.D. Ill. 2010) ......................................30

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ...........................................................34

*Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ....................................5

*Litwin v. American Express Co.*, 838 F. Supp. 855 (S.D.N.Y. 1993).....................................33, 34

*Livent, Inc. Noteholders Sec. Litig., In re*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ...................6, 10

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008) ...............................35

*McCann v. Lucky Money, Inc.*, 29 Cal. Rptr. 3d 437 (Cal. Ct. App. 2005)...........................22, 26

*Mexico Money Transfer Litig., In re*, 267 F.3d 743 (7th Cir. 2001)...........................21, 22, 24, 26

*Mexico Money Transfer Litig. (W. Union & Valuta), In re*, 164 F. Supp. 2d 1002 (N.D.
    Ill. 2000), *aff'd*, 267 F.3d 743 (7th Cir. 2001) ...............................................................26

*Moore v. PaineWebber, Inc.*, 189 F.3d 165 (2d Cir. 1999) ....................................25, 34

*National Council of Young Israel v. Wolf*, 963 F. Supp. 276 (S.D.N.Y. 1997) ...........................16

*National W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 175 F. Supp. 2d 489 (S.D.N.Y. 2000) ........................................................................................25

*Naughright v. Weiss*, 826 F. Supp. 2d 676 (S.D.N.Y. 2011) .........................................25

*Nelson v. Publishers Circulation Fulfillment, Inc.*, No. 11 CIV. 1182 TPG, 2012 WL 760335 (S.D.N.Y. Mar. 7, 2012) ............................................................................28

*Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266 (3d Cir. 1998) ...............30

*Pacheco v. Serendensky*, 393 F.3d 348 (2d Cir. 2004) ..................................................2

*Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529 (2d Cir. 1999).................................24

*Procapui-Productores de Camaroes De Icapui Ltda. v. Layani*, No. 07-6627, 2008 WL 3338199 (S.D.N.Y. Jan. 11, 2008)..................................................................16

*Sanchez v. Giromex, Inc.*, No. D042459, 2004 WL 2750332 (Cal. Ct. App. Dec. 2, 2004) ..........................................................................................................22, 26

*Sanders v. Forex Capital Mkts., LLC*, No. 11-0864, 2011 WL 5980202 (S.D.N.Y. Nov. 29, 2011) ...................................................................................................30

*Segue Software, Inc. Sec. Litig., In re*, 106 F. Supp. 2d 161 (D. Mass. 2000) .............................35

*Shivangi v. Dean Witter Reynolds, Inc.*, 637 F. Supp. 1001 (S.D. Miss. 1986) *aff'd*, 825 F.2d 885 (5th Cir. 1987) .................................................................................23

*Shorrock v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 74-24, 1977 WL 1064 (D. Or. Nov. 18, 1977) ...........................................................................................23

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004) ...................35

*Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406 (2d Cir. 2008) ...........................3

*State St. Bank & Trust Co. Fixed Income Funds Inv. Litig., In re*, 774 F. Supp. 2d 584 (S.D.N.Y. 2011).....................................................................................4, 10

*Sterling Interiors Group, Inc. v. Haworth, Inc.*, No. 94-9216, 1996 WL 426379 (S.D.N.Y. July 30, 1996).....................................................................................16

*Sutton Assocs. v. LEXIS-Nexis*, 761 N.Y.S.2d 800 (App. Div. 2003) ...........................29

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008)................................................................................34, 35

*United States v. Agne*, 214 F.3d 47 (1st Cir. 2000) ........................................17

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) ...................................25

*United States v. Bank of New England, N.A.*, 821 F.2d 844 (1st Cir. 1987)................................35

*United States v. Behmanshah*, 49 F. App'x 372 (3d Cir. 2002) ....................18

*United States v. Bortnick*, No. 03-0414, 2004 WL 2752471 (E.D. Pa. Nov. 29, 2004) ...............17

*United States v. Carollo*, No. 10-654 HB, 2011 WL 3875322 (S.D.N.Y. Aug. 25, 2011) ...................................................................................................17

*United States v. Coffman*, 94 F.3d 330 (7th Cir. 1996) ................................28

*United States v. Esterman*, 135 F. Supp. 2d 917 (N.D. Ill. 2001)................18

*United States v. Grass*, 274 F. Supp. 2d 648 (M.D. Pa. 2003) ...............14, 17

*United States v. Ohle*, 441 F. App'x 798 (2d Cir. 2011) ...............................12

*United States v. Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010)........................11

*United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970)...........................20, 28

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ...............................26, 30

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ....................................20

*United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) .................................20, 21

*United States v. Ubakanma*, 215 F.3d 421 (4th Cir. 2000)............................17

*United States v. Vanoosterhout*, 898 F. Supp. 25 (D.D.C. 1995), *aff'd*, 96 F.3d 1491 (D.C. Cir. 1996) ........................................................................14

*WorldCom, Inc. Sec. Litig., In re*, 352 F. Supp. 2d 472 (S.D.N.Y. 2005) ....................................35

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2713 (2012)........................................35

*Wsol v. Fiduciary Mgmt. Assocs., Inc.*, 266 F.3d 654 (7th Cir. 2001)............................30

**Statutes, Rules**

7 U.S.C. § 2(c) ..........................................................................................................29

12 U.S.C. § 24(Seventh) .........................................................................................19

12 U.S.C. § 24a ........................................................................................................19

12 U.S.C. 92A ..........................................................................................................18

Financial Institutions Reform, Recovery and Enforcement Act of 1989,
    Pub. L. No. 101-73, 103 Stat. 183

    § 907, 103 Stat. 183, 462 ..............................................................................12

    § 961(k), 103 Stat. 183, 500 .........................................................................14

    § 961(*l*), 103 Stat. 183, 501 ...........................................................................14

    § 961(m), 103 Stat. 183, 501 ........................................................................14

    § 963(c), 103 Stat. 183, 504-05 ....................................................................14

    12 U.S.C. § 1833a .............................................................................1, 11, 12, 14

    12 U.S.C. § 1833a(b)(3)(A) ....................................................................11, 13

    12 U.S.C. § 1833a(c)(1)-(3) ..........................................................................12

    12 U.S.C. § 1833a(c)(2) ..........................................................................10, 15

18 U.S.C. § 287 ........................................................................................................13

18 U.S.C. § 982(a) .............................................................................................14, 17

18 U.S.C. § 1001 ......................................................................................................13

18 U.S.C. § 1032 ......................................................................................................13

18 U.S.C. § 1341 ................................................................................................11, 13

18 U.S.C. § 1343 ................................................................................................11, 13

18 U.S.C. § 1344 ..................................................................................................1, 11

18 U.S.C. § 3293(2) .................................................................................................11

Fed. R. Civ. P. 9(b) ..........................................................................................1, 15, 16, 17, 34

Fed. R. Civ. P. 12(b)(6)............................................................................................1

**Legislative Materials**

H.R. Rep. No. 101-54, Part I (1989), *reprinted in* 1989 U.S.C.C.A.N. 86....................................12

**Administrative Materials**

SEC, *Brokerage and Research Services*, Exchange Act Rel. No. 23,170, 51 Fed. Reg.
16,004 (Apr. 30, 1986)........................................................................................31, 32

Dep't of Labor, *Proposed Class Exemption Relating to Certain Employee Benefit Plan
Foreign Exchange Transactions*, 56 Fed. Reg. 11757-03 (Mar. 20, 1991) .......................5

**Other Authorities**

International Monetary Fund, Annual Report on Exchange Arrangements and Exchange
Restrictions (2011)................................................................................................6

Jonathan R. Macey & Maureen O'Hara, The Law and Economics of Best Execution, 6 J.
Fin. Intermediation 188 (1997) .............................................................................30

Lawrence E. Mitchell, *Structure As an Independent Variable in Assessing Stock Market
Failures,* 72 Geo. Wash. L. Rev. 547 (2004)....................................................29

*Random House Unabridged Dictionary* 33 (2d ed. 1993)............................................11

Defendant The Bank of New York Mellon ("BNYM") respectfully submits this memorandum of law in support of its motion to dismiss the Second Amended Complaint ("SAC") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

This is the Government's third complaint, filed with the benefit of BNYM's prior motion to dismiss, which identified the numerous legal and factual defects in the Government's second complaint. Yet the Government still is unable to allege facts to support a cognizable claim under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a. The Government is out of strikes; its claim should be dismissed with prejudice.

The SAC fails to state a claim for two independent reasons, each of which requires dismissal. First, the SAC fails to state a claim under FIRREA because it fails to identify any federally insured financial institution that was "affect[ed]" by BNYM's alleged conduct. The Government's principal theory – that BNYM itself is the federally insured financial institution "affect[ed]" by its own alleged misconduct – asks this Court to endorse an interpretation of FIRREA that is contrary to the statute's text, purposes, and structure, as well as the uniform interpretation of similar language in other federal statutes. The SAC's allegations that a handful of BNYM's custody customers were federally insured financial institutions are likewise insufficient because the SAC fails to allege any facts showing that BNYM's supposed fraud has actually resulted in harm to any such customer.

Second, the SAC disregards controlling Second Circuit precedent, and fails to plausibly allege a cognizable mail and wire fraud scheme that is the essential prerequisite for imposition of FIRREA penalties. To begin with, it is highly implausible that, prior to 2007, BNY and Mellon, which were then two separate competitors, engaged in a single, coordinated scheme to defraud.

The SAC contains *no* allegations as to how such coordination occurred, much less allegations to make such a scheme plausible under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009).

Moreover, the SAC's own allegations negate any plausible scheme, by acknowledging that BNYM accurately and promptly reported to its customers the actual prices it applied to every standing instruction transaction.  Under Second Circuit law, a trading counter-party that is accurately informed of the services that will be provided, and knows the price it has paid, cannot have been defrauded.  Similarly, the SAC alleges that BNYM's trading counter-parties understood that BNYM earned a spread in negotiated foreign exchange transactions, and further alleges that its standing instruction services included related administrative services that were not included in negotiated transactions.  It is not plausible to allege that any custody customer could have thought that BNYM was providing these premium standing instruction services without including any spread on the associated foreign exchange, *i.e.*, at more favorable rates than those available in negotiated transactions.  The SAC's allegations make clear that customers did not misunderstand the prices associated with BNYM's standing instruction services, as they elected to execute the vast majority of their foreign exchange volume with BNYM through negotiated transactions.  Because the SAC's allegations preclude any claim of fraud, the Government has "pleaded [it]self out of court."  *Pacheco v. Serendensky*, 393 F.3d 348, 354 (2d Cir. 2004) (internal quotations omitted).

