**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　Plaintiff,　　　　　　　　　　:　　11 Civ. 6969 (LAK)
　　　　　　　　　　　　　　　　　　　　:
　　　　　　- v. -　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　:　　<u>ECF Case</u>
THE BANK OF NEW YORK MELLON and　　　 :
DAVID NICHOLS,　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　:
　　　　　Defendants.　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW OF THE UNITED STATES
## <u>IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
86 Chambers Street – 3rd Floor
New York, N.Y. 10007
Tel. No.:  (212) 637-2800
Fax No.:  (212) 637-2730

PIERRE G. ARMAND
LAWRENCE H. FOGELMAN
JAMES NICHOLAS BOEVING
Assistant United States Attorneys
　　　-Of Counsel-

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

FACTS...........................................................................................................................................3

    A.    BNYM's Standing Instruction Service...................................................................3

    B.    Defendants Intentionally and Materially Misrepresented Its Standing
        Instruction Service to Current and Prospective Clients........................................4

        1.    "Best Execution" ......................................................................................4

        2.    "Best Rate of the Day" .............................................................................6

        3.    "At the Time the Trade is Executed" .......................................................6

        4.    "Free of Charge" and "Minimize Risks and Costs" ...............................7

        5.    Aggregation and Netting .........................................................................8

        6.    All Standing Instruction Clients Did Not Receive the Same Price ........8

        7.    BNYM Defrauded Customers Trading in Restricted Currencies...........9

    C.    Defendants Intentionally Withheld Material Information to Conceal
        Their Fraud ..........................................................................................................10

    D.    Defendants Reaped Enormous Profits from These Fraudulent Practices.............13

    E.    Defendants' Fraud Affected Federally Insured Financial Institutions ...............13

ARGUMENT .................................................................................................................................14

THE SAC STATES A FIRREA CLAIM AGAINST THE DEFENDANTS.................................14

POINT I.    THE GOVERNING STATUTORY FRAMEWORK .................................14

    A.    FIRREA.................................................................................................................14

    B.    The Mail and Wire Fraud Statutes.......................................................................15

POINT II.    THE SAC ALLEGES THAT DEFENDANTS' MAIL AND WIRE
FRAUD  "AFFECT[ED]" FEDERALLY INSURED FINANCIAL INSTITUTIONS....15

    A.    BNYM May Be Held Liable Under FIRREA for Committing Fraud that
Puts Its Own Federally Insured Deposits at Risk ............................................17

        1.    The Plain Text of FIRREA and Relevant Case Law Establish that a Federally
Insured Financial Institution May Be Held Liable For Perpetrating a Fraud
"Affecting" Itself ............................................................................17

        2.    Holding a Federally Insured Financial Institution Liable Under
FIRREA for Fraud Furthers the Legislative Purpose of FIRREA......................24

    B.    The SAC Adequately Alleges that Federally Insured Financial Institutions
Were Affected By Defendants' Mail and Wire Fraud........................................27

POINT III.    THE SAC PLEADS MORE THAN SUFFICIENT FACTS TO STATE A
CLAIM THAT DEFENDANTS VIOLATED THE MAIL AND WIRE
FRAUD STATUTES.......................................................................................33

    A.    The SAC Sufficiently Alleges a Scheme to Defraud........................................34

        1.    Disclosing Price Alone Does Not Negate the Fraudulent Scheme....................34

        2.    The SAC's Allegations Are Plausible ....................................................37

        3.    Defendants Had a Duty to Disclose the Bank's Pricing Practices....................39

    B.    The SAC Sufficiently Alleges Fraudulent Intent .............................................41

        1.    The Governing Standard..................................................................41

        2.    The SAC Adequately Pleads that BNYM Intended to Defraud
Its Clients.................................................................................43

            a.    BNYM's Scheme to Defraud Establishes Its Specific Intent.................44

            b.    BNYM's Effort to Conceal Its Scheme Is Further Evidence
of Its Intent to Defraud............................................................45

            c.    BNYM's Profits and Its Client's Corresponding Losses
Evince Intent..........................................................................45

            d.    BNYM's Arguments Are Without Merit .............................................46

ii

3.      The SAC Adequately Pleads that Nichols Intended to Defraud Clients........................................................................................48

     a.      Nichols Intended to Commit Fraud .........................................48

     b.      Nichols' Arguments Are Unavailing.......................................49

C.      The Government Adequately Alleges That Defendants' Misrepresentations and Omissions Were Material .........................................................................51

1.      "Best Execution" and "Best Rate of the Day"....................................52

2.      "At the Time the Trade Is Executed" ..................................................55

3.      "Free of Charge" and "Minimize Risks and Costs" ...........................56

4.      Netting ................................................................................................58

5.      Same Pricing Terms ...........................................................................58

CONCLUSION .....................................................................................................................60

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*AUSA Life Insurance Co. v. Ernst and Young,*
  206 F.3d 202 (2d Cir. 2000)...................................................................................45

*Acito v. IMCERA Group, Inc.,*
  47 F.3d 47 (2d Cir. 1995)....................................................................................29

*Archer v. Nissan Motor Acceptance Corp.,*
  550 F.3d 506 (5th Cir. 2008)................................................................................53

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..........................................................................................37

*Bernstein v. Misk,*
  948 F. Supp. 228 (E.D.N.Y. 1997) .......................................................................29

*Besteman v. Hager,*
  No. 06-10223-BC, 2007 WL 1686513 (E.D. Mich. Jun. 8, 2007)...........................19

*Bridge v Phoenix Bond & Indemnity Co.,*
  553 U.S. 639 (2008)..........................................................................................29

*Capital Management Select Fund v. Bennett,*
  670 F.3d 194 (2d Cir. 2012)................................................................................39

*In re Cardiac Devices Qui Tam Litigation,*
  221 F.R.D. 318 (D. Conn. 2004)..........................................................................28

*City of Pontiac General Employees' Retirement System v. Lockheed Martin Co.,* 844 F.
  Supp. 2d 498 (S.D.N.Y. 2012)............................................................................47

*Corley v. Rosewood Care Center Inc. of Peoria,*
  388 F.3d 990 (7th Cir. 2004)...............................................................................53

*In re Crazy Eddie Securities Litigation,*
  812 F. Supp. 338 (E.D.N.Y. 1993) .......................................................................29

*Cresswell v. Sullivan & Cromwell,*
  922 F.2d 60 (2d Cir. 1990)..................................................................................23

*Defer LP v. Raymond James Financial, Inc.,*
  654 F. Supp. 2d 204 (S.D.N.Y. 2009)...................................................................43

*Defer LP v. Raymond James Financial, Inc.*,
  No. 08 Civ. 3449 (LAK), 2010 WL 3452387 (S.D.N.Y. Sept. 2, 2010) ..........................42, 43

*Degulis v. LXR Biotechnology, Inc.*,
  928 F. Supp. 1301 (S.D.N.Y. 1996)...........................................................29

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*,
  553 F.3d 187 (2d Cir. 2009)....................................................................42

*Evercrete Corp. v. H-Cap Limited*,
  429 F. Supp. 2d 612 (S.D.N.Y. 2006).......................................................29

*FDIC v. Isham*,
  777 F. Supp. 828 (D. Colo. 1991)............................................................26

*Florida State Board of Administration v. Green Tree Finance Corp.*,
  270 F.3d 645 (8th Cir. 2001)...................................................................50

*Freudenberg v. ETrade Finance, Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).......................................................53

*Griffin v. McNiff*,
  744 F. Supp. 1237 (S.D.N.Y. 1990)..........................................................43

*Hansen Beverage Co. v. Innovation Ventures, LLC*,
  No. 08-CV-1166-IEG, 2009 WL 6597891 (S.D. Cal. Dec. 23, 2009)...................53

*Hemi Group, LLC v. City of New York*,
  130 S. Ct. 983 (2010)............................................................................30

*Hoff v. Larkins*,
  No. 07 Civ. 0514 (TCM), 2010 WL 1221788 (E.D. Mo. 2010) ...........................19

*Hunt v. Enzo Biochem, Inc.*,
  471 F. Supp. 2d 390 (S.D.N.Y. 2006)........................................................29

*International Union of Operating Engineers v. Bank of New York Mellon Corp.,* No. C 11-
  03620, 2012 WL 476526 (N.D. Cal. Feb. 14, 2012).......................................13, 56

*Inventorprise Inc. v. Target Corp.*,
  No. 09-CV-00380, 2009 WL 3644076 (N.D.N.Y. Nov. 2, 2009) ...........................23

*Iron Workers Local Number 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*,
    616 F. Supp. 2d 461 (S.D.N.Y. 2009) ................................................................47

*Kassner v. 2nd Avenue Delicatessen Inc.*,
    496 F.3d 229 (2d Cir. 2007) ................................................................33

*Lee v. Bankers Trust Co.*,
    166 F.3d 540 (2d Cir. 1999) ................................................................19

*Litwin v. America Express Co.*,
    838 F. Supp. 855 (S.D.N.Y. 1993) ................................................................59

*In re Livent, Inc. Noteholders Sec. Litigation*,
    174 F. Supp. 2d 144 (S.D.N.Y. 2001) ................................................................54

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ................................................................47

*In re MBIA, Inc. Sec. Litigation*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) ................................................................47

*Maersk, Inc. v. Neewra, Inc.*,
    554 F. Supp. 2d 424 (S.D.N.Y. 2008) ................................................................42

*McCann v. Lucky Money, Inc.*,
    29 Cal. Rptr. 3d 437 (Cal. Ct. App. 2005) ................................................................57

*McCarty v. Roots*,
    62 U.S. 432 (1858) ................................................................19

*Meisel v. Grunberg*,
    651 F. Supp. 2d 98 (S.D.N.Y. 2009) ................................................................42

*In re Mexico Money Transfer Litigation*,
    267 F.3d 743 (7th Cir. 2001) ................................................................36, 37, 57

*Muller-Paisner v. TIAA*,
    289 F. App'x 461 (2d Cir. 2008) ................................................................41

*Neder v. United States*,
    527 U.S. 1 (1999) ................................................................52

*Nelson v. Publishers Circulation Fulfillment, Inc.*
    No. 11 Civ. 1182 (TPG), 2012 WL 760335 (S.D.N.Y. May 7, 2012) ................................................................53

*Nielsen Co. v. Success Sys.,*
   11 Civ. 2939 (BSJ) (FM), 2012 WL 124592 (S.D.N.Y. Jan. 17, 2012) .................................32

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000)..........................................................................................44, 53

*Phillips v. Kidder, Peabody & Co.,*
   933 F. Supp. 303 (S.D.N.Y. 1996)..........................................................................................54

*Powers v. British Vita, P.L.C.,*
   57 F.3d 176 (2d Cir. 1995)..........................................................................................43

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.,*
   68 F.3d 1478 (2d Cir. 1995)..........................................................................................40, 41

*Resolution Trust Corp. v. Gibson,*
   829 F. Supp. 1110 (W.D. Mo. 1993) .................................................................................27

*Rhinelander Paper Co. v. F.E.R.C.,*
   405 F.3d 1 (D.C. Cir. 2005) .................................................................................18

*Robinson v. City of New Haven,*
   578 F. Supp. 2d 385 (D. Conn. 2008) .................................................................................32

*Sanchez v. Giromex,*
   No. D042459, 2004 WL 2750332 (Cal. Ct. App. Dec. 2, 2004) (Br. at 26) .........................57

*SEC v. Pentagon Capital Management PLC,*
   612 F. Supp. 2d 241 (S.D.N.Y. 2009)..........................................................................................45

*SEC v. Savino,*
   No. 01 Civ. 2438 (GBD), 2006 WL 375074 (S.D.N.Y. Feb. 16, 2006) .................................45

*In re Scholastic Corp. Securities Litigation,*
   252 F.3d 63 (2d Cir. 2001)..........................................................................................54

*Snyder v. Farnam Cos., Inc.,*
   792 F. Supp. 2d 712 (D.N.J. 2011) .................................................................................53

*State of Florida v. The Bank of New York Mellon Corp.,*
   Case No. 2009 CA 4140 (Leon County, FL) .................................................................................41

*State of New York v. The Bank of New York Mellon Corp.,*
   Index No: 09/114735 (N.Y. County, NY) .................................................................................41

*In re Take-Two Interactive Securities Litigation,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)................................................................47

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.,*
    531 F.3d 190 (2d Cir. 2008)................................................................46

*United Savers Acceptance Corp. v. Kelton,*
    775 F. Supp. 141 (D. Vt. 1991)................................................................51

*United States ex rel. Bledsoe v. Community Health System,*
    501 F.3d 493 (6th Cir. 2007)................................................................28

*United States ex rel. Franklin v. Parke-Davis,*
    147 F. Supp. 2d 39 (D. Mass. 2001) ................................................................28

*United States v. Abbate,*
    47 F. App'x 52 (2d Cir. 2002) ................................................................31

*United States v. A&P Trucking Co.,*
    358 U.S. 121 (1958)................................................................17

*United States v. Agne,*
    214 F.3d 47 (1st Cir. 2000)................................................................30

*United States v. Altman,*
    48 F.3d 96 (2d Cir. 1995)................................................................51

*United States v. Autuori,*
    212 F.3d 105 (2d Cir. 2000)................................................................15, 34, 40

*United States v. Bank of New England, N.A.,*
    821 F.2d 844 (1st Cir. 1987)................................................................43

*United States v. Barrett,*
    178 F.3d 643 (2d Cir. 1999)................................................................43

*United States v. Bennett,*
    161 F.3d 171 (3d Cir. 1998)................................................................27

*United States v. Bouyea,*
    152 F.3d 192 (2d Cir. 1998)................................................................ *passim*

*United States v. Bradley,*
    644 F.3d 1213 (11th Cir. 2011)................................................................43

*United States v. Carollo,*
    No. 10 Cr. 654 (HB), 2011 WL 3875322 (S.D.N.Y. Aug. 25, 2011) ......................................30

*United States v. Chacko,*
    169 F.3d 140 (2d Cir. 1999).............................................................................................45

*United States v. Collins,*
    361 F.3d 343 (7th Cir. 2004)...........................................................................................21

*United States v. D'Amato,*
    39 F.3d 1249 (2d Cir. 1994).......................................................................................46, 47

*United States v. Daugerdas,*
    No. 99 Cr. 581 (WHP), 2011 WL 6020113 (S.D.N.Y. Apr. 5, 2011) ........................19, 20, 21

*United States v. Federal Record Service Corp.,*
    No. 99 Civ. 3290 (BSJ), 1999 WL 335826 (S.D.N.Y. May 24, 1999)...................................40

*United States v. Frank,*
    156 F.3d 332 (2d Cir. 1988)............................................................................................44

*United States v. Ghavami,*
    No. 10 Cr. 1217 (KMW*)*, 2012 WL 2878126 (S.D.N.Y. Jul. 13, 2012)......................... *passim*

*United States v. Gravatt,*
    280 F.3d 1189 (8th Cir. 2002)........................................................................................46

*United States v. Harkonen,*
    No. C 08-00164, 2010 WL 2985257 (N.D. Cal. July 27, 2010) .............................................44

*United States v. Hartz,*
    296 F.3d 595 (7th Cir. 2002)..........................................................................................27

*United States v. Hoffecker,*
    530 F.3d 137 (3d Cir. 2008)............................................................................................21

*United States v. Johnson,*
    130 F.3d 130 (9th Cir. 1997)...............................................................................27, 30, 31

*United States v. Martin,*
    411 F. Supp. 2d 370 (S.D.N.Y. 2006).................................................................................46

*United States v. Martinez,*
    172 F.3d 39, 1999 WL 38842 (2d Cir. Jan. 27, 1999) ..........................................................20

*United States v. Mavashev*,
    No. 08-CR-902 (DLI), 2009 WL 4746301 ...................................................................30, 31

*United States v. Mittelstaedt*,
    31 F.3d 1208 (2d Cir. 1994).........................................................................................52

*United States v. Mullins*,
    613 F.3d 1273 (10th Cir. 2010), *cert. denied* 131 S. Ct. 582 (2010) ................................18, 31

*United States v. Naranjo*,
    634 F.3d 1198 (11th Cir. 2011).....................................................................................50

*United States v. O'Connor*,
    656 F.3d 630 (7th Cir. 2011).........................................................................................42

*United States v. Ohle*,
    678 F. Supp. 2d 215 (S.D.N.Y. 2010)......................................................................20, 21, 30

*United States v. Paneras*,
    222 F.3d 406 (7th Cir. 2000).........................................................................................43

*United States v. Park*,
    164 F. App'x 584 (9th Cir. 2006) ..................................................................................45

*United States v. Pelullo*,
    964 F.2d 193 (3d Cir. 1992)....................................................................................30, 31

*United States v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ....................................................................................44

*United States v. Ragosta*,
    970 F.2d 1085 (2d Cir. 1992).......................................................................................34

*United States v. Regent Office Supply*,
    421 F.2d 1174 (2d Cir. 1970).......................................................................................36

*United States v. Rubin/Chambers, Dunhill Insurance Serv.*,
    831 F. Supp. 2d 779 (S.D.N.Y. 2011)..................................................................... *passim*

*United States v. Schinnell*,
    80 F.3d 1064 (5th Cir. 1996)........................................................................................31

*United States v. Serpico*,
    320 F.3d 691 (7th Cir. 2003)............................................................................20, 21, 24, 31

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007)...................................................................................15, 36

*United States v. Sheneman,*
    682 F.3d 623 (7th Cir. 2012)...........................................................................................43

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987)..............................................................................................36

*United States v. Stevens,*
    210 F.3d 356 (2d Cir. 2000)............................................................................................42

*United States v. Tarallo,*
    380 F.3d 1174 (9th Cir. 2004).........................................................................................48

*United States v. Teyibo,*
    877 F. Supp. 846 (S.D.N.Y. 1995), *aff'd* 101 F.3d 681 (2d Cir. 1996) ...................52

*United States v. Townley,*
    665 F.2d 579, 585 (5th Cir. 1982)...................................................................................52

*United States v. Treadwell,*
    593 F.3d 990 (9th Cir. 2010)...........................................................................................44

