**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Case No. 11 Civ. 06969 (LAK) |
| | ) |
| v. | ) ECF Case |
| | ) |
| THE BANK OF NEW YORK MELLON and DAVID NICHOLS, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**THE BANK OF NEW YORK MELLON'S REPLY IN SUPPORT**
**OF ITS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

## ARGUMENT

**I.      The Complaint Fails to State a Claim Under FIRREA**

**A.      The Government's Theory That BNYM's Alleged Fraud Affected BNYM Through Litigation Is Untenable Under FIRREA**

The Government's theory of FIRREA liability is that BNYM's alleged scheme to defraud its custody customers also adversely affected BNYM by exposing BNYM – a federally insured financial institution – to "potential liability, ongoing and mounting legal expenditures, as well as immediate and ongoing reputational harm."  SAC ¶ 177.  That theory fails as a matter of law, for three principal reasons.  First, the claim that BNYM's alleged efforts to defraud its customers adversely affected BNYM is contrary to FIRREA's text.  Second, applying FIRREA to support the imposition of massive penalties on federally insured financial institutions undermines FIRREA's core purpose and disrupts Congress's carefully calibrated banking regulatory regime.  Third, the Government's theory that the commencement of private litigation constitutes "affecting" BNYM within the meaning of FIRREA is untenable.

**1.**  Textually, the Government does not – and cannot – argue that the phrase "a violation . . . affecting a federally insured financial institution" would, in ordinary usage, encompass fraud *by* that institution.  12 U.S.C. § 1833a(c)(2).  *See also* BNYM Mem. 11-12; *Watson v. United States*, 552 U.S. 74, 80, 128 S. Ct. 579, 584 (2007) (ordinary statutory meaning is preferred to literal, but unnatural, reading).  While the Government argues that the term "affect" could be used reflexively in other contexts (such as drug use), *see* Opp. 19, the language here is not susceptible to that reflexive meaning because a person's own fraud ordinarily is not said to affect that person.  *See Lewyt Corp. v. Commissioner*, 349 U.S. 237, 249, 75 S. Ct. 736, 744 (1955) ("literalness of meaning affixed merely to a particular word or phrase may itself distort what the provision as an entirety and in context conveys").  The Court should reject the Government's

unprecedented attempt to distort the statute's natural meaning.

The Government's strained theory that the mere pendency of civil lawsuits also "affect[ed]" BNYM cannot overcome this textual obstacle. FIRREA plainly requires that the effect on the federally insured financial institution stem from the mail or wire fraud violation. But here, the SAC negates that element by alleging that the violation in question – the allegedly fraudulent pricing scheme – *benefited* BNYM. *See* SAC ¶ 183 ("BNYM has gained substantial profits from this unlawful fraud."). The cited lawsuits are inadequate under FIRREA, which requires that the effect result from the violation itself – not from private parties' unproven allegations. Indeed, many of the allegations against BNYM do not even sound in fraud.[1]

**2.** The Government's attempt to stretch § 1833a(c)(2) to encompass frauds *committed by* federally insured financial institutions also runs contrary to FIRREA's core purpose. Congress intended FIRREA to be a shield to protect federally insured financial institutions, not a sword against them. *See* BNYM Mem. 12-13; *United States v. Serpico*, 320 F.3d 691, 694 (7th Cir. 2003) ("the whole purpose of [the statute] is to protect financial institutions"). Imposing penalties weakens those institutions, puts federally insured deposits at risk, and thus turns Congress's central objective on its head. That is why Congress enacted a separate scheme to impose penalties *against* depository institutions. Unlike § 1833a, that scheme involves special standards and safeguards designed to balance the need for sanctions and deterrence against the potential impact of those sanctions on the federal banking system and federally insured deposits. *See* 12 U.S.C. § 1818(i); Pub. L. No. 101-73, § 907, 103 Stat. 183, 462-63 (1989) (amending 12 U.S.C. § 1818(i)(2)).[2]

---

[1] *See*, *e.g.*, SAC ¶ 177(e) (SEPTA lawsuit involving no fraud claim but only contract and fiduciary duty claims).
[2] "In FIRREA, Congress greatly expanded the FDIC's power to impose civil monetary penalties but incorporated safeguards to ensure that excessive penalties are not assessed." *Oberstar v. FDIC*, 987 F.2d 494, 504 (8th Cir. 1993) (discussing 12 U.S.C. § 1818(i)(2)(A)-(C)). These penalties differ significantly from those that can be imposed