The affirmative misrepresentations alleged in the SAC also do not plausibly support the existence of a "scheme to defraud."  The Government's allegations as to all of these statements rest on the absurd premise that the investment managers representing BNYM's customers – sophisticated investment professionals responsible for managing billions of dollars of pension,

corporate, and institutional assets – were so gullible that they were misled by isolated statements in separate documents into believing what was obviously too good to be true:  that BNYM was offering standing instruction services for "free" (effectively at a loss), and that the rates assigned to transactions executed under these services would be literally the "best" (in the sense of the most favorable to the customer) reported anywhere in the world on that day.  This Court would also have to accept as plausible that the world's most sophisticated investment managers were so deceived even though they had at their fingertips (1) the actual rates that BNYM assigned to their standing instruction transactions, (2) publicly reported interbank rates on that day, and (3) rates assigned to their own negotiated transactions, all of which demonstrated that customers did not receive the most favorable reported interbank rates, and that BNYM earned a favorable spread. And the Court would have to accept that, for more than a decade, despite all this available information, not a single custody customer realized that standing instruction rates were less favorable than negotiated rates.  These facts, which can be considered by the Court on a motion to dismiss,[1] strain plausibility past the breaking point.  The SAC should be dismissed.

Finally, the SAC fails to allege facts supporting a strong inference that David Nichols – the only named employee defendant – or any other BNYM employee had the necessary specific intent to defraud BNYM's customers through this implausible scheme.

## FACTUAL BACKGROUND

### A.    BNYM's Core Custodial and Foreign Exchange Services

BNYM is one of the largest custody banks in the world.  *See* SAC ¶ 20.  BNYM was created on July 1, 2007 by the merger of The Bank of New York ("BNY") and Mellon Financial

---

[1] The Klimmek Declaration filed herewith attaches documents that BNYM reasonably believes to be the documents quoted or referenced in the SAC, or of which this Court may take judicial notice, and which are therefore properly considered on a motion to dismiss.  *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006); *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  Exhibits to the Declaration are cited as "Ex. __."

Corporation ("Mellon").[2]  Prior to that date, BNY and Mellon were competitors.  BNYM's primary business is providing custody services to large institutional investors, typically public and private pension funds, global financial institutions, insurances companies, mutual funds, and large corporations.  *See id.* ¶¶ 19-20.  As a custodian, BNYM performs largely administrative services, including holding its custody customers' assets, maintaining sub-custody accounts in foreign countries, effecting deposits and withdrawals of cash, and settling purchases and sales of securities and currency upon instructions from its customers.  *See id.* ¶ 19.  BNYM's core custodial functions do not involve investment discretion; its custody customers typically appoint professional investment managers charged with the fiduciary responsibility for making investment decisions with respect to the funds held in custody.  *See id.* ¶¶ 4, 7, 22, 55, 85.

Separate and apart from its custodial services, BNYM also provides a wide variety of ancillary financial services pursuant to separate written agreements.  Among them are various FX services in which BNYM, acting on a principal basis, exchanges foreign currencies with its customers.  *See* SAC ¶¶ 22, 97.[3]  BNYM's customers have no obligation to use BNYM's FX services:  whether to trade foreign currency with BNYM, and which method of FX execution to choose, is left entirely to the discretion of the customers and their professional investment managers.  *See id.* ¶ 22.  BNYM's custody customers, acting through their investment managers, routinely execute foreign exchange with third-party FX providers rather than BNYM.[4]

---

[2] *See* SAC ¶ 74 (referring to merger of BNY and Mellon); *see also* Ex. 1, at 3 (BNYM 2007 10-K).  This court may properly consider BNYM's 10-K on a motion to dismiss.  *See In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011) ("On a motion to dismiss, the Court may properly consider . . . public filings with the Securities and Exchange Commission ('SEC').").

[3] *See also* Ex. 2 (BNYM's FX Procedures).  Exhibit 2 is the current version of a document known as BNYM's FX Procedures, which provides detailed information about BNYM's standing instruction program and is quoted in the SAC at ¶ 97.

[4] *See, e.g.*, Ex. 3, at BNYM-SDNY-0001800.  Exhibit 3 is an excerpt from BNY's response to a Request for Proposal ("RFP") from KeyBank, N.A., which is quoted in the SAC at ¶¶ 46, 68.  Because BNYM provides the service of settling FX transactions executed with third parties, it typically charges customers a small, flat fee (usually $35-$50) for handling these transactions.  There is no charge for FX transactions in which BNYM acts as a trading counterparty.  *See, e.g.*, Ex. 3, at BNYM-SDNY-0001800.

As the SAC alleges, there are two principal ways in which investment managers or custody customers may elect to trade foreign currency with BNYM.  First, they can negotiate foreign currency trades – directly or indirectly using electronic trading platforms – with BNYM's sales desk.  The price assigned to each negotiated transaction is agreed upon between the customer and BNYM, and typically includes a spread over a reported interbank buy or sell rate for a given currency pair at the time of the negotiation.  *See* SAC ¶¶ 22, 36.  The "interbank rate" refers to the rates at which highly rated banks, including BNYM, trade with other highly rated banks in bilateral transactions, ordinarily in amounts with a value of more than $1,000,000.[5] Each participant in an interbank transaction must have a specific credit relationship with its trading counterparty.  The SAC does not allege that any of BNYM's custody customers have the necessary financial capabilities to participate in interbank transactions or that they have any contractual or other legal right to receive interbank rates on foreign exchange transactions with BNYM.

Second, BNYM's custody customers can, directly or through their investment managers, execute transactions in foreign currencies using BNYM's "standing instruction" service.[6] Through this service, an investment manager or customer can prospectively instruct BNYM to convert selected foreign currency balances to a base currency (usually, U.S. dollars) on a daily basis or direct BNYM to convert a custody customer's dollar or foreign currency balances in the amount necessary to settle the purchase or sale of a foreign security.  *See id.* ¶¶ 21-22.  BNYM's

---

[5] *See, e.g., Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1300 (S.D. Fla. 2005).  The SAC alleges that, according to Capital Group, "[t]here is NO minimum for wholesale interbank prices in forex . . . ." SAC ¶ 31, but this does not mean that interbank trades are not typically in excess of $1 million, or that interbank market participants would accept a large number of small trades each day.  *See* Dep't of Labor, *Proposed Class Exemption Relating to Certain Employee Benefit Plan Foreign Exchange Transactions*, 56 Fed. Reg. 11757-03 (Mar. 20, 1991).

[6] In addition to providing negotiated and standing instruction services, BNYM has negotiated benchmark agreements with certain customers, pursuant to which BNYM automatically executes certain foreign exchange transactions at a rate determined by adding a fixed spread, *e.g.*, 15 basis points, over a benchmark rate, usually an interbank rate reported by an agreed-upon source at a particular time (*e.g.*, 4 p.m. London time) on the day the trade is executed.  *See* SAC ¶¶ 86-91.

standing instruction services thus provide customers the administrative benefit of seamlessly integrating foreign currency execution with an underlying securities transaction. *See id.* ¶ 2; Ex 3, at BNYM-SDNY-0001798. Customers thus typically use BNYM's standing instruction service for smaller volume transactions, for which direct negotiation is inefficient, or for transactions in restricted currencies, which are highly regulated by the issuing country and thus create significant additional execution risks.[7] Because BNYM's standing instruction service provides additional administrative benefits, the exchange rates for those transactions are generally less favorable than the rates for negotiated transactions. *See* SAC ¶ 36. BNYM typically prices these transactions at the edges of the daily range of reported interbank rates, *i.e.*, BNYM sells near the highest reported interbank rate and buys nears the lowest reported interbank rate on the day of the trade.[8]

The SAC acknowledges that BNYM's customers and their managers utilize standing instructions services in a financially rational manner. The overwhelming majority of BNYM's FX trading volume (88% in 2009) consists of negotiated FX transactions. *See id.* ¶¶ 22, 37. Because standing instructions are typically used for smaller transactions or transactions in restricted currency, such transactions account for a much smaller portion of BNYM's FX trading

---

[7] *See* SAC, Ex. A; Int'l Monetary Fund, Annual Report on Exchange Arrangements and Exchange Restrictions, at 34-40, 48-68 (2011) (summarizing various types of foreign exchange regulations, primarily in developing countries). Exhibit A to the SAC indicates that, for BNYM's top 200 standing instruction customers, the average standing instruction trade ranged in size from a low of $184,000 in 2009 to a high of $279,000 in 2008. *Compare* SAC, Ex. A, at 9 (showing total trade count and trade volume for 2008) *with id.* at 13 (2009 totals). The Government cherry-picks a tiny fraction of BNYM's standing instruction trades (250 from each year) to support its disingenuous claim that "BNYM's standing instruction transactions frequently involved substantial amounts of money." SAC ¶ 38. The SAC's infinitesimal and plainly unrepresentative sample (250 trades out of over 770,000 trades, or less than 0.03%) provides no support for its misleading suggestion that large standing instruction transactions were "frequent[]." *Id.*; *see In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) (court is not required to "accept as truth conflicting pleadings . . . that are contradicted . . . by documents upon which its pleadings rely . . . .").

[8] The Government repeatedly refers to such rates as "the worst rate of the day," SAC ¶¶ 44, 58, 88, but as it elsewhere acknowledges, these rates were near the limits of reported *interbank* rates for the day, *see id.* ¶ 29. This is hardly the "worst" rate of the day because the daily interbank range does not represent the entire possible range of rates on any given day. For example, because a negotiated rate involves a spread over a contemporaneous interbank rate, *see id.* ¶¶ 22, 36, the rate in a negotiated transaction executed when the daily reported interbank rate peaks will be worse than the rates assigned to standing instruction transactions on that day.

volume (12% in 2009).  *See id.*

**B.      The Allegations of the Complaint**

The SAC alleges that BNYM provided standing instruction services through "a fraudulent business model," in which it (1) misrepresented to customers that standing instruction services would be provided on more favorable terms than were actually provided; and (2) failed to disclose its methodology for determining those prices.  *Id.* ¶ 4.  The purported claim rests on six alleged affirmative statements about BNYM's standing instruction services:

1.  BNYM allegedly described its standing instruction service on its website and in RFP responses to some customers as:  "Operationally simple, free of charge and integrated with the client's activity on the various securities markets, FX standing instruction is designed to help clients minimize risks and costs related to the foreign exchange and concentrate on their core business."  *Id.* ¶¶ 67-68; Exs. 3-4.[9]

2.  BNYM allegedly told certain customers that "we price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk."  SAC ¶ 60; *see also* Exs. 6, 9.[10]

3.  BNYM allegedly stated in two RFP responses that its foreign exchange services provided the "best rates" or the "best rate of the day."  SAC ¶ 45.

4.  BNYM allegedly stated on its website and in responses to RFPs and customer inquiries that the "benefits" of its standing instruction service included "'FX execution according to best execution standards.'"  *Id.* ¶ 41; Exs. 4-5; *see also* SAC ¶ 46; Ex. 3.  BNYM also allegedly provided some customers a document explaining how it "assist[s] plan sponsors and their fund managers in achieving best execution in foreign exchange."  SAC ¶ 56; Ex. 6.