*United States v. Vanoosterhout,*
    898 F. Supp. 25 (D.D.C. 1995), *aff'd*, 96 F.3d 1491 (D.C. Cir. 1996) ...................23

*United States v. Wiant,*
    314 F.3d 826 (6th Cir. 2003)...........................................................................................31

*United States v. Wynn,*
    684 F.3d 473 (4th Cir. 2012)...........................................................................................42

*In re WorldCom, Inc. Securities Litigation,*
    352 F. Supp. 2d 472 (S.D.N.Y. 2005).............................................................................47

*In re Xerox Corp. Securities Litigation,*
    165 F. Supp. 2d 208 (D. Conn. 2001).............................................................................53

## **Statutes**

1 U.S.C. § 1 .........................................................................................................................17, 22

12 U.S.C. § 1833a................................................................................................................1, 41

12 U.S.C. § 1833a(a) ...................................................................................................14, 17, 22

12 U.S.C. § 1833a(c) ........................................................................................................15, 17

15 U.S.C. § 645(a) ................................................................................................................23

18 U.S.C. § 1005 ..................................................................................................................23

18 U.S.C. § 1007 ..................................................................................................................23

18 U.S.C. § 1014 ..................................................................................................................23

18 U.S.C. § 1341 ............................................................................................................15, 17

18 U.S.C. § 1343 ............................................................................................................15, 17

18 U.S.C. § 3293(2) ..............................................................................................................18

28 U.S.C. § 1927 ..................................................................................................................23

35 U.S.C. § 292 ....................................................................................................................23

## Miscellaneous

135 Cong. Rec. S3993-01 (daily ed. Apr. 17, 1989) .........................................................25

135 Cong. Rec. S4001 (daily ed. Apr. 17, 1989) ..............................................................25

135 Cong. Rec. S4003 (daily ed. Apr. 17, 1989) ..............................................................25

135 Cong. Rec. S9895 (daily ed. Aug. 3, 1989) ...............................................................26

H.R. Rep. No. 101-681(I), *reprinted in* 1990 U.S.C.C.A.N. 6472 ...............................18

H.R. Rep. No. 101-54(I), *reprinted in* 1989 U.S.C.C.A.N. 86 ......................................25

P.L. 101-647, § 2507, 104 Stat. 4789 (1990) ....................................................................18

Pub. L. 101-73, Title IX, § 961(*l*)(1), 103 Stat. 183 (1989) ..........................................18

Pub. L. 101-73, Title IX, § 961(m), 103 Stat. 183 (1989) ...............................................18

*Prosecuting Fraud in the Thrift Industry: Hearings Before the H. Subcomm. On
Criminal Justice of the Committee on the Judiciary, 101st Cong. (1989),*
  1989 WL 1178203 ...............................................................................................25

Remarks by President Bush Upon Signing H.R. 1248 into Law,
    1989 WL 1178375, at *1 (Aug. 9, 1989) ................................................................................26

S. Rep. No. 101-19 (1989), 1989 WL 1178181 ...........................................................................24

**PRELIMINARY STATEMENT**

The Bank of New York Mellon ("BNYM" or the "Bank") and David Nichols, a Managing Director of BNYM (collectively, "defendants"), violated the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA"), because they fraudulently misled customers about the Bank's foreign exchange ("FX") service, thereby committing mail and wire fraud that affected federally insured financial institutions.  As alleged in the Second Amended Complaint ("SAC"):  defendants intentionally made material misrepresentations to existing and prospective clients about how BNYM's FX standing instruction service worked, including, *inter alia*, that BNYM offered "best execution," the "best rate of the day," prices reflecting market rates at "the time the trade is executed by the foreign exchange desk," and "netting" of clients' trades, as well as that the service was "free" and "minimize[d]" costs.  Defendants employed these misrepresentations to conceal the truth about the standing instruction service, including the key fact that BNYM did not execute trades at all, but simply assigned clients virtually the worst prices of the day.  Indeed, BNYM personnel, including Nichols, acknowledged that concealment was the key to the huge profits that defendants reaped from their fraud.  The fraud harmed numerous financial institutions whose deposits are federally insured (including BNYM itself) by exposing them to losses.

In their respective motions to dismiss, defendants proffer two principal arguments, neither of which has merit.  First, defendants argue that, even if they did commit fraud, they are not liable under FIRREA.  According to defendants, a federally insured financial institution is not liable under FIRREA for committing a fraud affecting itself.  However, the plain text, case law and legislative history of FIRREA conclusively establish that federally insured financial institutions may be held liable under FIRREA when they commit frauds that puts their own federally insured deposits at risk.  FIRREA was enacted in the wake of the Savings and Loan Crisis in the 1980s specifically to

enhance the Government's ability to prosecute the kinds of fraud and misconduct, including conduct of financial institutions themselves, that jeopardize federally insured deposits.  *Infra*, Pt. II. Defendants also argue that the SAC fails adequately to identify other affected federally insured financial institutions.  This argument, however, fails since the SAC identifies specific examples of federally insured financial institutions who received fraudulent statements and incurred actual losses from defendants' scheme, which is sufficient.  *Infra*, Pt. II.

Second, defendants argue that the SAC fails to detail the fraud, or show scienter and materiality.  Defendants wrongly claim that because their clients could learn the price associated with an FX transaction or that the transactions occurred within a guaranteed range, there could be no fraud.  They conveniently ignore, however, the SAC's allegations that they deliberately concealed how they were pricing these transactions so that their clients were unable to ascertain the falsity of their representations that the Bank would price transactions at favorable rates.  *Infra*, Pt. III.A.1.  Nor can defendants shift the blame to their intended victims by arguing that, notwithstanding the multitude of fraudulent misrepresentations and omissions detailed in the SAC, it would have been implausible for the Bank's clients to believe what defendants were telling them. *Infra*, Pt. III.A.2.  Defendants also argue that they had no fiduciary duty to disclose the truth of the pricing scheme, but ignore cases demonstrating that defendants had a duty to correct their misleading statements, share their superior knowledge with clients, and that their representations inviting the trust of the Bank's clients necessitated further disclosures.  *Infra*, Pt. III.A.3. Defendants' claim that the SAC fails to allege scienter also misses the mark, as the SAC alleges that defendants acted recklessly in promoting, carrying out, and concealing their scheme, while benefiting in a concrete and personal way as a result.  *Infra*, Pt. III.B.  Finally, defendants cannot demonstrate that the particularized misrepresentations alleged in the complaint are not material by engaging in factual arguments on a motion to dismiss.  *Infra*, Pt. III.C.

**FACTS**

As set forth in the SAC, defendants offered BNYM's clients a standing instruction service that provided clients with currency trades on an as-needed basis for, among other things, purchasing foreign securities and converting dividends in foreign currencies into dollars.  *Infra*, Facts, A.  Defendants, however, made material misrepresentations about this service to mislead their clients about what they were actually getting.  *Infra*, Facts, B.  In addition, defendants intentionally omitted disclosing how the Bank actually priced its standing instruction transactions, knowing that such disclosure would hurt the Bank's profits as clients would seek better pricing.  *Infra*, Facts, C.  Indeed, the Bank profited enormously from this scheme, and Nichols himself benefited through his bonus.  *Infra*, Facts, D.  BNYM has been affected by defendants' fraud and the scheme has affected the Bank's federally insured financial institution clients.  *Infra*, Facts, E.

**A.      BNYM's Standing Instruction Service**

BNYM performs FX services for its custodial clients.  SAC ¶ 19.  Clients can directly negotiate currency trades with BNYM at exchange rates agreed to by the parties.  SAC ¶¶ 2, 22.  Alternatively, clients can take part in BNYM's "standing instruction" FX service, through which BNYM automatically provides currency exchange on an as-needed basis in circumstances where, for example, the client receives dividends on foreign securities or buys or sells foreign securities.  SAC ¶¶ 2, 22.  As Nichols asserts, "[m]any fund managers and asset owners choose to use BNYM's standing instruction services because they do not have the knowledge, operational infrastructure, or personnel to negotiate and manage foreign exchange transactions."  (Nichols Br. at 3-4).[1]

BNYM routed standing instruction trade requests throughout the day to its Currency Management System ("CMS").  SAC ¶ 26.  Rather than maintaining inventories of currencies to

---

[1]   Citations to BNYM's Memorandum of Law in Support of Its Motion to Dismiss the Second Amended Complaint are referenced as "Br. at __," and to the Memorandum of Law in Support of Defendant David Nichols' Motion to Dismiss as "Nichols Br. at __".

address the currency needs of standing instruction clients, BNYM would determine its own currency needs based on the standing instruction trades submitted to CMS, and buy or sell on the spot market whatever currencies the Bank required in its CMS portfolio. SAC ¶¶ 26-27. These trades on the Bank's behalf were time-stamped and the exchange rates were recorded. SAC ¶ 28.

While BNYM met its own currency needs based on the standing instruction transactions that came through each day by executing trades on the interbank market, BNYM's standing instruction clients did not have their currency needs met through trades on the interbank market. SAC ¶¶ 29-32. Instead, BNYM waited until the late afternoon, examined the full range of reported interbank prices for each currency pair, and assigned the worst possible interbank rates for its standing instruction clients – *i.e.*, the lowest rate for currency sales and the highest rate for currency purchases. SAC ¶ 29. BNYM frequently applied a slight modifier to avoid providing the absolute worst price of the day, but rather gave clients very close to the worst price of the day. SAC ¶ 29. BNYM gained the difference between the price obtained by the Bank for itself on the interbank market, and the close to the worst price of the day that BNYM assigned its clients. SAC ¶¶ 32, 36.

**B.    Defendants Intentionally and Materially Misrepresented the Bank's Standing Instruction Service to Current and Prospective Clients**

Defendants made material misrepresentations about the Bank's standing instruction service from at least 2000 through 2011. Defendants did not differentiate between federally insured and non-federally insured clients in making these false statements. SAC ¶¶ 40, 141-42.

**1.    "Best Execution"**

Defendants fraudulently misrepresented to current and prospective clients – through the Bank's website, responses to requests for proposals ("RFPs") from prospective clients describing the Bank's services, in Question and Answer documents, and in a submission to a magazine – that the Bank provided "best execution." SAC ¶¶ 41-59. BNYM made these representations to federally insured clients such as KeyBank and U.S. Bank, as well as pension funds. SAC ¶¶ 46, 47, 56.

4

Defendants knew that the industry standard definition of "best execution" required maximizing the value a client received via a trade, and used the term to mislead clients into thinking that they were do so while actually providing virtually the worst interbank price of the day.  SAC ¶¶ 53-54.

Nichols was the architect of the Bank's definition of "best execution" that was circulated to clients, including federally insured financial institutions such as U.S. Bank.  SAC ¶¶ 53, 56.  In preparing the Bank's articulation of "best execution" in May 2005, Nichols expressly drew on the industry standard definition of best execution.  SAC ¶ 53.  He cited the Security Exchange Commission's statement that "best execution is trading 'in such a manner that the client's total cost or proceeds in each transaction is the most favorable under the circumstances,'" and likewise cited the Association for Investment Management and Research's definition of best execution as "well informed trade execution decisions made with the intent of maximising [sic] the value of the client portfolio under the particular circumstances at the time."  SAC ¶ 53.  Drawing on these industry definitions, Nichols wrote in the Bank's articulation of best execution that the Bank's "goal" was "maximizing the value of the client portfolio under the particular circumstances at the time."  SAC ¶ 53.  Nichols and the Bank also included in this definition of best execution the false statement that the Bank was in fact assisting investment managers in discharging their fiduciary duties by maximizing the proceeds of each trade.  SAC ¶ 55.  Nichols disseminated this language to clients and encouraged other BNYM employees to do the same.  SAC ¶ 10.  He knew that his statements about standing instruction were false and/or misleading, yet he continued to make them in order to enhance the Bank's revenue, his own compensation, and his advancement at the Bank.  SAC ¶ 10.

BNYM did not provide "best execution."  It neither sought to "maximize" the value of its clients' portfolios, nor assist managers in discharging their fiduciary duties.  Instead, BNYM assigned the worst or close to the worst price of the day to its clients, profiting at their expense.  SAC ¶¶ 35, 44.  Defendants simply lied by claiming to offer "best execution" to standing instruction

service clients.  Indeed, while outwardly claiming that its standing instruction service offered "best execution" to clients, defendants internally acknowledged efforts by clients to achieve "best execution" had cut into BNYM's sales margins.  SAC ¶ 58.

        **2.**     **"Best Rate of the Day"**

Other documents prepared and disseminated by BNYM purported to offer clients the "best rate."  In a Question and Answer document to guide employees in answering client inquiries from 2005, the Bank represented that it "ensures best execution on foreign exchange transactions through the following mechanisms:  As a major market participant, the Bank is actively engaged in making markets and taking positions in numerous currencies so that we can provide the best rates for our clients."  SAC ¶ 43.  BNYM similarly referenced the price it provided as the "best rate of the day."  SAC ¶ 43.  A June 2006 Question and Answer document also advised current and prospective clients:  "Clients benefit from our attractive rates because we aggregate all client income in any given currency to obtain the 'best rate of the day.'  That 'best rate of the day' is applied to all of the income conversions that we execute for that day, regardless of the amount."  SAC ¶ 44.  Nichols circulated this false language in April 2006 to other BNYM employees as the Bank's "RFP boilerplate."  SAC ¶ 44.  As explained above, BNYM provided the worst rate of the day for clients, not the "best rate."

        **3.**     **"At the Time the Trade is Executed"**

The Bank's definition of "best execution," which Nichols drafted, falsely represented that BNYM "price[d] foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk."  SAC ¶ 60.  In truth, BNYM did not "execute" trades for standing instruction clients at a specific time.  SAC ¶ 63.  Rather, while BNYM executed transactions for its own portfolio at a specific time and at a specific rate, the Bank's standing instruction clients were assigned close to the lowest rate of the entire trading day for currency sales,

and were likewise assigned close to the highest rate for the entire trading day for currency purchases.  SAC ¶¶ 26-29.  Yet, defendants misled clients into believing that a contemporaneous trade actually occurred, specifically stating that there was a "time" that the trade was "executed."  SAC ¶ 63.  BNYM made this statement to many clients, including federally insured entities (such as U.S. Bank) and pension funds.  SAC ¶¶ 60-61.  BNYM even misled clients inquiring about the prices, claiming that trades had occurred when prices were unfavorable.  SAC ¶ 64.

> **4.     "Free of Charge" and "Minimize Risks and Costs"**

BNYM stated on its website that its standing instruction service was "free of charge" and "designed to help clients minimize risks and costs related to the foreign exchange and concentrate on their core business."  SAC ¶ 66.  BNYM also made these claims in RFPs to many clients including federally insured financial institutions (*e.g.*, KeyBank) and pension funds.  SAC ¶ 68.  BNYM's true pricing scheme enabled it to claim substantial and hidden fees – the difference between the price BNYM obtained for itself and the worse price given to clients.  SAC ¶ 69.

Nichols admitted to other Bank personnel that standing instruction transactions were not free of charge.  For example, Nichols stated in an August 2006 email: "We charge a premium for our services."  SAC ¶ 70.  BNYM recognized that disclosure of standing instruction "fee information" would hurt the Bank's profits, and that clients would seek to "reduce their fees."  SAC ¶ 128.

Nichols also understood that standing instruction services were not designed to minimize costs.  In 2003, Nichols modified a quotation in an article attributed to him asserting that standing instruction and best execution were important in "controlling costs" by removing the reference to controlling costs, explaining:  "Under no circumstances do we want this article to appear to be all about controlling costs.  That would be very counter-productive to our intent in sponsoring the Pensions Week FX supplement, as <u>plan sponsor costs are our revenues</u>."  SAC ¶ 71 (emphasis added).

### 5.    Aggregation and Netting

BNYM falsely represented on its website until 2012 that standing instruction clients benefited from "[a]ggregation and netting of trades based on guidelines tailored to client needs." SAC ¶ 74.  Prior to the merger with Bank of New York, Mellon Bank N.A. also represented that: "Currency purchases and sales effected pursuant to these Procedures in the same currency and having the same trade and value date may be netted for pricing purposes within a customer account."  SAC ¶ 74.  BNYM's "best execution" definition likewise promised "aggregating or netting trades."[2]  Clients would have had significant savings if BNYM actually netted trades, because instead of engaging in separate buy and sell transactions in the same currency for a client, the Bank would have bought or sold only the net amount needed for the transaction.  SAC ¶¶ 74-75.

BNYM, however, did not actually provide clients with netting at BNYM's Pittsburgh trading desk.  SAC ¶ 79.  Instead, BNYM priced the larger side of the transaction at close to the worst interbank price of the day, and the opposite side of the transaction was priced at least half a percentage point apart from the larger side of the transaction.  SAC ¶ 77.  BNYM thus made a profit on both the buy and sell side of the transaction at the clients' expense, instead of offsetting those transactions against each other.  SAC ¶ 77.  BNYM knew that this practice was not "netting."  A bank document from 2010 described the practice at the Pittsburgh desk as a "bid/offer scheme," and explicitly distinguished this practice from "netting" performed at other trading desks.  SAC ¶ 79.

### 6.    All Standing Instruction Clients Did Not Receive the Same Price

BNYM routinely and falsely told clients that all standing instruction transactions were priced at the same rate.  SAC ¶ 83.  BNYM's Welcome Package distributed to many clients, including Fidelity in 2007, stated:  "The terms of FX transactions with any Plan shall not be less favorable to the Plan than terms offered by the Bank of New York to unrelated parties in a

---

[2]  *See* Declaration of Daniel H.R. Laguardia ("Laguardia Decl.") Ex. 5.

comparable arm's length FX transaction."  SAC ¶ 85.   An April 2007 form Welcome Package contained the same misrepresentation.  SAC ¶ 85.  BNYM likewise wrote in a 2009 email to a client that "all clients in our SI program are executed at the same rate."  SAC ¶ 83.

However, contrary to its misrepresentations that standing instruction customers received the same pricing, BNYM gave special treatment to certain standing instruction clients when defendants deemed it necessary.  SAC ¶¶ 87, 92.  For example, when clients challenged the fairness of standing instruction pricing, BNYM switched them to a standing instruction practice with benchmark pricing.   SAC ¶ 86.   This provided clients a specific price spread for standing instruction transactions as compared to a particular benchmark rate for that day.  SAC ¶ 86.