Critically, moreover, Congress placed the primary responsibility for assessing and collecting those penalties not on the Department of Justice but, instead, on "the appropriate Federal banking agency." *Id.* § 1818(i)(2)(E)(i).[3]  Congress also conditioned the imposition of penalties on an evaluation, among other things, of "the size of financial resources . . . of the insured depository institution." *Id.* § 1818(i)(2)(G)(i).  The Government's expansive reading of § 1833a should be rejected because it would disrupt Congress's carefully crafted regulatory scheme by permitting prosecutors lacking bank regulatory expertise to inflict enormous harm on federally insured financial institutions without consideration of the § 1818(i) safeguards.

The Government's cases do not support its position because, as the Government acknowledges (at 23-24), none of them involved the imposition of penalties under § 1833a on a federally insured financial institution.  These cases merely hold that a *third party* whose fraud harms a federally insured financial institution can be penalized for affecting the institution, even if the institution was a willing participant in the scheme.[4]  The distinction is critical:  penalizing third parties is consistent with Congress's purpose to protect federally insured financial institutions "by deterring would-be criminals from including financial institutions in their schemes," *Serpico*, 320 F.3d at 694, but penalizing the institution itself undermines that purpose as well as Congress's allocation of authority to federal banking regulators under FIRREA.

Nor does FIRREA's legislative history support the Government's reading.  As the

---

under § 1833a.  As amended by FIRREA, § 1818(i)(2) provides for three tiers of penalties on federal depository institutions, ranging from a penalty of $5,000 per day for simply "violat[ing] any law or regulation," *id.* § 1818(i)(2)(A), to a penalty of up to $1 million or 1% of an institution's assets per day, for a violation that "knowingly or recklessly causes a substantial loss to such depository institution," *id.* § 1818(i)(2)(C), (D).

[3] The "appropriate Federal banking agency" is defined as the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, or the Board of Governors of the Federal Reserve System, depending on the type of depository institution.  12 U.S.C. § 1813(q).  Because BNYM is a state-chartered bank that is a member of the Federal Reserve System, the relevant banking agency is the Federal Reserve.  *See id.*

[4] *See Serpico*, 320 F.3d at 698 (affirming individual's conviction); *United States v. Ohle*, 678 F. Supp. 2d 215, 234 (S.D.N.Y. 2010) (denying individual defendant's motion to dismiss the indictment); *United States v. Daugerdas*, No. S3 09 CR 581 WHP, 2011 WL 6020113 (S.D.N.Y. Apr. 5, 2011) (same); *United States v. Ghavami*, No. 10 CR 1217 KMW, 2012 WL 2878126 (S.D.N.Y. July 13, 2012) (admitting non-prosecution agreements against individual defendants to show their fraud affected financial institutions).

Government's own quotations show, *see* Opp. 24-27, Congress was concerned about protecting federally insured institutions from "fraud and insider abuse" – *i.e.*, where "individuals in a position of trust in the institution or closely affiliated with it have, in general terms, breached their fiduciary duties; traded on inside information; usurped opportunities or profits; engaged in self-dealing; or otherwise used the institution for personal advantage"[5] – as well as from fraud "perpetrated by outsiders, such as borrowers or by futures and options traders with whom the thrift dealt."[6]  But Congress nowhere indicated an intent to penalize the federally insured financial institution itself for those acts.  And, of all the examples cited in FIRREA's voluminous legislative history, the Government cannot point to a single one in which the depository institution was the alleged perpetrator of the fraud, as opposed to its victim.[7]

**3.**  The Government's theory that BNYM's alleged fraud affected BNYM by exposing it to litigation is also illogical.  BNYM has already obtained dismissal of the first lawsuit listed in the SAC (at ¶ 177), brought by the Commonwealth of Virginia.  Judge Alsup also has dismissed the California False Claims Act claims brought by the same relator.  Two other suits have been