5.  BNYM allegedly stated on its website and in RFP responses to some customers that the "benefits" of its standing instruction service included "[a]ggregation and netting of trades based on guidelines tailored to clients needs."  SAC ¶ 74; Exs. 4-5; *see also* SAC ¶ 78.

6.  BNYM allegedly represented to a few customers that "all clients receiv[e] the same spot

---

[9] Exhibit 4 is a printout of a page from the standing instruction website prior to the change in the website in 2009 and is quoted in the SAC at ¶ 67.  Exhibit 5 is screenshots of this and other pages after the 2009 change, and is quoted in the SAC at ¶ 74.  In 2009, BNYM removed the phrase "free of charge" from its website and added an explanation of its understanding of "best execution."  *See* SAC ¶¶ 41, 59, 67; Exs. 4-5.  On January 11, 2012, pursuant to a partial settlement of this action, BNYM again modified the website by, among other things, removing all references to "best execution" and to "netting." SAC ¶¶ 25, 74.

[10] Exhibit 6 is an internal email chain and attachment sent from David Nichols to Baudouin de Guchteneere on March 11, 2009, which is quoted in the SAC at ¶ 56.  Exhibit 9 is an internal email sent from David Nichols to William Filonuk on May 11, 2005, which quoted in the SAC at ¶ 53.

price" on standing instruction transactions, SAC ¶ 88 (quoting Ex. 8); *see also id.* ¶ 83, and BNY's ERISA policy stated that rates on standing instruction transactions with an ERISA plan "'shall not be less favorable to the Plan than terms offered by BNY to unrelated parties in a comparable arm's length FX Transaction,'" *id.* ¶ 84 (quoting Ex. 7).[11]

In addition to these affirmative misstatements, the SAC alleges that BNYM "actively concealed from its standing instruction clients that trades would be priced at or near the worst reported interbank rate of the day." *Id.* ¶ 96. Notably, the Complaint alleges that this fraudulent scheme occurred over more than a decade (from 2000 to 2011), *see id.* ¶ 1, despite the fact that, prior to their merger in 2007, BNY and Mellon were not only separate companies, but actively competing for custody clients.

### C.   Factual Allegations that Require Dismissal of the Government's Claim

The Government acknowledges that BNYM gave its customers substantial accurate information about BNYM's foreign exchange services, and standing instruction in particular. First, the SAC acknowledges that customers were provided with BNYM's FX Procedures, which described its standing instruction service. *See id.* ¶¶ 5, 84-85, 97-98. The FX Procedures explained that BNYM posted a "Daily Schedule" each morning, listing guaranteed rates for that day in each of more than 70 currency pairs.[12] *Id.* ¶¶ 97-98; Ex. 2, at BNYM-SDNY-0000309. BNYM guaranteed that the rate it would apply to standing instruction transactions on that day would be (1) at least as favorable to the custody customer as the rate published in the Daily Schedule, and (2) within 3% of the relevant interbank bid or ask rates at the time the rates were assigned. *See* Ex. 2, at BNYM-SDNY-0000309-10. If a customer or investment manager was dissatisfied with the guaranteed rate, it could opt out of the standing instruction program for any

---

[11] Exhibit 7 is a copy of BNYM predecessor BNY's Foreign Exchange Policies and Procedures for ERISA Plans, which is quoted in the SAC at ¶ 84. Exhibit 8 is an email chain between BNYM and Fidelity, which is quoted in the SAC at ¶ 88.

[12] The SAC acknowledges that BNYM informed its customers and their investment managers of the terms of its FX Procedures. *See* SAC ¶¶ 85, 96.

or all transactions executed that day.  *See id.* at BNYM-SDNY-0000309.

Second, the SAC acknowledges that each day, "[a]fter a standing instruction FX trade [has been] executed," BNYM provided its customers and their investment managers "the final exchange rate obtained."  SAC ¶ 100.  There is no allegation – and the Government cannot in good faith allege – that BNYM's reports of the "final exchange rate obtained" for each standing instruction transaction were in any way inaccurate.

Third, the SAC recognizes that customers also had access to publicly reported interbank rates through services such as Bloomberg or Reuters.  *See id.* ¶¶ 102, 124, 143-153, 155-174.

Fourth, the SAC acknowledges that in negotiated transactions, BNYM and the customer "are negotiating a price based on prevailing market rates at the time of the trade," and BNYM earns a "modest" spread in such transactions.  *Id.* ¶ 36.

Fifth, the SAC recognizes that standing instruction transactions provide additional administrative benefits not available in negotiated transactions.  For example, BNYM's standing instruction service "automatically provides currency exchange on an as needed basis when, for example, the client buys or sells foreign securities or receives dividends on foreign securities that are repatriated to the United States," *id.* ¶ 2, thus eliminating the administrative burden of identifying these foreign currency needs and negotiating appropriate foreign exchange transactions to satisfy them, *see id.* ¶ 22.[13]

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678,

---

[13] Specifically, in a standing instruction transaction, BNYM – and not its customers – assumes responsibility for monitoring securities and identifying transactions that require a foreign exchange transaction, promptly executing the necessary transaction, ensuring that the transaction settles, and timely crediting the appropriate amount of currency to the appropriate account so that the underlying securities transaction can be completed.  *See, e.g.*, Ex. 3, at BNYM-SDNY-0001798.

129 S. Ct. at 1949 (internal quotations omitted).  Where the allegations "are merely consistent with a defendant's liability, [the complaint] stops short of the line between possibility and plausibility of entitlement to relief."  *Id.*, 129 S. Ct. at 1949 (internal quotations omitted).  "[T]he Court may properly consider documents referenced in or integral to the complaint."  *State St. Bank & Trust Co.*, 774 F. Supp. 2d at 588; *see supra* n.1.  And the Court is not required to "accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."  *Livent*, 151 F. Supp. 2d at 405-06; *see also Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) ("[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true.").

## ARGUMENT

### I.   The Complaint Fails To State a Claim Against BNYM Under FIRREA § 1833a

The SAC fails to state a claim under FIRREA because it lacks allegations establishing that any violation of the mail or wire fraud statutes "affect[ed] a federally insured financial institution."  12 U.S.C. § 1833a(c)(2).  The Government attempts to satisfy this requirement through two theories, both of which lack merit.

#### A.   BNYM Itself Cannot Be Both the Perpetrator of the Fraud *and* the "Affect[ed]" Institution for Purposes of FIRREA § 1833a

The Government's first theory is that BNYM engaged in a violation of the mail and wire fraud statutes that "affect[ed]" *itself* by exposing BNYM to litigation and the attendant legal costs and reputational harm.  SAC ¶¶ 176-180.  That is a wholly unprecedented and, with due respect to the Government, absurd theory of FIRREA liability.  The Government's reading turns FIRREA on its head, and would convert a statute designed to *shield* federally insured financial

10

institutions from fraud by others into a weapon to impose punitive civil fines on federally insured financial institutions.  To our knowledge, the Government's theory has never been accepted by any court, and this Court should reject it as inconsistent with the text, purposes, and structure of FIRREA, as well as with the longstanding, settled interpretation of other federal statutes with analogous language.

First, the Government's suggestion that BNYM's alleged scheme to defraud *affected itself* under the statute should be rejected because it "is inconsistent with the natural meaning of the language read in the context of the statute as a whole."  *American Hosp. Ass'n v. N.L.R.B.*, 499 U.S. 606, 611, 111 S. Ct. 1539, 1542 (1991).  The statute imposes civil penalties on a "person" who engages in "a violation of, or a conspiracy to violate," the mail or wire fraud statutes, 18 U.S.C. §§ 1341, 1343, "affecting a federally insured financial institution."  12 U.S.C. § 1833a(c)(2), (b)(3)(A).  The most natural reading of the statute is that the "person" who is potentially subject to penalties under the statute is distinct from the federally insured financial institution that is affected by that person's violation.  In ordinary English usage, "affect" is a transitive verb used to express the fact that one entity "act[s] on" or "produce[s] an effect or change in" another. [14]  Thus, one would not normally say that a fraud "affects" the perpetrator himself, and it would be particularly odd to use the phrase "fraud affecting" a person to refer to fraud *by* that person.  The Government's strained, reflexive interpretation of the word "affect" is plainly not the most natural reading of the statute. [15]  Had Congress intended to extend § 1833a to

---

[14] *Random House Unabridged Dictionary* 33 (2d ed. 1993).

[15] *United States v. Ohle*, 678 F. Supp. 2d 215, 228 (S.D.N.Y. 2010), is not to the contrary.  There the district court held that the ten-year statute of limitations for an offense that "affects a financial institution," 18 U.S.C. § 3293(2), applied to a bank employee that had used his position at the bank to promote a fraudulent tax shelter and fraudulently obtain referral fees from the bank.  *See Ohle*, 678 F. Supp. 2d at 228.  The district court rejected the employee's argument that a financial institution cannot be "affected" under § 3293(2) "if it is an active participant in the offense." *Id.*  But the district court did not rule that fraud committed by a financial institution can "affect" the institution itself.  Nor could it have, as the bank was not a defendant in that case.  Moreover, on appeal, the Second Circuit did not adopt the district court's reasoning, instead affirming on the narrower ground that

mail or wire fraud *by* a federally insured financial institution, it would have done so explicitly.[16]

Second, the Government's unprecedented and unnatural construction of § 1833a should be rejected because it directly contravenes the statute's stated purpose. *See General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 589, 124 S. Ct. 1236, 1242 (2004) (relying on statutory purposes to reject novel and expansive construction of statute). Section 1 of FIRREA states that it was enacted to, among other things, "strengthen the civil sanctions and criminal penalties for *defrauding or otherwise damaging* depository institutions and their depositors." Pub. L. No. 101-73, § 101(10), 103 Stat. 183, 187 (emphasis added).[17] That section makes clear that § 1833a was designed to protect depository institutions and their depositors by penalizing third parties whose fraudulent conduct either directly victimizes the institution ("defrauding") or indirectly harms the institution as a result of that fraud ("otherwise damaging"). It was plainly not intended to grant the Government sweeping authority to impose draconian penalties on federally insured financial institutions for perpetrating frauds on third parties.

Third, the structure of § 1833a confirms that it was designed to penalize criminal conduct in which a third party victimizes federally insured financial institutions and was not intended to impose liability on such institutions. Subsection 1833a(c) limits the application of civil penalties under FIRREA to violations of specific criminal statutes: (1) section 215, 656, 657, 1005, 1006, 1007, 1014, or 1344 of Title 18; (2) section 287, 1001, 1032, 1341 or 1343 of Title 18 affecting a federally insured financial institution; or (3) section 645(a) of Title 15. *See* 12 U.S.C.