Nichols himself told a client, Fidelity, in May 2011, that "all clients receiv[e] the same spot price," even though he knew this was false.  SAC ¶¶ 88, 92; Laguardia Decl. Ex. 1.  Indeed, in January 2004, Nichols explained to other Bank personnel:  "in certain highly competitive cases where the prospect is a company of substantial market stature, or they are being guided by a consultant that is specifically focusing on benchmark execution, then we should express a willingness to engage the customer in discussions regarding transparency in standing instruction execution."  SAC ¶ 88.  At the same time, Nichols rejected the idea of benchmarking in a standard RFP response that would be distributed to prospective clients, observing: "[W]e do not want to make the paragraph [in the attached RFP] describing our willingness to embrace transparency and accountability through a WM benchmark pricing arrangement the standard RFP answer used bankwide."  SAC ¶ 88.  Nichols opposed benchmark pricing because it "limits our potential to take wider margins when intraday spreads in emerging market currencies widen."  SAC ¶ 94.

## 7.    BNYM Defrauded Customers Trading in Restricted Currencies

BNYM defrauded customers by making false representations regarding the pricing of restricted currencies.  BNYM did not begin to inform clients about how the Bank priced standing

instruction transactions until late 2009, when the California Attorney General filed a fraud lawsuit against State Street Bank based on its standing instruction service.  SAC ¶¶ 112, 129-130, 141.  Eventually BNYM told clients that "BNY Mellon typically derives pricing for standing instruction trades (whether processed in the U.S. or elsewhere) from the respective currency's daily pricing range for directly executed, marketable size FX transactions between financial institutions [the interbank range of the day]; we tend to price our purchases of currencies towards the low end of this range and our sales of currencies towards the high end, regardless of trade size."  SAC ¶ 141.  This representation was false with respect to restricted currencies, such as the New Taiwan dollar.  In fact, instead of assigning a price based on the worst interbank rate of the day, BNYM took its fraud a step further.  BNYM assigned prices by taking into account artificial rates set by foreign governments such as the Central Bank of China, which exceeded the interbank price range and did not reflect actual trading on the interbank market.  SAC ¶¶ 142-44.  Customers thus received worse prices than any price reported on the interbank market by Bloomberg, while the Bank pocketed extremely large spreads at its customers' expense.  SAC ¶¶ 145, 147-54.   When one Bank employee recognized the manipulation in the New Taiwan dollar market, and sought guidance on how to price a USD/TWD trade, he was told to use the artificial range of the day.  SAC ¶ 146.

C.     **Defendants Intentionally Withheld Material Information to Conceal Their Fraud**

To further the scheme, defendants provided clients incomplete and misleading information to conceal how it priced the transactions and generated its spreads.  SAC ¶ 112.  Indeed, defendants knew that pricing transparency and "best execution" would cut into the Bank's enormous spreads.  SAC ¶¶ 58, 126.  A February 2008 internal email to Nichols indicated that standing instruction was extremely profitable solely because of the Bank's lack of transparency, and that transparency would negate the profits.  SAC ¶ 105.  After acknowledging that "Standing Instruction FX is the most profitable form of business," the email bluntly explained that switching to a different platform with

transparency would reduce profits: "[a]ll these pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved."  SAC ¶ 105; *see also* SAC ¶¶ 108, 128.

Thus, instead of disclosing BNYM's actual pricing practices, BNYM provided a "Daily Schedule" that set a floor and a ceiling for the price the client would receive.  SAC ¶ 98.  However, BNYM admitted that these guaranteed rates were not realistic for trading, and not useful in validating the reasonableness of the rates.  SAC ¶ 98.  This is because, as BNYM admitted, the guaranteed range "almost invariably exceed[s] the range of daily reported interbank rates for each currency pair."  SAC ¶ 98.  Likewise, BNYM represented that standing instruction trades, in accordance with ERISA, would "not deviate by more or less than 3 percent from the relevant interbank bid [*i.e.*, purchase] or ask [*i.e.*, sale] rates."  SAC ¶ 97.  This additional floor and ceiling provided no information to clients about how within that range the price of a transaction would be determined.  SAC ¶ 98.  Indeed, this representation created the misimpression, particularly in conjunction with the "best execution" and "free of charge" misrepresentations, that clients would receive, or at least have the chance to receive, the best rate within the guaranteed range.  SAC ¶ 99.

BNYM also provided incomplete and misleading information in reporting on transactions. It failed to provide time stamps for trades that a client could use to verify whether the rate received was a fair and reasonable exchange rate.  SAC ¶ 100.  Without a time stamp, a Bank client could not determine if the price of a transaction reflected the prevailing interbank rate.  SAC ¶ 100.  Further, the monthly statements provided to clients did not indicate whether a particular transaction was executed through the standing instruction service or was a directly negotiated trade.  SAC ¶ 102.

BNYM made misrepresentations to clients when asked to fill in the information that BNYM otherwise routinely omitted.  For example, in response to inquiries by the San Diego County Employees Retirement Association ("SDCERA") including a request for time stamps, BNYM falsely claimed that the Bank was trying to get SDCERA a good price, and that time stamps were

not available because BNYM's traders agreed on prices earlier in the day but did not close the transactions until hours later.  SAC ¶ 124.  Similarly, when confronted with the poor pricing BNYM provided to the New Jersey Department of the Treasury, Division of Investment ("New Jersey"), BNYM falsely stated that the Bank had obtained a price for the trade and then took a spread on top of the price, rather than acknowledging that the Bank assigned prices based on the worst price of the day.  SAC ¶ 115-16.  At least one BNYM Vice President on occasion told clients that a price was due to "bad timing" or the small size of the transaction, even though timing and size had nothing to do with the pricing.  SAC ¶ 123.

BNYM persisted in this obfuscation even after the California Attorney General sued State Street in October 2009 challenging similar fraudulent practices with regard to its standing instruction service.  SAC ¶ 129.  BNYM personnel were well aware that the California lawsuit exposed fraudulent practices that it had sought to conceal.  Within hours after the filing of the lawsuit, BNYM's Managing Director emailed the news report to all BNYM FX sales employees with the subject heading, "Oh No."  SAC ¶ 130.  As a former Bank employee asked his colleagues still at the Bank, in light of the State Street lawsuit, "is the 'Game' over? . . . Time to retire after raping the custodial accounts, all 'Public Trust' money?"  SAC ¶ 130.

BNYM nevertheless continued to hide the truth regarding its pricing practices.  In response to a deluge of inquiries from clients following the State Street lawsuit, BNYM referred clients to its website that provided a false, incomplete and misleading description of the Bank's standing instruction service.  SAC ¶¶ 131-33, 137.  Indeed, when one bank employee suggested that the Bank "fully disclos[e] a pricing schedule" to clients through a defined sales margin above a benchmark, the Bank rejected the proposal.  SAC ¶ 134-35.  As one bank official remarked on October 28, 2009, he did "NOT like" the proposal, recognizing that "[o]nce pricing spreads are disclosed it will be a race to how quickly clients can work it down to zero."  SAC ¶ 135.

**D.    Defendants Reaped Enormous Profits from These Fraudulent Practices**

The Bank made enormous profits from its fraudulent standing instruction practice.  In 2009, for example, the Bank's standing instruction transactions accounted for approximately 12 percent of the Bank's overall FX trading volume, but 69 percent of the Bank's profits from FX.  SAC ¶ 37. Indeed, the Bank made approximately $1.539 billion in gross sales margin from just its top 200 standing instruction clients from 2007 to 2010.  SAC ¶ 155.  A BNYM analysis from November 2009 indicated that the Bank's "sales margin" on standing instruction transactions was 22.33 basis points, as compared to 1.18 through an e-commerce platform.  SAC ¶ 109.

BNYM employees involved in the Bank's FX practice, such as Nichols, received bonuses that were based, in part, on revenue from standing instruction trades.  SAC ¶ 110.  Nichols knew that these revenues had an impact on his bonus.  He wrote in a June 2004 email concerning a standing instruction flat fee methodology: "This is currently our revenue and it should remain so; we all understand how the bonus pool funds."  SAC ¶ 110.

**E.    Defendants' Fraud Affected Federally Insured Financial Institutions**

BNYM, a federally insured financial institution, has been affected by the defendants' fraud. SAC ¶ 175.  It faces significant exposure, as evidenced by the numerous lawsuits pending against the Bank relating to its standing instruction practice.  SAC ¶ 177.  BNYM potentially has billions of dollars in liability and mounting legal expenses, in addition to immediate and ongoing reputational harm that could continue to affect the Bank's stock price and the Bank itself.  SAC ¶ 177.[3]  BNYM admitted in its 2009 10-K that governmental investigations, including by state attorneys general, "could have an adverse effect on us."  SAC ¶ 178.  The Bank's 2010 Annual Report stated that standing instruction judgments or settlements arising out of lawsuits concerning the Bank's standing

---

[3]   Defendants have already lost a motion to dismiss a complaint raising similar allegations based on the Bank's standing instruction program under different legal theories.  *See Int'l Union of Operating Engineers v. Bank of New York Mellon Corp.*, No. C 11-03620, 2012 WL 476526 (N.D. Cal. Feb. 14, 2012).

13

instruction services "could have a material effect on net income in a given period."  SAC ¶ 178.  In fact, BNYM has already paid to resolve disputes regarding its standing instruction practice.  After Prudential complained about standing instruction pricing, the Bank paid back Prudential more than half of the $28 million in revenues generated from Prudential's standing instruction transactions. SAC ¶ 138.  Similarly, after New Jersey complained that the Bank was price gouging on standing instruction trades, New Jersey received $100,000 in reimbursement.  SAC ¶ 115.  Finally, BNYM's credit rating was downgraded by Moody's in March of 2012 based on, *inter alia*, the Bank's decline in FX revenue.  SAC ¶ 179.

The Bank's scheme not only put its own federally insured deposits at risk, but also affected its federally insured clients.  Each of the fraudulent representations and omissions set forth herein was aimed at both federally insured and non-federally insured current and prospective clients.  *See* SAC ¶ 40.  BNYM's estimated sales margin on standing instruction transactions for its top 20 federally insured financial institutions (and/or affiliates of these institutions) totaled more than $300 million from 2007 through 2010, including Fifth Third Bank, Bessemer, and Huntington National Bank.  SAC ¶ 24 n.1.  The Bank made these enormous profits at the expense of its federally insured clients whom defendants defrauded.  SAC ¶ 33.

## ARGUMENT

## THE SAC STATES A FIRREA CLAIM AGAINST THE DEFENDANTS

### I.      THE GOVERNING STATUTORY FRAMEWORK

#### A.      <u>FIRREA</u>

Section 951(a) of FIRREA provides that "[w]hoever violates any provision of law to which this section is made applicable by subsection (c) of this section shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section."  12 U.S.C. § 1833a(a).  Section 951(c) of FIRREA, in turn, identifies the criminal violations as to which FIRREA civil penalties

apply, and authorizes the United States to recover civil penalties for violations of, or conspiracies to violate, among other things, the mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), affecting a federally insured financial institution.  12 U.S.C. § 1833a(c).

### B.      The Mail and Wire Fraud Statutes

The mail and wire fraud statutes prohibit the use of mail or wires in furtherance of a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. §§ 1341, 1343.  The elements of a mail or wire fraud violation are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme."  *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007).  To satisfy the first element, the Government must show:  (1) "the existence of a scheme to defraud"; (2) "the requisite scienter (or fraudulent intent) on the part of the defendant"; and (3) "the materiality of the misrepresentations."  *United States v. Autuori,* 212 F.3d 105, 115 (2d Cir. 2000) (internal citations omitted).

## II.    THE SAC ALLEGES THAT DEFENDANTS' MAIL AND WIRE FRAUD "AFFECT[ED]" FEDERALLY INSURED FINANCIAL INSTITUTIONS

Defendants argue that, even if they violated the mail and wire fraud statutes, the Government cannot sue them under FIRREA because the fraud did not "affect[]" any federally insured financial institution.  First, defendants contend that BNYM cannot be both a perpetrator of a fraud and an "affect[ed]" federally insured financial institution, arguing that:  (1) the perpetrator and the "affect[ed]" entity cannot be the same person or entity under FIRREA; (2) the purpose of FIRREA allegedly was solely to "protect" federally insured financial institutions, not impose liability on them; (3) the structuring of sections 951(b), which sets forth the penalties available, and section 951(c), which identifies the applicable predicate criminal offenses, assertedly suggest that the perpetrator and the "affect[ed]" entity cannot be the same; (4) FIRREA should be narrowly

construed because it is a punitive statute; and (5) no court has held that a federally insured financial institution may be subject to suit under FIRREA when it commits a fraud that affects its own federally insured deposits.  (Br. at 10-14; Nichols Br. at 27).[4]

The plain text of FIRREA and relevant case law, however, do not support defendants' twisted view that Congress somehow created a safe harbor in FIRREA to insulate federally insured financial institutions from sanction for engaging in fraud that threatens the security of their own federally insured deposits and those of other federally insured financial institutions.  *See* Pt. II.A.1, *infra*.  Furthermore, contrary to defendants' suggestions, holding federally insured financial institutions liable under such circumstances is consistent with and furthers the legislative intent behind FIRREA, namely to prosecute those who engage in fraudulent conduct that puts federally insured deposits at risk.  *See* Pt. II.A.2, *infra*.

Second, defendants contend that the SAC has failed to allege that other federally insured financial institutions were "affect[ed]," claiming that:  (1) the SAC does not identify all of the "affect[ed]" institutions; (2) the SAC fails to plead that federally insured financial institutions have been "affect[ed]" by losses incurred by their affiliates; and (3) U.S. Bank cannot be "affect[ed]" because the funds it lost belonged to a depositor, not U.S. Bank.  (Br. at 14-18; Nichols Br. at 27).

These  arguments are equally unfounded.  Where, as here, the Government has alleged the existence of a broad and complex fraudulent scheme, the complaint need not identify each and every "affect[ed]" entity, and may instead plead examples with specificity, which the SAC plainly does.  *See* Pt. II.B, *infra*.  The SAC further identifies actual losses that were incurred by both federally insured financial institutions and their affiliates.  *Id*.  Contrary to defendants' claim, courts have found that financial institutions may be "affect[ed]" within the meaning of FIRREA when their affiliates incur actual losses.  *Id*.  Finally, defendants cannot dodge FIRREA liability by

---

[4]  While Nichols attempts to adopt BNYM's mistaken argument that the Bank cannot be "affect[ed]" by its own fraud, he plainly cannot do so, since he is an individual and his conduct can "affect" the Bank.

arguing that the taken funds belonged not to the federally insured financial institution itself, but rather its depositor.  Even if such a factual argument were appropriate on a motion to dismiss, which it is not, a federally insured financial institution may still be affected when its depositors' funds are taken.  *Id.*

A.    **BNYM May Be Held Liable Under FIRREA for Committing Fraud that Puts Its Own Federally Insured Deposits at Risk**

1.    **The Plain Text of FIRREA and Relevant Case Law Establish That a Federally Insured Financial Institution May Be Held Liable For Perpetrating a Fraud "Affecting" Itself**

The express language of FIRREA and case law interpreting the meaning of the word "affect[]" demonstrate that federally insured financial institutions, like BNYM, may be held liable for civil penalties under FIRREA when they commit mail and wire fraud and the offense "affect[s]" the perpetrating federally insured financial institution itself.  Section 951(a), which defines who may be sued under FIRREA, indicates that Congress did not create an exception from liability for "affect[ed]" federally insured financial institutions.  This section broadly states that "[w]hoever violates any provision of . . . subsection (c) . . . shall be subject to a civil penalty."  12 U.S.C. §§ 1833a(a).  The mail and wire fraud statutes listed in section 951(c) also apply to "[w]hoever" violates them.  18 U.S.C. §§ 1341, 1343; 12 U.S.C. § 1833a(c).  There is no dispute that the term "[w]hoever" applies to entities as well as individuals.[5]  Had Congress intended to exempt federally insured financial institutions from civil penalties under FIRREA when they engage in fraudulent conduct "affecting" themselves, it could have easily done so.  Instead, it used the broad language "[w]hoever."

---

[5]  Title 1 of the U.S. Code defines the words "whoever" and "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  1 U.S.C. § 1. The Supreme Court has explained that the word "whoever" must be "liberally interpreted," particularly in connection with the Criminal Code, which was enacted in tandem with 1 U.S.C. § 1.  *See United States v. A&P Trucking Co.*, 358 U.S. 121, 123 n.2 (1958).

Contrary to defendants' claims, Congress' use of the phrase "affecting a federally insured financial institution" in section 951(c) in no way demonstrates any intent on the part of Congress to bar civil penalties when the "affect[ed]" entity is also the perpetrator of the fraud. FIRREA itself does not define what it means to "affect[]" a federally insured financial institution, and no court has yet considered the meaning of this word as it appears specifically in section 951(c)(2) of FIRREA. However, many courts have interpreted virtually identical language (without the requirement that the institution be "federally insured") in another provision of FIRREA extending the statute of limitations for mail and wire fraud that "affects a financial institution,"[6] as well as a prior version of the Sentencing Guidelines, promulgated following FIRREA, that enhanced punishment for offenses that "affected a financial institution."[7] Those courts have consistently held that the word "affect" is a broad and unambiguous term meaning to "produce an effect on" or to materially or detrimentally "influence." *See, e.g.*, *United States v. Ghavami*, No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *5 (S.D.N.Y. Jul. 13, 2012) (finding that the "most common meaning of the verb 'affect' is 'to produce an effect upon,'" and that the term is "secondarily defined as 'to produce a material influence upon or alteration in' and tertiarily defined as 'to have a detrimental influence on'") (quoting *Webster's Third New International Dictionary*).[8]

---

[6]   Section 961(*l*) of FIRREA provided a ten-year statute of limitations (rather than the traditional five-year limitation period) for a mail or wire fraud offense that "affects a financial institution." *See* Pub. L. 101-73, Title IX, § 961(*l*)(1), 103 Stat. 183 (1989); 18 U.S.C. § 3293(2).