---

[5] *See* H.R. Rep. No. 100-1088, at 7-8 (1989), *filed with* P.L. No. 101-73 Leg. His., Pt. 1 (Westlaw); S. Rep. No. 101-19, at 9 (1989), 1989 WL 1178181 (same); H.R. Rep. No. 101-54, Pt. 1, at 300, *reprinted in* 1989 U.S.C.C.A.N. 86, 96 (1989) (noting that "fraud and insider abuse has been a major factor in a significant portion of thrift failures in the 1980's"); *Prosecuting Fraud in the Thrift Industry: Hearings Before the H. Subcomm. on Criminal Justice of the Comm. on the Judiciary*, 101st Cong. 1989 WL 1178203, at *3-*4, *10 (1989) (recognizing the need to punish "individuals who ran their institutions into the ground for their own personal gain" and listing examples); *Failure of Independent CPA's to Identify Fraud, Waste and Mismanagement and Assure Accurate Financial Position of Troubled S&L's:  Hearings Before the H. Comm. on Banking, Finance and Urban Affairs*, 101st Cong., 1st Sess. 28 (1989), *filed with* P.L. No. 101-73 Leg. His., Pt. 1 (Westlaw) (Rep. Roth asking about obtaining "restitution" from those who "took loans through insider trading, and so forth, who did not intend to repay them").

[6] *Prosecuting Fraud in the Thrift Industry,* 1989 WL 1178203, at *11.

[7] *See* H.R. Rep. No. 100-1088, at 178-92 (listing "case studies" of fraud and insider abuse)*, Prosecuting Fraud in the Thrift Industry,* 1989 WL 1178203, at *81-*88 (summarizing current and pending civil and criminal cases and containing recommendations for additional investigation).  One paradigmatic example repeatedly referenced by Congress was *FSLIC v. Dixon*, in which the Fifth Circuit recognized internal managers' "colossal fraud and recklessness *against* Vernon [Savings & Loan Association]."  835 F.2d 554, 566 (5th Cir. 1987) (emphasis added). *See* H.R. Rep. No. 100-1088, at 184 (referring to the *Dixon* case); *Prosecuting Fraud in the Thrift Industry*, 1989 WL1178203, at *83 (same); *Failure of Independent CPA's to Identify Fraud*, 101st Cong., 1st Sess. 28, 158 (same). In any event, to the extent the legislative history reflects any concern about misconduct *by* federally insured financial institutions, the focus was on mismanagement and failure to comply with safety and soundness regulations, which Congress addressed in FIRREA § 907, 103 Stat. at 462-63 (amending 12 U.S.C. § 1818(i)); *see also* H.R. Rep. No. 101-54, Pt. 1, at 393-94, 1989 U.S.C.C.A.N. at 189-90; *supra* pp. 2-3 (summarizing amendments).

dismissed voluntarily. *See id.* ¶ 177(i) & (j). Surely the commencement of *meritless* litigation should not trigger FIRREA penalties. The Government's theory that the scope of FIRREA is dependent on whether lawsuits are filed leads to additional perverse results. What if the Government is the first to discover an alleged fraud? Would it have to wait to pursue FIRREA penalties until someone else discovered it and brought suit? Or could the Government's own FIRREA lawsuit create the "potential liability, . . . mounting legal expenditures, . . . and ongoing reputational harm," *id.* ¶ 177, necessary to satisfy FIRREA's "affecting" requirement? Conditioning FIRREA liability on such fortuities further illustrates why the Government's unprecedented, circular theory of "affecting" misconstrues the statute's text, distorts Congress's purposes, and should be rejected.

**B.    The Complaint Fails Adequately To Allege That BNYM's Conduct Affected Any Other Federally Insured Financial Institution**

The Government acknowledges that, to withstand a motion to dismiss, it must at a minimum plead examples of federally insured financial institutions affected by BNYM's supposed fraud. *See* Opp. 28-29. But the Government's third attempt to do so is still deficient.

First, many of the customers named in the SAC are not themselves federally insured, but parent companies or affiliates of federally insured financial institutions. The Government's own cases hold that, to show that fraud causing loss to a subsidiary affected a federally insured parent company, a party must establish factually that the subsidiary's loss had a "sufficiently direct" effect on the parent.[8] Here, the SAC alleges no facts that would support a plausible allegation of

---

[8] *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (financial institution was affected by mail and wire fraud against its subsidiary where subsidiary borrowed money for transaction with defendant and then lost $150,000 of borrowed funds due to defendant's fraud); *see also United States v. Pelullo*, 964 F.2d 193 (3d Cir. 1992) (savings and loan affected by wire fraud against subsidiary because institution was involved in the subsidiary's issuance and management of the loan). *United States v. Mavashev*, No. 08-CR-902 DLI (MDG), 2009 WL 4746301, at *4 (E.D.N.Y. Dec. 7, 2009), cited at Opp. 31, is inapposite because that case merely observed in *dicta* that a criminal indictment need not allege how a loss to a subsidiary affected a federally insured parent company to overcome the "'high standard' defendant must satisfy in order to defeat the indictment." *Id.*; *see also United States v. Diallo*, No.