---

defendants affected the bank by defrauding it of referral fees, thereby "obtaining monies that Bank One would otherwise not have paid, or at the very least, not to these persons." *United States v. Ohle*, 441 F. App'x 798, 800 (2d Cir. 2011). Here, by contrast, there is no similar allegation that Nichols or any other BNYM employees attempted to defraud BNYM – to the contrary, the Government alleges that these employees were faithfully implementing BNYM's policies. SAC ¶¶ 39, 104-110.

[16] *See, e.g.*, FIRREA, 101 Pub. L. No. 73, § 907, 103 Stat. 183, 462 (1989) (imposing penalties for banking violations by federally insured financial institutions).

[17] *See also* H.R. Rep. No. 101-54, Part I, at 118 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86 (explaining that one of FIRREA's purposes was to "increase criminal and civil money penalties for crimes of fraud *against* financial institutions and depositors") (emphasis added).

§ 1833a(c)(1)-(3).  Each of the Code sections enumerated in paragraph (1) expressly proscribes bribery of a bank officer or employee, or fraud against a bank, financial institution, or a federal regulator of such institutions, and the section cited in paragraph (3) similarly proscribes fraud against the Small Business Administration.  By contrast, none of the statutes listed in paragraph (2) is, by its terms, limited to offenses committed against financial institutions.[18]  The obvious reason that Congress added the limiting language "affecting a federally insured financial institution" in paragraph (2) was to ensure that that paragraph, like paragraphs (1) and (3), would be limited to circumstances in which the victim of the wrongdoing is a federally insured financial institution.  The context supplied by paragraphs (1) and (3) thus shows that paragraph (2) only applies where the fraud is directed at a federally insured financial institution.  *See Dolan v. United States Postal Serv.*, 546 U.S. 481, 486, 126 S. Ct. 1252, 1257 (2006) ("'[A] word is known by the company it keeps' – a rule that 'is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.'") (citation omitted).

Subsection (b) of the statute also reinforces this reading, because it prescribes a "[s]pecial rule" that applies "[i]f any person derives pecuniary gain from the violation, or if the violation results in pecuniary loss to a person other than the violator . . . ."  12 U.S.C. § 1833a(b)(3)(A). This rule shows that Congress understood a FIRREA violation to involve two distinct entities: (1) the "violator," who may derive "pecuniary gain" from the violation, and (2) "a person other than the violator," who may suffer a "pecuniary loss" as a result of the violation.  In the case of mail or wire fraud "affecting a federally insured financial institution," *id.* § 1833a(c)(2), the "violator" is the perpetrator of the fraud, while the institution – "a person *other than the violator*"

---

[18] *See* 18 U.S.C. § 287 (punishing false claims to government officials); *id.* § 1001 (punishing false statements to government officials), *id.* § 1032 (punishing concealment of assets from, or corruptly impeding the functions of, the FDIC or other regulators); *id.* § 1341 (mail fraud); *id.* § 1343 (wire fraud).

– is the victim of the fraud.  Again, the Government's theory would render the Bank *both* the

*perpetrator* and *victim* of the same fraud – a result that is contrary to the plain language of the

statute and simply illogical.

Fourth, the Government's expansive reading of § 1833a is inconsistent with the familiar

canon of statutory construction that a punitive statute should be narrowly construed.[19]  That

canon of construction strongly militates against the Government's wildly expansive

interpretation of § 1833a, which would impose punitive sanctions well beyond Congress's intent

as evidenced by the text, structure, and purposes of the statute.  *See supra* pp. 11-13.

Fifth, the Government's untenable reading of § 1833a is further undermined by numerous

cases interpreting other criminal statutes that were amended by FIRREA to include phrases such

as "affects a financial institution," or "affecting a financial institution."[20]  *See United States v.*

*Grass*, 274 F. Supp. 2d 648, 653 (M.D. Pa. 2003) (construing 18 U.S.C. § 982(a) and collecting

cases interpreting similar provisions).  Hundreds of cases in the two decades following

FIRREA's enactment have interpreted and applied its language in the context of these other

statutes, and *not one* has ever held that a financial institution can be penalized on the theory that

it was "affect[ed]" by *its own* mail or wire fraud violation.[21]  This Court should decline to be the

_____

[19] *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 70 (2d Cir. 1990) ("a statute with a punitive thrust . . . is to be strictly construed"); *Inventorprise, Inc. v. Target Corp.*, 09-CV-00380, 2009 WL 3644076, at *3 (N.D.N.Y. Nov. 2, 2009) (where civil "statute is 'penal in nature [it] must be construed strictly'") (citation omitted); *United States v. Vanoosterhout*, 898 F. Supp. 25, 30 (D.D.C. 1995) (holding that section 1833a is a "[p]unitive statute[]" that should "be narrowly construed"), *aff'd*, 96 F.3d 1491 (D.C. Cir. 1996).

[20] *See* Pub. L. No. 101-73, § 961(k), 103 Stat. at 500 (amending mail and wire fraud statutes to provide for extended penalty if the fraud affects a financial institution); *id.* § 961(*l*), 103 Stat. at 501 (extending statute of limitations from 5 to 10 years if, *inter alia*, defendant commits mail or wire fraud that "affects a financial institution"); *id.* § 961(m), 103 Stat. at 501 (directing the Sentencing Commission to establish guidelines "to provide for a substantial period of incarceration for a violation of, or a conspiracy to violate, section 215, 656, 657, 1005, 1006, 1007, 1014, 1341, 1343, or 1344 of title 18, United States Code, that substantially jeopardizes the safety and soundness of a federally insured financial institution"); *id.* § 963(c), 103 Stat. at 504-05 (amending 18 U.S.C. § 982(a) to require forfeiture order when court finds that a violation of mail or wire fraud, or other statutes "affecting a financial institution").

[21] Unlike statutes such as 18 U.S.C. §§ 20, 982, 1341, 1343, 1344, and 3293, which refer to a "financial institution," FIRREA uses the more restrictive term "federally insured financial institution," 12 U.S.C.

first to reach that unprecedented and untenable result.

**B.      The Complaint Fails to Allege that Any Other Federally Insured Financial Institution Was Affected by BNYM's Supposed Fraud**

The Government's back-up theory of FIRREA liability is that BNYM's alleged fraud affected certain custody customers that are federally insured financial institutions. *See* SAC ¶ 174. This theory should also be rejected because the SAC fails to allege facts showing that any of these federally insured financial institution customers were "affect[ed]" by BNYM's alleged violations of the mail and wire fraud statutes.

**1.**   As an initial matter, the SAC contains numerous generalized allegations regarding effects on federally insured financial institutions that fail to satisfy Rule 9(b). The SAC generally alleges that BNYM's supposed fraud affected unspecified custodial customers that were "federally insured financial institutions (and/or subsidiaries or affiliates of these institutions)." *Id.* ¶ 24. The SAC also alleges that unspecified customers in four lists of BNYM's top 200 standing instruction customers are also federally insured financial institutions or their affiliates. *See id.* These ambiguous, generalized allegations certainly cannot satisfy the Government's obligation under Rule 9(b).[22] Without knowing which customers the Government alleges are federally insured financial institutions, neither the Court nor BNYM can ascertain

---

§ 1833a(c)(2). *See Vanoosterhout*, 898 F. Supp. at 30 (holding that small business investment company was not a "federally insured financial institution" under § 1833a and noting that "[p]unitive statutes, such as FIRREA, are to be narrowly construed.").

[22] *See Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 631 (S.D.N.Y. 2006) (allegations of mail fraud based on statements on website were insufficiently particular because they did not identify who had relied on the statements); *Hunt v. Enzo Biochem, Inc.*, 471 F. Supp. 2d 390, 408 (S.D.N.Y. 2006) (general allegations of misrepresentations to shareholders insufficient where recipients of statements were not identified); *cf. Bernstein v. Misk*, 948 F. Supp. 228, 235 (E.D.N.Y. 1997) (allegations of civil RICO conspiracy to violate mail and wire fraud statutes were deficient because they failed to distinctly identify the enterprise and other participants).

The SAC's allegations are similarly deficient as to Fidelity because the SAC defines "Fidelity" as including a number of Fidelity entities, only some of which were federally insured, *see* SAC ¶ 41 n.2, and it is not clear from the SAC's allegations which of BNYM's representations were made to which Fidelity entity. *See id.* ¶¶ 24, 74, 82, 85, 88, 133, 156-159. Without this information it is impossible to determine whether BNYM's statements were made to, or had any effect on, any federally insured Fidelity entity. *Cf. Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1311 (S.D.N.Y. 1996) ("Rule 9(b) is not satisfied by [a] complaint in which 'defendants are clumped together in vague allegations.'") (citations omitted).

even the most basic information about the basis for the Government's FIRREA claim. This cause of action must therefore be dismissed as to all customers that are not specifically alleged to be federally insured financial institutions. *See National Council of Young Israel v. Wolf*, 963 F. Supp. 276, 279-82 (S.D.N.Y. 1997) (Kaplan, J.) (noting that "ordinarily" where complaint's allegations are inadequate, "the motion to dismiss would be granted as to the insufficient allegations").[23]

**2.**  The SAC also identifies nine standing instruction customers that are alleged to be affiliates of federally insured financial institutions.[24]  But a fraud that merely affects a subsidiary or an affiliate of a federally insured financial institution does not give rise to civil penalties under FIRREA.  FIRREA imposes penalties only if the alleged fraud "affect[s]" the federally insured financial institution itself.  To the extent the Government's theory is that fraud on an affiliate indirectly affected the federally insured financial institution, the SAC's allegations are inadequate.  The Government bears the burden to plead facts that support an inference that the fraud against the affiliate also affected the federally insured financial institution itself.[25]  The Court "cannot leap to [this] conclusion . . . without more information than the bare assertion that a parent-subsidiary relationship existed between the two."  *United States v. Bortnick*, No. 03-

---

[23]  Additionally, a number of BNYM's alleged misrepresentations, such as those relating to "best rates" and "best rate of the day," SAC ¶ 45, "netting," *id.* ¶ 74, and whether customers receive the same rates, *see id.* ¶¶ 83-84, 88, are not adequately alleged to have been made to any federally insured financial institution or affiliate.  *See supra* p. 15 & n.22. Conversely, the SAC also fails to allege that BNYM made any misrepresentations to a number of federally insured custody customers allegedly affected by its supposed fraud.  *See* SAC ¶¶ 166 (Bessemer Trust Co.), 167 (Bank of America), 168 (Huntington National Bank).  Because of these deficiencies, the Government's FIRREA claim must also be dismissed as to these statements and these customers.

[24]  *See id.* ¶¶ 24 n.1 (Prudential Financial and Franklin Templeton), 41 n.2 (FMR and Fidelity Investments Money Management), 82 (Ameriprise), 161 (Royal Bank of Scotland), 164 (SEI Investments), 165 (Citigroup Inc.) 169 (ING North America).