[7]   Pursuant to a directive in section 961(m) of FIRREA, the Sentencing Commission promulgated guidelines increasing penalties for certain violations that "substantially jeopardized the safety and soundness of a federally insured financial institution." *See* Pub. L. 101-73, Title IX, § 961(m), 103 Stat. 183 (1989). One year later, Congress passed the Comprehensive Crime Control Act of 1990, which afforded the Government additional tools to combat fraud and abuse affecting financial institutions. H.R. Rep. No. 101-681(I), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6576-77. Among other things, this Act directed the Sentencing Commission to promulgate guidelines increasing the offense level for certain crimes "affecting a financial institution," including mail and wire fraud. *Id.*; P.L. 101-647, § 2507, 104 Stat. 4789 (1990).

[8]   *See also United States v. Mullins*, 613 F.3d 1273, 1278 (10th Cir. 2010) ("affect" means "to 'make a material impression on; to act upon, influence, move, touch, or have an effect on,' Oxford English Dictionary 211 (2d ed. 1989), or, perhaps more appositely to this case, 'to have a detrimental influence on,' Webster's Third New International Dictionary 35 (2002)"), *cert. denied* 131 S. Ct. 582 (2010); *Rhinelander Paper Co.*

There is no reason to ascribe any different meaning to the word "affecting" in section 951(c)(2), appearing in the same legislation.  The word is unambiguous and its plain meaning governs.  *See United States v. Daugerdas*, No. 99 Cr. 581 (WHP), 2011 WL 6020113, at *1-2 (S.D.N.Y. Apr. 5, 2011); *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999).  Nothing in FIRREA suggests that Congress intended to exclude financial institutions from liability when they commit fraud that produces an effect on, or negatively influences, their federally insured deposits.

Nor does the word "affect" limit its application solely to a factual scenario, as defendants suggest, in which a third party victimizes a federally insured financial institution.  Contrary to defendants' assertion (Br. at 11), the word "affect" is not a non-reflexive verb that applies solely to circumstances when one person acts upon another.  To the contrary, the word "affect" has long been used reflexively to describe effects parties may produce on themselves.  *See, e.g.,McCarty v. Roots*, 62 U.S. 432, 436 (1858) ("If the endorsers had an agreement, valid between themselves, as to sharing equally the loss occasioned by their endorsements, such agreement only affected themselves, and did not run with the bills so as to affect their legal liabilities. . .").[9]  Indeed, it is logical that one's actions and omissions can produce effects on oneself as much as they can third parties.  For example, a reckless driver may affect those he crashes into as well as himself.

In fact, courts have repeatedly rejected the same argument defendants advance here – that the Bank cannot be "affect[ed]" by a fraud that it has perpetrated.  For example, with respect to the phrase "affects a financial institution" in section 961(*l*) of FIRREA, courts have consistently held that the word "affect[]" applies both to perpetrators and victims of fraud.  *See United States v.*

---

*v. F.E.R.C.*, 405 F.3d 1, 6 (D.C. Cir. 2005) (The verb "affect" means, very broadly, "to produce an effect on; to influence in some way."  Black's Law Dictionary 92 (8th ed. 2004)).

[9]  *See also Hoff v. Larkins*, No. 07 Civ. 0514 (TCM), 2010 WL 1221788, at *2 (E.D. Mo. 2010) ("Petitioner had admitted use of methamphetamine while he was on bond and was ready to address how his drug use and business had adversely affected himself and others, including his family."); *Besteman v. Hager*, No. 06-10223-BC, 2007 WL 1686513, at *2 (E.D. Mich. Jun. 8, 2007) (defendant "grabbed the man's shoulder, pepper sprayed Plaintiff (with some spray affecting himself), and fell to the ground with Plaintiff.").

*Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) ("[The defendant's] argument would have more force if the statute provided for an extended limitations period where the financial institution is the object of the fraud.  Clearly, however, Congress chose to extend the statute of limitations to a broader class of crime.") (citation omitted); *United States v. Martinez*, 172 F.3d 39, 1999 WL 38842, at *2 (2d Cir. Jan. 27, 1999) (Table) ("The word 'affect[]' in the statute is not the same as 'defraud'"); *see also Ghavami*, 2012 WL 2878126, at *5 (the term "affects" "is not limited to circumstances in which a financial institution is the object or victim of a scheme to defraud" but rather includes active participants); *Daugerdas*, 2011 WL 6020113, at *1-2 (the term "affects" applies to financial institutions that "participated in a fraud" because "[n]othing in the statute's language precludes its application to a financial institution that participated in a fraud"); *United States v. Rubin/Chambers, Dunhill Ins. Serv.*, 831 F. Supp. 2d 779, 783 (S.D.N.Y. 2011) (a financial institution can be "affect[ed]" by a fraudulent scheme "where it actively participated in the scheme"); *United States v. Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010) (same).  As the Second Circuit explained in *Bouyea*, Congress could have chosen a more limiting term such as "defrauds," but instead used the broader word "affect[]" to cover a wider class of conduct.  152 F.3d at 195.

The Seventh Circuit's decision in *United States v. Serpico*, 320 F.3d 691 (7th Cir. 2003), is particularly instructive.  In *Serpico*, labor official defendants were convicted of mail fraud in connection with a loan-for-deposits scheme and a hotel loan kickback scheme.  320 F.3d at 693-94. Financial institutions were participants in the fraud, one of which pleaded guilty to conspiring with the defendants.  *Id.* at 693-95.  On appeal, the defendants argued that the fraud did not "affect" the financial institutions who were "willing participants" and "active perpetrator[s]" of the fraudulent scheme.  *Id.*  The Seventh Circuit rejected this argument, holding that "the mere fact that participation in a scheme is in a bank's best interest does not necessarily mean that it is not exposed to additional risks and is not 'affected.'"  *Id.* at 695.  The court observed that the banks'

involvement in the fraud did expose them to risks, such as such as having risky loans on their books.  *Id.*  As to one of the financial institutions that pled guilty to conspiracy, the Court found "it hard to understand how a bank that was put out of business as a direct result of the scheme was not 'affected,' even if it played an active part in the scheme."  *Id.*

The *Ghavami* case in this District, which involved a number of financial institutions who entered into non-prosecution agreements in which they admitted that their employees engaged in criminal bid rigging activities, is also instructive.  The financial institutions employees, who were subsequently prosecuted, sought to exclude evidence relating to these agreements, which the Government intended to offer to prove that the co-conspirator financial institutions had been "affect[ed]" by the crimes.  Relying on *Bouyea*, *Serpico*, *Ohle* and *Daugerdas*, the court observed that a financial institution may be "affect[ed]" by a fraudulent scheme, even if it was an active participant, which these financial institutions were.  The court allowed evidence concerning the non-prosecution agreements, as well as settlement agreements with the Securities Exchange Commission and other entities, for purposes of demonstrating that the co-conspirator financial institutions were "affect[ed] financial institutions."  2012 WL 2878126, at *5-10.[10]

Courts have also broadly interpreted the prior version of the Sentencing Guidelines enhancing punishment for crimes that "affected a financial institution" to apply where the financial institution itself was involved in perpetrating the fraud.  *United States v. Hoffecker*, 530 F.3d 137, 198 (3d Cir. 2008) (sentence enhanced where "the fraud affected a financial institution that was itself the vehicle for the fraud"); *United States v. Collins*, 361 F.3d 343, 348 (7th Cir. 2004) (same).

---

[10]   The *Rubin/Chambers* decision in this District reached a similar conclusion.  As in *Ghavami*, co-conspirator financial institutions entered into non-prosecution agreements with the Government in which they admitted that their employees knowingly and actively participated in the charged conduct, including wire fraud and conspiracy to rig bids, fix prices and manipulate the municipal derivatives market. *Rubin/Chambers*, 831 F. Supp. 2d at 781-82.  The individual employee defendants were prosecuted and sought to exclude the agreements.  Finding that financial institutions that participate in fraud may be "affect[ed]," the court allowed evidence of the non-prosecution agreements. *Id.* at 783-785.

In support of their arguments, defendants offer a number of strained interpretations of FIRREA that are belied by the statute's plain text and fly in the face of its legislative history.  For example, defendants' claim that section 951(b)(3)(A) evidences some intent on the part of Congress to keep perpetrators and "affect[ed]" federally insured victims distinct from each other (Br. at 11-14), is specious.  As a threshold matter, as noted above, it is section 951(a) that sets forth who may be sued under FIRREA, not section 951(b), which merely sets forth the amount of civil penalties available.  *See* 12 U.S.C. § 1833a(a).  Section 951(b)(3)(A) provides that "[i]f any person derives pecuniary gain from the violation, or if the violation results in pecuniary loss to a person other than the violator, the amount of the civil penalty may exceed the amounts described in paragraphs (1) and (2) [$1 million and $5 million, respectively] but may not exceed the amount of such gain or loss."  *Id.* § 1833a(b)(3)(A).  Accordingly, if a federally insured financial institution commits a mail or wire fraud that affects itself or any other federally insured financial institution and "any person derives pecuniary gain" from it, the penalty may be the amount of the gain.  Conversely, if the violation results in a loss to any person other than the institution that is the violator, the penalty may be the amount of loss.  That is precisely what the Government has alleged here.

Nothing in section 951(b)(3)(A) suggests that civil penalties no longer apply when the perpetrator of the fraud is an "affect[ed]" federally insured financial institution.  While defendants speculate that the word "person" is distinct from an affected federally insured financial institution, the broad definition of "person," which extends to individuals and entities alike, indicates that the opposite is true.  *See* 1 U.S.C. § 1.  As with the word "[w]hoever," had Congress intended to narrow the definition of "person," it could have done so.

Defendants are also wrong in speculating that Congress included the language "affecting a federally insured financial institution" in section 951(c)(2), but not in sections 951(c)(1) and (3), in order "to ensure that…paragraph [(2)], like paragraphs (1) and (3), would be limited to

circumstances in which the victim of the wrongdoing is a federally insured financial institution." (Br. at 13). As an initial matter, nothing in section 951(c) requires that the "affect[ed]" federally insured financial institution be "the victim." Indeed, section 951 is listed under Subtitle E, which is called "Civil Penalties For Violations Involving Financial Institutions" – not victimizing them. Moreover, many of the offenses listed in section 951(c)(1) and (3) do not require that a financial institution be the victim.[11] Since subsections 951(c)(1) and (c)(3) do not require a federally insured financial institution victim, there is no basis to conclude that 951(c)(2) should be any different.

While defendants argue that the Court should generally construe FIRREA narrowly because the statute is a punitive one (Br. at 14), that should not be the case where, as here, Congress has used broad and unambiguous language, which the courts are bound to follow. Moreover, the cases defendants cite to support their narrow reading of the statute are not apposite here.[12]

Finally, defendants' assertion that they cannot be subject to suit under FIRREA because no court has held that "a financial institution can be penalized on the theory that it was 'affect[ed]' by its own mail and wire fraud violation" (Br. at 14), simply ignores the holdings of numerous courts that a financial institution can be "affect[ed]" by a fraud in which it is a central player. *See* p.19-22 *supra*. While those cases involved prosecutions of financial institution employees and other individuals, that is not because the financial institutions themselves were immune from liability. To

---

[11] For example, a person or entity who violates 18 U.S.C. § 1005 (referenced in section 951(c)(1)) by engaging in a fraudulent transaction with the intent to defraud the United States may do so without victimizing or affecting a federally insured financial institution. The same holds true for 18 U.S.C. §§ 1007, 1014 and 14 U.S.C. §645(a), which make it a crime for any person or entity to submit false statements to, *inter alia*, the FDIC, the Federal Housing Administration and the Small Business Administration.

[12] *See, e.g., Cresswell v. Sullivan & Cromwell*, 922 F.2d 60 (2d Cir. 1990) (federal question jurisdiction could not be premised on 28 U.S.C. § 1927, which permits litigants to seek costs from anyone "who so multiplies the proceedings in any case unreasonably and vexatiously," but does not authorize independent lawsuit); *Inventorprise Inc. v. Target Corp.*, No. 09-CV-00380, 2009 WL 3644076 (N.D.N.Y. Nov. 2, 2009) (involving claim of false patent marking in violation of 35 U.S.C. § 292); *United States v. Vanoosterhout*, 898 F. Supp. 25 (D.D.C. 1995) (dismissing FIRREA claim against president of financial institution premised on submitting false claims to the Government in violation of 18 U.S.C. §§ 287 and 1001 solely because the financial institution was not federally insured), *aff'd*, 96 F.3d 1491 (D.C. Cir. 1996).

23

the contrary, in some of these cases, the financial institutions pleaded guilty or entered into non-prosecution agreements in which they admitted to criminal liability. *See, e.g., Serpico*, 320 F.3d at 695 (financial institution pleaded guilty to conspiracy); *Ghavami*, 2012 WL 2878126, at *8 (financial institutions entered into non-prosecution agreements with Government admitting, acknowledging and accepting responsibility for the criminal conduct of its employees); *Rubin/Chambers*, 831 F. Supp. 2d at 781-82 (same). By contrast, defendants identify no case that supports their narrow interpretation of the statute.

> **2. Holding a Federally Insured Financial Institution Liable Under FIRREA for Fraud Furthers the Legislative Purpose of FIRREA**

Congress did not enact FIRREA, as defendants suggest, to protect federally insured financial institutions solely from fraud by third parties. (Br. at 12). What defendants ignore, and what the legislative history establishes, is that Congress enacted FIRREA following the Savings and Loan Crisis of the 1980s in large part to enhance the Government's ability to prosecute any fraud and misconduct putting federally insured deposits at risk, including conduct by financial institutions themselves. Indeed, as the legislative history makes clear, misconduct by financial institutions was one of the major causes of the crisis and the massive losses taxpayers incurred when financial institutions failed and the Government had to make their federally insured depositors whole.

While defendants claim that Congress viewed banks as "victims" of fraud committed by "others" (Br at 12), FIRREA's legislative history is replete with references to the fraud and abuse by financial institutions and their employees as one of the principal causes of the crisis to be addressed by the statute. For example, the Senate Banking Committee Report concerning FIRREA states that "fraud and insider abuse by thrift managers" was one of "three sets of factors" contributing substantially to the crisis. S. Rep. No. 101-19 (1989), 1989 WL 1178181, at *7. Further, Senator Schumer, then Chairman of the Subcommittee on Criminal Justice of the House Committee on the Judiciary, noted that "there's evidence that the majority of thrift failures are

attributable . . . to simple mismanagement and fraud" and that the industry crisis "will cost the thrift insurance fund, the industry and ultimately the taxpayers at least $80 billion." *Prosecuting Fraud in the Thrift Industry: Hearings Before the H. Subcomm. on Criminal Justice of the Comm. on the Judiciary*, 101st Cong. (1989), 1989 WL 1178203, at *2.

Indeed, members of Congress repeatedly cited to fraud and mismanagement by financial institutions and their employees, not fraud by outsiders, as the problem that needed to be addressed by the legislation. *See, e.g.,* H.R. Rep. No. 101-54(I) at 97, 1989 U.S.C.C.A.N. 86, 98 (1989) (noting that "[w]ithout adequate supervision, thrifts were free to engage in fraudulent and risky activities, often at the expense of the FSLIC"); *see also Failure of Independent CPA's to Identify Fraud, Waste and Mismanagement and Assure Accurate Financial Position of Troubled S&L's: Hearings Before the H. Comm. on Banking, Finance and Urban Affairs*, 101st Cong. 5 (1989) ("I am hopeful that every possible means available will be used to bring fraudulent S&L officials to justice.") (statement of Rep. Carroll Hubbard, Jr.); *Id.* at 6 ("Everybody talks about going after the crooks in the S&L industry, and we should . . . But I would also like to see us go after the inept, the negligent officers and directors of these institutions for whatever civil liability they may be responsible for.") (statement of Rep. John LaFalce); *Id.* at 13 ("In January of this year, we testified before this committee that financial institutional failures have often been associated with management-related problems such as serious internal control weaknesses, insider abuse and fraud, unresponsiveness to regulators and disregard for the safety and soundness of financial operations.") (statement of Frederick D. Wolf, Assistant Comptroller General, General Accounting Office); 135 Cong. Rec. S4003 (daily ed. Apr. 17, 1989) ("Not only did these institutions gamble with our money, many of their officers engaged in massive outright fraud.") (statement of Sen. Bond).

The Federal Savings and Loan Insurance Fund became insolvent as a result of the crisis, requiring a $100 billion bailout. 135 Cong. Rec. S3993-01, S4001 (daily ed. Apr. 17, 1989)

(statement of Sen. Bond).   Congress, however, coupled the bailout with stiffened penalties for financial crimes to prevent a similar crisis from occurring again.   *Id.* ("We cannot, in good conscience, accept the burdens that this bill puts on the taxpayer without actively pursuing every crook who stole from FSLIC with maximum criminal penalties and maximum recovery of ill-gotten gain.   Nor can we proceed without sending a strong signal there will be tough criminal penalties to be enforced in the future when and if similar fraud is perpetrated.").[13]

President George H.W. Bush, upon signing FIRREA, made clear that it was the taxpayers who were the victims, and FIRREA would make sure that deposits remained secure.   FIRREA would "safeguard and stabilize America's financial system and put in place permanent reforms so these problems will never happen again.   And moreover, it says to tens of millions of S&L depositors:   You will not be the victim of others' mistakes.   We will see – guarantee – that your insured deposits are secure."   Remarks by President Bush Upon Signing H.R. 1248 into Law, 1989 WL 1178375, at *1 (Aug. 9, 1989).[14]

In sum, the legislative history demonstrates that one of the main purposes of FIRREA was to civilly and criminally prosecute the kinds of misconduct and abuse involving financial institutions and their officers and directors that threaten the safety and soundness of federally insured deposits, which taxpayers must pay for when financial institutions fail.   *See FDIC v. Isham,* 777 F. Supp. 828, 831 (D. Colo. 1991) ("Through FIRREA, Congress intended to address bank failures caused

---

[13]   *See also* 135 Cong. Rec. S9895 (daily ed. Aug. 3, 1989) (Senator Riegle explained that FIRREA served three important goals, namely:   (1) preventing the Government, which "cannot escape its deposit insurance liabilities," from incurring further losses from bank failures; (2) helping the Government to "bring those responsible for this [crisis] to justice"; and (3) preventing the crisis from happening again "by enacting a comprehensive regulatory overhaul.").