such a direct effect on any federally insured institution.  Moreover, insofar as the SAC alleges

that certain of BNYM's custody customers were parent companies of federally insured

subsidiaries, *see* SAC ¶¶ 24 n.1, 161-165, 169, the Government bears the burden of making an

even less likely showing:  an effect flowing in the opposite direction, *i.e.*, that a loss to a parent

company directly affected a federally insured subsidiary.[9]  For example, the Government

suggests that Franklin Templeton lost $4.8 million from standing instruction transactions in

2010.  *See id.* ¶ 24 n.1; *id.*, Ex. A, at 14; Opp. 28-29.  That same year, Franklin Templeton

reported profits of $1.4 billion and total assets of $10.7 billion.[10]  Absent concrete allegations, it

is simply implausible that a comparatively tiny loss (0.33% of profits, and 0.04% of assets) to the

parent would have had an effect – let alone a "sufficiently direct" one – on Franklin Templeton's

federally insured subsidiary.

Second, the Government describes standing instruction transactions involving federally

insured financial institutions or their affiliates, but none of those customers are alleged to have

received any alleged misrepresentation from BNYM.  *See* SAC ¶¶ 161-168; BNYM Mem. 16

n.23.  The Government argues (at 29 n.17) that these institutions were defrauded by BNYM's

website, but the SAC contains no particularized or concrete allegations supporting that

conclusory assertion.  Specifically, the SAC nowhere alleges that these institutions even saw

BNYM's website, much less relied on it in deciding to execute standing instruction trades with

---

09 CR 858 (SAS), 2009 WL 4277163, at *2 n.10 (S.D.N.Y. Nov. 24, 2009) ("a civil plaintiff's burden to survive a motion to dismiss appears to be higher than the government's burden to survive a motion to dismiss a criminal indictment"); *United States v. Marchese*, No. 89 CR 229 (7S) (PKL), 1991 WL 60338, at *2 (S.D.N.Y. Apr. 11, 1991) ("The cases cited by the RICO Defendants in support of their motion, are inapposite, involving as they do motions to dismiss civil RICO complaints, and not criminal indictments.") (citations omitted).

[9] The situation is even more attenuated in the case of Prudential Financial, where BNYM's custody customers are alleged to have been affiliates of a federally insured financial institution, Prudential Bank & Trust, FSB ("PB&T"), *see* SAC ¶ 137 n.4, as any loss would have to travel up from the custody customer to the parent company and then back down to PB&T.  As to Fidelity, the SAC does not allege which Fidelity entities were standing instruction customers, but it appears that the customers were also affiliates of the federally insured Fidelity subsidiaries identified in the SAC.  *See id.* ¶ 41 n.2.

[10] *See* Franklin Resources, Inc., 2010 10-K, at 38 (Nov. 16, 2010).

BNYM.  Absent any such allegations, the Government has failed to plead that any statements on the website affected these institutions.[11]

Finally, the SAC alleges that a single institution, U.S. Bank, both received alleged misrepresentations and was a federally insured financial institution.  *See* SAC ¶¶ 56, 61, 160.  But as BNYM has explained, those allegations are inadequate because they fail to allege that U.S. Bank was trading on its own account rather than on its customers' behalf, *see* BNYM Mem. 17-18, and losses incurred by U.S. Bank's customers are not sufficient, without more, to show that U.S. Bank was "affect[ed]" under FIRREA, *see Bouyea*, 152 F.3d at 195.[12]  Moreover, the Government nowhere alleges that U.S. Bank relied on BNYM's alleged misrepresentations in requesting standing instruction transactions.