[25]  *See Procapui-Productores de Camaroes De Icapui Ltda. v. Layani*, No. 07-6627, 2008 WL 3338199, at *3 (S.D.N.Y. Jan. 11, 2008) (holding that "[t]o satisfy Rule 9(b)," RICO claim based on mail or wire fraud must allege, *inter alia*, "the precise effects of the fraudulent activity"); *Filler v. Hanvit Bank*, 247 F. Supp. 2d 425, 430 (S.D.N.Y.) *vacated in part on other grounds*, 2003 WL 21729978 (S.D.N.Y. July 25, 2003), *aff'd*, 378 F.3d 213 (2d Cir. 2004) ("Rule 9(b) also requires a plaintiff to adequately allege that the defendant's statements were the proximate cause of the plaintiff's injuries."); *Sterling Interiors Group, Inc. v. Haworth, Inc.*, No. 94-9216, 1996 WL 426379, at *11 (S.D.N.Y. July 30, 1996) (holding in RICO context that "[t]o plead causation, the plaintiff must specifically allege that the predicate acts of racketeering were the proximate cause of his injuries.").

0414, 2004 WL 2752471, at *4 (E.D. Pa. Nov. 29, 2004) (dismissing indictment for bank fraud); *cf. also United States v. Carollo*, No. 10-654 HB, 2011 WL 3875322 (S.D.N.Y. Aug. 25, 2011) (dismissing indictment for mail and wire fraud affecting a financial institution because indictment failed to explain how fraud had affected institution).  Here, the SAC provides the Court with no basis to draw any such inference, and it is therefore inadequate to state a FIRREA claim as to these affiliates.

**3.**  That leaves only one customer – U.S. Bank – that the Government specifically alleges was a federally insured financial institution, received alleged misrepresentations from BNYM, and was affected by them.[26]  Despite that allegation, the SAC still fails to state a claim because it fails to allege facts showing how BNYM's alleged misrepresentations caused U.S. Bank any economic *loss*.  A scheme to defraud "affect[s]" a financial institution only if it proximately causes an "actual financial loss" or a "realistic prospect of loss."  *United States v. Agne*, 214 F.3d 47, 53 (1st Cir. 2000).[27]  An institution is not "affect[ed]" by fraud where it is merely an intermediary for a fraudulent transaction that causes losses to others.  *See United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000).  Similarly, a fraud that causes losses to the customer of a federally insured financial institution but has "[no] cognizable impact" on the institution itself, does not "affect[]" the institution.  *United States v. Esterman*, 135 F. Supp. 2d 917, 920 (N.D. Ill. 2001).

Here, the SAC does not allege any facts supporting an inference that U.S. Bank, as

---

[26] The SAC alleges that BNYM made misrepresentations to KeyBank (at ¶¶ 46, 68), but does not allege that KeyBank was affected by the alleged misrepresentations, *see id.* ¶¶ 155-181 (identifying institutions allegedly affected by BNYM's misrepresentations).  As explained above, the SAC's allegations relating to Fidelity are also deficient.  *See supra* n.22.

[27] *See also Carollo*, 2011 WL 3875322, at *2 (applying *Agne*); *Grass*, 274 F. Supp. 2d at 653 (construing 18 U.S.C. § 982(a) and collecting cases interpreting similar provisions).  Congress's use of the causal term "affecting" requires a showing of causation, and absent statutory language to the contrary, establishing causation requires a showing of proximate cause.  *See Hemi Group, LLC v. City of New York, N.Y.*, 130 S. Ct. 983, 989 (2010) (recognizing that similar statutory language in RICO statute imposes proximate cause requirement).

opposed to its customer, received less favorable terms on standing instruction transactions.  *See*

SAC ¶¶ 160, 175.  The SAC nowhere alleges that U.S. Bank was transacting with BNYM for its

own account, with its own funds, as opposed to transacting on behalf of a customer.  Without

that factual allegation, the SAC lacks the factual predicate for an inference that U.S. Bank itself –

rather than its customer – sustained a loss.  Surely, if the Government had a good-faith basis to

make such an allegation in *the third* complaint filed in this matter, it would have done so.  Its

silence on this point speaks volumes.

Moreover, there are numerous indications that U.S. Bank was, in fact, transacting foreign

exchange on behalf of its customers, not for its own account.  The very document relied on in the

SAC is BNYM's response to an inquiry from "Trust Legal and Trust compliance," Ex. 6, at

BNYM-SDNY-0259929, strongly suggesting that the standing instruction transactions at issue

here were executed by U.S. Bank on behalf of its trust customers.  *See* 12 U.S.C. § 92A

(permitting banks to provide trustee and fiduciary services to customers); *First Nat. Bank of*

*Chicago v. Comptroller of Currency*, 956 F.2d 1360, 1361 (7th Cir. 1992) (describing regulation

of bank-managed trust funds).  Additionally, U.S. Bancorp (U.S. Bank's parent) describes the

business of its "banking subsidiaries," such as U.S. Bank, as providing "a wide range of products

and services to individuals, businesses, institutional organizations, governmental entities and

other financial institutions," including "[a]ncillary services *such as foreign exchange*."[28]

Moreover, standing instruction transactions are frequently executed in connection with

settlement of securities transactions, *see* SAC ¶ 21, but federal banking laws typically preclude

banks such as U.S. Bank from trading in securities for their own account, *see* 12 U.S.C. §

---

[28] *See* Ex. 10, at 5 (emphasis added).  Exhibit 10 is a copy of U.S. Bancorp's 10-K for the year ended December 31, 2010.  This Court may take judicial notice of the 10-K for purposes of the motion to dismiss.  *See supra* n.2; *cf. also United States v. Behmanshah*, 49 F. App'x 372, 376 n. 2 (3d Cir. 2002) (taking judicial notice of Securities and Exchange Commission ("SEC") filings to determine that PNC Bank is federally insured).

24(Seventh).[29]  All of this indicates that U.S. Bank was executing standing instruction transactions for its customers, not for its own account.  In any event, it is the Government's obligation to allege concrete facts to support a plausible inference of harm to U.S. Bank (rather than its customers).  Because the SAC is devoid of any such allegations, it fails to state a claim.

## II.      The SAC's Own Allegations Negate Any Scheme to Defraud

The SAC also fails to state a claim under FIRREA because it admits key facts that negate any plausible scheme to defraud.[30]  First, the SAC's acknowledgement that BNYM accurately disclosed the actual rates assigned to each standing instruction precludes a finding of fraud.  A buyer that knows exactly what product or service it is receiving and at what price cannot, as a matter of law, have been defrauded.  *See United States v. Starr*, 816 F.2d 94 (2d Cir. 1987).  Second, none of BNYM's alleged misrepresentations could plausibly have misled its custody customers into believing that it executed standing instruction transactions at contemporaneously reported interbank rates, without including any spread, because the SAC acknowledges that those customers understood that BNYM earned a spread on negotiated transactions, which did not provide the same administrative benefits as BNYM's enhanced standing instruction service.  No reasonable custody customer could possibly have understood BNYM to be offering more favorable rates on a service that provided more benefits, and the SAC's allegations make clear that customers did not understand BNYM's statements in this implausible way.

### A.      BNYM's Accurate Disclosure of Its Standing Instruction Prices Negates Any Scheme To Defraud

The Government's acknowledgement that BNYM promptly and accurately reported the actual rates assigned to each standing instruction transaction, *see supra* p. 9, is fatal to a claim of

---

[29] Banks are permitted to invest a limited portion of their capital in fixed income securities, *see* 12 U.S.C. § 24(Seventh), and the Gramm-Leach-Bliley Act permits national banks to create subsidiaries to engage in financial activities such as investing in equities, *see id.* § 24a.

[30] These allegations constitute binding judicial admissions.  *See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006).

fraud.  Mail and wire fraud requires misconduct that affects an "essential element" of the transaction, such as "the quality, adequacy or price of goods to be sold."  *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970).  For transactions in a commodity such as foreign currency, there can be no dispute about "quality" or "adequacy."  Accordingly, if the prices are accurately reported, there is no misrepresentation of an essential element of the transaction and there can thus be no scheme to defraud as a matter of law.  Here, because the Government concedes that BNYM's customers "received exactly what they paid for," *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (citation omitted) – namely, a valuable service that included an exchange of foreign currency with BNYM at rates that were almost always *more favorable* (and never less favorable) than what BNYM had guaranteed and that were promptly and accurately disclosed – BNYM cannot have violated the mail or wire fraud statutes under settled Second Circuit precedent.

The Government's mail and wire fraud theory rests solely on allegations that BNYM misled its customers about the spread between the rates it assigned to standing instruction transactions – and accurately disclosed – and BNYM's own cost of funds.  *See* SAC ¶ 4.  Those allegations cannot state a mail or wire fraud claim as a matter of law because "the way BNYM was actually pricing standing instruction transactions," *id.* – given that BNYM always priced within its guaranteed rates – does not relate to an "essential" element of the transaction.  That principle is illustrated by the Second Circuit's decision in *Starr*.  There, the defendant collected bulk mailings from their customers and charged them as if their mail had been accepted for delivery by the Postal Service at high mail rates.  *See* 816 F.2d at 95-96.  At the Post Office, however, defendants hid the customers' high-rate mail in low-rate mail packages and then paid the Postal Service at the low-rate price for delivery.  The defendants nonetheless charged their

customers as if the defendants had paid the higher rates to the Postal Service, and even produced and mailed false invoices to their customers to suggest they had paid the higher rates for the mailings.  The defendants then retained the difference between the high rate they had charged their customers and the low rate they had paid to the Post Office.  *See id.*  But the Second Circuit held that this did *not* constitute a scheme to defraud.  This is because the customers received precisely the services they had bargained for – *i.e.*, "[m]ail was sent on time and arrived at the appropriate destination" – at the price to which they had agreed.  *Id.*  It was of no relevance that defendants misled their customers about the underlying cost for the bulk mailings.

That principle governs this case.  As in *Starr*, when BNYM traded as a principal in standing instruction transactions, it (1) informed its customers and their investment managers the rates it was contractually guaranteeing for those transactions; (2) consistently assigned rates that were more favorable than those guarantees; and then (3) accurately disclosed the rates assigned to each transaction.  As in *Starr*, BNYM's customers "received exactly what they paid for," 816 F.2d at 98 – BNYM's standing instruction services at rates that were guaranteed ahead of time and promptly and accurately disclosed to customers afterward.  The Government's allegation of fraud rests solely on the claim that the price customers received should have been closer to BNYM's actual cost of currency.  But *Starr* squarely forecloses such a claim as a matter of law.

Other courts have come to the same conclusion, specifically in the context of FX transactions.  As Judge Easterbrook stated in *In re Mexico Money Transfer Litigation*, 267 F.3d 743 (7th Cir. 2001), "[m]oney is just a commodity in an international market," and "since when is failure to disclose the precise difference between wholesale and retail prices for any commodity 'fraud'?"  *Id.* at 749 (approving class settlement of, *inter alia*, civil RICO claims based on mail and wire fraud on ground that claims were meritless).  The court explained:

The customer of a bank's foreign-exchange section (or an airport's currency kiosk) is quoted a retail rate, not a wholesale rate, and must turn to the newspapers or the Internet to determine how much the bank has marked up its Swiss Francs or Indian Rupees. . . . [The defendants] revealed truthfully, and separately, the exchange rate they offered (the price per peso) and the rate for the wire transfer to Mexico.  Each customer was told how many dollars in the United States would result in how many pesos delivered in Mexico.