[14]   In addition to protecting taxpayers and "keep[ing] the new Federal Deposit Insurance System solvent," the President further remarked that the bill's enactment meant that "[b]eginning today, penalties for wrongdoing by officers and directors of insured institutions will be increased up to $1 million per day.   And criminal penalties will be toughened from yesterday's slap on the wrist to the clang of a prison door.   Those who try and loot the savings of their fellow citizens deserve, and will receive, swift and severe punishment." Remarks by President Bush Upon Signing H.R. 1248 into Law, 1989 WL 1178375, at *2 (Aug. 9, 1989).

by officer and director misconduct."); *Resolution Trust Corp. v. Gibson*, 829 F. Supp. 1110, 1119 (W.D. Mo. 1993) ("Thus, the stated purposes of FIRREA are to strengthen the powers of the government in relation to officers and directors engaging in harmful misconduct."); H. Rep. 101-54(I) (1989), at 107 (House report leading up to enactment of FIRREA states under "Enhanced enforcement powers," that "[t]he legislation increases civil and criminal penalties for crimes involving financial institutions and improves methods to detect misconduct in financial dealings."). Holding banks responsible for conduct that puts their own federally insured deposits at risk is consistent with and furthers this legislative purpose of FIREEA. Accordingly, there is no basis for defendants' claim that FIRREA should be interpreted to exclude federally insured financial institutions from liability under FIRREA when they engage in such conduct.

### B.   The SAC Adequately Alleges that Federally Insured Financial Institutions Were Affected By Defendants' Mail and Wire Fraud

As a threshold matter, defendants' fraud "affect[ed]" BNYM, which itself is a federally insured financial institution. The fraud has exposed BNYM to substantial losses as a result of the fraud, including declining stock prices, a credit rating downgrade, litigation risks and costs, settlements of fraud related liability, loss of reputation and customer goodwill, and the risk of incurring future similar costs. SAC ¶¶ 115, 138, 175-79. All of these losses and risks of losses are sufficient to "affect[]" a federally insured financial institution, which defendants do not dispute.[15]

Defendants err in suggesting that the SAC must identify every federally insured financial institution "affect[ed]" by defendants' fraud to comply with Rule 9(b). (Br. at 15). Where, as here,

---

[15]   *See, e.g., Ghavami*, 2012 WL 2878126, at *5 (financial institution may be affected by settlements of criminal or civil liability); *Rubin/Chambers*, 831 F. Supp. 2d 779 (same); *United States v. Hartz*, 296 F.3d 595, 600 (7th Cir. 2002) (bank "affect[ed]" where defendant "used the bank to commit the fraud and as a result, the bank was forced to pay $150,000 to . . . extract itself from civil liability for its actions in inadvertently assisting [defendant's] scheme."); *United States v. Johnson*, 130 F.3d 130, 1355 (9th Cir. 1997) (bank can be affected by harm to the bank's "employee morale and customer relationships," "reputation" and "immediate and long-term operations and policies"); *United States v. Bennett*, 161 F.3d 171, 193 (3d Cir. 1998) (crime affected financial institution that paid $18 million to settle a lawsuit and was exposed to "negative publicity that harmed its reputation").

the alleged fraud is "complex and far reaching" over a long period of time, the Government need not plead the specifics of each and every instance of fraud, and may instead describe representative examples of the fraud.  *See, e.g.*, *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 510 (6th Cir. 2007) (Government could plead "a complex and far-reaching fraudulent scheme with particularity, and provide examples of specific false claims submitted to the government pursuant to that scheme"); *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 49 (D. Mass. 2001) (where allegations are "complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible"); *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004) ("[W]here the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct.").

That is what the Government has done here.  Specifically, the SAC alleges that defendants' fraudulent scheme spanned many years and involved repeated fraudulent misrepresentations and omissions to virtually all BNYM's custodial clients, regardless of whether they were federally insured financial institutions.  SAC ¶¶ 5, 39, 96, 101, 106, 155, 184.  The SAC provides examples of instances where BNYM clients, including those that are federally insured financial institutions, received misrepresentations from defendants.  SAC ¶¶ 46-47, 56, 85-88.  A number of the false representations were made publicly to all current and prospective clients on BNYM's website.[16] SAC  ¶¶  7, 40-41, 66-68, 74.  The SAC further alleges that defendants concealed material

---

[16]  BNYM erroneously asserts that the SAC fails to allege that the false representations "best rate," "best rate of the day" and "netting" were made to federally insured financial institutions.  To the contrary, the Government alleges that these misrepresentations were made systematically by the Bank and its employees, including Nichols, to BNYM's custodial clients (including federally insured financial institutions).  SAC ¶¶ 39-41, 46, 56.  The phrases "best rate" and "best rate of the day" were incorporated into Question and Answer documents for dissemination to clients.  SAC ¶¶ 43-44.  This language was also furnished by Nichols to others at BNYM for use a "boilerplate" language in responses to requests for proposal.  SAC ¶¶ 44.  The representation regarding "netting" also appeared in BNYM's definition of "best execution" disseminated to the Bank's clients, *see* Laguardia Decl. Ex. 5, and on the Bank's website, SAC ¶ 74.

information about the standing instruction service from all clients, including federally insured financial institutions.  SAC ¶¶ 31, 71, 80, 90-103, 131, 133.  The SAC explains that, but for a handful of custodial clients that received benchmark pricing, all custodial clients suffered losses when BNYM assigned their transactions the worst rate of the day instead of providing best execution.  SAC ¶¶ 33-38, Ex. A.  The SAC also identifies specific trades where federally insured financial institutions suffered actual losses as a direct result of defendants' mail and wire fraud, including Fidelity, U.S. Bank, Bessemer Trust, Bank of America, N.A., and Huntington National Bank  SAC ¶¶ 159-60, 166-68. [17]  The SAC also attaches an internal BNYM list of custodial clients, many of which are federally insured financial institutions, as well as the amounts that these clients lost each year as a direct result of defendants' mail and wire fraud scheme, including Fifth Third Bank ($17.6 million), Bessemer Trust Co., N.A. ($15.5 million), and Huntington National Bank ($8.7 million).  SAC ¶ 24 n.1.[18]  These examples are pleaded with more than sufficient particularity to provide defendants fair notice of the nature of the fraud alleged, which is the primary purpose of Rule 9(b).  *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995).[19]

---

[17]  BNYM's assertion that the SAC fails to allege that defendants made false representations to federally insured financial institutions Bessemer Trust, Bank of America and Huntington National Bank, is wrong. Defendants' misrepresentations about "free of charge," "minimiz[ing]" costs, "best execution" and "netting" were all made on BNYM's website and thus were made to all of BNYM's client, like Fidelity.  SAC ¶¶ 7, 40-41, 66-68, 74.  Further, defendants fraudulently concealed their pricing model from all clients who were not benchmarked, including these federally insured financial institutions.  SAC ¶¶ 31, 71, 80, 90-103, 131, 133.  Lastly, the SAC details specific transactions where these federally insured financial institutions did not receive best execution as promised.  SAC ¶¶ 159-60, 166-68.  In any event, the SAC need not identify every instance in which a federally insured financial institution received a false representation.

[18]  BNYM's suggestion that it cannot ascertain which of the clients on its own customer list are federally insured financial institutions is disingenuous, as this information is all easily and publicly available on the FDIC website at http://www2.fdic.gov/IDASP/ (last access Oct. 11, 2012).  Indeed, in its motion to dismiss the first amended complaint, BNYM repeatedly referred to the FDIC online directory and requested that the Court take judicial notice of which financial institutions were federally insured.

[19]  The authorities defendants rely upon are inapposite.  For example, defendants cite *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612 (S.D.N.Y. 2006), arguing that the SAC must identify customers who relied on Internet misrepresentations.  But, the mail and wire fraud statutes do not require proof of reliance.  *See, e.g.*, *Bridge v Phoenix Bond & Indem. Co.*, 553 US 639, 648 (2008); *In re Crazy Eddie Sec. Litig.*, 812 F. Supp. 338, 350 (E.D.N.Y. 1993).  Moreover, in *Evercrete*, unlike here, the plaintiff could not identify any customers that were defrauded and the only alleged misrepresentation was made on the website.  Defendants'

Defendants err in suggesting that the Government must prove that the fraud proximately caused a federally insured financial institution to suffer an economic loss. (Br. at 17). All the Government is required to show is "some impact" on a federally insured financial institution from the fraud that is "sufficiently direct" and not "unreasonably remote." *See Bouyea*, 152 F.3d at 195 (looking to whether the effect of the scheme to defraud was "sufficiently direct"); *United States v. Pelullo*, 964 F.2d 193, 216 (3d Cir. 1992) (determining whether impact on financial institution from a scheme to defraud was not "unreasonably remote"); *United States v. Mavashev*, No. 08-CR-902 (DLI) (MDG), 2009 WL 4746301, *4 (E.D.N.Y. Dec. 7, 2009) ("at minimum there needs to be some impact on the financial institution") (internal citation omitted); *Rubin/Chambers*, 831 F. Supp. 2d at 782 (government must show that impact on financial institution is "sufficiently direct" in relation to the offense); *Ohle*, 678 F. Supp. 2d at 229 (same); *see also Johnson*, 130 F.3d at 1354 (applying sentence enhancement "regardless of the degree of effect upon the financial institution, so long as there is "some effect" that is "reasonably foreseeable").[20] Further, the federally insured financial institution need not incur "economic losses" to be "affect[ed]," but rather "expos[ure] to a new or increased risk of loss" is sufficient. *See Ghavami*, 2012 WL 2878126 at *6 (financial

---

reliance on *Hunt v. Enzo Biochem, Inc.*, 471 F. Supp. 2d 390 (S.D.N.Y. 2006), is also misplaced. In *Hunt*, unlike here, the plaintiff failed to identify anyone who received the fraudulent statements. Finally, *Bernstein v. Misk*, 948 F. Supp. 228 (E.D.N.Y. 1997), and *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301 (S.D.N.Y. 1996), are inapposite because in those cases, unlike here, the plaintiffs failed to explain what each fraud participant did.

[20]   The cases defendants cite do not impose any proximate causation requirement for offenses that "affect" federally insured financial institutions. *See United States v. Agne*, 214 F.3d 47, 52-53 (1st Cir. 2000) (at minimum there must be "some impact on the financial institution," but evidenced established that financial institution was contractually protected from sustaining loss or being sued); *United States v. Carollo*, No. 10 Cr. 654 (HB), 2011 WL 3875322 (S.D.N.Y. Aug. 25, 2011) (no "affect" on financial institution where no actual loss and *de minimis* risk). While defendants do cite authority dealing with proximate causation, they cite only to RICO cases, which are wholly inapplicable. For example, defendants cite to *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010), in which the court held that in a civil RICO case where, unlike here, the plaintiff alleges that the defendant's wrongful conduct caused plaintiff to suffer an injury, plaintiff must establish that defendant proximately caused his injury. Here, the Government is not required to allege that it was injured by plaintiff's fraud. Rather FIRREA, unlike RICO, authorizes the Government to impose civil penalties for violations of certain criminal offenses "affecting a federally insured financial institution." If Congress had intended to impose a proximate causation requirement in FIRREA cases, it certainly could have done so by using a phrase like "proximately causing injury" to a federally insured financial institution.

institution is "affect[ed]" for purposes of Section 961(*l*) of FIRREA if it was "exposed . . . to a new or increased risk of loss").[21]

The SAC easily meets this standard.  As noted above, the SAC describes a broad and complex fraudulent scheme in which defendants provided misrepresentations to its standing instruction clients and concealed material information about the fraud from them, and provides numerous examples of federally insured financial institutions to which defendants made fraudulent misrepresentations and from which defendants hid critical facts about the service.  The SAC also identities specific federally insured financial institutions who suffered actual losses from their participation in BNYM's standing instruction service.

Defendants are also wrong to claim that the SAC improperly alleges that federally insured financial institutions were "indirectly affected" by fraud perpetrated on their affiliates.  Courts hold that there is a "sufficiently direct" impact on financial institutions under FIRREA section 961(*l*) when their affiliates suffer a loss from the fraud.  *See Bouyea*, 152 F.3d at 195 (evidence that the defrauded subsidiary experienced a loss was "sufficiently direct" for a jury to find that the parent financial institution "affected"); *Pelullo*, 964 F.2d at 215-16 (impact on a parent financial institution from a scheme to defraud a wholly-owned subsidiary was not "unreasonably remote"); *Mavashev*, 2009 WL 4746301, at *3 (financial institution could be "affect[ed]" by fraud upon subsidiaries).

Here, the SAC alleges that a number of federally insured financial institutions were "affect[ed]" by the losses sustained by their affiliates from the fraud.  *See, e.g.*, SAC ¶¶ 24 n.1, 41

---

[21]  *See also Serpico*, 320 F.3d at 693 (financial institution is "affect[ed]" for purposes of Section 961(*l*) of FIRREA if it was "exposed . . . to a new or increased risk of loss"); *Mullins*, 613 F.3d at 1278-79  (same); *United States v. Abbate*, 47 F. App'x 52, 53 (2d Cir. 2002) (affirming finding by district court that "any effect on a financial institution sufficed" for purposes of sentencing enhancement); *Johnson*, 130 F.3d at 1354 (applying sentence enhancement "regardless of the degree of effect upon the financial institution, so long as there is "'some effect'"); *United States v. Wiant*, 314 F.3d 826, 830 (6th Cir. 2003) ("[n]owhere does the term imply any *de minimis* limitation; on the contrary, the breadth of the definition indicates that the guideline is intended to encompass even minimal impacts"); *United States v. Schinnell*, 80 F.3d 1064, 1070 (5th Cir. 1996) (showing of realistic exposure to substantial potential liability is sufficient to be "affected" for purpose of sentencing enhancement).

n.2, 82, 137 n.4, 161-66, 175, 184.   The SAC further alleges that federally insured financial institutions were affected by the losses sustained by their parent entities.   *See, e.g*, SAC ¶ 163 (Ameriprise Bank, FSB is a federally insured financial institution and wholly owned subsidiary of Ameriprise Financial, Inc., which lost approximately $163,000 on a single fraudulent transaction); SAC ¶ 165 (Citibank, N.A., is a federally insured financial institution and wholly owned subsidiary of Citigroup, Inc., which lost approximately $137,000 on a single fraudulent transaction).[22]   The BNYM internal client list attached to the SAC also identifies numerous affiliates of federally insured financial institutions and the losses they sustained each year as a result of the fraud, including Prudential Financial ($20.5 million); Franklin Templeton Investments ($17.8 million); and ING U.S. ($50.2 million); *see also* SAC ¶ 24 n.1; *accord* SAC ¶¶ 161-65 (identifying BNYM sales margin from certain FX transactions involving affiliates of federally insured entities).

Finally, defendants argue that the SAC fails adequately to allege that U.S. Bank was "affect[ed]" by defendants' mail and wire fraud because, according to them, U.S. Bank cannot be "affect[ed]," as the money defendants fraudulently took purportedly was from U.S. Bank's clients, as opposed to U.S. Bank itself.   (Br. at 17-18).   This, however, is a factual argument that is improper on a motion to dismiss.   *Nielsen Co. v. Success Sys.*, 11 Civ. 2939 (BSJ) (FM)*, 2012 WL 124592, at *2 (S.D.N.Y. Jan. 17, 2012); *Robinson v. City of New Haven*, 578 F. Supp. 2d 385, 389 (D. Conn. 2008).   Whether or not a federally insured financial institution was affected by the alleged fraud is a question of fact.   *Ghavami*, 2012 WL 2878126, at *5.   For purposes of this motion to dismiss, the allegation that U.S. Bank suffered an actual loss must be accepted as true.   Indeed, BNYM's own documents, which identify U.S. Bank as a custodial client, *see* SAC Ex. A, support the allegation that the lost funds belonged to U.S. Bank.   In any event, even if the funds ultimately

---

[22]   The Court may take judicial notice of the following facts set forth in publicly available regulatory filings: Ameriprise Bank, FSB is a subsidiary of Ameriprise Financial, Inc., *see* Form 10-K, dated February 24, 2012, at 87; Citibank, N.A. is a wholly owned subsidiary of Citigroup, Inc., *see* Form 10-K, dated February 24, 2012, at 137.

belonged to U.S. Bank clients, U.S. Bank is still "affect[ed]" when its depositors' funds are taken. As explained above, FIRREA was enacted to protect federally insured deposits.

## III.   THE SAC PLEADS MORE THAN SUFFICIENT FACTS TO STATE A CLAIM THAT DEFENDANTS VIOLATED THE MAIL AND WIRE FRAUD STATUTES

Defendants attempt to argue that the Government failed to state a claim for mail and wire fraud by placing their own spin on why, as a factual matter, their misrepresentations could not have misled anyone, contending that the Government has just taken their statements out of context. These arguments are inappropriate on a motion to dismiss where "the court is to accept as true all facts alleged in the complaint.   The court is to draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

Specifically, defendants fail to demonstrate that the Government has not satisfactorily alleged (1) a scheme to defraud, (2) that defendants had the requisite intent, or (3) that the fraudulent misrepresentations and omissions are material.   Defendants argue that the disclosure of the price associated with an FX trade and/or the Bank's articulation of a guaranteed range of prices within which its FX trades would fall negate the possibility that they had engaged in fraud; in defendants' view, in light of such disclosure, the idea that they were misleading their clients is not plausible, and they concomitantly deny any duty to disclose the truth of the Bank's actual pricing to clients.   These arguments are unavailing.   The disclosures defendants rely upon in no way preclude the plausible allegations set forth in the SAC that defendants were scheming to trick their standing instruction clients into believing they were receiving a rate of exchange far better than the worst rate of the day.   Moreover, defendants' disclaimer of their duty to be truthful with clients is simply wrong in light of their affirmative misstatements, superior knowledge and invitations for clients to repose trust in the Bank.   *Infra*, Pt. III.A.  Nor can defendants credibly assert that the SAC fails to allege intent; the SAC's many allegations set forth, at a minimum, defendants' recklessness in

promoting, carrying out and concealing the fraudulent scheme that benefited them directly. *Infra*, Pt. III.B. Finally, the detailed and particularized allegations of the SAC more than sufficiently set forth the materiality of the defendants' fraudulent misrepresentations and omissions, and defendants' factual challenges to these allegations are inappropriate on a motion to dismiss. *Infra*, Pt. III.C.