The Government's brief offers no additional reason to conclude there was any actual loss by U.S. Bank.  Instead, it merely responds that this "is a factual argument that is improper on a motion to dismiss," and that the SAC's allegation that "U.S. Bank suffered an actual loss must be accepted as true."  Opp. 32.  Especially given that the Government has already obtained discovery from both BNYM and U.S. Bank regarding these matters, its failure to provide a particularized allegation of loss speaks volumes.  This Court should not permit a billion-dollar lawsuit to proceed on the basis of an unsupported, conclusory, and quite doubtful allegation that a *single* federally insured financial institution suffered some unspecified loss because of

---

[11] *See Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612 (S.D.N.Y. 2006) (dismissing RICO-based mail and wire fraud claims based on statements on a website where plaintiffs failed to identify customers who read the statements). The Government argues (at 29 n.19) that *Evercrete* does not apply because reliance is not an element of mail and wire fraud.  But FIRREA requires that the mail or wire fraud "affect[]" a federally insured financial institution, and the SAC does not allege any way – much less a "sufficiently direct" way – in which the alleged scheme would affect an institution if neither it nor its agents were aware of BNYM's alleged misrepresentation.

[12] The Government conclusorily asserts that "U.S. Bank is still 'affect[ed]' when its depositors' funds are taken," Opp. 33, but points to no factual allegations in the SAC supporting such an inference, and offers no answer to *United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000) (institution is not "affect[ed]" by fraud where it is merely an intermediary for a fraudulent transaction that causes losses to others), or *United States v. Esterman*, 135 F. Supp. 2d 917, 920 (N.D. Ill. 2001) (fraud causing loss to customer does not "affect[]" institution absent facts showing "cognizable impact" on the institution).

BNYM's alleged conduct.

## II.   The Government's Theory of Fraudulent Nondisclosure Fails as a Matter of Law

BNYM's opening memorandum (at 25-34) explains why the Government's allegations of affirmative misstatements fail to state a claim.  The Government's response argues that BNYM engaged in fraud merely by failing to disclose its pricing methods, which it had a duty to disclose.  The Government cites three legal bases for this duty.  None is valid.[13]

The Government's first theory is that BNYM owed a duty to disclose because it made "'partial or ambiguous statements that require further disclosure in order to avoid being misleading.'"  Opp. 40 (quoting *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000)). This theory is wholly dependent on the Government's allegations of affirmative misstatements, which are legally deficient and should be dismissed.  *See* BNYM Mem. 25-34.

The Government also asserts that a party in an arms' length business transaction has a duty to disclose its pricing methodology if it knows the other party does not possess it.  *See* Opp. 40-41.  That mischaracterizes the law.  Arms' length counter-parties have no duty to disclose pricing information even if the other party does not know it and "would very much like to know" it for purposes of negotiating a better deal.  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  That proposition is at the heart of the orderly operation of competitive, free markets.[14]  Indeed, the Supreme Court rejected this argument in interpreting the federal securities

---

[13] The Government does not allege generally that BNYM was in a fiduciary relationship with its customers with respect to standing instruction transactions.  *See* Opp. 39-40.  While the SAC alleges conclusorily that BNYM owed fiduciary duties to certain customers, *see* SAC ¶ 103 n.3, the Government alleges no concrete facts to support that allegation, *see* BNYM Mem. 24-25.  The Government cannot overcome its deficient pleading by citing in its opposition brief (at 41 n.27) to disputed and unadjudicated allegations in other proceedings.  Even if these allegations had been incorporated into the SAC, they would be stricken or disregarded as "immaterial . . . matter" under Fed. R. Civ. P. 12(f).  *See RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) ("[P]aragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial.").
[14] *See, e.g.*, *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1313 (11th Cir. 2000) ("As a general matter of federal law, retailers are under no obligation to disclose their pricing structure to consumers."); *In re Canandaigua*

fraud statute.  *See Chiarella v. United States*, 445 U.S. 222, 232, 100 S. Ct. 1108, 1116 (1980)

(rejecting argument that nondisclosure of material nonpublic information constitutes securities

fraud even where that information "gives certain buyers or sellers an unfair advantage over less

informed buyers and sellers").  And the Seventh Circuit specifically held that the mail and wire

fraud statutes do not require a foreign currency seller to disclose its margin when selling foreign

currency.  *See In re Mexico Money Transfer Litig.*, 267 F.3d 743, 749 (7th Cir. 2001).

Tellingly, the Government cites no case imposing federal mail or wire fraud liability

based on this "superior knowledge" principle.[15]  Although it cites some cases recognizing a duty

to disclose based on superior knowledge under New York law, the U.S. Supreme Court rejected

New York law in *Chiarella*.  *See* 445 U.S. at 240, 100 S. Ct. at 1120-21 (Burger, C.J., dissenting)

(criticizing majority opinion as inconsistent with New York's superior knowledge doctrine).