*Id.*[31]  Many other courts faced with similar allegations have reached the same conclusion.[32]

**B.**     **BNYM's Statements Could Not Have Misled Its Customers Into Believing that Standing Instruction Rates Were More Favorable than Negotiated Rates**

The SAC's allegations also show that BNYM's statements could not plausibly have led its custody customers or their investment managers to believe that it priced standing instruction transactions at the contemporaneously reported interbank rate, without including a spread over that rate.  Specifically, the SAC acknowledges (1) that BNYM's custody customers understood that the rates in negotiated transactions with BNYM included a spread over reported interbank rates at the time of the transaction, and (2) standing instruction service provides additional administrative benefits that are not available in a negotiated transaction.  *See supra* p. 9.

Given these admissions, the SAC cannot plausibly allege that, in using phrases such as "free of charge," "best rate of the day," and "best execution," BNYM was communicating to custody customers that they were receiving the reported interbank rate at the time of each transaction and thus that BNYM earned no spread on such transactions.  *See* SAC ¶¶ 30, 39, 41-

---

[31] Like the customers in *Mexico Money Transfer*, BNYM's custody customers could easily assess its pricing of standing instruction transactions by comparing BNYM's reported rates to interbank rates publicly available through Bloomberg and Reuters.  *See* SAC ¶¶ 102, 124, 143-153, 155-174.  Even without time-stamps, *see id.* ¶ 100, it would have been readily apparent after even a few days of reports that BNYM was pricing standing instruction transactions near the edge of the daily range of reported interbank rates.  Similarly, BNYM's netting practices were readily ascertainable from the trade reports it provided to customers.  *See id.*  Any customer that compared the prices assigned to two transactions for the same currency pair reported on the same day would have quickly been disabused of any erroneous belief that BNYM netted all trades for all customers in all currency pairs.

[32] *See Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 416 (S.D.N.Y. 2004); *Compania Sud-Americana de Vapores v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 424-25 (S.D.N.Y. 1992); *McCann v. Lucky Money, Inc.*, 29 Cal. Rptr. 3d 437, 448-49 (Cal. Ct. App. 2005); *Sanchez v. Giromex, Inc.*, No. D042459, 2004 WL 2750332, at *11-*14 (Cal. Ct. App. Dec. 2, 2004).

42, 60, 63, 66, 69.  It simply makes no sense that BNYM would charge lower prices (*i.e.*, no spread) for an enhanced service that provided significantly greater convenience and administrative benefits than it charged for negotiated transactions (for which it charged a spread). No customer – let alone a sophisticated investment manager – could have reasonably interpreted BNYM's statements as adopting such an irrational pricing regime.  And no rational customer would have ever sought a negotiated trade from BNYM or its competitors.

The Government's claim is especially implausible given that BNYM disclosed in its FX Procedures that it executes standing instruction trades "on a principal basis," *i.e.*, selling from its own position for its exclusive benefit, rather than acting as an agent for customers.[33]  *Id.* ¶ 97; (quoting Ex. 2, at BNYM-SDNY-0000309).  The FX Procedures also provided that BNYM's sole contractual obligation was to apply FX "rates that will not deviate by more or less than three (3) percent from the relevant Interbank bid or ask rates and will not be less favorable to the account than the corresponding rates indicated on the Daily Schedule for that day," Ex. 2, at BNYM-SDNY-0000309-10 (rates that usually fell well outside the interbank trading range, *see* SAC ¶ 98).  These statements further dispel any reasonable suggestion that BNYM was forgoing any ability to earn a spread over contemporaneous reported interbank rates.  *See Capital Mgmt. Select Fund Ltd. v. Bennett*, 670 F.3d 194, 207 (2d Cir. 2012) (rejecting fraud claim where contract language "unambiguously warned" of defendant's practices).

Moreover, the SAC's allegations confirm that BNYM's customers did not share the Government's implausible interpretation of BNYM's statements concerning its standing

---

[33] *See Shivangi v. Dean Witter Reynolds, Inc.*, 637 F. Supp. 1001, 1003 (S.D. Miss. 1986) (explaining that where trades "are handled on a principal basis," this means that the seller "sells the stock to its retail customer from its own account, whether or not in inventory, rather than acting as an agent of the customer," and noting that such sales typically include a markup), *aff'd*, 825 F.2d 885 (5th Cir. 1987); *Shorrock v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 74-24, 1977 WL 1064, at *6 (D. Or. Nov. 18, 1977) (approving broker's explanation that "[w]hen you buy shares from a firm that is acting as a principal, you buy the stock from the firm on a net-price basis.  No commission is charged, but the firm's compensation is included in the price.").

instruction service.  Specifically, the SAC alleges that the vast majority of BNYM's foreign currency trading volume (88% in 2009) was in negotiated transactions in which BNYM's customers accepted a "spread" over the prevailing interbank rates.  *See* SAC ¶¶ 36-37.  No sophisticated trading counter-party – especially investment managers responsible for managing billions of dollars of assets − would have paid a spread over a reported interbank rate in a negotiated transaction if it believed BNYM offered more favorable rates and provided additional administrative benefits through its standing instruction program.  Because the Government's interpretation of BNYM's statements presumes such widespread irrationality, it "stops short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (internal quotations omitted).

### C.      BNYM Was Under No Duty to Disclose Its Pricing Methods or Profits

The Government also alleges that BNYM failed to disclose that it priced standing instruction transactions near the edges of the daily reported interbank range.  *See* SAC ¶¶ 4, 39(f), 96-101.  But the SAC fails to set forth any facts to suggest that BNYM had any legal duty to disclose this information.  "As a general matter of federal law, retailers are under no obligation to disclose their pricing structure to consumers."  *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1313 (11th Cir. 2000); *see also Mexico Money Transfer*, 267 F.3d at 749; *cf. Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 533 n.2, 540 (2d Cir. 1999) (noting that because, "[a] 'principal' sells a security from its own account in order to fill a customer's order," seller "acting as a principal" had no duty to disclose remuneration under Rule 10b-10).

The SAC's only effort to plead the existence of a duty to disclose BNYM's spread is the allegation that "BNYM and its employees had a heightened duty of candor" to unspecified clients "with whom the Bank shared a fiduciary relationship."  SAC ¶ 103 n.3.  This conclusory allegation fails to "set forth specific facts constituting the alleged relationship with sufficient

particularity to enable the Court to determine whether, if true, such facts could give rise to a fiduciary relationship," and thus does not establish any duty to disclose. *Naughright v. Weiss*, 826 F. Supp. 2d 676, 695 (S.D.N.Y. 2011).  Moreover, the SAC's admission that BNYM informed clients that it executed standing instruction transactions "on a principal basis," SAC ¶ 97, shows that no fiduciary duty was owed with respect to these transactions. *See Compania Sud-Americana de Vapores*, 785 F. Supp. at 426 (finding no fiduciary relationship in context of arms-length foreign exchange transactions).  Absent any legal duty to disclose its profit margin or pricing methodology, BNYM's alleged failure to disclose that information cannot constitute fraud. *See United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) ("[A]n omission can violate the fraud statute only in the context of a duty to disclose.").

## III. BNYM's Representations to Custody Customers Were Not Materially False or Misleading

The SAC also fails to state a claim under FIRREA because the six statements alleged in the SAC do not plausibly constitute a scheme to defraud.  The Government's allegations rest on implausible interpretations of these statements that are inconsistent with their plain language and the surrounding context.  *See National W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 175 F. Supp. 2d 489, 494 (S.D.N.Y. 2000) (whether statements are materially misleading depends not on "the content of a single document or statement," but on the "representations taken together and in context") (internal quotations omitted).[34]

### A. "Free of Charge"

The Government alleges that BNYM's statements on its website and in an RFP response to KeyBank that the standing instruction service was "free of charge" and "designed to help

---

[34] *See also United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) (holding that in determining whether a statement is material, "[a]nalysis of the misrepresentations must be in the context in which they were made."); *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 171 (2d Cir. 1999) (evaluating various representations to plaintiffs to determine whether they "accurately communicated to the plaintiffs the economic parameters" of the transaction).

minimize risks and costs related to the foreign exchange," SAC ¶ 68 (quoting Exs. 3, 4), were false because they could only be understood to state that BNYM earned no profit or spread on standing instruction transactions, *see id.* ¶ 69. That interpretation is not supported by the plain language of the statements. *See Bennett*, 670 F.3d at 207. As numerous courts have recognized, in the context of foreign exchange transactions, a "charge" refers to a separate, per-transaction fee or commission. A profit margin or "spread" over the seller's cost is *not* a "charge."[35]

Thus, the term "free of charge" meant that BNYM's standing instruction services were offered without a supplemental per-transaction fee to the customer. That was wholly accurate: BNYM did not charge customers any such fee on standing instruction transactions (as distinct from third-party FX transactions, for which BNYM frequently did charge flat per-transaction fees). BNYM explained this in unambiguous terms in its RFP response to KeyBank: "The Bank of New York does not charge any fee or any other transaction costs for its foreign exchange services, except for third party foreign exchange transactions, which are charged a $50 per transaction fee for the receipt and the delivery of the currency." Ex. 3, at BNYM-SDNY-0001800. As the RFP response makes clear, *see Rigas*, 490 F.3d at 231, the phrase "free of charge" refers to the absence of any "fee or other *transaction cost*[]" for standing instruction transactions.[36] It did not suggest that BNYM was giving away currency for free.

## B.   FX Prices "Generally Reflecting the Interbank Market Rate"

The SAC also alleges that in RFP responses to some customers and in a document

---

[35] *See In re Mexico Money Transfer Litig. (W. Union & Valuta)*, 164 F. Supp. 2d 1002, 1024 (N.D. Ill. 2000) ("the exchange rate is not to be understood as a commission or fee," even though rate included a spread), *aff'd*, 267 F.3d 743 (7th Cir. 2001); *Sanchez*, 2004 WL 2750332, at *11-*14 (spread earned from currency exchange is not a "fee, cost, or charge" under California disclosure statute); *McCann*, 29 Cal. Rptr. 3d at 448-49 (same).