A.    **The SAC Sufficiently Alleges a Scheme to Defraud**

"The mail and wire fraud statutes do not define scheme to defraud, but it has been described as a plan to deprive a person of something of value by trick, deceit, chicane or overreaching." *Autuori*, 212 F.3d at 115 (quotations omitted). "It is characterized by a departure from community standards of 'fair play and candid dealings.'" *Id.* at 115 (quoting *United States v. Ragosta,* 970 F.2d 1085, 1090 (2d Cir. 1992)). A "scheme to defraud" is "construed broadly to encompass "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006).

Here, the SAC has alleged such a scheme. As the SAC sets forth, defendants represented to standing instruction clients, among other things, that they were receiving a service designed to maximize the value of their FX transactions free of cost, when this was not what the Bank provided. *See supra* Facts, B; SAC ¶¶ 41-72. Further, the SAC alleges that defendants provided certain incomplete and misleading information while withholding other information, all in an effort to conceal their actual practices. *See supra* Facts, B-C; SAC ¶¶ 41-103. As explained below, the Court should reject defendants' arguments that, because clients ultimately received a price or allegedly had access to other information, they did not commit fraud.

1.    **Disclosing Price Alone Does Not Negate the Fraudulent Scheme**

*First*, BNYM inaccurately asserts that the Government "acknowledge[s] that BNYM promptly and accurately reported the actual rates assigned to each standing instruction transaction."

(Br. at 19).   To the contrary, the SAC alleges that BNYM did not provide transparency in reporting standing instruction transactions.  SAC ¶ 102.  BNYM failed to provide time stamps for transactions which clients could use to verify the fairness of the exchange rate.  SAC ¶ 100.  Without a time stamp, a client could not tell if the assigned price reflected the market price at the time of the transaction.  Nor did BNYM separate its standing instruction trades from its directly negotiated trades in monthly statements for clients or provide any basis for a client to determine which of the trades were executed through standing instructions.  SAC ¶ 102.  Mixing transaction types made it harder for clients to track the pricing received for standing instruction transactions, and gave clients such as the Capital Group "the appearance of skewing the numbers."  SAC ¶ 102.  Defendants thus hid the fact that BNYM assigned prices based on the worst interbank rate of the day.

*Second*, BNYM brazenly misrepresents the allegations in the SAC, claiming without citation to the SAC that "the Government concedes that BNYM's customers 'received exactly what they paid for.'" (Br. at 20) (quoting a case, not the SAC).   The statement itself ignores BNYM's representation that its standing instruction service was "free of charge," not a service that its clients "paid for."   Moreover, as set forth above in detail, *see supra* Facts, B, there are numerous allegations in the SAC describing how BNYM did not provide the services that defendants represented to clients they were providing such as "best execution."  SAC ¶¶ 39-103.

*Third*, BNYM's guaranteed range of prices (Br. at 20) does not negate defendants' fraudulent misrepresentations about how the Bank priced standing instruction transactions.   The guaranteed range merely set a floor and ceiling to prices, and provided clients with no information about how a transaction would be priced within that broad range.   The spread between the guaranteed prices was so large as to render the guaranty practically meaningless.  BNYM admitted that the guaranteed rates of "each currency pair almost invariably exceed the range of daily reported

interbank rates for each currency pair."  SAC ¶ 98.  Indeed, as BNYM told one client, the guaranteed rates were not realistic for trading or validating the reasonableness of rates.  SAC ¶ 98.

Nor do the cases relied on by BNYM demonstrate that the disclosure of prices alone or a guaranteed range of prices absolve BNYM of its fraudulent conduct.  Rather, those cases generally stand for the proposition that where a client gets the goods or services it anticipated, and there is no misrepresentation as to the "nature of the bargain," the client has not been defrauded.[23]  Notably, BNYM fails to mention the language in *Shellef* regarding the "nature of the bargain," in an effort to twist these cases and argue that the disclosure of price alone is dispositive as to whether there was fraud, irrespective of defendants' false representations regarding the service they were actually providing.  Here, as alleged in the SAC, defendants represented, *inter alia*, that clients would receive best execution on standing instruction trades, that the Bank would maximize the value of its clients' portfolios, and that the Bank would price transactions reflecting the market rate at the time of the transaction, but instead, the Bank provided its clients with close to the worst price of the day.  These misrepresentations thus go to the very heart of the bargain.[24]

BNYM makes much of *In re Mexico Money Transfer Litigation*, 267 F.3d 743 (7th Cir. 2001) in support of its theory that a disclosure of prices necessarily precludes a finding of fraud. (Br. at 21-22).  While that case involved foreign currency exchange, the comparisons end there.  In

---

[23]  *See Shellef*, 507 F.3d at 108 (Br. at 20) (observing that mail fraud conviction could not stand where misrepresentation was not "'directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain,'" but that there was a basis for a wire fraud prosecution where the "type of misrepresentation" is one "'directed to . . . the nature of the bargain'") (citations omitted); *United States v. Regent Office Supply*, 421 F.2d 1174, 1182 (2d Cir. 1970) (Br. at 20) (no mail fraud where defendants "did not attempt to deceive their prospective customers with respect to the bargain they were offering").

[24]  BNYM's reliance on *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) is likewise misplaced.  In *Starr*, unlike in this case, the fraudulent scheme did not involve misrepresentations by defendants to customers, for whom the defendants provided bulk mail services.  Rather, the agreement between the defendants and their customers was the "delivery of mail to the appropriate destination in a timely fashion."  *Id.* at 100.  The customers received that service.  *Id.* at 99.  Instead, the victim of the defendants' scheme was the postal service, whom the defendants had cheated of its revenue by underpaying postal fees for the mailings.  *Id.* at 100.  Here, by contrast, the fraudulent misrepresentations go to the nature of the standing instruction service being furnished to the client.

*Mexico Money*, the Seventh Circuit noted the difficulties the plaintiff class would have in proving fraud in rejecting the argument that the settlement value of a class action was too low.  *Id.* at 749. That was because the defendants revealed, *before* each customer decided to use the defendants' service, "the exchange rate they offered (the price per peso) and the rate for the wire transfer to Mexico.  Each customer was told how many dollars in the United States would result in how many pesos delivered in Mexico."  *Id.*  Here, the nature of the bargain defendants represented to BNYM's clients was much different.  Defendants did not advise BNYM's clients of the exact rates offered before each standing instruction transaction.  Moreover, unlike in *Mexico Money*, defendants in this case promised, among other things, "best execution," the "goal of maximizing the value of the client portfolio," and that the transaction would be "free of charge."

### 2.     The SAC's Allegations Are Plausible

BNYM argues that "admissions" in the SAC render the allegations of fraud in the complaint "implausible."  (Br. at 22-24).  The SAC's allegations describe, in particularized factual detail, a knowing and deliberate deception perpetrated by the defendants in an effort to maintain the Bank's profits to the detriment of its clients, and thus amply complies with the requirements set forth by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint sets forth facts regarding defendants' representations and their actual practices that would allow a fact-finder to draw the reasonable inference that defendants engaged in a fraudulent scheme.

While arguing that the Government's allegations of fraud are "implausible," BNYM does not ever square BNYM's practice of pricing standing instructions at close to the worst price of the day with its affirmative misrepresentation that the Bank offered best execution and sought to maximize the value of its clients' portfolios.  Instead, BNYM ignores these misrepresentations, and argues that the Government's assertions of fraud are implausible because BNYM offers directly negotiated transactions that "included a spread," and, therefore, according to defendants, it would

have been irrational for a standing instruction client to believe that the rates it received through a standing instruction transaction would reflect the interbank rate with "no spread." (Br. at 22). But nothing about how BNYM priced or executed directly negotiated trades negates the false statements and material omissions that BNYM repeatedly made in an effort to preserve its ill-gotten standing instruction revenue, or would make it irrational for a standing instruction client to fail to comprehend that BNYM's pricing scheme would result in the client receiving the least favorable rate of the day.  Indeed, these services meet different needs:  a directly negotiated trade involves a direct negotiation with a trader at BNYM (and the opportunity to negotiate with other banks), at the timing of the client's choosing, at a price agreed to by the parties.  By contrast, standing instruction involves automatic transactions carried out on an as needed basis.  SAC ¶¶ 2, 22.  While BNYM refers to these differences as the "administrative benefits" of the standing instruction program (Br. at 22), these "benefits" provide no basis for defendants to misrepresent key terms of the standing instruction program, and do not render the Government's allegations of fraud implausible.  Nor does the percentage of directly negotiated trades executed by the Bank (Br. at 24) demonstrate that "BNYM's customers did not share the Government's implausible interpretation of BNYM's statements," or negate the falsity of BNYM's representations.[25]  Indeed, BNYM's assertion that customers did not share the Government's interpretation is wholly undermined by the multiple lawsuits filed against the Bank based on its standing instruction practices.  SAC ¶ 177.

Similarly, BNYM cannot credibly assert that the SAC's allegations of fraud are implausible based on representations made by BNYM that it conducts trades "on a principal basis," that rates "will not deviate by more or less than three (3) percent from the relevant Interbank bid or ask rates,"

---

[25]  Defendants' claim that clients and their investment managers would never do directly negotiated trades if they were expecting best execution pricing on standing instruction transactions is at best a speculative factual assertion.  Clients and investment managers can expect best execution from BNYM for transactions they elect to handle through the standing instruction service and still want to directly negotiate other foreign exchange transactions because they want to control the decision as to the timing and pricing of the trades.

and will "not be less favorable to the account than the corresponding rates indicated on the Daily Schedule for that day." (Br. at 23). Nothing about these statements neutralizes the false appearance defendants created through their representations that BNYM would provide best execution, maximize the value of its clients' portfolios, and price transaction at levels reflecting the interbank market at the time the trade is executed. The additional representations cited by BNYM at most set a floor and a ceiling for the transaction, but do not address how price would be determined within that range. SAC ¶ 98; *see also* SAC ¶¶ 96-103. BNYM's fraud in this case is thus far different from the case cited by BNYM where a contract "unambiguously warned" of defendant's practices. (Br. at 23) (citing *Capital Mgmt. Select Fund v. Bennett*, 670 F.3d 194, 207 (2d Cir. 2012)).[26]

Essentially, defendants seek to blame their intended victims, claiming that they could not have plausibly believed they were receiving favorable rates on FX transactions. As the SAC details, however, the Bank's standing instruction clients could plausibly believe they were receiving favorable rates because that is what defendants told them. SAC ¶¶ 41-59. Further, defendants recognized that they had to conceal their actual pricing practices because transparency would result in clients not accepting the Bank's standing instruction pricing and the defendants' profits would disappear. *See supra*, Facts, C. Indeed, had the nature of the bargain been so obvious, as defendants now argue, they would have had no need for such concealment and would not have been concerned about transparency. In sum, the Court should reject defendants' implausibility argument in light of the concrete allegations of fraud detailed in the SAC that more than satisfy *Iqbal*.

### 3.    Defendants Had a Duty to Disclose the Bank's Pricing Practices

Defendants had a duty to disclose how the Bank priced standing instruction transactions. SAC ¶ 103. BNYM wrongly claims that the Government does not allege "any facts to suggest that

---

[26]  Nor can BNYM claim that the allegations of fraud are implausible because prior to 2007, Bank of New York and Mellon were separate companies that could not have "engaged in a single, coordinated scheme to defraud." (Br. at 1-2). Whether these two banks coordinated their fraudulent representations to clients is a fact issue. The SAC details the specific misrepresentations made both prior to and after the merger.

BNYM had any legal duty" to advise customers that BNYM priced standing instruction transactions at close to the worst interbank range of the day.  (Br. at 24).  BNYM ignores the factual allegations in the SAC, and misrepresents the legal framework, arguing that such a duty could only derive from a "fiduciary relationship" between the Bank and its customers.  (Br. at 24-25).  BNYM's disclosure obligations arose, however, from three independent bases: its affirmative misrepresentations, its superior knowledge, and its representations inviting a heightened level of trust.

Having made incomplete and misleading representations to their clients, *see* SAC ¶¶ 39-103, defendants had a duty to disclose how the Bank actually priced standing instruction transactions. The Second Circuit has held that "[a] duty to disclose can also arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading." *Autuori*, 212 F.3d at 119.  BNYM cites this case, but ignores its holding.  (Br. at 25). In *Autuori*, the defendant's "upbeat statements were misleading by their incompleteness" about the true state of affairs of the business.  212 F.3d at 119.  For example, the defendant's representations about a company's financial reputation "created a duty to disclose" the company's "recent financial difficulties." *Id.*  The circuit court ruled that a jury could find that incomplete statements were misleading based on the defendant's failure to disclose his knowledge about the business. *Id.*

Defendants also had a duty to disclose based on their superior knowledge of standing instruction pricing.  In *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995), the Second Circuit held that a duty to disclose may arise in the absence of a fiduciary relationship where "'one party possesses superior knowledge, not readily available to the other, and knows that the other party is operating under a mistaken perception of material fact.'" (citation omitted); *see also United States v. Fed. Record Serv. Corp.*, No. 99 Civ. 3290 (BSJ), 1999 WL 335826, at *17 (S.D.N.Y. May 24, 1999).  Defendants had superior knowledge about how BNYM actually assigned prices to its standing instruction transactions, *see supra* Facts, A-B, and

obfuscated reporting of those transactions to avoid detection, *see supra* Facts, C.   Indeed, Nichols has conceded that many standing instruction clients did not have the "knowledge" to "negotiate and manage foreign exchange transactions."   (Nichols Br. at 3-4).   As alleged in the SAC, Bank officials, including Nichols, knew that if their customers actually had knowledge of the Bank's pricing practices, clients would opt out.  SAC ¶¶ 105-06, 108, 126-28, 134-36.   They admitted that standing instruction was "extremely profitable to the Bank *solely* because of the lack of transparency with regard to how BNYM determined pricing," SAC ¶ 105, and recognized that clients with more information would seek better pricing.  SAC ¶ 108.

Furthermore, a duty to disclose arose given BNYM's representations "signifying a heightened level of trust."  *Remington Rand*, 68 F.3d at 1483.  Indeed, BNYM's promise of best execution and its representation that it assisted fund managers in meeting their fiduciary obligations invited a heightened level of trust from its custodial clients.  SAC ¶ 55; *see also Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 (2d Cir. 2008) (finding defendants' portrayals that they will assist customers in purchasing the best insurance and investment option available to them, in addition to statements that trust is a crucial dimension in their relationship with their customers, to be indicative of a fiduciary duty).[27]  Further, as Nichols explained, given the lack of knowledge of many standing instruction clients to negotiate and manage foreign exchange transactions, customers would "rely on BNYM's expertise in this area."  (Nichols Br. at 4).

### B.   The SAC Sufficiently Alleges Fraudulent Intent

#### 1.      The Governing Standard

The Government has alleged, as required by the mail and wire fraud statutes referenced in FIRREA, that defendants intended to defraud the Bank's clients.  *See* 12 U.S.C. § 1833a; *see, e.g.*,

---

[27]  Moreover, BNYM did have a fiduciary relationship with at least certain standing instruction clients.  SAC ¶ 103 n.3.  *See also State of New York v. The Bank of New York Mellon Corp.*, Index No: 09/114735 (N.Y. County, NY), Complaint and Superseded Complaint ¶¶ 38-39, 51, 59-61; *State of Florida v. The Bank of New York Mellon Corp.*, Case No. 2009 CA 4140 (Leon County, FL), Complaint in Intervention ¶ 3.

*United States v. Stevens*, 210 F.3d 356 (2d Cir. 2000) (Table) ("intent to defraud" means acting "knowingly and with the intent to deceive, for the purpose of causing some financial loss to another").[28]  Pursuant to Federal Rule of Civil Procedure 9(b), the plaintiff must plead facts "which give rise to a strong inference that the defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth."  *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 458 (S.D.N.Y. 2008).  Whether an inference of scienter is strong "is comparative," and courts evaluate the facts alleged along with any reasonable inferences favoring plaintiffs and compare them to plausible, nonculpable explanations for the defendant's conduct.  *Defer LP v. Raymond James Fin., Inc.*, No. 08 Civ. 3449 (LAK), 2010 WL 3452387, at *4 (S.D.N.Y. Sept. 2, 2010).  A strong inference exists "only if a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* (alteration in original).

A strong inference of scienter is typically proven by pleading facts that show either that the defendants had motive and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness.  *See Meisel v. Grunberg*, 651 F. Supp. 2d 98, 109 (S.D.N.Y. 2009).  Motive can be shown through evidence that the defendants "benefited in some concrete and personal way from the purported fraud."  *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*, 553 F.3d 187, 198 (2d Cir. 2009).  Recklessness refers to "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," and may be shown through evidence that the defendants (1) personally benefited from the fraud, (2) deliberately engaged in illegal behavior, (3) knew or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.  *Id.* at 198-99.  The

---

[28]  *See also United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012); *United States v. O'Connor*, 656 F.3d 630, 644 (7th Cir. 2011).

complaint need only provide a "minimal factual basis" for allegations of scienter. *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995).

Moreover, in cases specifically addressing mail and wire fraud, intent to defraud may be shown "both from circumstantial evidence and inferences drawn by examining the scheme itself." *United States v. Sheneman*, 682 F.3d 623, 629 (7th Cir. 2012); *see also United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011) (intent "is shown by the existence of the scheme"); *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000) (intent to defraud may be established "by inferences drawn from examining the scheme itself"). Indeed, the Second Circuit has instructed that courts should "look at the entire circumstances of defendant's conduct" as an indication of the requisite intent. *United States v. Barrett*, 178 F.3d 643, 648 (2d Cir. 1999).