Moreover, even New York cases generally have limited the application of the "superior

knowledge" doctrine to specific contexts where the counter-party would expect disclosure, and

lack of disclosure would make the transaction inherently unfair.[16]  But when purchasing

commodities in an unregulated market, no purchaser reasonably expects that the seller will

disclose its pricing margins.  *See In re Mexico Money*, 267 F.3d at 749 ("Neiman Marcus does

not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates

and incentives it receives to sell cars.").  Thus, even if the superior-knowledge doctrine were

---

*Sec. Litig.*, 944 F. Supp. 1202, 1212 (S.D.N.Y. 1996) (requiring "disclosure of every single significant product and price decision" would be "absurd in a competitive market").

[15] *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995), applied the superior knowledge doctrine to a claim of fraudulent inducement under New York law.  *United States v. Federal Record Serv. Corp.*, No. 99 CIV. 3290 (BSJ), 1999 WL 335826, at *17 (S.D.N.Y. May 24, 1999), did not apply the doctrine to the mail fraud claims before it, merely mentioning the doctrine – which it recognized as a principle of New York law – in a string cite for the proposition that omissions may give rise to fraud liability.

[16] For example, the superior knowledge principle applies paradigmatically to latent property defects because a typical property purchaser "would reasonably expect" a seller to disclose such defects, Restatement (Second) of Torts 551(2)(e) & cmt. *l*, and thus nondisclosure would "render the transaction inherently unfair."  *Grill v. Philip Morris USA, Inc.*, 653 F. Supp. 2d 481, 491 (S.D.N.Y. 2009).

incorporated into the mail- and wire-fraud statutes (which it is not), that doctrine would have no application here.

Finally, the Government contends that BNYM had a duty to disclose because it made "representations 'signifying a heightened level of trust.'" Opp. 41 (quoting *Remington Rand*, 68 F.3d at 1483). But the Government mischaracterizes *Remington Rand*, which actually said that a duty to disclose could arise from "a fiduciary or other *relationship*" – not "representations," Opp. 41 – "signifying a heightened level of trust." 68 F.3d at 1483 (emphasis added); *see also United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991). Because the SAC fails to allege facts establishing a relationship of trust between BNYM and its custody clients with respect to foreign exchange, *see supra* note 13, its invocation of *Remington Rand* is unavailing.

BNYM's statement to certain custody customers that "'[u]nderstanding the fiduciary role of the fund manager, it is our goal to provide best execution for all foreign exchange executed in support of our clients' transactions,'" SAC ¶ 55, cited at Opp. 41, does not suffice to establish a relationship of trust and confidence.[17] BNYM plainly was referring to the "fiduciary role *of the fund manager*."[18] Indeed, the Government itself alleges that BNYM informed customers that it executed standing instruction transactions "'on a principal basis,'" SAC ¶ 97, making clear that it assumed no fiduciary or similar obligation. *See* BNYM Mem. 23 & 8 n.11, 25.

## CONCLUSION

For the foregoing reasons, BNYM's motion to dismiss should be granted.

---

[17] Tellingly, the SAC specifically omits the prior complaint's allegations describing the contractual relationship between BNYM and certain custody customers. *See* First Am. Compl. ¶ 23 (Dkt. No. 19); *see also* BNYM Mot. to Dismiss 3-4, 33 n.37 (Dkt. No. 24) (explaining that those contracts did not impose fiduciary obligations with respect to foreign exchange).

[18] BNYM also did not undertake to advise custody customers on which of the available foreign exchange options – including those offered by third parties – they should choose, and thus *Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 (2d Cir. 2008), cited at Opp. 41, is inapposite. *See id.* (emphasizing defendants' representations that "they offer a wide range of investment products, that they will help their customers choose among those products").

Dated:  November 13, 2012

Respectfully submitted,

THE BANK OF NEW YORK MELLON


*/s/ Reid M. Figel*

Reid M. Figel (RF-8663)
Rebecca A. Beynon (*pro hac vice*)
David L. Schwarz (*pro hac vice*)
Derek T. Ho (DH-0104)
Gregory G. Rapawy (*pro hac vice*)
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
rfigel@khhte.com
rbeynon@khhte.com
dschwarz@khhte.com
dho@khhte.com
grapawy@khhte.com

*Counsel for The Bank of New York Mellon*