[36] The Government fails to plausibly allege that the standing instruction service was not "designed to help minimize risks and costs related to the foreign exchange." SAC ¶ 68. As BNYM explained in the KeyBank RFP response, standing instruction service automates identification and processing of numerous, typically small, foreign exchange transactions to BNYM, thereby transferring the operational risks and administrative costs of executing these transactions from the client to BNYM. *See* Ex. 3, at BNYM-SDNY-0001798.

provided to U.S. Bank, BNYM stated that it "'price[d] foreign exchange at levels generally reflecting the interbank market at the time the trade is executed.'" SAC ¶ 62 (quoting Ex 6, at BNYM-SDNY-0259930).  According to the Government, this statement "fraudulently suggested that BNYM's trading desk would be executing trades for clients at the prevailing interbank rate at the time the trade is executed."  *Id.* ¶ 63.

That assertion cannot withstand scrutiny.  The Government disingenuously omits the language that appears immediately after the quoted sentence:

> The vast majority of our trades will be priced *within the interbank range applicable on trade date*.  In some instances, pricing may be *outside the daily range*, particularly for very small trades, because of the addition of a spread to cover the cost of processing and currency risk management.

Ex. 6, at BNYM-SDNY-0259930 (emphases added).  BNYM's reference to the interbank range of the day – including the possibility that some trades would occur "outside the daily range" – makes clear that the reference to prices "*generally reflecting* the interbank market" did not mean that all foreign exchange transactions would be executed at the reported interbank rate at the moment of execution.  Rather, these representations – considered in their totality – accurately suggested that BNYM would offer pricing for all FX transactions at levels generally within the reported range of interbank rates (*i.e.*, "generally reflecting") on the day of execution.[37]

### C.   "Best Rate"

The Government alleges that BNYM falsely promised customers the "best rates" and the "best rate of the day" on standing instruction transactions.[38]  None of these allegations suffice to

---

[37] The Government also ignores the fact that this statement provides a general description of BNYM's foreign exchange services, including both negotiated and standing instruction.  *See* Ex. 6, at BNYM-SDNY-0259930 (referring to "all foreign exchange executed in support of our clients' transactions").  But as the SAC acknowledges, BNYM's customers understood that it earned a spread over contemporaneously reported interbank rates in negotiated transactions, *see* SAC ¶ 36, and thus could not have construed BNYM's statements as promising to execute foreign exchange transactions at such rates.

[38] Specifically, the Government alleges that BNYM represented in one RFP response that "'[a]s a major market participant, we actively engage in making markets and taking positions in numerous currencies to obtain the

state a claim.  BNYM's references to the "best rates" and "best rate of the day" are, as a matter

of law, indefinite and "inherently subjective expressions that are ill-suited as the basis for mail

and wire fraud claims."  *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1008-09

(7th Cir. 2004).  As the Seventh Circuit has explained, "[a]lmost all sellers engage in a certain

amount of puffing; all buyers, even those who are rather gullible, know this; it would not do to

criminalize business conduct that is customary rather than exceptional and is relatively

harmless."  *United States v. Coffman*, 94 F.3d 330, 334 (7th Cir. 1996).[39]  That argument applies

with even greater force to BNYM's sophisticated customers and their investment managers, who

had ample incentive and tools to evaluate for themselves the favorability of the rates BNYM

assigned to standing instruction transactions.  References to "best rates" are too indefinite

because they leave open key questions such as:  Best rates compared to what?  Best rates

available to whom?  For these reasons, courts have recognized that vague, subjective phrases

such as "best rate" are non-actionable puffery, and this Court should reach the same

conclusion.[40]

### D.     "Best Execution"

Next, the SAC alleges that BNYM used the term "best execution" on its website and in

---

best rates for our clients,'" and represented in another RFP response that "'[c]lients benefit from our attractive rates because we aggregate all client income in any given currency to obtain the "best rate of the day." That "best rate of the day" is applied to all of the income conversions that we execute for that day, regardless of amount.'" *Id.* ¶ 45.

[39] *Accord Nelson v. Publishers Circulation Fulfillment, Inc.*, No. 11 CIV. 1182 TPG, 2012 WL 760335, at *4 (S.D.N.Y. Mar. 7, 2012) ("Under . . . the federal mail and wire fraud statutes, 'opinions and puffery or ultimately unfulfilled promises' are not actionable as fraud.") (citation omitted); *Regent Office Supply*, 421 F.2d at 1180 (in context of advertising, mail fraud liability is proper only where "claims or statements . . . go beyond mere puffing and enter the realm of fraud where the product must inherently fail to do what is claimed for it.").

[40] *See, e.g., Archer v. Nissan Motor Acceptance Corp.*, 550 F.3d 506, 510 (5th Cir. 2008) ("best rate"); *Associates In Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 570 (7th Cir. 1991) ("'highest' rate of return"); *Crofton v. Bank of Am. Home Loans*, No. 11-10124, 2011 WL 1298747, at *8 (E.D. Mich. Mar. 31, 2011) ("'the best rate' available"); *Farmer v. Countrywide Fin. Corp.*, No. SACV08-1075, 2009 WL 1530973, at *6 (C.D. Cal. May 18, 2009) ("'the best possible rates around'"); *Anderson v. General Motors Acceptance Corp.*, 476 F. Supp. 2d 624, 627 (N.D. Miss. 2007) ("best interest rate" and "lowest prices anywhere"), *aff'd*, 269 F. App'x 452 (5th Cir. 2008); *Sutton Assocs. v. Lexis-Nexis*, 761 N.Y.S.2d 800, 802 (App. Div. 2003) ("best rates [it] could offer").

RFPs and communications to customers.[41]  The Government alleges that BNYM's statements concerning best execution were false because "best execution" is "commonly understood" to mean providing "the best available market price at the time that the currency trade is executed," SAC ¶ 42, and BNYM's standing instruction service did not meet this requirement, *see id.* ¶ 30. These allegations fail to state a claim for two reasons.

First, like the terms "best rate" or "best price," the term "best execution" as used by BNYM in the context of unregulated foreign exchange transactions is also inactionable puffery. *See supra* n.40.  Indeed, the SAC itself equates "best execution" with "best rates."  *See* SAC ¶ 42 (alleging that "best execution" entails providing the "best available market rate at the time that the currency trade is executed").  "Best execution" cannot serve as the basis for a fraud claim because it lacks sufficient definiteness.  For example, the Government's own definition leaves critical questions unanswered:  In which "market" is the evaluation made?  To which benchmark should prices be compared to determine what is "best"?  To whom must the price be "available"? *See* Lawrence E. Mitchell, *Structure As an Independent Variable in Assessing Stock Market Failures*, 72 Geo. Wash. L. Rev. 547, 566 (2004) (explaining that "best available price is a slippery and not comfortably determinate concept").  If, for example, the Government's definition were construed as requiring that BNYM execute standing instruction transactions at the best price available to custody customers in the market for automated execution of foreign exchange transactions, BNYM would likely satisfy this requirement (at a minimum, the SAC alleges no facts to the contrary).  Moreover, the term "best execution" is particularly indefinite in

---

[41] Specifically, BNYM is alleged to have (1) stated on its website that standing-instruction customers would "'benefit from . . . FX execution according to best execution standards,'" SAC ¶ 41 (quoting Ex. 4), (2) stated in an RFP response to KeyBank that standing instruction transactions would be "[h]andled and executed according to best execution, following market regulations," *id.* ¶ 46 (quoting Ex. 3), and (3) provided its "standard" statement on best execution to custody customers including U.S. Bank, *id.* ¶ 56 (quoting Ex. 6).

the unregulated foreign exchange markets,[42] as there is no regulatory guidance on its meaning.[43]

Second, the SAC's interpretation of BNYM's statements concerning "best execution" is implausible in light of their context. *See Rigas*, 490 F.3d at 231. Specifically, the plain language of BNYM's "standard" statement on best execution simply does not promise to provide the "best available market price." Rather BNYM explained in that statement that its "[p]ricing practices vary," that different types of trades "have distinct operational and pricing parameters," and that "[i]n some instances, pricing may be outside the daily [interbank] range . . . because of the addition of a spread . . . ." Ex. 9, at BNYM-SDNY-0235886. Nor did BNYM promise to price standing instruction transactions so as to "maximis[e] [sic] the value of the client portfolio under the particular circumstances at the time." *Id.*; *see* SAC ¶ 51. Rather, BNYM offered "post-trade analysis comparing our trade execution to recognized industry benchmarks *to assist the fund manager in demonstrating* that the execution of each trade was consistent with the goal of maximizing the value of the client portfolio under the particular circumstances at the time." Ex. 9, at BNYM-SDNY-0235886 (emphasis added). This makes clear that BNYM contemplated that custody clients and investment managers would be comparing its foreign exchange execution with "industry benchmarks," and was representing that, compared to those benchmarks, it offered superior execution. The SAC utterly fails to allege that this representation is false, as it does not identify any industry benchmark, let alone allege that

---

[42] BNYM's spot foreign exchange transactions with its custody clients are exempt from federal regulation. *See* 7 U.S.C. § 2(c); *Sanders v. Forex Capital Mkts., LLC*, No. 11-0864, 2011 WL 5980202, at *9 (S.D.N.Y. Nov. 29, 2011) (noting that, aside from certain retail foreign exchange transactions, spot transactions in foreign currency are not regulated by the Commodities Futures Trading Commission).

[43] Courts have recognized that "the promise of 'best execution' is a defined, specific concept *in the securities context*." *Last Atlantis Capital LLC v. AGS Specialist Partners*, 749 F. Supp. 2d 828, 834 (N.D. Ill 2010) (emphasis added). But these cases rely on extensive regulatory guidance specific to the equities markets that does not exist in foreign exchange markets. *See, e.g.*, *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 270-71 (3d Cir. 1998) (en banc). And even in the context of the securities markets, courts and scholars recognize that best execution is a highly general standard with "multiple dimensions that tend to be in conflict." *Wsol v. Fiduciary Mgmt. Assocs., Inc.*, 266 F.3d 654, 657 (7th Cir. 2001) (citing Jonathan R. Macey & Maureen O'Hara, *The Law and Economics of Best Execution*, 6 J. Fin. Intermediation 188, 219-20 (1997)).

BNYM's execution failed to meet it.

Additionally, the SAC fails to allege that BNYM's statements concerning best execution are false even accepting the "industry standard definition[]" of best execution alleged in the SAC.  SAC ¶ 53.  The SAC alleges that the term is addressed by guidance promulgated by the SEC and the Association for Investment Management and Research ("AIMR").  *See id.* (quoting Ex. 9).  The guidance the SEC has provided, however, is that the "best execution" duty of a "money manager" requires it to "execute securities transactions for clients in such a manner that the client's total cost or proceeds in each transaction is the most favorable under the circumstances."  Ex. 9 (quoting SEC, *Brokerage and Research Services*, Exchange Act Rel. No. 23,170, 51 Fed. Reg. 16,004, 16,011 (Apr. 30, 1986)).[44]  As the SEC explains, an investment manager's best execution duty is not determined solely by price:

> A money manager should consider the full range and quality of a broker's services in placing brokerage including, among other things, the value of research provided as well as execution capability, commission rate, financial responsibility, and responsiveness to the money manager.  The Commission wishes to remind money managers that the determinative factor *is not the lowest possible commission cost* but whether the transaction represents the best qualitative execution for the managed account.  In this connection, money managers should periodically and systematically evaluate the execution performance of broker-dealers executing their transactions.