Lastly, where, as here, the complaint alleges fraud by an organization, intent may be based upon the collective knowledge of its employees. *See, e.g.*, *Defer LP v. Raymond James Fin.*, 654 F. Supp. 2d 204, 218 & n.100 (S.D.N.Y. 2009) (collecting cases); *United States v. Bank of New England, N.A.*, 821 F.2d 844, 855–56 (1st Cir. 1987) (aggregating knowledge of corporation's employees to support knowledge element in finding defendant corporation criminally liable).

As set forth below, the well-pleaded allegations in the SAC show that, at a minimum, defendants behaved recklessly in promoting, carrying out, and concealing their scheme, and also benefited in a concrete and personal way from the end result of their scheme. *See Griffin v. McNiff*, 744 F. Supp. 1237, 1246 (S.D.N.Y. 1990) (defendant's financial interest, combined with access to actual facts and participation in preparation of misleading financial documents, were allegations "sufficient to satisfy the threshold requirements for pleading scienter under Rule 9(b)").

### 2.    The SAC Adequately Pleads that BNYM Intended to Defraud Its Clients

The SAC's allegations adequately set forth the Bank's intent to defraud. First, the scheme itself evinces BNYM's fraudulent intent. Second, the Bank's concerted effort to conceal its scheme

is further evidence that it intended to defraud as many of its standing instruction customers as possible. Third, the necessary and foreseeable result of the scheme gives rise to a strong inference of intent. The Bank's arguments to the contrary are unpersuasive.

### a. BNYM's Scheme to Defraud Establishes Its Specific Intent

Where, as here, the Bank sought to profit at its clients' expense by misrepresenting the purported benefits of the Bank's standing instruction service, intent to defraud may properly be inferred. *See United States v. Frank*, 156 F.3d 332 (2d Cir. 1988) (upholding conviction notwithstanding erroneous jury charge on intent because essence of scheme was to obtain money by inducing their customers to pay for services that were not provided, and thus, their intended gain to themselves was inextricably bound to a corresponding loss to their customers).[29] The SAC contains detailed allegations explaining the various misrepresentations BNYM knowingly made to customers. *See generally supra*, Facts, B; SAC ¶¶ 29, 41-49, 51, 54-56, 58, 60-62, 71, 73-94.

Moreover, that the Bank knew its representations to its clients were false yet continued to make them provides a strong inference of fraudulent intent. *Cf. United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1121 (D.C. Cir. 2009) (corporation's specific intent to defraud may be inferred where internal corporate knowledge is contrary to public statement); *Novak*, 216 F.3d at 308 ("securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements"); *United States v. Harkonen*, No. C 08–00164, 2010 WL 2985257, at **3-12

---

[29] *See also United States v. Treadwell*, 593 F.3d 990, 997 (9th Cir. 2010) ("The intent to induce one's victim to give up his or her property on the basis of an intentional misrepresentation causes 'harm' by depriving the victim of the opportunity to weigh the true benefits and risks of the transaction, regardless of whether or not the victim will suffer the permanent loss of money or property").

(N.D. Cal. July 27, 2010) (upholding wire fraud conviction because statements in the defendant's press release contradicted his own knowledge).[30]

### b. BNYM's Effort to Conceal Its Scheme is Further Evidence of Its Intent to Defraud

The Bank went to great lengths to keep hidden from its clients the Bank's actual method of pricing its trades. *See generally supra*, Facts, C; SAC ¶¶ 64, 96-140. The Bank's efforts to conceal its scheme are further evidence of its fraudulent intent. *See, e.g.*, *SEC v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 264 (S.D.N.Y. 2009) (strong inference of intent found where defendants, *inter alia*, made efforts to conceal their fraudulent scheme from clients); *SEC v. Savino*, No. 01 Civ. 2438 (GBD), 2006 WL 375074, at *14 (S.D.N.Y. Feb. 16, 2006) (a defendant's intent to defraud was "further demonstrated" by his efforts to "conceal their scheme after [the client] began to investigate [the defendant's] trades").

### c. BNYM's Profits and Its Client's Corresponding Losses Evince Intent

The SAC alleges that the Bank obtained hundreds of millions of dollars of ill-gotten gains by lying to and/or misleading its standing instruction customers. *See, e.g.*, SAC ¶¶ 3-8, 11, 24, 33, 37-38, 109, 155-74. Where, as here, it is clear that a scheme, viewed broadly, is necessarily going to cause injury, it can be presumed that the Bank had the requisite intent to defraud. *See AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202, 221-22 (2d Cir. 2000) (finding presumption that intent exists when it is clear that the scheme is going to injure "appropriate in circumstances such as these, where a large entity, firm, institution, or corporation is acting in a manner that easily can be foreseen to result in harm"); *see also United States v. Chacko*, 169 F.3d 140, 148 (2d Cir. 1999);

---

[30]  That two standing instruction clients were reimbursed once they discovered that the Bank was pricing their respective trades at or near the worst price of the day, *see* SAC ¶¶ 115, 138, is additional circumstantial evidence of the Bank's intent. *Accord United States v. Park*, 164 F. App'x 584 (9th Cir. 2006) (settlement agreement from prior civil action involving counterfeit merchandise at defendant's gift shop, in which defendant had agreed not to sell counterfeit merchandise in the future, together with evidence that shop subsequently sold identical merchandise, allowed reasonable fact finder to infer that defendant knew her goods were counterfeit).

*United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994); *United States v. Gravatt*, 280 F.3d 1189, 1192 (8th Cir. 2002).[31]   Actually providing best execution, executing trades at the spot price at the time of the transaction, and netting would have substantially reduced the Bank's revenue, as the Bank admits, *see, e.g.*, SAC ¶¶ 79, 108; *see also* SAC ¶¶ 33, 71, 105, 128, 136, and customers would have gained more from their FX transactions.   *See* SAC ¶¶ 135-36; *see also* SAC ¶¶ 108, 127.   Put simply, the Bank realized substantial gain, and the clients suffered corresponding losses. Thus, the necessary result of the Bank's scheme establishes a strong inference of the Bank's intent.

### d.  BNYM's Arguments Are Without Merit

The Bank cannot defeat the SAC's allegations demonstrating intent by arguing that the Government must plead facts that a specific employee or agent of BNYM acted with the requisite intent.  (Br. at 34).  First, Nichols possessed specific intent to defraud BNYM's clients.  *See infra* Pt. III.C.3.  This alone is sufficient to defeat the Bank's argument, which the Bank necessarily concedes.  (Br. at 35).  Second, it is well-settled that the Government does not need to plead that a particular identified individual acted with scienter in order to establish that the Bank acted with the requisite intent.  In *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008), cited by the Bank (Br. at 34), the Second Circuit stated unequivocally that a "strong inference" may be raised "with regard to a corporate defendant without doing so with regard to a specific individual defendant."  *Id.* at 195.  Similarly, the Seventh Circuit, in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, also cited by the Bank (Br. at 34-35 n.48), held that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals

---

[31]  *See also United States v. Martin*, 411 F. Supp. 2d 370 (S.D.N.Y. 2006) (Wire fraud conspiracy indictment sufficiently stated fraudulent intent element by alleging that defendant had engaged in scheme to defraud by "doping" racehorse and then profit by placing bets on horse; success of scheme necessarily required that those betting on non-doped horses lose their wagers, and thus permitted inference of intent to injure those bettors); *cf.* Restatement (Second) of Torts § 8A comment b (1965) ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.").

who concocted and disseminated the fraud."  513 F.3d 702, 710 (7th Cir. 2008); *see also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 281 (S.D.N.Y. 2008) ("[t]o carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter.  Proof of a corporation's collective knowledge and intent is sufficient." (quoting *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005)); *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 590–91 (S.D.N.Y. 2010) (finding corporate scienter for misrepresentations where individual scienter was absent).  Thus, the Government need not show (although it has shown) that individual employees acted with the requisite intent.  Rather, as set forth *supra* Pt. III.B.2.a, the Bank's intent can and should be inferred from the scheme.[32]

The Bank also argues that its desire to gain a profit does not establish motive.  (Br. at 35). But here the Bank did not just seek to make a profit; rather, it deliberately deceived its clients and made the profit at their expense.  Where, as alleged here, the Bank profited through its deceptive scheme, the Bank's suggestion that this profit does not demonstrate intent should be rejected. "When the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself."  *D'Amato*, 39 F.3d at 1257; *supra* Pt. III.B.2.c.

Finally, the Bank has failed to argue that the SAC does not show circumstantial evidence of conscious misbehavior or recklessness.  As illustrated above, *see supra* Section III.C.2.a-c, the SAC plainly has made such allegations.

---

[32]  Virtually every case relied upon by the Defendants arose in a completely different and unrelated context involving securities actions brought by private plaintiffs pursuant to the Public Securities Litigation Reform Act ("PSLRA"), which was enacted "to curtail the champertous vice of lawyer-driven securities litigation." *City of Pontiac Gen. Employees' Retirement Sys. v. Lockheed Martin Co.*, 844 F. Supp. 2d 498, 500 (S.D.N.Y. 2012); *see also Iron Workers Local No. 25 Pension Fund v. Credit–Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 463 (S.D.N.Y. 2009).  The PSLRA does not concern or otherwise address the pleading standards applicable to the United States in a non-class action, non-securities matter. Moreover, unlike the PSLRA, which was enacted to limit certain types of private lawsuits, FIRREA was intended to broaden the Government's law enforcement authority to pursue fraud.

### 3.   The SAC Adequately Pleads that Nichols Intended to Defraud Clients

#### a.  Nichols Intended to Commit Fraud

The SAC sufficiently pleads that Nichols specifically intended to commit fraud.   The allegations in the complaint, considered collectively, show that Nichols had both a motive to commit fraud and acted recklessly or consciously misbehaved.

Nichols made numerous representations he knew to be false, which alone establishes his intent.  *See United States v. Tarallo*, 380 F.3d 1174, 1181 (9th Cir. 2004) (evidence sufficient to find intent to defraud were defendant knew statements to investors were false).  For instance, he drafted and disseminated, and encouraged other employees to disseminate his definition of "best execution," even though he knew that the Bank did not provide best execution.  SAC ¶¶ 50-53, 55-58, 60, 122.[33]  In addition, to respond to client inquiries about how the Bank ensured the client received a fair price, he circulated the Bank's "RFP boilerplate" stating that clients received the "best rate of the day" even though he knew this was not true.  SAC ¶¶ 44, 58.  Nichols also falsely represented to at least one client that "all clients receiv[e] the same spot price," while acknowledging internally that certain clients had been switched to a benchmarking form of standard instruction pricing.  SAC ¶¶ 87-88, 94, 116.

In addition, Nichols behaved recklessly.  He knew that his public statements concerning best execution – made through Global Finance Magazine and on the Bank's website[34] – were false.  SAC ¶¶ 57-58.  He also was aware of and involved in the Bank's efforts to conceal the scheme.

---

[33]  Nichols' statement on "best execution" falsely stated that:   "Understanding the fiduciary role of the fund manager, it is our goal to provide best execution for all foreign exchange executed in support of our clients' transaction," "we generally price foreign exchange at levels reflecting the interbank market at the time the trade is executed," and that "[b]est execution encompasses a variety of services designed to maximize the proceeds of each trade, while containing the total cost of processing." Klimmek Decl. Ex. 9.

[34]   Nichols admits in his employee self-assessment that he was responsible for "sales messaging and marketing content" on the Bank's website.  Laguardia Decl. Ex. 1.   The Bank's website also falsely represented that standing instruction was "free of charge" and would "help clients minimize risks and costs." SAC ¶ 67.  Nichols also disseminated "background materials" for addressing the "value of standing instruction" that represented "aggregating or netting trades."  Laguardia Decl. Ex. 2.

SAC ¶¶ 108, 128.  For instance, even though he was aware certain clients received benchmarked pricing for their standing instruction trades, he actively opposed a more widespread disclosure of this type of "transparency and accountability" because it "limits our potential to take wider margins."  SAC ¶¶ 88, 94.  His motive for this reckless behavior was to advance at the Bank and to obtain a concrete and personal benefit – increased compensation.  SAC ¶¶ 10, 110.  Accordingly, the SAC adequately pleads that Nichols intended to commit fraud.

### b.  Nichols' Arguments Are Unavailing

Nichols asserts that the SAC does not adequately plead that he had a motive to commit the fraud because the Government has not alleged that Nichols benefited in a concrete and personal way, and asserts that his desire to profit from the scheme is not evidence of motive.  (Nichols Br. at 21-23).  He is mistaken.  Contrary to Nichols' assertion, the Government has not alleged only that Nichols stood to gain financially in a manner that can be "'imputed to all corporate officers.'" (Nichols Br. at 21) (citation omitted).  Rather, the Government alleged that standing instruction revenues "were included in the bonus pool for BNYM employees involved in FX," such as Nichols. SAC ¶ 110.  Indeed, Nichols admits that his email seeking to preserve "the bonus pool" for standing instruction trades reflects an effort to ensure that Nichols' group, Global Markets, and not the different Custody group at the Bank, received bonuses for the Bank's standing instruction business. (Nichols Br. at 22 (Nichols wanted to "make sure that the fee was credited to Global Markets rather than another department within BNYM")); Laguardia Decl. Ex. 11 ("This is currently our revenue and it should remain so; we all understand how the bonus pool funds.") [35]  Accordingly, the SAC alleges that Nichols and his Global Markets group profited through standing instruction trades, as

---

[35]   Nichols' claim that this email does not concern the standing instruction program is also incorrect. (Nichols Br. at 22-23).  The email clearly references the standing instruction program, and is discussing a potential shift from that program to a flat fee methodology.  *See* Laguardia Decl. Ex. 11.  If, upon making the switch, Nichols desired for the revenue to "remain" the revenue of his department, it necessarily follows that under the standing instruction program the revenue was credited to his department for bonus purposes.

distinct from other groups in the Bank such as Custody.  *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661–62 (8th Cir. 2001) (plaintiffs made a showing of a direct link between the compensation package and the fraudulent statements); *United States v. Naranjo*, 634 F.3d 1198, 1207 (11th Cir. 2011) ("[e]vidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud").[36]

Nichols also claims that the SAC does not plead that he acted with conscious misbehavior or recklessness.  He claims this is so because (1) he purportedly promoted post-trade analysis to standing instruction customers (Nichols Br. at 24-25), (2) he made public statements concerning best execution that supposedly undermine the allegations in the SAC (*id.* at 25-26), and (3) his role at BNYM somehow prevented him from acting recklessly (*id.* at 26).  Each argument lacks merit.

First, that Nichols offered to provide Reuters High/Low Reports does not limit his culpability.  Rather, clients could not measure the fairness of the prices received on standing instruction trades because the Bank refused to provide time stamps.  *See* SAC ¶¶ 5, 93, 100, 124-25. Nichols knew that no time stamp was provided, *see* SAC ¶ 136, and thus should have known that clients could not evaluate the fairness of the trades.  Moreover, the monthly statements sent to clients did not distinguish between standing instruction transactions and other trades, further preventing clients from understanding whether they obtained a fair price.  *See* SAC ¶ 102.  Rather than negate Nichols' intent, this shows that he had access to superior information but failed to disclose it, all in the name of higher profits and a bigger bonus.

Second, Nichols' public statements do not undermine the allegations in the SAC.  For example, Nichols touts an article where he asserts that "'pricing is undeniably an important consideration in achieving best execution'" (Nichols Br. at 26; Laguardia Decl. Ex. 3), which is

---

[36]   In addition, Nichols fails to dispute the allegation that his fraudulent conduct also helped him advance at the Bank.  *See* SAC ¶ 10; Laguardia Decl. Ex. 1 (listing "accomplishments" relating to "best execution" definition in employee self-assessment).

antithetical to giving standing instruction customers the worst price of the day and does not vitiate the fraudulent definition of best execution and promises of best price that Nichols and BNYM made directly to customers.   Indeed, Nichols' own internal communications reveal that he plainly understood that best execution focused on "the client's total cost or proceeds," and he drafted the Bank's definition of best execution with this in mind.  SAC ¶ 53.[37]

Finally, Nichols' claim that his role at BNYM negates his intent is not credible.  Nichols was a Managing Director and the head of Product Management at BNYM.  *See* SAC ¶ 14.  In this capacity, Nichols developed and disseminated the fraudulent definition of best execution.  When BNYM employees had questions about the Bank's response to client inquiries concerning pricing and best execution they went to him.  SAC ¶¶ 44, 51-52, 89, 116-22.  He, in turn, provided them with misleading information to give to the Bank's clients.  SAC ¶¶ 44, 51-52, 116-22.  Nichols knew or should have known that the information he was providing was false or misleading, yet he made no efforts to correct it.   In fact, while Nichols may claim that he dealt with clients infrequently, when he did so on at least one occasion, he lied to them.  SAC ¶ 88.  In any event, Nichols need not initiate or control the fraudulent scheme – participation is sufficient, and it has been adequately pled.  *See, e.g.*, *United Savers Acceptance Corp. v. Kelton*, 775 F. Supp. 141, 143 (D. Vt. 1991) ("by knowingly participating in the scheme [the defendant] contemplated that plaintiff would be harmed thereby, whether or not she initiated the plan or controlled its outcome").

## C.   The Government Adequately Alleges That Defendants' Misrepresentations and Omissions Were Material

The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose.  *See United States v. Altman*, 48 F.3d 96, 102

---

[37]   Moreover, while BNYM touted on its website and in RFP responses that the standing instruction service was free of charge and minimized costs, *see* SAC ¶¶ 67-68, Nichols edited an article because he did not "want this article to appear to be all about controlling costs," since "plan sponsor costs are our revenues." SAC ¶ 71.  He failed to make similar edits to RFP responses or the website.  SAC ¶ 71.

(2d Cir. 1995).  A misrepresentation is material if it has a tendency to influence the decision of the person or entity to which it was directed.  *See Neder v. United States,* 527 U.S. 1, 16 (1999).  "To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction."  *United States v. Mittelstaedt,* 31 F.3d 1208, 1217 (2d Cir. 1994).  "[I]t is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading."  *United States v. Townley,* 665 F.2d 579, 585 (5th Cir. 1982).