SEC, *Brokerage and Research Services*, 51 Fed. Reg. at 16,011 (emphasis added).[45]  The Government's insistence that "best execution" involves the best price, *see* SAC ¶ 42, contradicts

---

[44] Similarly, the AIMR defines "best execution" for investment managers as "well informed trade execution decisions made with the intent of maximising [sic] the value of the client portfolio under the particular circumstances at the time."  Ex. 9 (quoting AIMR, Proposed AIMR Trade Management Guidelines, at 4 (Nov. 12, 2001) ("AIMR Guidelines"), *available at* http://web.archive.org/web/20031002093903/http://www.aimr.org/pdf/standards/proposed_tmg.pdf).  The AIMR has changed its name and is now the CFA Institute.  *See* https://www.cfainstitute.org/pages/index.aspx.

[45] *See also* AIMR Guidelines, at 4 (noting, *inter alia*, that best execution "has aspects that may be measured and analyzed over time on an *ex-post* basis even though accurate measurement on a trade-by-trade basis may not be feasible").  These SEC and AIMR definitions also make clear that, contrary to the government's suggestion, Nichols was not referring to a "standard definition[]" for the foreign exchange industry – there is no such definition in the unregulated foreign exchange markets, *see supra* pp. 29-30 & nn.42-43 – but rather to the investment management industry.

the very guidance it invokes, by ignoring the numerous factors relevant to providing "the best qualitative execution." The SAC's allegations thus do not plausibly show that BNYM's use of the term best execution in reference to these transactions was false, much less that it could support a violation of the federal mail and wire fraud statutes.[46]

### E.    Netting

The Government also contends that BNYM falsely stated on its website that its customers "'benefit from . . . [a]ggregation and netting of trades based on guidelines tailored to client needs.'" *Id.* ¶ 74.  According to the SAC, "[a]ggregation and netting of trades means that, when a client executes multiple transactions requiring both the purchase and sale of a particular currency for the same value date, the transactions are aggregated and netted so that, rather than engaging in multiple separate currency trades, the client will need to buy or sell only the net amount of currency needed for all of the transactions." *Id.* ¶ 75.  The SAC alleges that BNYM's statement was false because, with respect to trades executed by its Pittsburgh trading desk, BNYM and its predecessor Mellon "priced the larger side of the transaction at or near the worst interbank price of the day, and the opposite side of the transaction at a different price at least half a percentage point apart." *Id.* ¶ 77.

Here, too, the Government's alleged scheme to defraud finds no support in the cited documents.  BNYM did not promise netting in every circumstance.  Rather, it offered to provide netting based on individualized guidelines "tailored to client needs" – *i.e.*, it invited customers to negotiate customized netting arrangements with BNYM.  The SAC does not allege that any BNYM customer ever entered into any such netting arrangements, much less that BNYM failed

---

[46] Because "numerous factors are relevant to execution, including (in addition to speed) price, clearing costs, convenience, and others," and thus "[falling] short of a hypothetical ideal market on one particular dimension" does not entail a breach of the duty of best execution, "considered as a whole and in light of the numerous dimensions on which [a client] might measure quality of execution." *Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410, 412 (2d Cir. 2009).

to adhere to any actual agreed-upon guidelines with any customer.  Absent any such allegations, BNYM's wholly accurate statement cannot plausibly constitute a scheme to defraud.

### F.     Same Rate

The Government also alleges that BNYM misrepresented that "each standing instruction client would receive the same pricing terms."  *Id.* ¶ 83.  The Government focuses on a May 2011 email, in which a BNYM employee responded to a question from Fidelity Mutual about whether BNYM priced currencies in developed and restricted markets in the same way.

> Yes, our current pricing process for what you call "Treasuries" (i.e. developed market currencies) is the same as for restricted market currencies.  We use the range of interbank pricing as a guide for pricing, generally purchasing currencies towards the low of the range and selling currencies towards the high of the range, with all clients receiving the same spot price.

Ex. 8 (quoted in SAC ¶ 88).  The Government alleges that this was fraudulent because, in fact, BNYM offered "benchmarking" arrangements to certain customers in which they agreed on a pre-negotiated spread over an external pricing source, or other custom-negotiated arrangements that allegedly offered more favorable standing instruction rates.  *See* SAC ¶¶ 86-90.  But the email does not deny the existence of such arrangements.  Rather, the email addressed whether, as to customers that "use the range of interbank pricing," currency trades in the same currency pair on a given day receive the same rate.  BNYM accurately responded that they do.[47]

In any case, a seller's representations about whether its other customers receive the same rate cannot as a matter of law constitute a scheme to defraud.  *See Litwin v. American Express Co.*, 838 F. Supp. 855, 859 (S.D.N.Y. 1993).  *Litwin* involved a fraud-based civil RICO action alleging that American Express had falsely stated to customers that its annual fee was not

---

[47] The Complaint also alleges that BNYM predecessor BNY's FX Policies and Procedures also stated that "the 'terms of FX transactions with any [ERISA plan] shall not be less favorable to the [ERISA plan] than terms offered by BNY to unrelated parties in a comparable arm's length FX transaction.'"  SAC ¶ 84 (quoting Ex. 7).  The Complaint does not identify any customer to whom this representation was made—let alone a customer that was an ERISA plan—and in any case fails to explain why standing instruction transactions using range-of-day pricing are "comparable" to transactions executed under a benchmarking agreement.

waivable, even though it had authorized its sales agents to waive the fee for certain preferred

customers.  *Id.* at 858-59.  The Court dismissed the plaintiff's claims:

> [A]n unlawful scheme to defraud must include at a minimum the potential for
> actual harm or injury.  There is no such potential or actuality here.  Consumers are
> told that if they want defendants' service, they must pay a fee.  If they pay that
> fee, they get the service.  That they might get the service also without paying the
> fee, or by paying a lesser fee, does not mean that they have suffered cognizable
> damage.  If it did, the resulting rule of law would bring the marketplace to a
> virtual standstill.  Merchants who advertised a price and then lowered it in
> response to consumer haggling . . ., including automobile dealers and electronics
> merchants, would be guilty of fraud. . . .  The mail and wire fraud statutes were
> not meant to protect consumers against the irritation of learning that others have
> gotten a better deal.

*Id.* at 859 (internal citations omitted).  This reasoning applies with even greater force to BNYM's

sophisticated customers and their investment managers, who could not have been ignorant of the

fact that market participants in a position to drive a hard bargain often get a better deal.

## IV.    The Complaint Fails to Allege Facts Supporting a Strong Inference of Fraudulent Intent

The SAC also should be dismissed pursuant to Rule 9(b) because it fails to "allege facts

that give rise to a strong inference of fraudulent intent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d

273, 290 (2d Cir. 2006) (internal quotations omitted); *see also Moore*, 189 F.3d at 173 (applying

strong inference requirement to mail and wire fraud claims).  Where, as here, the defendant is a

corporation, a plaintiff must plead facts supporting a strong inference that a particular agent or

individual employee acted with the requisite scienter.  *See Teamsters Local 445 Freight Div.*

*Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (citation omitted);

*Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004).[48]

---

[48] This Court has recognized that "there is authority at least suggesting that a plaintiff may establish corporate scienter by relying on the collective knowledge of its employees."  *Defer LP v Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218 & n.100 (S.D.N.Y. 2009) (Kaplan, J.) (citing *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005); *Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955, 962 (7th Cir. 1995); *United States v. Bank of New England, N.A.*, 821 F.2d 844, 855-56 (1st Cir. 1987)).  But *WorldCom* and *Caterpillar* should

34

Here, the Government has identified only one BNYM employee, David Nichols, who it alleges to have defrauded BNYM's custody customers. *See* SAC ¶¶ 10-11. As explained in Nichols' separate memorandum of law, the Government has failed to allege facts supporting a strong inference that Nichols possessed a specific intent to defraud BNYM's custody customers. Nichols' Mem. in Supp. of Mot. to Dismiss, at 21-27. Because the SAC fails to allege a strong inference of scienter as to Nichols – the only BNYM employee alleged to have acted with scienter – it has also failed to allege a strong inference of scienter as to BNYM and therefore must be dismissed.[49] *See Dynex Capital Inc.*, 531 F.3d at 195. In any case, the only motives that the SAC alleges to support an inference of fraud are the desire to earn profits, *see* SAC ¶¶ 4, 6, 103-140, and to maintain the confidentiality of sensitive information on BNYM's pricing methods and margins, *see id.* ¶¶ 88, 105-108, 127. But all corporations and their officers prefer to obtain more profits and to keep sensitive pricing information confidential, so alleging such motives does nothing to separate a viable fraud claim from a baseless one. *See Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996). The SAC's allegations thus cannot establish a strong inference that BNYM's employees specifically intended to defraud custody customers.

## CONCLUSION

For the foregoing reasons, BNYM's motion to dismiss should be granted.

---

not be followed in light of the more recent and compelling authority of *Dynex, Southland*, and *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 708 (7th Cir. 2008).

[49] The SAC likewise fails to allege any conduct by other BNYM employees that would support a strong inference of scienter. Its allegations that BNYM changed its website to clarify its definition of "best execution," SAC ¶ 59, "negate[] rather than support[] any inference of scienter." *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 169-70 (D. Mass. 2000). Also insufficient is the SAC's allegation that, after the State Street lawsuit, Robert Donelan, "a former Bank employee who had left BNYM in 2008," sent an email implying that BNYM was "raping . . . custodial accounts, all 'Public Trust' money." SAC ¶ 130. Even if this graphic and prejudicial statement (which BNYM rejects categorically) were intended as a serious accusation, the SAC fails to allege facts showing that Donelan had actual knowledge of BNYM's practices. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 442 (S.D.N.Y. 2005) (Kaplan, J.). Similarly, the SAC notes that a BNYM employee expressed concern about the State Street lawsuit, sending an email with the subject "Oh No," but this is entirely consistent with a concern that the lawsuit might result in numerous customer inquiries and (meritless) litigation against BNYM. *See, e.g., WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1055 (9th Cir. 2011) (ambiguous email insufficient to support "strong inference" of scienter), *cert. denied*, 132 S. Ct. 2713 (2012).

Dated:  August 6, 2012

Respectfully submitted,

THE BANK OF NEW YORK MELLON

/s/ Reid M. Figel

Reid M. Figel (RF-8663)
Rebecca A. Beynon (*pro hac vice*)
David L. Schwarz (*pro hac vice*)
Derek T. Ho (DH-0104)
Gregory G. Rapawy (*pro hac vice*)
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
rfigel@khhte.com
rbeynon@khhte.com
dschwarz@khhte.com
dho@khhte.com
grapawy@khhte.com

*Counsel for The Bank of New York Mellon*