The SAC provides numerous examples of defendants' misrepresentations and omissions that were specifically intended to influence BNYM's clients to use the Bank's standing instruction service, despite the fact that BNYM was assigning clients the worst or next-to-worst rates of the day, to preserve BNYM's most lucrative form of foreign exchange revenue.  Courts routinely find that misrepresentations and omissions such as these, which have a tendency to influence decision making, are material.  *See, e.g.*, *United States v. Teyibo*, 877 F. Supp. 846, 861 (S.D.N.Y. 1995), *aff'd* 101 F.3d 681 (2d Cir. 1996) (indictment properly alleged materiality by asserting defendant lied to broker-dealers to induce trading activity).

Defendants proffer a number of arguments, which they claim demonstrate that their misrepresentations are not material, but these arguments are actually just factual disputes that their misrepresentations were not so egregious when viewed "in context."[38]  Such factual arguments are not appropriate for consideration on a motion to dismiss.

### 1.    "Best Execution" and "Best Rate of the Day"

Defendants claim the term "best execution" is puffery, making a factual argument that the term has no definite meaning within the industry.   As a threshold matter, whether or not misrepresentations constitute puffery, "except in clear cases, . . . is normally a question of fact for

---

[38]  Defendants do not argue that their concealment of BNYM's pricing scheme was not material.

the jury." *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 723 (D.N.J. 2011).[39]   Indeed, the

cases defendants cite were either decided on summary judgment,[40] or they involve clear instances of

subjective salesman talk that can be readily verified or that no reasonable person could ever rely

upon.[41]   That is simply not the case here.

The SAC alleged that there is a definite meaning for best execution for foreign exchange

transactions, namely to provide the best available rate at the time the transaction is executed.

SAC ¶ 7.   Indeed, Nichols drew on industry standard definitions in drafting the Bank's definition of

"best execution." SAC ¶ 53.   The Bank's definition misrepresents the facts about its pricing

methods, which is not puffery.[42]   It includes, for example, the "goal of maximizing the value of the

client portfolio under the particular circumstances at the time."   SAC ¶ 51.   It is a factual

misrepresentation, not puffery, to represent that the Bank will maximize a client's value, while

actually providing the worst rate of the day to customers.   Defendants also included the objectively

false statement in the best execution definition that "we price foreign exchange at levels generally

reflecting the interbank market at the time the trade is executed by the foreign exchange desk."

SAC ¶ 60.   BNYM conducted no such trades and just assigned virtually the worst price.

Defendants make improper factual arguments that the SAC takes their misrepresentations

about providing "best execution" out of "context."   Defendants argue that the reference to "post-

---

[39]   *See also Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG, 2009 WL 6597891 (S.D. Cal. Dec. 23, 2009).

[40]   *See, e.g., Corley v. Rosewood Care Ctr. Inc. of Peoria*, 388 F.3d 990 (7th Cir. 2004); *Archer v. Nissan Motor Acceptance Corp.*, 550 F.3d 506, 510 (5th Cir. 2008).

[41]   *See, e.g., Nelson v. Publishers Circulation Fulfillment, Inc.* No. 11 Civ. 1182 (TPG), 2012 WL 760335 (S.D.N.Y. May 7, 2012), (general statements that employees would be "rewarded," enjoy "safety and protection," and be a "team" constitute puffery).

[42]   *See Novak v. Kasaks,* 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory situation was "in good shape" or "under control" when defendants knew the contrary was true were false and misleading) (citation omitted); *Freudenberg v. E*Trade Fin., Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) (false statements by defendant about its "discipline," "conservatism," "quality" "strong performance" and potential for "growth" not puffery); *In re Xerox Corp. Sec. Litig.,* 165 F. Supp. 2d 208, 218 (D. Conn. 2001) (statements were not puffery because defendants "made specific statements, including ... those characterized by the defendants as merely reflecting optimism, knowing they were contrary to the company's actual situation").

trade analysis" permitting customers to compare BNYM's prices to "industry benchmarks" in the Bank's definition of best execution indicates that the Bank was "representing that, compared to those benchmarks, it offered superior execution." (Br. at 30). Apart from improperly arguing facts, this argument is disingenuous, because without having time stamps showing when during the day the purported trades were executed, it was extremely difficult for customers to evaluate the fairness of the price, or whether the price reflected the market at the time of execution. SAC ¶ 100. The reports that BNYM provided to customers lumped the standing instruction transactions together with directly negotiated trades, further obfuscating the Bank's pricing practices. SAC ¶ 102. At bottom, assigning clients virtually the worst interbank price of the day is not best execution.[43]

Nor are BNYM's misrepresentations of "best price" mere puffing. Hardly the subjective talk of salesmen, BNYM told clients that the Bank "ensures best execution" by offering the "best rates for our clients." SAC ¶ 43. The Bank also explained that it had the ability to do so because as "a major market participant, the Bank is actively engaged in making markets and taking positions in numerous currencies so that we can provide the best rates for our clients." SAC ¶ 43. Moreover, the mechanism allowing the Bank to achieve the best rates for standing instruction clients was to "aggregate all client income in any given currency to obtain the 'best rate of the day.'" SAC ¶ 44. These are not, as the Bank asserts, "inherently subjective" descriptions. (Br. at 28). Rather, this language conveyed to customers that by lumping all standing instruction clients' trades together, BNYM would thereby be able to provide, and would provide, the best prices available at the time the trades were being executed – which was entirely false.[44]

---

[43]  Defendants also inappropriately assert the factual argument that best execution in the securities context is not exclusively about price, and that the same should hold true for foreign exchange. (Br. at 31). However, even if, as Nichols contends, "'pricing is undeniably an important consideration in achieving best execution'" but not the only criteria (Nichols Br. at 26), pricing at the worst interbank rate of the day is antithetical to even this description of best execution.

[44]  Nichols claims that he did not actually make the "best rate of the day" misrepresentation to clients. The SAC, however, alleges that Nichols circulated this language to other employees in April 2006 for use as the

### 2.    "At the Time the Trade Is Executed"

Defendants assert that the phrase, "we price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk," is not materially false, because customers somehow should have understood that the Bank was only promising a price within the daily range.  Defendants point out that documents in which this phrase appears also stated that only the "vast majority" of trades would be priced "within the interbank range applicable on trade date," and that the price might fall "outside the daily range" particularly for "very small trades" which included "a spread to cover the cost of processing and currency risk management."   While defendants claim that it was "disingenuous[]" for the Government to leave this additional language out of the complaint, far from clearing up the preceding misrepresentations, the additional language actually contains *more false statements*.  Defendants were lying when they said BNYM added a spread to small trades to cover processing and risk management costs.  To the contrary, BNYM simply assigned clients the worst or next-to-worst interbank rate of the day, which resulted in massive spreads bearing no relation to any purported costs BNYM incurred.  SAC ¶¶ 26-29, 33-34.  Furthermore, this language falsely suggests that BNYM was earning this purported spread to cover its costs only for small trades.   In truth, BNYM applied its pricing scheme to standing instruction transactions irrespective of size.  SAC ¶¶ 26-29, 33-34.  Moreover, telling clients that they would most likely receive a price within the daily range did nothing to clarify for clients that, contrary to defendants' statements, BNYM's "foreign exchange desk" was not

---

Bank's boilerplate for RFP responses.  A defendant need not be the person who made the misrepresentation to be found liable for having engaged in a scheme to defraud.  *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 (2d Cir. 2001) (executive could be liable for misstatements not specifically attributed to him, where he "was primarily responsible" for communications with investors and analysts and was "involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements"); *In re Livent, Inc. Noteholders Sec. Litig.*, 174 F. Supp. 2d 144, 152 (S.D.N.Y. 2001) (broker potentially liable for "structuring and keeping secret the misrepresented [relationship]" between underwriter and company); *Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 316 (S.D.N.Y. 1996) (underwriter could be liable for "actively participat[ing] in formulating the language of the prospectus").

"executing" standing instruction trades at all, let alone executing the trades at rates "generally reflecting the interbank market at the time the trade is executed," and that BNYM actually was just assigning its clients the worst or next-to-worst interbank price of the day.[45]

### 3.    "Free of Charge" and "Minimize Risks and Costs"

Defendants' representations that standing instruction was "free of charge" and "designed to help clients minimize risks and costs related to the foreign exchange" go to the heart of the standing instruction service.  Defendants intended for the Bank's customers to believe that the standing instruction service was free and minimized costs, when in fact BNYM was giving clients close to the worst price of the day and reaping enormous profits at their expense.[46]  Nor can defendants isolate representations about "free of charge" from the Bank's representations about "best execution" or "best rate," for example, and seek to dismiss them, since, as the Bank admits, "whether statements are materially misleading" requires examining the "'representations taken together and in context.'"  (Br. at 25) (citation omitted).

Moreover, it is disingenuous for the Bank to argue that "free of charge" could not be construed by clients to relate to the enormous spreads that BNYM made on standing instruction transactions but only to a "separate, per-transaction fee or commission."  (Br. at 26).  Indeed, the Bank itself referred internally to the "fees" that it made from the standing instruction service by referencing the spreads it made on transactions, and not "per-transaction fee[s]."  For example, the

---

[45]   Defendants also claim that the document containing the misstatement, "we price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk," was a "general description" of BNYM's foreign exchange services, including both negotiated and standing instruction.  This is a factual argument that cannot be properly considered on a motion to dismiss. Moreover, it is demonstrably false.  Nichols circulated this definition in response to an inquiry about "pricing standing instructions," Laguardia Decl. Ex. 5, and in 2009 he attached the updated version of this document and described it as "background materials developed over the past couple of years to address questions about the value of standing instruction execution."  *Id.* Ex. 2.  The document also discusses "aggregating or netting trades," *id.* Exs. 2, 5, which only make sense in the context of standing instruction transactions.

[46]   *Cf. Int'l Union of Operating Eng'rs,* 2012 WL 476526, at *4-7 (finding plaintiff stated a claim against BNYM under California False Advertising Law, breach of contract and New York's General Business Law Section 349 based on, *inter alia*, representation that standing instruction transactions were "free of charge").

Bank explained that distributing "fee information" would "hurt" the Bank "many times over in reduced revenue," that "Trust and Custody clients could expect to reduce their fees and we could leave \$3 mil[lion] or more on the table each year," that "Global Markets clients can further reduce their fees from 20 BPS to 1 BPS," and that the Bank would "need to generate more business to attain [the] same fee level."  SAC ¶ 128.  BNYM cannot credibly argue on a motion to dismiss that customers should have construed its "free of charge" representation as meaning free of a per-transaction "fee," when the Bank itself internally counted its revenue from the enormous spreads it took as a "fee."  Nichols also admitted that "[w]e charge a premium for our services."  SAC ¶ 70.[47]

Similarly, BNYM fails to demonstrate that the language disseminated to clients about minimizing costs cannot constitute part of the scheme to defraud because, according to the Bank, this language referred to the Bank's contention that "standing instruction service automates identification and processing" of foreign currency transaction.  (Br. at 26 n.36).  The Bank's argument raises a fact question that is improper on a motion to dismiss.  The Bank also ignores Nichols' admission that standing instruction services were not designed to "minimize" costs as the Bank falsely told clients.  In 2003, Nichols removed language about "controlling costs" from an

---

[47]  The Bank's cases on this point are inapposite.  In *In re Mexico Money*, 267 F.3d at 749 (Br. at 26), customers at a retail currency exchange store knew *before* each customer decided to use the defendants' service, "the exchange rate they offered (the price per peso) and the rate for the wire transfer to Mexico. Each customer was told how many dollars in the United States would result in how many pesos delivered in Mexico."  *See also Sanchez v. Giromex*, No. D042459, 2004 WL 2750332, at *13 (Cal. Ct. App. Dec. 2, 2004) (Br. at 26) (finding no deception where defendants disclosed to consumers that they were "(1) selling an amount of pesos to plaintiffs at a stated exchange rate, (2) sending that amount of pesos to the designated recipients in Mexico; and (3) charging a flat fee for transmitting the pesos.").  BNYM's citation to a California disclosure statute cited in *Sanchez* (Br. at 26 n.35) has no relevance to an allegation based on mail and wire fraud.  Moreover, in *Sanchez*, the court stated that "those statutory provisions do not clearly permit or clearly prohibit nondisclosure of the FX spread."  *Sanchez*, 2004 WL 2750332, at *11.  BNYM failed to disclose this finding in its brief, and also fails to advise this Court that *Sanchez* is unpublished and not citable.  *See* California Rule of Court 8.1115.  BNYM's reliance on *McCann v. Lucky Money, Inc.*, 29 Cal. Rptr. 3d 437, 442 (Cal. Ct. App. 2005) (Br. at 26), is similarly misplaced.  In that case, the defendant provided the exchange rate, amount of commissions or fees, and the net exchange rate.  In this case, BNYM did not disclose an exchange rate prior to the transaction, promised that the client would receive "best execution," and represented that the service was "free of charge" and minimized costs.

article about standing instruction, explaining:  "Under no circumstances do we want this article to appear to be all about controlling costs" because "plan sponsor costs are our revenues."  SAC ¶ 71.

### 4.      Netting

BNYM does not dispute that it failed to offer netting at its Pittsburgh desk.  Rather, the Bank contends that its representation that it offered "[a]ggregation and netting of trades based on guidelines tailored to client needs," SAC ¶ 74, requires the Government to allege that a BNYM customer actually "entered into" "such netting arrangements" with the Bank and/or that BNYM failed to adhere to its agreed-upon arrangement.  (Br. at 32).  Nothing in the Bank's representation indicated that this service was not available to all of its standing instruction clients, or that an arrangement was required.  Indeed, BNYM did not reference "guidelines tailored to client needs" in other representations promising "netting."   In its definition of "best execution," defendants represented that among the "variety of services" that the Bank provided "to maximize the proceeds of each trade" are "aggregating or netting trades."  Laguardia Decl. Ex. 5; *see also* SAC ¶ 74.  This representation was false.  BNYM failed to provide netting for *any* transactions conducted through its Pittsburgh trading desk.  SAC ¶ 76-77.

### 5.      Same Pricing Terms

Contrary to BNYM's assertion that the Government focused on a single email to Fidelity in alleging that BNYM misrepresented that all standing instruction clients are given terms not less favorable than any other party (Br. at 33), the SAC alleged that BNYM made these false representations systematically.  SAC ¶ 84.  BNYM made these representations in emails to clients such as White Mountain Advisors (2009) and Fidelity (2011),[48] through a policy addressing ERISA

---

[48]   The block quote in the email to Fidelity cited by BNYM does not dispel fraud but rather demonstrates BNYM's false representations that all clients receive the same spot price.  Moreover, BNYM omits from the block quote the statement that:  "However, pricing applied to income trades is guided by the same range of day parameter as all other standing instruction trades."  Klimmek Decl. Ex. 8.  This statement was knowingly false in light of the Bank's benchmarking of certain standing instruction arrangements.

plans, and included the representations that the "terms of FX transactions with any Plan shall not be less favorable to the Plan than terms offered by The Bank of New York to unrelated parties in a comparable arm's length FX transaction" as standard language in Welcome Packages to investment managers that both pre-and post-dated the merger, including Capital Guardian (2007), Acadian Asset Management (2007), and Eagle Global Advisors (2008).  SAC ¶¶ 83-88.  Clients were also falsely told that the service "does not lend itself" to "'benchmark' pricing."  SAC ¶ 93.

These representations were materially false because a select group of standing instruction clients, including those with "substantial market stature" (SAC ¶ 88), were switched to an entirely different form of standing instruction pricing – benchmarking.  Instead of receiving the worst price of the day, clients with benchmarking arrangements received a specific price spread as compared to a particular benchmark.   SAC ¶ 86.   For example, BNYM planned to offer BlackRock a benchmarking deal of 1.5 basis points for its standing instruction transactions.  SAC ¶ 92.  By contrast, in 2009, BNYM had an average sales margin spread on standing instruction transactions of 22.33 basis points.  SAC ¶ 109.  This not a case where a credit card company charges an annual fee and fails to tell customers that the fee can sometimes be waived.  (Br. at 33) (citing *Litwin v. Am. Express Co*., 838 F. Supp. 855, 859 (S.D.N.Y. 1993)).  In that situation, both customers who paid and did not pay the annual fee received the same credit card service.  Here, the entire mechanism of pricing standing instruction transactions was materially different, and had a substantial impact on the amount of money the service cost the Bank's clients.  Defendants lied to clients by representing that all clients receive the same pricing in order to preserve their profits.  SAC ¶¶ 86-95.[49]

Nor is it true, as Nichols contends, that benchmarking is no longer a standing instruction trade, but rather "a negotiated agreement with individualized pricing and specifications."  (Nichols

---

[49]  *See* SAC ¶ 94 (Nichols admitting that "benchmark pricing limits our potential to take wider margins when intraday spreads in emerging market currencies widen"); ¶ 88 (Nichols rejecting "willingness to embrace transparency and accountability through a WM benchmark pricing arrangement" in standard RFP response).

Br. at 19).   His factual contention is belied by contemporaneous documents that refer to benchmarking as a form of standing instruction pricing.   Nichols himself referred to benchmarking as a form of "standing instruction trading" with more "transparency."   SAC ¶ 88.   Another executive also referred to benchmarking as within the "'standing instruction channel.'"   SAC ¶ 92.

In sum, the SAC provides more than sufficient concrete and particularized allegations establishing that BNYM and Nichols made material misrepresentations and omissions to standing instruction clients with the specific intent to defraud.

## CONCLUSION

The defendants' motions to dismiss the Government's SAC should be denied.

Dated: October 12, 2012
      New York, New York

                                       Respectfully submitted,

                                       PREET BHARARA
                                       United States Attorney for the
                                       Southern District of New York

By:      /s/
                                         PIERRE G. ARMAND
                                       LAWRENCE H. FOGELMAN
                                       JAMES NICHOLAS BOEVING
                                       Assistant United States Attorneys
                                       86 Chambers Street, 3rd Floor
                                       New York, New York 10007
                                       Tel:    (212) 637-2724/2719/2748
                                       Fax:    (212) 637-2730/2686
                                       Email: Pierre.Armand@usdoj.gov
                                              Lawrence.Fogelman@usdoj.gov
                                              James.N.Boeving@usdoj.gov