UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

Plaintiff,

-against- 11 Civ. 6969 (LAK)

THE BANK OF NEW YORK MELLON and DAVID NICHOLS,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

Appearances:

Pierre G. Armand
Lawrence H. Fogelman
James Nicholas Boeving
Assistant United States Attorneys
PREET BHARARA
UNITED STATES ATTORNEY

Reid M. Figel
Rebecca A. Beynon
David L. Schwarz
Derek T. Ho
Gregory G. Rapawy
KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

*Attorneys for Defendant The Bank of New York Mellon*

Stephen Fishbein
Daniel H.R. Laguardia
SHEARMAN & STERLING LLP

*Attorneys for Defendant David Nichols*

*Table of Contents*

Background. . . . . 3
- I. Facts . . . . . 3
  - A. Overview of Standing Instruction Trading. . . . . 3
  - B. Representations About Standing Instruction Pricing. . . . . 4
    - 1. Best Execution. . . . . 5
    - 2. Other Representations. . . . . 8
  - C. Pricing Practices.. . . . . 10
  - D. Effects on Bank. . . . . 12
- II. Procedural History. . . . . 15

Discussion. . . . . 16
- I. Legal Standard. . . . . 16
- II. "Affecting" a Financial Institution.. . . . . 18
  - A. Claim Against Nichols.. . . . . 18
    - 1. "Victimizing". . . . . 19
      - a. Text. . . . . 19
      - b. Statutory Structure. . . . . 21
      - c. Legislative History and Purpose. . . . . 24
    - 2. "Indirect Harm" by a Third Party.. . . . . 28
    - 3. Sufficiency of the SAC. . . . . 30
  - B. Claim Against BNYM. . . . . 35
- III. Sufficiency of Fraud Allegations. . . . . 40
  - A. Basic Principles. . . . . 40
  - B. Representations Relating to Quality of Traditional Standing Instruction Pricing. . . . . 44
    - 1. "Best Execution". . . . . 45
      - a. Materially False or Misleading. . . . . 45
      - b. Intent to Deceive. . . . . 48
      - c. Intent to Harm. . . . . 60
    - 2. Generally Reflecting Interbank Rate at Time of Execution. . . . . 62
    - 3. Free of Charge and Minimizing Costs. . . . . 64
    - 4. "Best Rate of the Day". . . . . 67
  - C. Netting. . . . . 68
  - D. Same Pricing. . . . . 72
    - 1. Non-ERISA Clients. . . . . 73
    - 2. ERISA Clients. . . . . 74
  - E. Fraudulent Omissions. . . . . 75
    - 1. Superior Knowledge. . . . . 76
    - 2. Heightened Level of Trust. . . . . 77

Conclusion. . . . . 78

LEWIS A. KAPLAN, *District Judge.*

The United States brings this civil fraud suit against defendants The Bank of New York Mellon ("BNYM" or the "Bank") and one of its employees, David Nichols. The second amended complaint ("SAC") alleges that defendants engaged in a scheme to defraud the Bank's custodial clients by representing, among other things, that the Bank provided "best execution" when pricing foreign exchange ("FX") trades under its "standing instructions" program. In *Southeastern Pennsylvania Transportation Authority v. Bank of New York Mellon Corp.* ("*SEPTA*"),[1] this Court held that one such custodial client had stated legally sufficient claims for breach of contract and breach of fiduciary duty based on similar alleged misrepresentations. This matter is before the Court on defendants' motions to dismiss the SAC for failure to state a claim upon which relief may be granted.

The government sues under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").[2] Section 951 of that statute[3] permits the Attorney General to bring an action for civil penalties against anyone who violates any of a number of criminal statutes, including those prohibiting mail and wire fraud when the fraud is one "affecting a federally insured financial institution."[4] Although Section 951 has existed for nearly 24 years, it seems not to have been applied much. In fact, this decision marks the first occasion upon which a court has been called to interpret the meaning of the phrase "affecting a federally insured financial institution"

---

1 No. 12 Civ. 3066, --- F. Supp.2d ----, 2013 WL 440628 (S.D.N.Y. Jan. 23, 2013).

2 P.L. 101-73, 103 Stat. 183 (1989).

3 12 U.S.C. § 1833a.

4 *Id.* § 1833a(c)(2).

under that section.

In particular, this case presents the following question of first impression by any court: whether a federally insured financial institution may be held civilly liable under Section 1833a for allegedly engaging in fraudulent conduct "affecting" that same institution. This question currently is presented in two other cases in this district.[5]

BNYM contends that it cannot be held liable on such a theory, arguing that the affected institution must be the victim of or an innocent bystander to the alleged fraud, not the perpetrator. The Court disagrees. In passing FIRREA, Congress sought to deter fraudulent conduct that might put federally insured deposits at risk. Where, as alleged here, a federally insured financial institution has engaged in fraudulent activity and harmed itself in the process, it is entirely consistent with the text and purposes of the statute to hold the institution liable for its conduct.

Regarding the merits of the fraud allegations, the complaint generally suffices to allege the principal claim here—that defendants fraudulently misrepresented their standing instruction service as providing best execution. As in *SEPTA*, the complaint plausibly alleges that the Bank priced its trades inconsistent with the industry understanding of the term, rendering defendants' representations at least misleading. While the government here has a burden to plead facts giving rise to a strong inference of fraudulent intent, the complaint does so. It contains allegations that, if proven, would permit the conclusion not only that Bank employees knew their practices were inconsistent with an industry understanding of "best execution," but also took active steps to mislead their clients about how trades were being priced.

---

5 *See United States v. Wells Fargo Bank, N.A.*, No. 12 Civ. 7527 (JMF) (S.D.N.Y.); *United States ex rel. O'Donnell v. Countrywide Fin. Corp.*, No. 12 Civ. 1422 (JSR) (S.D.N.Y.).

This said, while the government adequately pleads a number of other alleged misrepresentations closely related to the notion of best execution, its theories of fraud on some other grounds are insufficient. Accordingly, defendants' motions to dismiss are granted in part and denied in part as detailed below.

## *Background*

### *I. Facts*

The Court briefly provides an overview of BNYM's standing instruction program and the central representations and practices at issue in this case. Additional allegations, particularly those pertaining to the government's theory of fraudulent intent, are introduced in the discussion section as they become relevant. Further details about the standing instruction program from one customer's perspective may be found in this Court's decision in *SEPTA*.

#### *A. Overview of Standing Instruction Trading*

BNYM is one of the world's largest custodial banks, holding on behalf of its clients domestic and international financial assets, including currency and securities.[6] Its clients often need to engage in currency transactions in connection with the assets BNYM holds on their behalf.[7] This occurs, for example, when a client earns dividends or other foreign currency income from its foreign

---

6 SAC ¶ 2.

7 *Id.* ¶ 21.

assets or buys or sells a security in a transaction denominated in a foreign currency.[8]

BNYM has provided certain foreign exchange services to these custodial clients in two principal ways.[9] First, the client may contact BNYM directly and execute a currency trade with BNYM at a price agreed upon at the time.[10] Second, under its standing instruction service, BNYM automatically provides currency exchange as the needs arise.[11] The standing instruction service relieves clients from having to negotiate individual FX trades in such circumstances, as BNYM handles the trade "from start to completion," setting the price itself.[12] Only after the fact does the client learn the rate at which the exchange was executed.[13]

*B. Representations About Standing Instruction Pricing*

This case is about how the Bank set its prices for standing instruction trades. As this Court discussed in greater detail in *SEPTA*, the principal policies and procedures of the standing instructions program provided limited information about BNYM's pricing practices. They noted that the pricing would be no worse than certain prices set forth in a daily schedule each morning and deviate no more than three percent from the relevant interbank rate—the latter guarantee apparently

8 *Id.*

9 *Id.* ¶ 22.

10 *Id.*

11 *Id.*

12 *SEPTA*, 2013 WL 440628 at *2 (internal quotation marks omitted).

13 SAC ¶ 100.

to ensure compliance with ERISA requirements.[14] The procedures did not state how BNYM would price the transactions aside from fulfilling these two guarantees, nor did they state expressly that BNYM otherwise was free to price the trades however it wished.[15]

*1. Best Execution*

The SAC alleges that defendants filled this void through various representations to clients conveying the impression that BNYM in fact was providing its clients the best prices it could obtain in the market at the times it executed the standing instruction trades.

The most important of these alleged representations was "best execution." "Best execution" allegedly is a term with an "industry definition" and is "commonly understood to mean that the client receives the best available market price at the time that the currency trade is executed."[16] The SAC alleges that the Bank used this term on its website, in its responses to clients' requests for proposals (RFPs), and in other communications with clients.

In particular, the SAC alleges that BNYM's website—to which clients were referred—stated that one of the "benefits" of the service was "'FX execution according to best execution standards.'"[17] The website stated also, "'Operationally simple, free of charge, and

14 *Id.* ¶¶ 97–98; *see SEPTA*, 2013 WL 440628 at *12. These two guarantees allegedly provided little information because three percent is a very wide band and, as the Bank itself allegedly told a client, the daily schedule prices were "'not realistic for trading'" because of the extent to which they diverged from market rates. SAC ¶ 98.

15 *See* Klimmek Decl., Ex. 2.

16 SAC ¶¶ 42, 53.

17 *Id.* ¶ 41.

integrated with the client's activity on the various securities markets, FX standing instruction is designed to help clients minimize risks and costs related to the foreign exchange and concentrate on their core business.'"[18]

In addition, defendant David Nichols, a managing director and the head of products management at BNYM, drafted a three-paragraph "standard comment" (the "Standard Comment") on best execution that was disseminated to the Bank's clients.[19] In light of the alleged industry understanding of the term, the SAC alleges that the Standard Comment furthered the impression that the Bank was providing the best available market price through the following statements:

- "'Understanding the fiduciary role of the fund manager, it is our goal to provide best execution for all foreign exchange executed in support of our clients' transactions.'"[20]
- "'[W]e price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk.'"[21]
- "'Best execution encompasses a variety of services designed to maximize the proceeds of each trade, while containing inherent risks and the total cost of processing.'"[22]
- "'We also support post-trade analysis comparing our trade execution to recognized industry benchmarks to assist the fund manager in demonstrating that the execution of each trade was consistent with the goal of maximizing the value of the client

---

18 *Id.* ¶ 67 (emphasis of SAC omitted).

19 *Id.* ¶ 51 (internal quotation marks omitted).

20 *Id.* ¶ 55.

21 *Id.* ¶ 60.

22 *Id.* ¶¶ 51, 57.

portfolio under the particular circumstances at the time.'"[23]

The Standard Comment was provided in responses to requests for proposals ("RFPs"), responses to client inquiries, and was submitted also to a trade magazine.[24]

Other RFP responses contained different language that, the SAC alleges, strengthened the impression that the Bank provided best execution in accordance with the alleged industry definition of the term. In one response, the Bank stated that it "'ensure[d] best execution'" by, among other things, "'actively engag[ing] in making markets and taking positions in numerous currencies so that we can provide the best rates for our clients.'"[25] It stated also, "'Clients benefit from our attractive rates because we aggregate all client income in any given currency to obtain the "best rate of the day." That "best rate of the day" is applied to all of the income conversions that we execute for that day, regardless of amount.'"[26]

The SAC alleges that the representations set forth above generally were made by the Bank from 2000 through 2011 and by Nichols from 2004 to 2011.[27]

---

23. Laguardia Decl., Ex. 2 at 9; *see* SAC ¶ 51.

24. *Id.* ¶¶ 51, 56–57.

25. *Id.* ¶¶ 43, 49.

26. *Id.* ¶ 45. These statements allegedly were also part of internal "question and answer" documents designed to guide employees in responding to client inquiries about standing instruction pricing. *Id.* ¶¶ 43–44.

27. *Id.* ¶ 1.

Certain representations were altered in late 2009, after a lawsuit was unsealed against State Street Bank. In particular, the Bank removed the reference to standing instruction being "free of charge" from its website, and added a further statement about best execution there:

*2. Other Representations*

Separate from these various representations about the quality of standing instruction pricing in the ordinary course, the Bank allegedly made representations about "netting."[28] Netting of trades means that to the extent a client may need to buy and sell the same currency on the same day, the bank aggregates those needs to calculate a single amount of the currency that the client would buy or sell that day, and then execute only that one trade with the client.[29] Netting can result in significant cost savings for the client, because the client does not pay spreads on transactions that otherwise would cancel out.[30]

The SAC alleges that BNYM's website stated that standing instruction clients benefitted from "'[a]ggregation and netting of trades based on guidelines tailored to clients needs."[31] Moreover, a policy and procedures document from BNYM's predecessor stated that "'Currency purchases and sales effected pursuant to these Procedures in the same currency and having the same

---

> "We consider best execution, as it relates to the Standing Instruction process, as providing a consistent, accurate and efficient means of facilitating pre-trade, trade and post-trade activities. These activities include identification of trade requirements, pre-trade administration associated with regulated markets, arranging settlement, reconciling discrepancies, posting cash to accounts and reporting all relevant transaction details to investment accounting systems."

*Id.* ¶¶ 59, 72.

28 *Id.* ¶ 75.

29 *Id.*

30 *Id.*

31 *Id.* ¶ 74.

trade and value date may be netted for pricing purposes within a customer account.'"[32] The SAC alleges that the predecessor represented to one particular client, the Florida Retirement System Trust Fund ("FRSTF"), that "'[o]ur system automatically nets foreign exchanges when trades are routed to our trading desk.'"[33]

Finally, defendants allegedly represented that all standing instructions clients received the same pricing. In particular, the Bank had a policy for its ERISA clients that provided that the "'terms of FX transactions with any [ERISA plan] shall not be less favorable to the [ERISA plan] than the terms offered by BNY to unrelated parties in a comparable arm's length FX transaction.'"[34] This policy mimicked a statutory requirement necessary to permit transactions between BNYM and ERISA plans.[35] Defendants emphasized this point to various clients in other communications, with BNYM telling one that "'all clients in our SI [standing instruction] program are executed at the same rate (We are required to do this to fulfill ERISA requirements,'" and Nichols telling another that "'all clients receiv[ed] the same spot price.'"[36]

---

32 *Id.*

33 *Id.* ¶ 78.

34 *Id.* ¶ 84.

35 *See* 29 U.S.C. § 1108(b)(18)(B) (providing exemption to ordinary prohibitions on certain trades when, *inter alia*, "at the time the foreign exchange transaction is entered into, the terms of the transaction are not less favorable to the plan than . . . the terms afforded by the bank . . . in comparable arm's-length foreign exchange transactions involving unrelated parties").

36 SAC ¶¶ 83, 88.

*C. Pricing Practices*

Allegedly contrary to the impression conveyed by the above representations, BNYM priced standing instruction trades as follows. It collected standing trade requests for various currencies throughout the trading day until the early afternoon (around 1:30 p.m. Eastern time).[37] At that time, it determined at an aggregate level the amount of each currency it needed to buy or sell in order to accommodate all of its clients requests, and executed the necessary transactions on its own behalf in the spot market.[38] Later in the afternoon (typically around 4:00 p.m. Eastern time), BNYM assigned prices to the standing instructions trades it would execute with its clients.[39] To do so, the Bank examined the full range in which a given currency had traded in the interbank market that day and priced each standing instruction trade with a client at the rate within that range least favorable to that client.[40] For example, BNYM might sell euros to a client at the highest price at which the euro had traded that day, while buying euros from another client at the lowest price at which the euro had traded. The SAC alleges that BNYM frequently applied a "slight modifier" so that the rate charged was not quite the worst intraday interbank rate.[41]

The SAC alleges that the customer later learned the exchange rate at which its trades

---

37 *Id.* ¶ 27.

38 *Id.* The Bank typically did not maintain inventories of currencies for use in these transactions. *Id.* ¶ 26.

39 *Id.* ¶ 29.

40 *Id.*

41 *Id.*

occurred.[42] The Bank did not provide time stamps—that is, information about when in the day a particular trade was executed.[43] The customer received a monthly report providing information about their currency trading, but this monthly report did not indicate which trades were negotiated directly and which occurred under standing instruction.[44]

As to netting, whether the Bank actually netted customer trades allegedly varied depending on which trading desk executed the order. While the New York and Brussels trading desks did net trades for the clients' benefit, the Pittsburgh trading desk allegedly did not.[45] Rather, the Pittsburgh trading desk allegedly priced the larger side of the transaction (e.g., the purchases if the client was a net buyer of the currency that day, and the sales if the client was a net seller) at or near the worst interbank rate of the day, and then priced the opposite side of the transaction at a different price at least a half percentage point apart.[46]

Finally, the Bank allegedly did not provide the same pricing to all standing instruction clients. Instead, when a client complained about the pricing it had received, when BNYM had reason to believe that the client was likely to scrutinize its pricing more carefully, or

---

42 *Id.* ¶ 100.

43 *Id.*

44 *Id.* ¶ 102. The SAC does not make clear whether this monthly report was the only disclosure of prices that the customer received or whether the price was disclosed each day. Although the Bank's brief suggests that the latter is true, BNYM Mot. Dismiss 9, it does not cite to anything in the SAC for this proposition, *see* SAC ¶ 100.

45 *Id.* ¶¶ 75, 76, 79.

46 *Id.* ¶ 77. The SAC alleges also that after investigation FRSTF learned that it had not been receiving the benefit of netting on all of its trades. *Id.* ¶ 78.

when the client was of "'substantial market stature,'" BNYM switched the client to a benchmarking pricing model for standing instruction trades.[47] Under benchmarking, BNYM charged only a fixed, specific price spread to the standing instruction trade on top of a particular industry benchmark rate published that day, resulting in much better pricing to such clients than others received.[48] The SAC alleges also that the Bank's netting practices resulted in different prices to different clients, as the pricing varied depending on which trading desk executed a particular client's transactions.[49]

*D. Effects on Bank*

The SAC alleges that BNYM's pricing practices permitted it to earn "enormous" spreads on standing instruction trades compared to the "modest" spreads it earned in negotiated transactions.[50] Thus, a Bank analysis allegedly concluded that from January to November 2009, its spreads on standing instruction trades were approximately 22.33 basis points, while transactions negotiated by phone call provided spreads of 2.80 basis points and electronic transactions provided spreads of 1.18 basis points.[51] Standing instruction trades in 2009 allegedly represented approximately 12 percent of the Bank's overall FX trading volume, but accounted for approximately

---

47 *Id.* ¶¶ 86, 88, 90.

48 *Id.* ¶ 86.

49 *Id.* ¶ 95.

50 *Id.* ¶ 36.

51 *Id.* ¶ 109.

69 percent of its FX profits.[52] The SAC alleges that BNYM's sales margins for its top 200 standing instructions clients totaled over $1.5 billion from 2007 to 2010.[53]

Over time, and particularly after a lawsuit against State Street Bank alleging similar practices was made public in late 2009, BNYM's clients became more interested in BNYM's pricing practices, and a number complained about the pricing they were receiving.[54] These matters came to a head in 2011, when various lawsuits were filed by customers, investors, and others, and the Bank disclosed further information about its pricing practices, including that it "'tend[ed] to price our purchases of currencies at the low end of the daily interbank range, and to price its sales at the high end, regardless of trade size.'"[55]

As clients have learned more about the Bank's practices, the SAC alleges, the Bank has suffered various negative consequences. It asserts that numerous lawsuits have been filed

---

52 *Id.* ¶ 37.

53 *Id.* ¶ 3.

54 *Id.* ¶¶ 111, 131. The SAC alleges a number of particular incidents in which the Bank allegedly misled customers in its response to such inquiries; these examples are discussed in more detail below.

55 *Id.* ¶ 141.

against the Bank in both state[56] and federal[57] courts, which collectively expose it "to billions of dollars in potential liability, ongoing and mounting legal expenditures, as well as immediate and ongoing reputational harm which has and could continue to affect its stock price."[58]

The SAC further alleges that the revelations have affected the Bank's FX business. Some clients have become dissatisfied with BNYM, and some have left it altogether.[59] Of those who have stayed, a number have switched to a defined spread or benchmarking pricing model, which provides lower margins.[60] The corresponding reduction in FX revenue, *inter alia*, allegedly

---

56

*See id.* ¶ 177 (citing *Commonwealth of Virginia v. Bank of New York Mellon*, Case No. CL-2009-15377 (Fairfax Cnty., Va.); *State of Florida v. Bank of New York Mellon Corp.*, Case No. 2009 CA 4140 (Leon Cnty., Fla.); *In the Matter of the Bank of New York Mellon Corp.*, Dkt. No. 2011-0044 (Mass. Sec. Div. Admin. Complaint); *State of New York v. Bank of New York Mellon Corp.*, Index No: 09/114735 (Sup. Ct. N.Y. Cnty., N.Y.); *Zucker v. Hassell*, Index No. 112133/2011 (N.Y. Cnty., N.Y.)).

57

*See In re Bank of New York Mellon Corp. S'holder Derivative Litig.*, No. 11 Civ. 8471 (LAK) (S.D.N.Y.); *In re Bank of New York Mellon Corp. False Claims Act Foreign Exch. Litig.*, No. 12 Civ. 3064 (LAK) (S.D.N.Y.); *Louisiana Mun. Police Emp. Ret. Sys. v. Bank of New York Mellon Corp.*, No. 11 Civ. 9175 (LAK) (S.D.N.Y.); *Clark v. Hassell*, No. 11 Civ. 8810 (LAK) (S.D.N.Y.); *Sansano v. Bank of New York Mellon Corp.*, No. 12 Civ. 3069 (LAK) (S.D.N.Y.); *Terrazas v. Bank of New York Mellon Corp.*, No. 12 Civ. 3068 (LAK) (S.D.N.Y.); *Se. Pa. Transp. Auth. v. Bank of New York Mellon Corp.*, No. 12 Civ. 3066 (LAK) (S.D.N.Y.); *Int'l Union of Operating Engineers v. Bank of New York Mellon Corp.*, No. 12 Civ. 3067 (LAK) (S.D.N.Y.); *Ohio Police & Fire Pension Fund v. Bank of New York Mellon Corp.*, No. 12 Civ. 3470 (LAK) (S.D.N.Y.); *Los Angeles Cnty. Emp. Ret. Assoc. v. Bank of New York Mellon Corp.*, No. 12 Civ. 8990 (LAK) (S.D.N.Y.); *Carver v. Bank of New York Mellon Corp.*, No. 12 Civ. 9248 (LAK) (S.D.N.Y.).

58

SAC ¶ 177.

59

*Id.* ¶¶ 179–80.

60

*Id.* ¶ 179.

caused BNYM's credit rating to be downgraded by Moody's in March 2012.[61]

## *II. Procedural History*

The initial complaint in this case was filed in October 2011[62] and sought civil penalties under FIRREA as well as an injunction injunctive relief under the fraud injunction statute.[63] In January 2012, the parties entered into a partial settlement pursuant to which the government dismissed its claim for injunctive relief and BNYM agreed, *inter alia*, no longer to use the terms "best execution," "free," or "netting" in describing standing instructions, no longer to represent that all standing instruction clients receive the same pricing, and to describe its pricing practices on its website.[64]

The SAC was filed in June 2012.[65] Count One alleges that BNYM violated the mail and wire fraud statutes[66] by fraudulently representing that the standing instruction service (1) provided "best execution," (2) "price[d] foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk," (3) was "free of charge" and "minimiz[ed] costs," (4) provided "'the best rate of the day,'" (5) provided "netting," (6) provided

---

[61] *Id.*

[62] DI 1.

[63] *See* 18 U.S.C. § 1345.

[64] DI 17 ¶¶ 1, 3.

[65] DI 31.

[66] 18 U.S.C. §§ 1341, 1343.

the same pricing to all standing instruction clients and (7) used the interbank range to price certain restricted currencies.[67] In addition, the SAC alleges that the Bank (8) fraudulently failed to disclose further information about its pricing practices.[68] BNYM is alleged to be liable civilly under 12 U.S.C. § 1833a. Count Two of the SAC alleges that Nichols violated the mail and wire fraud statutes and is liable under Section 1833a with respect to (1), (2), (4), (6), and (8). As required by Section 1833a, the SAC alleges that defendants' fraud affected a federally insured financial institution—to wit, BNYM itself, as well as a number of other clients that are federally insured financial institutions.

Defendants move to dismiss,[69] contending that the SAC fails to allege any federally insured financial institution was affected by the alleged fraud under the meaning of Section 1833a and that the allegations fail sufficiently to plead claims of fraud against either of them.[70]

*Discussion*

*I. Legal Standard*

To survive a Rule 12(b)(6) motion, a plaintiff must plead facts sufficient "to state a

---

67 SAC ¶¶ 39, 141–42.

68 *Id.* ¶ 39.

69 DI 38, 41.

70 BNYM's motion does not address the sufficiency of the allegations that it committed fraud through its disclosures regarding restricted currencies. The Court therefore discusses this claim no further in this opinion.

claim to relief that is plausible on its face."[71] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[72] In resolving a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[73] It may "rely upon documents attached to the complaint as exhibits and documents incorporated by reference in the complaint."[74] "Moreover, when a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment."[75] Finally, the SAC's allegations of fraud are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b), discussed below.

---

71 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

72 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

73 *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006).

74 *Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011) (alterations omitted).

Courts properly may consider also "matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks and alterations omitted).

75 *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (internal quotation marks and alterations omitted).

*II. "Affecting" a Financial Institution*

*A. Claim Against Nichols*

Section 1833a provides that "[w]hoever violates any provision of law to which this section is made applicable by subsection (c)" shall be civilly liable in an action for civil penalties brought by the Attorney General. Section 1833a(c) in turn sets forth the applicable violations:

> "(c) Violations to which penalty is applicable
>
> "This section applies to a violation of, or a conspiracy to violate
>
> "(1) section 215, 656, 657, 1005, 1006, 1007, 1014, or 1344 of title 18;
> "(2) section 287, 1001, 1032, 1341 or 1343 of title 18 *affecting a federally insured financial institution*; or
> "(3) section 645(a) of title 15."[76]

Defendants contend that Nichols cannot be liable under Section 1833a because the SAC fails sufficiently to allege that BNYM was "affect[ed]" as that term should be understood.[77] They advance two principal alleged limits on the construction of the "affecting" clause which, if adopted, would preclude liability for Nichols on this theory. First, they contend that "affecting" means "victimizing," thus requiring that the fraud be "directed at" the federally insured financial institution, in this case, BNYM. Second, they suggest that the "affecting" clause can mean "indirectly harm[ing]," but only insofar as the alleged harm is caused solely by persons other than the federally insured financial institution.

---

76 12 U.S.C. § 1833a(c) (emphasis added).

77 BNYM advanced virtually all of the arguments regarding FIRREA in its briefs, and Nichols adopted those arguments by reference. Thus, in this section, the Court construes BNYM's arguments to the extent that they can support Nichols' position. For ease of exposition, the Court ascribes these arguments to "defendants" generally.

Neither contention is persuasive. The SAC sufficiently alleges that BNYM was affected to permit liability as to Nichols.[78]

*1. "Victimizing"*

*a. Text*

The Court begins, as it must, with the text.[79] "Affect" means "to act upon" as in "to produce an effect . . . upon," "to produce a material influence upon or alteration in," or possibly "to have a detrimental influence on."[80] None of these definitions comes even close to defendants' notion that "affecting" may mean only "victimizing." If Congress had wanted to limit civil penalties to cases in which the financial institution was the victim, it obviously could have done so; instead, it chose a singularly broad term.[81] The Second Circuit made precisely this point in *United States v. Bouyea*,[82] when construing the term "affects a financial institution" in a different provision of

---

78 In view of this conclusion, the Court need not reach the government's contentions that other federally insured financial institutions were affected.

79 *See United States v. Coppola*, 671 F.3d 220, 240 (2d Cir. 2012) ("'Courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: judicial inquiry is complete.'") (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (alterations omitted)).

80 WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 35 (1993).

81 *See United States v. Johnson*, 130 F.3d 1352, 1354 (9th Cir. 1997) (noting that sentencing enhancement based on whether fraud "affected a financial institution" applies "in a wide variety of circumstances" given "the breath of the word 'affect.'").

82 152 F.3d 192 (2d Cir. 1998).

FIRREA regarding statutes of limitation, Section 961(l).[83] It rejected the argument that a financial institution was not affected when its subsidiary, but not the institution itself, was defrauded, noting that the "'argument would have more force if the statute provided for an extended limitations period where the financial institution is the object of fraud. Clearly, however, Congress chose to extend the statute of limitations to a broader class of crimes.'"[84]

While the holding of *Bouyea* was relatively narrow, courts within this district also construing FIRREA Section 961(l) persuasively have extended its reasoning to cases much like this one.[85] In each, the court rejected a defendant's argument that a financial institution participating in a fraudulent scheme could not be "affected" because it was not the victim of the scheme. As one such court noted, the limitation defendants seek to impose simply is "absent from the plain language of the statute."[86]

The text of the statute supports the government.

---

83

18 U.S.C. § 3293(2). Courts have noted that "[w]hether a fraud does or does not 'affect a financial institution' is a recurring consideration in federal criminal jurisprudence'" and cases interpreting the phrase in one context often are applied in others. *United States v. Grass*, 274 F. Supp.2d 648, 654 n.5 (M.D. Pa. 2003) (internal quotation marks omitted).

In addition to Section 1833a and statutes of limitation provisions, the concept arises in the context of criminal forfeiture, *see* 18 U.S.C. § 982(a)(2)(A), and certain sentencing guideline enhancements, *see Johnson*, 130 F.3d at 1354.

84

152 F.3d at 195 (quoting *United States v. Pellulo*, 964 F.2d 193, 215–16 (3d Cir. 1992)).

85

*See United States v. Ghavami*, No. 10 Cr. 1217 (KMW) 2012 WL 2878126, *5–*7 (S.D.N.Y. 2012); *United States v. Rubin/Chambers Dunhill Ins. Servs.*, 831 F. Supp.2d 779, 783–84 (S.D.N.Y. 2011); *United States v. Daugerdas*, No. 09 Cr. 581 (WHP) 2011 WL 6020113, *1 (S.D.N.Y. Apr. 5, 2011); *United States v. Ohle*, 678 F. Supp.2d 215, 229 (S.D.N.Y. 2010) *aff'd* 441 F. App'x 798 (2d Cir. 2011).

86

*Daugerdas*, 2011 WL 602113 at *1.

*b. Statutory Structure*

In the absence of textual support, defendants urge this Court to read in a "victimizing" limitation from the structure of Section 1833a. The attempt fails. If anything, the structure of the section further bolsters a broad understanding of the term.

*i. Section 1833a(c)(1), (3)*

As defendants point out, the violations enumerated in Section 1833a(c) fall into two principal categories: (a) those that apply without any additional limitation (embodied in Section 1833a(c)(1), (3))[87] and (b) those that apply only if the violation is one "affecting a federally insured financial institution" (embodied in Section 1833a(c)(2)).[88] Defendants contend each

---

87

At the risk of oversimplification, this category of violations generally includes (1) financial institution bribery, both attempting to bribe or accepting a bribe [18 U.S.C. § 215]; (2) theft, embezzlement, or misapplication of financial institution funds [*id.* §§ 656, 657]; (3) false entries in financial institution records [*id.* §§ 1005, 1006]; (4) false statements to influence the FDIC [*id.* §§ 1007]; (5) false statements to influence various regulators or financial institutions upon an application [*id.* § 1014; 15 U.S.C. § 645(a)]; (6) bank fraud [18 U.S.C. § 1344].

88

This category includes: (1) false claims to the United States [*id.* § 287]; (2) false statements within federal jurisdiction [*id.* § 1001]; (3) concealing assets from, or impeding the functions of, the FDIC or other conservators [*id.* § 1032]; (4) mail fraud [*id.* § 1341]; (5) wire fraud [*id.* § 1343].

Notwithstanding the general rule of the last antecedent, it is readily apparent that "affecting a federally insured financial institution" modifies each of the violations in Section 1833a(c)(2). Otherwise Section 1833a could be applied to any false statement made within federal jurisdiction under 18 U.S.C. § 1001, even those having nothing to do with the financial industry. *See Am. Int'l Group, Inc. v. Bank of America*, --- F.3d ----, 2013 WL 1689066, *5 (2d Cir. 2013) (noting that where final element of list is not separated by comma, modifier ordinarily applies only to last antecedent, but only "where no contrary intention appears" (citing *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)) (emphasis and internal quotation marks omitted)).

violation in category (a) inherently requires victimization of a financial institution, and so the phrase "affecting a federally insured financial institution" was added in category (b) to ensure that the statute required victimization of them in all cases in which the statute created liability.[89]

Defendants' argument misconstrues the statute. In fact, a number of the violations in category (a) do *not* require that any financial institution be victimized. For example, violations of 18 U.S.C. §§ 1007, 1014, which proscribe *inter alia* the making of a false statement with the purpose of influencing an action by various regulators, including the FDIC and the Federal Housing Administration, are predicates to Section 1833a liability yet may occur without victimizing a financial institution. Another, 18 U.S.C. § 1005, makes liable anyone who *inter alia* makes false entries in financial books with intent to deceive federal regulators, or with intent to defraud any individual or company, including but expressly not limited to the financial institution itself. Thus, if an officer cooks an institution's books in order to deceive the FDIC or other regulators, to get mortgage insurance proceeds for the institution from mortgages guaranteed in part by the FHA, or even just to defraud a customer, civil penalties may be imposed without any need to show that the institution was victimized. Indeed, there is nothing in the text foreclosing the possibility that an institution could participate in and benefit from such a crime. If anything, the violations in category (a) suggest that Congress, in passing Section 1833a, was not necessarily concerned only with harm to financial institutions—let alone only their victimization—as it was with the presence of criminal activity in matters meaningfully involving financial institutions, however that activity may affect them.

---

89 *See* BNYM Mot. Dismiss 13.

*ii. Section 1833a(c)(2)*

The violations in category (b) other than mail and wire fraud—that is, those that apply only when the violation is one "affecting" a federally insured financial institution—are instructive as well.[90] Such violations include 18 U.S.C. § 287, which proscribes the making of false claims against the United States government. Surely, the construction of "affecting" that defendants advance here would apply equally to this violation.[91] But it is difficult to imagine how false claims against the United States government could victimize a financial institution—rather, the victims of such a crime plainly would be the taxpayers from whom the violator was hoping to obtain money improperly.[92]

Even if an example could be constructed in which a false claim against the United States somehow victimized (as opposed to having some collateral effects on) a financial institution, it would be far more natural to read the combination of Section 287 and "affecting" not to be limited

---

90. These other violations were not part of FIRREA as passed in 1989, but were introduced by the Financial Institutions Anti-Fraud Enforcement Act of 1990, as part of the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990, itself a part of the Crime Control Act of 1990. *See* P.L. 101-647, tit. XXV(H), § 2596(d)(1).

91. *See Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears. We have even stronger cause to construe a *single* formulation . . . the same way each time it is called into play." (emphasis in original; citation omitted)).

That these other provisions were introduced shortly after FIRREA's passage does not alter this strong presumption.

92. *See United States v. Montoya*, 716 F.2d 1340, 1344 (10th Cir. 1983) ("In enacting § 287 and its predecessors, Congress sought to protect the government from fraudulent claims.").

Similarly, it is not clear how a false statement made within federal jurisdiction, *see* 18 U.S.C. § 1001, could victimize a federally insured financial institution.

only to such narrow circumstances. Rather, Section 287 is a general false claims statute, applying to claims on the United States government in any number of areas. By limiting the applicable false claims to those "affecting a financial institution," Congress appears to have meant to restrict coverage of Section 1833a to those false claims against the government meaningfully involving financial institutions—that is, being in the financial industry.

Indeed, that "affecting" might mean something closer to "involving" is supported by the heading of the subtitle. Section 1833a came from Section 951 of FIRREA, which was the only section of Subtitle E of Title IX of FIRREA. Subtitle E was entitled "Civil Penalties for Violations *Involving* Financial Institutions."[93]

*c. Legislative History and Purpose*

Finally, defendants argue that the legislative history salvages their construction of "affecting" as "victimizing," contending that it shows that Congress was concerned exclusively with "shield[ing]" institutions from frauds committed at their expense.[94] Where, as here, the text and structure do not support defendants' construction, the Court cannot and should not rely on legislative history to take a different view.[95] Nevertheless, the legislative history does not support defendants'

93 P.L. 101-73, tit. IX(E) (emphasis added); *see Fla. Dep't. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (noting that although "subchapter heading cannot substitute for the operative text of the statute[,] . . . . statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute" (internal quotation marks and citations omitted)).

94 BNYM Mot. Dismiss 10 (emphasis omitted).

95 *See Bruesewitz v. Wyeth LLC*, 131 S. Ct. 1068, 1081 (2011) (concluding that where only one interpretation is supported by text and structure of statute, there is "no need" to rely on legislative history).

position in any event.

FIRREA was passed in direct response to the 1980's savings and loan crisis. According to committee reports, Congress sought to control the "outright fraud and insider abuse" that had pervaded the thrift industry and that it found to have been a significant contributor to the crisis.[96] They expressed concern both about fraud committed by outsiders against financial institutions and about fraud committed by insiders—that is, officers and managers of the thrifts situated similarly to Nichols.[97]

Defendants are correct that the reports' discussions of insider fraud focused primarily on insiders using their positions to secure personal gain at the expense of the institution.[98] This involved both direct embezzlement of funds and, more often, crimes such as misapplication of bank funds that "fraudulently put[] the bank's money at risk through bribes, kickbacks, or self-dealing."[99] By seeking personal gain when obligated to act in the institution's interest, these insiders victimized their institutions in ways quite different from the allegations here. But that is not the whole story.

The very House report on which defendants considerably rely points out that at least some of the fraud at issue was not due to thrift officers seeking to victimize their banks, but rather to save them without any intent to achieve personal gain:

"[A]s the economy turned bad in the early 1980's and as many speculative ventures

---

96 H.R. Rep. No. 101-54(I) at 294.

97 *See* H.R. Rep. No. 100-1088 at 1, 8.

98 *See* H.R. Rep. No. 101-54(I) at 311 (discussing advancement of funds to pursue "prosecution of individuals who have acted illegally against financial institutions").

99 *See* H.R. Rep. No. 100-1088 at 44 (internal quotation marks omitted).

> . . . went sour, normally honest bankers (including thrift insiders) have resorted to fraud or unsafe and unsound practices *in efforts to save a battered institution*. In those cases an incentive existed to turn an unhealthy financial institution around by garnering more deposits and then making even more speculative investments, hoping to 'make it big.' Sometimes there was no personal enrichment, just misapplication of funds to turn the situation around."[100]

The committee went on to quote a savings and loan president who discussed the many problems with managers of failed thrifts and noted that "'[i]nstead of attempting to remedy the problems which were so apparent, they spent all of their efforts in proposing intricate schemes to appear to aid in maintaining the equity at a proper level.'"[101]

Thus, Congress was addressing not only frauds by insiders who were trying to harm their employers, but also frauds by insiders seeking to benefit their employers—perhaps through deception of auditors or regulators. In cases of the latter sort, the fraudulent practices cannot be understood to be directed at, or victimizing, the thrifts—after all, the thrifts themselves could have been charged with crimes in those very instances.

In fact, the legislative history shows who Congress truly believed were the victims of the S&L crisis and whom Congress sought to protect through FIRREA: S&L depositors and

---

100 *Id.* at 34–35 (emphasis added).

101 *Id.* at 35 (alterations omitted).

The committee quoted also an S&L commissioner who said,

> "'We got a lot of new entrants, and they like to grow fast; and rapid growth is the cause of one of the worst ailments in a savings and loan business. If you have got a lot of money, high-cost money pushing you, and you have to make profits, you have to put it out awful fast; and some of these people had big egos, and some of them got their contributing property for capital [often leveraged 33 to 1 with overvalued appraisals].'"

*Id.* (alterations provided by House report).

federal taxpayers put at risk by the thrifts' fraudulent behavior.[102] As the government points out, the crisis bankrupted the Federal Savings and Loan Insurance Corporation, resulting in a taxpayer-funded bailout that some projected at the time as exceeding $100 billion.[103] Ensuring that taxpayers would not need to bail the industry out again in order to protect the funds of depositors is consistent not only with seeking to prevent fraud perpetrated against the financial institutions, but also with deterring or punishing fraud which occurs as a result of insiders' misguided efforts to benefit their institutions, particularly insofar as those efforts ultimately go on to expose the institutions to new and harmful risks.

The text of FIRREA itself makes this focus on depositors even clearer in this particular context. It sets forth as one of the general purposes of the statute "strengthen[ing] the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions *and their depositors*."[104] This confirms that Congress was concerned with more than just protecting financial institutions themselves, but also with preventing the "damaging" of "depositors."[105] While defendants cite to this purpose and contend that it supports their position, they entirely ignore the

---

102

*See* H.R. Rep. 101-54(I) at 301 ("Without adequate supervision, thrifts were free to engage in fraudulent and risky activities, often at the expense of the [Federal Savings and Loan Insurance Corporation].").

103

*See* Kenneth E. Scott, *Never Again: The S&L Bailout Bill*, 45 BUS. LAW. 1883, 1902 (1990) (discussing official Treasury projections that bailout would cost $166 billion over first ten years); 135 Cong. Rec. S3993-01, S4001 (daily ed. Apr. 17, 1989) (discussing "$100 billion insolvency" as "one of the most expensive public policy failures we've ever had") (statement of Sen. Bond).

104

FIRREA § 101(10) (emphasis added).

105

Moreover, setting aside the reference to "depositors," this purpose cannot support viewing "affecting" as "victimizing," since it suggests that "otherwise damaging" the institution is sufficient even if the institution is not the direct object of the crime.

latter reference.[106]

Thus, the legislative history does not support defendants' contentions.[107] The Court rejects defendants' contention that Nichols must have victimized BNYM in order for his alleged fraud to have "affected" it under Section 1833a.

*2. "Indirect Harm" by a Third Party*

Apparently recognizing the weakness of their "victimizing" formulation, defendants leave open the possibility that "affecting" may encompass indirectly harming an institution, so long as the harm is caused by actions of third parties and not the institution itself.[108] Thus, defendants

---

106 BNYM Mot. Dismiss 12.

107 In the *Wells Fargo* case presenting the same issue, Wells Fargo makes a separate argument regarding the legislative history bearing some mention here. An initial draft introduced in the House on March 6, 1989, included civil penalty provisions for the crimes now in Section 1833a(c)(1), but did not include mail and wire fraud. In a March 22, 1989 subcommittee hearing, Representative Doug Barnard testified that the legislation's omission of mail and wire fraud was a mistake, in light of the benefit that postal inspectors can play in investigating bank and S&L fraud cases. *See Prosecuting Fraud in the Thrift Industry, Hearings Before the H. Subcomm. on Criminal Justice of the Comm. on the Judiciary*, 101st Cong. (1989) (statement of Rep. Barnard). Then in a colloquy between Representative Chuck Schumer and Rep. Barnard's counsel, the counsel indicated that the administration had drafted these provisions and omitted mail and wire fraud due to their breadth compared to bank fraud. Wells Fargo contends that this history shows that "affecting" was meant to limit the scope of penalties for mail and wire fraud to the scope of penalties for bank fraud. *Id.*

The Court disagrees. The colloquy Wells Fargo cites cannot explain why Congress chose the word "affecting," as there is no indication that this term was before any of those individuals at that time. Indeed, if Congress had wanted to limit the scope of mail and wire fraud to bank fraud, then it could have borrowed language from the bank fraud statute itself. *See* 18 U.S.C. § 1344. Instead, it chose a much broader word.

108 Oral Arg. Tr. 11:25–12:3 ("Our position is that the type of harm that's contemplated by [Section 1833a(c)(2)] has to be harm in which, A, engages in a scheme which causes harm, affects B, which is a financial institution") (Mar. 28, 2013).

suggest that even if the Bank need not have been the victim of Nichols' alleged fraud, it must have been an innocent bystander, not a willful participant in the scheme. The point merits little discussion.

Courts repeatedly have rejected precisely such a contention in the FIRREA Section 961(l) context. As the Seventh Circuit has recognized, "the mere fact that participation in a scheme is in a bank's best interest does not necessarily mean that it is not exposed to additional risks and is not 'affected.'"[109] Indeed, it would be entirely unnatural to make determination of whether a bank was "affected" by a scheme turn on whether it participated in it. These are two entirely different questions. The former concerns the effects on the institution that proximately flow from the charged scheme; the latter relates to the institution's culpability in the scheme in the first instance.

Accordingly, accepting defendants' construction would yield absurd results. Consider two cases: (1) a junior bank employee, unbeknownst to the employer, engages in a fraudulent scheme to defraud the bank's customers and thereby increase his own compensation, but when the scheme comes to fruition, customers desert the bank and it fails; and (2) the same scheme occurs with the same results, but in this case the bank helps facilitate the scheme in order to increase its profits. Defendants' interpretation of the statute would suggest that the employee "affected" the institution in the first case but that the employee did not do so in the second, even though the scheme had identical effects on the institution in both.

In short, the Court declines to conclude that an institution cannot be affected by a fraud solely because it participates in it.

---

109

*United States v. Serpico*, 320 F.3d 691, 695 (7th Cir. 2003); *accord Ghavami*, 2012 WL 2878126 at *5; *Rubin/Chambers Dunhill Ins. Servs.*, 831 F. Supp.2d at 784; *Daugerdas*, 2011 WL 6020113 at *1; *Ohle*, 678 F. Supp.2d at 228–29.

*3. Sufficiency of the SAC*

Having rejected defendants' two proposed limiting constructions of the "affecting" clause, the Court turns to whether the SAC sufficiently alleges that BNYM was affected by Nichols' alleged fraud.

As the foregoing discussion suggests, there is at least some support for the proposition that BNYM's alleged participation in the fraud, along with its garnering of substantial profits from it, itself is sufficient to allege that BNYM was affected.[110] But the parties have cited no case, nor is the Court aware of any, as to whether a direct but positive effect alone is sufficient to "affect" a financial institution under any of the statutes using this term. This Court need not be the first.

The SAC alleges that BNYM was affected negatively in a number of ways. It alleges

---

110 "Affecting" ordinarily is understood to mean "producing an effect upon," whether that effect is positive or negative. *See Ghavami*, 2012 WL 2878126 at *5. Moreover, other provisions of FIRREA show that Congress knew well how to set forth a "negatively affecting" test, if that is what it wanted. *See* 12 U.S.C. § 1813(u)(4) (defining "institution-affiliated party" subject to regulatory penalties to include certain individuals when, *inter alia*, their actions have a "significant *adverse* effect" upon an insured institution (emphasis added)); *id.* § 1818(i)(2)(B)(ii)(II)(providing that certain violations can lead to aggravated regulatory penalties if, *inter alia*, the violation "causes or is likely to cause more than a minimal loss to such depository institution").

Furthermore, as noted above, the structure of the statute suggests that Congress may have been concerned more with fraudulent activity meaningfully involving financial institutions than solely with fraud harming those institutions, as many of the crimes enumerated in Section 1833a(c)(1) can be committed by a financial institution that only benefits from the offense.

Finally, while the legislative history does not necessarily show an indication that Congress was concerned with frauds that only benefitted financial institutions, this interpretation would understand Congress' choice of the broad word "affecting" to reflect a conclusion that, in the interest of taxpayers and depositors, fraud simply has no business being around the financial services industry altogether, due to its inherent risks and dangers. *See Serpico*, 320 F.3d at 694 (discussing purpose of FIRREA Section 961(l) as "deterring would-be criminals from including financial institutions in their schemes").

that the scheme directly has caused BNYM legal expenditures and exposed it to considerable legal exposure through the many cases pending before this Court and others in state court.[111] It alleges also that the scheme has damaged BNYM's business prospects by prompting the departure of a number of clients, by forcing BNYM to accept a less profitable business model due to increased scrutiny of custodial FX services, and by harming BNYM's reputation.

These allegations are sufficient. Courts regularly have concluded that a fraud affects an institution by embroiling it in costly litigation, whether because the fraud causes actual losses to the institution through settlements and attorney's fees[112] or because it exposes the institution to realistic potential legal liability.[113] Actual legal expenditures are tangible costs to the Bank that easily fall within the ambit of the term "affecting." That liability exposure is sufficient finds support

---

111 SAC ¶ 177.

112 *See Ohle*, 678 F. Supp.2d at 229 (finding sufficient effect when bank participated in scheme and thus incurred millions of dollars of losses in settlements and attorney's fees); *Rubin/Chambers Dunhill Ins. Servs.*, 831 F. Supp.2d at 783–84 ("A financial institution is 'affected' by a fraudulent scheme where it actively participated in the scheme and experienced financial losses in the form of legal settlements and costs as a result of that participation." (alterations omitted)); *Serpico*, 320 F.3d at 595 (finding bank "affected" by scheme in part because it was put out of business after having to plead guilty for its crimes in participating); *see also United States v. Bennett*, 161 F.3d 171, 193 (3d Cir. 1998) (offense "affected a financial institution" for purposes of sentencing enhancement when institution settled litigation resulting from scheme); *accord United States v. Wiant*, 314 F.3d 826, 830 (6th Cir. 2003); *United States v. Hartz*, 296 F.3d 595, 600 (7th Cir. 2002).

113 *Ghavami*, 2012 WL 2878126 at *9 (finding sufficient effect when scheme exposed institution to risk of "restitution payments, civil penalties, and criminal prosecution"); *United States v. Schinnell*, 80 F.3d 1064, 1070 (5th Cir. 1996) (concluding "threat of suit against a financial institution based upon a fraud perpetrated upon one of its customers" was sufficient for purposes of sentencing enhancement based on "affect[ing] a financial institution" when bank was "realistically exposed to substantial potential liability"); *see also United States v. Walker,* 191 F.3d 326, 336 n.1 (2d Cir. 1999) (attorney sufficiently contemplated harm to clients for purposes of finding intent to defraud when his fraud *inter alia* "embroiled several of them in legal difficulty").

in persuasive holdings that a bank can be "affected" when a scheme exposes the bank to "a new or increased risk of loss," even without a showing of actual loss.[114] The SAC sufficiently alleges here that BNYM has incurred actual losses in attorney's fees and been exposed to a realistic prospect of legal liability as a result of the fraud.[115]

Defendants contend that basing effects on litigation costs and exposure would be "illogical" because "[s]urely the commencement of *meritless* litigation should not trigger FIRREA penalties," and the allegations here are unproven.[116] The argument misses the point. First, if an employee commits fraud and thereby proximately causes a bank to incur actual legal expenses to defend itself from charges of misconduct, the employee's fraud will have affected the bank even if the litigation against the bank were to prove meritless. Second, as discussed below, the SAC plausibly alleges that defendants committed fraud, rendering it plausible that the litigation against BNYM is not meritless at all and that it is exposed to real potential legal liability.[117]

---

114

*United States v. Mullins*, 613 F.3d 1273, 1278 (10th Cir. 2010) (concluding such a risk "is plainly a material, detrimental effect on a financial institution, and falls squarely within the proper scope of the statute"); *accord Ghavami*, 2012 WL 2878126 at *5; *see also Serpico*, 320 F.3d at 694–95 ("Just as society punishes someone who recklessly fires a gun, whether or not he hits anyone, protection for financial institutions is much more effective if there's a cost to putting those institutions at risk, whether or not there is actual harm.").

115

The Court need not reach defendants' contention that using the threat of liability in this very action to constitute the necessary effect would be circular. As this Court is all to aware, there are many other cases besides this one pending against BNYM arising directly from the charged scheme. *See* SAC ¶ 177.

116

BNYM Reply Mot. Dismiss 4–5 (emphasis in original); *see also United States v. Wells Fargo Bank, N.A.*, No. 12 Civ. 7527, Dkt. 27 at 46 (complaining about use of "unproven allegations and unproven effects" to provide effect on institution).

117

To be sure, BNYM could have committed fraud and yet certain of the suits may be resolved in its favor nevertheless. *See Com. ex rel. FX Analytics v. Bank of New York Mellon*, 84 Va. Cir. 473 (Va. Cir. Ct. 2012) (dismissing suit against BNYM under Virginia False Claims

The sufficiency of the SAC is supported further by its allegations regarding BNYM's business prospects. It is difficult to fathom how BNYM could not have been affected when the scheme allegedly has led to the departure of a number of clients and to significant reputational harm for the Bank.[118] Moreover, the SAC alleges that the scheme has forced BNYM to accept a less profitable business model, as clients now demand benchmarking of FX transactions and greater transparency. While it might not be sufficient to allege only that an institution no longer is receiving the allegedly fraudulent profits it had been deriving from the scheme, the SAC's allegations permit the plausible inference that the harm has been more than that here. In particular, one may infer that BNYM, going forward, would have been able to make larger profits in standing instruction business had the alleged fraud never occurred than it will now make with respect to clients under benchmarking arrangements.

In concluding that these alleged negative effects suffice, the Court is mindful that the effects must be "sufficiently direct"[119] and that "there may be some point where the influence a defendant's wire fraud has on a financial institution becomes so attenuated, so remote, so indirect

---

Act because complaint failed to plead a "false claim"). Liability is sufficiently realistic in such a circumstance, however, to permit the conclusion that the bank is affected.

118 *See Johnson*, 130 F.3d at 1354 (concluding that fraud affected a financial institution for purpose of sentencing enhancement in part because it "damaged employee morale and customer relationships, marred the bank's reputation and influenced the bank's immediate and long-term operations and policies").

While the First Circuit has found insufficient evidence after trial showing only that the fraud "arous[ed] the[] possibilities" of an institution losing a client and tarnishing its reputation, the SAC here plausibly alleges that these harms indeed have taken place. *United States v. Agne*, 214 F.3d 47, 53 (1st Cir. 2000).

119 *Bouyea*, 152 F.3d at 195.

that . . . it does not in any meaningful sense affect the institution."[120] Here, the alleged negative effects are slightly removed from the underlying alleged scheme insofar as they manifested only when that scheme was revealed, not as it was ongoing. No matter. The touchstone of proximate causation is reasonable foreseeability, and it certainly was reasonably foreseeable that this alleged scheme, if uncovered, would result in these kinds of harms to the Bank.[121] The Second Circuit takes a liberal view of the harms that are sufficiently direct to find an intent to defraud. The effects here easily pass muster.[122]

Finally, contrary to defendants' contentions, the allegations of negative effects are not negated by BNYM's allegedly significant profits accumulated during the course of the charged scheme. The negative effects of legal costs, potential liability, and reduced future profit

---

120 *Mullins*, 613 F.3d at 1278 (internal quotation marks omitted); *see United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000) (concluding that "mere utilization of the financial institution in the transfer of funds" is not sufficient for purposes of sentencing enhancement).

121 *See Ohle*, 678 F. Supp.2d at 229 ("In using Bank A as a central player in the . . . conspiracy, [the conspirators] knew they were exposing it to risk if their fraud was uncovered.").; *Schinnell*, 80 F.3d at 1070 (concluding effect resulting from threat of suit was sufficient where "direct harm to the banks involved was certainly reasonably foreseeable").

In *Bouyea*, the Second Circuit quoted in *dicta* from a Third Circuit case which suggested that the effect might be "'unreasonably remote'" in a case where "'the fraud was directed against a customer of the depository institution which was then prejudiced in its dealings with the institution.'" 152 F.3d at 195 (quoting *United States v. Pellulo*, 964 F.2d at 193). In both *Bouyea* and *Pelullo*, however, the defendant was not an employee of the bank, and the hypothetical should be read in such a context. That is much different from this case.

122 *See United States v. Jacobs*, 117 F.3d 82, 93–94 (2d Cir. 1997) (concluding defendant contemplated actual harm when scheme exposed bank to risk of loss that was "rather remote"); *Walker*, 191 F.3d at 335–36 (defrauding clients in part by exposing them to legal liability in event joint fraudulent applications are discovered); *United States v. Autorino*, 381 F.3d 48, 54 (2d Cir. 2004) (holding that defendant defrauded FDIC when actions diluted value of FDIC's security interest, thereby being "likely to frustrate and impair the FDIC's ability to realize the benefit" of the interest).

opportunities are of a very different character than the profits BNYM accumulated. Those profits therefore reasonably cannot be understood to cancel out these losses and risks. As Judge Wood observed in reaching the same conclusion in a FIRREA Section 961(l) case, any attempt to compare the costs and benefits in this kind of situation would be "extremely complex and speculative" and "it is doubtful that Congress intended for a court to undertake such a difficult and indefinite exercise."[123] Moreover, offsetting the losses and risks with the profits "would perversely incentivize financial institutions to participate in frauds in which they expect to earn a net benefit, which is behavior that the statute seeks to discourage."[124] Thus, "in several cases where financial institutions participated in and received benefits from schemes to defraud but also incurred actual losses, courts in this district have not required that the loss exceed the benefits received."[125] Where, as here, the government alleges negative effects of a wholly different character than the positive benefits of the fraud to the institution, the SAC need not allege that the negative effects in any sense outweighed the positive effects.

For the foregoing reasons, the SAC sufficiently alleges that the fraudulent scheme "affected" BNYM, such that Nichols may be held liable under Section 1833a.

### B. *Claim Against BNYM*

The Court turns now to the claim against BNYM. BNYM argues that, to whatever

---

123 *Ghavami*, 2012 WL 2878126 at *6.

124 *Id.*

125 *Id.* (citing *Ohle*, 678 F. Supp.2d 215; *Rubin/Chambers Dunhill Ins. Servs.*, 831 F. Supp.2d 779).

extent the legislative history may support liability for *insiders*, there is no indication that Congress sought to permit imposition of penalties on the *institutions* themselves. It contends that the government's reading therefore would "turn[] FIRREA on its head, and would convert a statute designed to shield federally insured financial institutions from fraud by others into a weapon to impose punitive civil fines on federally insured financial institutions."[126]

The distinction that BNYM divines from the legislative history is entirely absent from the text. Section 1833a(a) creates liability for "[w]hoever violates any provision of law to which this section is made applicable by subsection (c)."[127] Subsection (c) then includes violations of mail and wire fraud provided only that the violation is one "affecting a federally insured financial institution."[128] But whether the alleged scheme "affected" BNYM is necessarily the same question whether we are assessing the potential liability of Nichols or the liability of BNYM itself. Thus, the only textual basis for distinguishing among those who can be held liable for committing that violation necessarily would be found in the word "whoever." As the government argues, however, "whoever" is a broad term that the Code specifically defines as including any person, corporation, or other entity.[129] Moreover, the Supreme Court has said that "whoever" should be "liberally interpreted."[130] There is simply no warrant in the text to carve out from the scope of the word

---

126 BNYM Mot. Dismiss 10–11 (emphasis omitted).

127 12 U.S.C. § 1833a(a).

128 *Id.* § 1833a(c).

129 1 U.S.C. § 1.

130 *United States v. A&P Trucking Co.*, 358 U.S. 121, 123 n.2 (1958).

"whoever" in Section 1833a(a) the affected financial institution described in Section 1833a(c)(2).[131]

BNYM complains that this reading requires the supposedly unnatural construction that BNYM is liable for "affecting itself" and that such a reading of "affecting" is contrary to the term's plain meaning. The Court disagrees. It is perfectly natural to say that one's actions may affect oneself. For example, one might say "John's criminal behavior is affecting his future career prospects" and "John's criminal behavior [thus] is affecting him."[132] Certainly, the construction is not so awkward as to permit BNYM to conjure an exception to "whoever" that otherwise is absent from the text.[133]

BNYM further argues that the government's reading is an end-run around on 12 U.S.C. § 1818(i), established also by FIRREA, which sets forth a three-tiered penalty structure to be imposed on institutions and their employees by their assigned regulator for various violations and unsafe practices. BNYM contends that the "carefully crafted" structure of Section 1818(i) was meant to be the exclusive authority pursuant to which penalties may be imposed on financial

---

131

Defendants try to create such a distinction by reference to Section 1833a(b)(3), claiming that as a victim to the fraud, the affected financial institution must be the "person other than the violator" while the perpetrator is the "violator." The point merits little discussion; this Court already has rejected its premise that the affected financial institution necessarily is a victim.

132

Indeed, as in this example, because the subject of the verb "affecting" in Section 1833a(c)(2) is the "violation" and not the violator, use of the reflexive "itself" would not seem necessary in any event.

133

Nor is the Court persuaded by the contention that the "government's reading is unnatural because it would permit two persons who are separately identified in the statute to be the same person." *O'Donnell*, No. 12 Civ. 1422, Dkt. 60 at 10. Creating an exception to "whoever" to support the Bank's reading is far more unnatural.

institutions pursuant to FIRREA.[134]

There are several problems with this argument. First, it proves too much—employees of the institutions also are subject to penalties under Section 1818(i), and BNYM cannot credibly argue that employees are not subject to Section 1833a.[135] Second, as discussed above, there is no doubt that institutions *can* be held liable under Section 1833a by virtue of various crimes enumerated in Section 1833a(c)(1) which does not contain the limiting phrase "affecting a federally insured financial institution."[136] Third, as the government pointed out at oral argument, drafters of committee reports specifically contemplated the possibility of overlapping penalties under Section 1818(i) and Section 1833a and indicated that such penalties would be cumulative.[137] Fourth, and most importantly, whether Section 1818(i) provides a separate penalty mechanism against institutions is entirely irrelevant when there is no basis in the text to exempt an institution from coverage under Section 1833a.

---

134 BNYM Reply Mot. Dismiss 3.

135 *See* 12 U.S.C. § 1818(i)(2) (permitting penalties to be assessed against both "insured depository institution[s]" and "institution-affiliated part[ies]"); *id.* § 1813(u)(1) (defining "institution-affiliated party" as including employees of insured depository institutions); *see also id.* § 1813(u)(4) (including even independent contractors such as attorneys, appraisers, or accountants as institution-affiliated parties in certain circumstances).

136 *See* 18 U.S.C. §§ 1005, 1007, 1014. Indeed, the government has sued Wells Fargo under Section 1833a for violations of Sections 1005 and 1014, in addition to its claims of mail and wire fraud. *See Wells Fargo*, No. 12 Civ. 7527, Dkt. 22 ¶ 169.

137 *See* H.R. Rep. 101-54(V) at 6 ("The proposal is to authorize the imposition of civil penalties for the commission of certain criminal offenses . . . . [T]he Administration states that the penalties can also be cumulative to other civil penalties, which also may be up to $1,000,000, which may be imposed by bank regulatory agencies under other provisions of this bill."). The report goes on to suggest that three separate penalties "for the same violation" are possible— (1) criminal fines, (2) civil penalties under Section 1833a, and (3) civil penalties under Section 1818(i). *Id.*

Indeed, it is not hard to imagine why Congress would have created an overall regulatory scheme under 1818(i) permitting the assigned regulator to assess penalties against the institution and its employees for general violations and unsafe practices, while providing also in Section 1833a that the Attorney General may obtain civil penalties for criminal activity by anyone. The Attorney General has special expertise in investigating and prosecuting criminal cases that bank regulators may not possess.

Finally, BNYM complains that assessing penalties against a financial institution would defeat the point of FIRREA by weakening the institution and therefore putting federally insured deposits at risk. Not only is this belied by the various penalties that clearly can be assessed under Sections 1833a(c)(1) and Section 1818(i) against institutions that have acted improperly, the argument ignores the principal purpose of these penalties—deterrence.[138] Congress well could have concluded that the deterrent effect of meaningful penalties is more important than permitting institutions to engage in dangerous fraudulent behavior without sanction for fear of hurting them. Moreover, Section 1833a places maximum limits on penalties; a court can tailor them to provide both for deterrence of future frauds and for avoiding harm to innocent parties like taxpayers and depositors, consistent with the purposes of FIRREA.[139]

138 *See Serpico*, 320 F.3d at 694 (recognizing deterrence as principal thrust of FIRREA enhanced criminal/civil provisions); *Ghavami*, 2012 WL 2878126 at *5 (same).

139 *Cf. United States v. Menendez*, No. 11 Civ. 6313 (MMM), 2013 WL 828926, *6 (C.D. Cal. Mar. 6, 2013) (setting forth factors court would use to assess Section 1833a penalty, which included *inter alia* defendant's "financial condition and ability to pay"); *Advance Pharmaceutical, Inc. v. United States*, 391 F.3d 377, 399 (2d Cir. 2004) (holding that defendant's ability to pay may be considered in assessing penalty under Controlled Substances Act); 12 U.S.C. § 1818(i)(2)(G)(i) (permitting regulator to consider financial resources of insured depository institution charged with violation in assessing penalties).

In sum, the essential point is this: the statute permits penalties against "whoever" commits a fraud affecting a federally insured financial institution. The purpose of that provision is to deter frauds that might put federally insured deposits at risk. Here, BNYM has been charged with participating in a fraudulent scheme and harming itself in the process. Just as Congress clearly intended to deter bank employees from engaging in fraud that results in harm to these institutions, Congress was entitled to conclude that penalties against financial institutions in cases like this would deter such institutions from similar, harmful, fraudulent conduct. If anything, the urgency may even be greater when the fraud allegedly pervades an institution that the government has backstopped. Both the text and purpose of FIRREA amply encompass the alleged conduct here. Defendants' motion to dismiss on this ground is denied in full.

## *III. Sufficiency of Fraud Allegations*

Defendants next contend that the SAC fails sufficiently to plead claims of wire or mail fraud against either of them. The allegations of fraud may best be divided into four categories: (1) representations about the quality of traditional standing instruction pricing, including best execution, (2) representations about netting, (3) representations about same pricing, and (4) fraudulent omissions.

### *A. Basic Principles*

Sections 1341 and 1343 prohibit the use of mails or wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent

pretenses, representations, or promises."[140] These statutes "are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose."[141] Moreover, "it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading."[142]

"Essential to a scheme to defraud is fraudulent intent."[143] In civil cases, Rule 9(b) applies to averments of fraud. This complaint therefore must allege facts that "give rise to a strong inference of fraudulent intent."[144] The Circuit has noted that the pleadings can allege the requisite strong inference by "(1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[145] "[T]he most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant. But it is possible to raise the required inference with regard to the corporate defendant without doing so with regard to a specific individual defendant" or even "'without being able to name the individuals who concocted and

---

140 18 U.S.C. §§ 1341, 1343.

141 *See United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000).

142 *Id.* (internal quotation marks omitted).

143 *Id.* at 116 (internal quotation marks omitted).

144 *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996) (applying principle in civil RICO suit where mail fraud is charged predicate crime).

145 *Id.*

disseminated the fraud.'"[146]

Our Circuit has suggested that intent to defraud for purposes of the mail and wire fraud statutes comprises two principal parts: (1) intent to deceive and (2) contemplation of actual harm to the victim.[147]

Where a "defendant made misrepresentations to the victim(s) with knowledge that the statements were false," an intent to deceive may be inferred.[148] To "assure that the defendant's conduct was calculated to deceive," courts consider also whether the scheme was "'reasonably calculated to deceive persons of ordinary prudence and comprehension.'"[149] The ordinary prudence standard is just a "tool" to be used in assessing the intent of the defendant, however, and a defendant may have the requisite intent even if the victims proved to be careless, gullible, or negligent.[150]

But "[m]isrepresentations amounting only to a deceit are insufficient," as such "deceit must be coupled with a contemplated harm to the victim."[151] Hence, deceit that does not go to the

---

146 *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (quoting *Makor Issues & Rights v. Tellabs, Inc.*, 513 F.3d 702, 708 (7th Cir. 2008)); *cf. Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp.2d 204, 218 & n.100 (S.D.N.Y. 2009) ("[T]here is authority at least suggesting that a plaintiff may establish corporate *scienter* by relying on the collective knowledge of its employees.").

147 *See generally United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180–81 (2d Cir. 1970).

148 *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999).

149 *United States v. Thomas*, 377 F.3d 232, 242–43 (2d Cir. 2004) (quoting *Silverman v. United States*, 213 F.3d 405, 407 (5th Cir. 1954)).

150 *Id.* at 243.

151 *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).

"nature of the bargain itself" where the customers "received exactly what they paid for" is not sufficient absent contemplation of harm to the victims.[152] Where misrepresentations are "only collateral to the sale"[153] and are not "capable of affecting the customer's understanding of the bargain [or] of influencing his assessment of the value of the bargain to him,"[154] there generally is no intent to defraud.

On the other hand, "[w]here the false representations are directed to the quality, adequacy, or price of the goods [or services] themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain."[155] Even if the misrepresentations do not go directly to the nature or quality of the services, intent to harm "may be inferable from facts indicating a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."[156] "In either instance, the intent of the schemer is to injure another to his own advantage by withholding or misrepresenting material facts."[157]

In sum, "[i]t is not sufficient that the defendant realizes that the scheme is fraudulent

152 *Id.*

153 *Id.*

154 *Regent Office Supply*, 421 F.2d at 1182.

155 *Id.*

156 *Id.*; *accord United States v. Shellef*, 507 F.3d 82, 109 (2d Cir. 2007); *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006); *Walker*, 191 F.3d at 335.

157 *Regent Office Supply*, 421 F.2d at 1182.

and that it has the capacity to cause harm to its victims."[158] Rather, the allegations, if true, "must demonstrate that the defendant had a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to the property rights of the victim."[159] But "where a necessary consequence of the scheme, if it were successful, would be injury to others, fraudulent intent may be inferred from the scheme itself."[160]

### *B. Representations Relating to Quality of Traditional Standing Instruction Pricing*

The first category of representations at issue here is representations going to the quality of traditional standing instruction pricing in the ordinary course. It comprises a number of distinct representations, including (1) best execution, (2) whether the price generally reflected the interbank market at the time of execution, (3) free of charge and minimizing costs, and (4) best rate of the day. The Bank is charged with all of them, and Nichols is charged with all but the representations that the service was free of charge and minimized costs.

The Court discusses these representations in turn. As discussed below, however, the analysis of fraudulent intent overlaps significantly in view of the similarity in the respective impression that each allegedly conveyed.

---

158 *Autuori*, 212 F.3d at 116 (internal quotation marks and alterations omitted).

159 *Id.* (internal quotation marks and alterations omitted).

160 *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006) (internal quotation marks omitted).

*1. "Best Execution"*

*a. Materially False or Misleading*

The SAC adequately alleges that the representation that BNYM provided "best execution" was materially false or misleading.

The SAC alleges that "best execution" is a term of art in the industry meaning that the bank provides to the customer the best price available in the circumstances.[161] In *SEPTA*, this Court previously rejected this Bank's argument that the Court could decide, as a matter of law, that the alleged industry understanding of best execution as best available price applies only to the securities markets and not the FX markets.[162] To the extent defendants in this case invoke documents quoted by the SAC as proving that "there is no standard definition of best execution" in the FX markets,[163] defendants ask this Court to consider the documents for the truth of the matters asserted therein, which is impermissible at this stage.[164] The Court therefore declines the invitation to adopt the Bank's position as a matter of law.

Defendants argue that the Standard Comment drafted by Nichols never said that best execution meant best price, and sought to emphasize the importance of other factors. But it need not have done so in light of the alleged industry understanding of the term. As this Court concluded

---

[161] SAC ¶ 42.

[162] *SEPTA*, 2013 WL 440628 at *11.

[163] Laguardia Decl. Ex. 5 ("Best Execution Survey") at 2.

[164] *See In re Lehman Bros. Securities and ERISA Litigation*, No. 09 MD 2017 (LAK), 2012 WL 4866504, *4 (citing *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 424–25 (2d Cir. 2008)).

in *SEPTA*, to whatever extent these statements "suggest that BNYM viewed its best execution standard as involving many aspects of trade facilitation other than pricing, the language does not expressly forswear the industry understanding of the term."[165] Thus, "[o]ne at least plausibly might read [the Standard Comment] as *adding* to BNYM's obligations, rather than implicitly redefining an oft-used industry pricing term without saying so expressly."[166] Moreover, the hill defendants must climb here is much steeper on this point than in *SEPTA* because the Standard Comment used several terms suggestive of a best pricing understanding of best execution, including "'goal of maximizing the value of the client portfolio under the particular circumstances at the time'" and "'maximize the proceeds of each trade.'"[167] Thus, defendants' contention that the Standard Comment did not expressly equate best execution with best available price is unavailing.[168]

Having sufficiently alleged that defendants' representations suggested that they were

165 *SEPTA*, 2013 WL 440628 at *12.

166 *Id.* (emphasis in original).

167 SAC ¶¶ 51, 53.

168 It is particularly unavailing as to BNYM insofar as the SAC alleges that the Bank described the service as providing best execution on its website without any clarifying definition at all, at least until late 2009. *See* Klimmek Decl., Ex. 4 (including screenshot of this website).

Moreover, the government alleges that the Bank made other statements closely pairing "best execution" with the notion of "best rates." In particular, the SAC alleges that RFP responses and a 2005 internal question and answer document designed to guide employees in responding to client inquiries about best execution stated as follows: "'The Bank of New York *ensures best execution* on foreign exchange transactions through the following mechanisms: As a major market participant, the Bank is actively engaged in making markets and taking position[s] in numerous currencies *so that we can provide the best rates for our clients*.'" SAC ¶ 43 (emphasis added by SAC). The proximity of "best execution" and "best rates" reinforces the plausibility of the government's contention that the Bank conveyed a materially false or misleading impression about best execution.

pricing under the industry definition, the SAC further adequately alleges that such representations were materially false or misleading. BNYM argues that it is not plausible that anyone could have believed that BNYM was offering a sophisticated service like standing instruction and providing the same prices it could obtain in the interbank market.[169] It argues also that the best execution statements cannot form the basis of a fraud claim because what constitutes the "best available" price is open to considerable debate in light of the many factors that go into assessing the quality of execution.

These arguments miss the point. BNYM may well be correct that even the SAC's definition of best execution did not require it to trade at the interbank rate itself; the Court is skeptical that a price is really "available" in the market if any bank offering that rate to its customers likely would lose on every trade. It may prove correct also that the industry understanding of "best available" price still incorporates certain qualitative factors of execution, such that a bank can offer price spreads larger than others but still be considered as providing best execution. Finally, it may prove correct that there is some disagreement in the industry about what exactly best execution requires. Nevertheless, at this stage, it is at least plausible that BNYM's practices—which allegedly produced spreads ten times that of negotiated transactions—sufficiently exceeded the bounds of any reasonable industry understanding of best execution to make the representation false or, at a minimum, misleading.

---

169 SAC ¶ 30 ("BNYM could have executed trades at prevailing interbank market rates with its standing instruction customers . . . .").

*b. Intent to Deceive*

*i. BNYM*

The SAC's allegations that BNYM intended to deceive its customers about the nature of its pricing practices through the "best execution" representation are more than sufficient to survive dismissal.

The SAC alleges that key BNYM employees knew that best execution was a term with an industry meaning—indeed, as discussed below, Nichols specifically invoked industry definitions in internal emails when crafting the Standard Comment.[170] Moreover, the SAC contains allegations permitting the inference that these same key BNYM employees were aware that they were not providing best execution under this industry meaning. In an October 2009 internal email directed to Nichols among others, BNYM executive vice president Jorge Rodriguez allegedly wrote,

> "'Bottom line is, [it's] volume [versus] quality spread business. The friendly business we have built our reputation on is undergoing considerable change with increased regulatory demands on our client to achieve 'Best Execution' and the growth in overall pricing transparency. For us to continually win, I feel we need to do a little of both recognizing that at the end of the day, it is all about profits.'"[171]

The SAC permits the inference that, in describing the need to "do a little" of "Best Execution," rather than the "friendly business" previously existing, Rodriguez believed that the Bank was not generally providing best execution at that time. The SAC alleges also that BNYM acknowledged that it did not provide best execution to at least one customer; when the New Jersey Department of Treasury allegedly discovered in late 2005 or early 2006 that it was receiving the worst interbank rate each day and confronted the Bank about it, the Bank allegedly "told New Jersey that the Bank

---

170 SAC ¶ 53.

171 SAC ¶ 127.

does not guarantee best execution" and then reimbursed it $100,000.[172]

In and of itself, the allegations that key senior officials at the Bank knew about the alleged industry understanding of the term, knew that the Bank was not actually ensuring best execution under that understanding, and yet referred clients to a website that said simply that the service offered "FX execution according to best execution standards" supports a strong inference of intent to deceive. But there is much more here as well.

The very nature of the Bank's pricing practices further supports this inference. The Bank repeatedly has taken the position that it was under no obligation to provide pricing any better than the morning daily schedule price so long as the price was within 3 percent of the relevant interbank rate. Thus, as this Court recognized in *SEPTA*, "[t]he allegations of the SAC arguably permit the inference that BNYM nevertheless consistently priced the transaction within the daily interbank range—against its immediate economic interest—to give clients the impression that the trades were executed at or near prevailing interbank rates, but that the executions unfortunately occurred at times of day when prices were less favorable."[173] Indeed, the SAC alleges that at least

172 *Id.* ¶ 115. The Court is mindful that the inferences one can draw from this particular incident are somewhat limited, as the SAC is not clear about whether the Bank itself used the term "best execution" in this conversation as something it did not provide.

173 *SEPTA*, 2013 WL 440628 at *21. This might have been a very different case if the Bank had simply applied an outsized but generally constant spread to every transaction. In such a circumstance, even if the size of the spread did not comport with traditional understandings of best execution, the case that the Bank was structuring its pricing in a way calculated to deceive the client would be much harder to make; the client likely would notice when its trades fell outside of the interbank range.

To be sure, the Bank could have priced its trades in the way it allegedly did without necessarily harboring intent to deceive. The choice between permissible inferences cannot be made at this stage, however.

one particular trader at the Bank on occasion told customers *precisely* this when the customer complained about pricing—that the poor pricing was due to "'bad timing,'" when in fact timing had nothing to do with the pricing of the trades.[174] The same trader allegedly said also on occasion that poor pricing was due to the sizes of the trade, even though the Bank allegedly priced large and small trades in the same way.[175]

The Bank allegedly misled other customers as well in responding to similar inquiries. Before allegedly stating that it did not guarantee best execution, the Bank told the New Jersey Department of Treasury that, in pricing standing instruction trades, it "obtained a price for the trade and then took a spread on top of the price."[176] When customer San Diego County Employees Retirement Association ("SDCERA") asked about the extent to which the Bank "marked up" its currency trades, the Bank allegedly told SDCERA that it "charged enough to cover its transaction costs," whereas the SAC alleges that the Bank's standing instruction profits well exceeded any transaction costs.[177] Moreover, when SDCERA ran its own analysis using Bloomberg reported rates to show that the trades always were priced near the worst interbank rate of the day, the Bank allegedly told SDCERA in substance that it "cannot compare it that way, and that Bloomberg was

---

174 SAC ¶ 123.

175 *Id.*; *see also id.* ¶ 141 (BNYM allegedly admitting to clients that "'we tend to price our purchases of currencies towards the low end of [the interbank] range and our sales of currencies towards the high end, regardless of trade size'").

176 *Id.* ¶ 115.

177 *Id.* ¶¶ 124–25.

not definitive."[178]

In each of these cases, the Bank set forth an explanation of how it priced transactions that likely was consistent with the industry definition of best execution, but that allegedly was inconsistent with how BNYM actually priced the trade. Such conduct supports the inference not only that these Bank employees were aware that its customers were under an inaccurate impression about what its pricing practices were, but that these same employees intended to further that erroneous impression through specific allegedly false statements.

The SAC's allegations about the Bank's alleged efforts to "conceal[]" its pricing practices also provide some, if more limited, support for the inference of intent to deceive.[179] While the Bank provided a monthly statement setting forth the prices it executed each trade at with clients, it did not provide time stamps for the trades nor distinguish between standing instruction and negotiated transactions.[180] The SAC permits also the inference that the Bank refused customer requests to provide periodic reports "'to evidence that you have provided us with best execution.'"[181] And when SDCERA asked for time stamps, the Bank told it that time stamps "were not available because BNYM's traders agreed on prices earlier in the day, but did not close the transactions until hours later."[182] As noted in *SEPTA* and discussed more below, the Court rejects the contention that

178 *Id.* ¶ 124.

179 *Id.* ¶ 96.

180 *Id.* ¶ 102.

181 *Id.* ¶ 118.

182 *Id.* ¶ 124.

the Bank had an independent obligation to provide time stamps or any particular form of transparency. There can be legitimate business reasons for a company not to provide its customers certain information about the services it provides to them. But to the extent that the Bank is charged with making affirmative misrepresentations about its practices, its unwillingness to provide the transparency that might have revealed the truth arguably supports an inference of intent to deceive.[183]

The SAC contains also various allegations permitting inferences of consciousness of guilt.[184] When a lawsuit was filed against State Street Bank setting forth allegations of similar practices, one BNYM managing director emailed the report to all FX sales employees with the subject heading "'Oh No.'"[185] That same day, a former employee who left the Bank in 2008 emailed his colleagues with an article about State Street, asking "'Well, is the "Game" over? . . . Time to

---

183 Further support along these lines may be found in the Bank's practices regarding benchmarking. As noted above, the SAC alleges that when Fidelity substantially increased its currency volumes and thus was likely to scrutinize the pricing it received, the Bank switched Fidelity to benchmarking without telling it. Upon information and belief, the SAC alleges that this was done to prevent Fidelity from noticing its poor pricing. The SAC alleges that the Bank reverted to traditional pricing once the volumes decreased. *Id.* ¶ 90. The SAC makes similar allegations regarding the Bank's pricing for BlackRock. *Id.* ¶ 91.

While price discrimination is undoubtedly a legitimate business practice, and nonculpable inferences may be drawn from these particular incidents, the allegations may be read also to support the inference that the Bank intended to deceive by ensuring that customers did not learn that the Bank was not providing best execution.

184 *See United States v. Gordon*, 987 F.2d 902, 907 (2d Cir. 1993) (observing that intent may be shown through circumstantial evidence of consciousness of guilt).

185 SAC ¶ 130.

retire after raping the custodial accounts, all "Public Trust" money?'"[186] While other inferences perhaps may be drawn from these allegations, they too support an inference of fraudulent intent in conjunction with the allegations set forth above.

In contending that the SAC does not sufficiently allege fraudulent intent, BNYM does little to engage with the numerous allegations of conscious misbehavior and recklessness set forth above. Rather, BNYM contends only that alleging corporate *scienter* requires alleging that a particular employee had the requisite intent, that the only employee alleged to have had such intent was Nichols, and that the SAC fails to allege such intent as to Nichols. As will be clear below, the Court disagrees that the SAC is insufficient in alleging a strong inference of fraudulent intent as to Nichols, making BNYM's argument entirely beside the point. More broadly, however, the allegations set forth above hardly involve "piecing together scraps of innocent knowledge held by various corporate officials" in the way that has given courts pause about theories of collective knowledge to allege corporate *scienter*.[187] Rather, the SAC alleges a pattern of misrepresentations by Bank employees who, the SAC plausibly alleges, knew that their representations were false. These give rise to a strong inference that these Bank employees intended to deceive customers into believing that they were receiving best execution as the SAC alleges that term is understood.[188]

---

186

*Id.* The Bank contends that the SAC fails to allege that this employee was aware of the Bank's pricing practices. But the SAC plainly alleges the similarities between State Street and BNYM, and so the very fact that the employee knew to email his colleagues this article and make this remark itself permits the inference that he knew about BNYM's pricing practices.

187

*United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1275 (D.C. Cir. 2010) (internal quotation marks omitted).

188

To the extent that defendants contend that disclosures that trading was on a "principal basis" or that the prices would not fall outside 3% of the relevant rate, or that the prices would be

*ii. Nichols*

Turning to the allegations against Nichols specifically, the Court concludes that the SAC is sufficient. It alleges that Nichols was aware of how the industry allegedly defined best execution. Indeed, he specifically invokes and quotes the SEC definition as "trading 'in such a manner that the client's total costs or proceeds in each transaction is the most favorable under the circumstances'" when circulating the Standard Comment in a May 2005 internal email.[189] It alleges also that Nichols was well aware of how the Bank priced standing instruction trades.[190] As noted above, one may infer that the scheme itself was designed to create or foster a false impression that the clients were receiving the best available price. It alleges also that Nichols received the email from Jorge Rodriguez suggesting that Rodriguez did not believe that the Bank then was providing best execution. Though this was not a view expressed by Nichols himself, one may infer that Nichols was aware that the representation either was inaccurate or misleading from his awareness that a fellow Bank official believed that the Bank was not providing best execution. Thus, one permissibly may infer that when Nichols used a term that he knew had a defined understanding, made further statements that tended to reinforce that understanding, and knew that his own colleague did not view the Bank's practices as falling within that understanding, he knowingly and

---

better than the daily schedule price, negate an intent to deceive, *SEPTA* forecloses their arguments. As we held there, none of those is inconsistent with BNYM providing best execution pricing, and thus none can negate the intent to deceive as a matter of law at this stage. *See SEPTA*, 2013 WL 440628 at *10–12. If the policies and procedures plainly had stated that BNYM could price however it chose within those guarantees, then this might have been a different case. But they did not.

189 SAC ¶ 53; Klimmek Decl., Ex. 9.

190 *See, e.g.,* Laguardia Decl., Ex. 2 (background materials apparently developed by Nichols discussing value of standing instruction trading and best execution at length).

intentionally misled the Bank's customers about what the Bank was providing.

In urging the Court to reach the opposite conclusion, Nichols' counsel at oral argument pointed to various statements that Nichols made—separate and apart from the Standard Comment—that purportedly show that Nichols was actively combating the impression that best execution meant best available price.[191] Nichols contends therefore that "the Government cannot meet its burden of pleading that Nichols consciously or reckless[ly] misled BNYM's clients into thinking that best execution meant lowest price."[192] As noted above, however, the government need not allege that Nichols intended to deceive clients into thinking that best execution meant best price. Rather, the government must allege that, in referring to best execution, Nichols intended to deceive clients about the nature of BNYM's pricing practices. Whatever Nichols may have believed to have been the *appropriate* definition of best execution in his own mind, and whatever he said to convince clients that price should not be the only consideration, the requisite intent to defraud is alleged sufficiently because the SAC adequately alleges that (1) Nichols knew that clients were viewing best execution as equal to best price and then (2) described the service as providing best execution (3) without disabusing clients of the impression that the service provided best price when, in fact, it allegedly did not.[193] Moreover, the record flatly contradicts Nichols' suggestion that he always

---

191 For example, when providing the Standard Comment to a Bank employee in order to respond to one particular customer request, Nichols forwarded also a Best Execution Survey published by Global Investor magazine; at the end of that article Nichols is quoted as saying: "'The reduction in administrative costs, integrity of reporting and aggregation of small amounts into market size, means that execution through the custodian here is easily defended as best.'" Best Execution Survey, Laguardia Decl. Ex. 5, at 5.

192 Nichols Mot. Dismiss. 26.

193 That Nichols had ample basis to know how customers would have understood his reference to best execution is supported by the very Global Investor survey on which Nichols relies.

provided additional statements "on top of those three paragraphs, that explain what he meant."[194] The SAC makes no such allegation, and in fact Nichols' contention is not supported by the documents defendants have asked this Court to consider in connection with their motions.

First, when T. Rowe Price asked for "'periodic reports to evidence that you [BNYM] have provided us with best execution,'" the request was forwarded to Nichols. Nichols provided the Standard Comment as "our statement on the subject," which a Bank employee passed on to the client.[195] There is no indication in this record that Nichols sought to dispel any misleading impression that the Standard Comment conveyed through additional statements in this instance.[196]

Second, the SAC alleges that the Standard Comment was provided to U.S. Bank in March 2009, without alleging that any other statements were made as well.[197] The email thread supplied by defendants suggests that U.S. Bank was given the Standard Comment and nevertheless wanted "additional information to more explicitly define 'best execution.'"[198] Nichols stated to the

---

Notwithstanding Nichols' attempts in that article to equate best execution with factors that go beyond just price, the survey indicates that a full 50 percent of those surveyed believed that best execution was defined by price alone, and 34 percent considered price along with other factors. Best Execution Survey at 3.

The SAC permits the inference that, even if Nichols knew that there was doubt about what best execution meant, he knew also that customers would not have understood it to encompass BNYM's practices.

194 Oral Arg. Tr. 40:19–20 (Mar. 28, 2013).

195 SAC ¶¶ 118–22.

196 *Id.*; *see* Laguardia Decl., Ex. 4.

197 SAC ¶¶ 56, 61.

198 Klimmek Decl., Ex. 6.

employee who passed along the request, "Regarding further detail on best execution, no, we do not have anything beyond what I gave you, *nor do I think we should stray into that area*."[199] Nichols then noted that in response to a question "What is Best Execution?" the Investment Company Institute ("ICI") said that "[w]hile there is no specific definition of 'best execution' under the securities laws" a broker-dealer must ensure best execution by considering *inter alia* "the price of [an] order, the size of an order, and the trading characteristics of the security involved."[200] Nichols stated that ICI was the national association of investment companies and thus "[i]f anyone should know, they should. Based on the definition above, it's clear that they have no intention of answering the question."[201] Nichols concluded, "US Bank is fishing for a silver bullet. There is none. The current answer stands."[202]

These episodes do not support Nichols' contentions that he cured any misleading impression created or reinforced by his Standard Comment. In fact, they support the government's position. While other inferences perhaps also may be possible from these documents and allegations, that T. Rowe Price requested "periodic reports to evidence that you have provided us with best execution" and that Nichols described U.S. Bank as "fishing for a silver bullet" permits the inference at this stage that Nichols was aware that these clients were under a mistaken impression about what BNYM meant when it said that it was providing best execution, but actively

---

199 *Id.* (emphasis added).

200 *Id.*

201 *Id.*

202 *Id.*

chose not to dispel that view.[203]

Indeed, the strong inference of intent to deceive arising from Nichols' conduct with respect to U.S. Bank and T. Rowe Price is further reinforced by how differently he acted with respect to a third, unnamed client in January 2004. In that case, Bank employees apparently drafted—and Nichols approved—a response to the question, "Will you commit to providing best execution where you act as agent for FX deals?"[204] The first part of the approved response stated, "In the case of *negotiated* foreign exchange, you will know that the Asset Manager executing the transaction is obliged to ensure best execution is achieved for its clients. Please refer to our response to question 2 for the reasons why we believe we offer a very competitive service to these financial institutions."[205] The response to question 2, in turn, discussed the "competitiveness of [the Bank's] FX rates."[206] One plausibly may infer from these remarks that Nichols understood that clients viewed best execution as a matter of providing best price.

The response then discussed the standing instruction program. It noted, with markedly greater candor than allegedly was provided to other clients, that "there has been some uncertainty . . . about the true cost of foreign exchange standing instructions" and that the Bank "always strive[s] to ensure our clients know how much any service costs."[207] Accordingly, it offered

203 To the extent that the email exchange regarding U.S. Bank was submitted by BNYM and not Nichols, the Court notes that it need not rely on the attachment to reach its conclusion.

204 Laguardia Decl., Ex. 6.

205 *Id.* (emphasis added).

206 *Id.*

207 *Id.*

to provide this client with a benchmarking pricing arrangement involving "pre-negotiation of FX margins."[208] In approving this response, Nichols warned that "we do not want to make the paragraph describing our willingness to embrace transparency and accountability through a . . . benchmark pricing arrangement the standard RFP answer used bankwide," but rather to make that "transparency and accountability" available only to select clients.[209] Given that this answer arose in the context of the Bank's willingness to commit to providing best execution, the response supports an inference that Nichols was aware that traditional standing instruction pricing—as opposed to benchmarking—did not provide best execution as this client would have understood the term.[210] Particularly in light of the SAC's allegations that this understanding of best execution was shared widely in the industry, the response to this client may bolster also the inference that Nichols was aware of the need to make such disclosures with respect to clients like U.S. Bank and T. Rowe Price, but actively chose not to do so in those cases.[211]

Finally, Nichols contends that his active pushing of "post-trade analysis" in both the Standard Comment and other communications negates an intent to deceive. The post-trade analysis Nichols apparently offered to provide would have shown the list of prices at which the client's trades

---

208 *Id.*

209 *Id.*

210 To be sure, the response did suggest that, by aggregating volume, the Bank could provide "better execution and exchange rates for smaller trades" in its traditional pricing model. *Id.* The proper inference to draw from the use of the term "better execution" rather than "best execution" cannot be decided at this stage.

211 Again, setting aside any representations about same pricing, the Court in no way suggests that it is improper to provide differing treatment to favored clients, with respect to pricing or transparency. This alleged incident is considered solely for how it may support an inference of fraudulent intent.

were completed along with the high and low prices of that day as reported by Reuters, flagging any prices that fell outside the daily range.[212] Such a report presumably might have made more apparent the alleged fact that the Bank consistently priced at the least favorable end of the daily range each day, and Nichols well may point at summary judgment or trial to his openness to providing such a report as evidence supporting his position. At the same time, however, it appears that the "analysis" did not provide anything more than what a client could have generated itself with publicly available data and the information BNYM already had been providing.[213] Certainly, it did not provide time stamp information that would have shown how the prices received deviated from the interbank rates at the times of execution. Whether this willingness to provide an analysis that could have been generated by the clients themselves defeats the other allegations that support finding an intent to deceive is not a question the Court can resolve at this time.

*c. Intent to Harm*

The government adequately alleges that the defendants contemplated actual harm to their customers that flowed from the alleged deceit.

BNYM provided standing instruction trading as a service to its custodial clients. Whether that service gave customers the best available market price at the time of execution or some other, less favorable price, is quite plainly a question that goes to the "nature or quality of the

---

212 *See* Laguardia Decl., Ex. 5.

213 *See* SAC ¶ 124 (suggesting that Bloomberg reported high and low rates of day were publicly available).

service" the Bank was providing.[214] Thus, this case does not resemble *Regent Office Supply*[215] or *Starr*,[216] where defendants lied to their victims but the victims nevertheless received the goods or services they expected. Rather, insofar as customers allegedly were misled as to the quality of BNYM's pricing, there was a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered."[217]

Defendants' contentions to the contrary would have more force if the facts were somewhat different. For example, suppose BNYM had engaged a customer in a directly negotiated transaction and quoted a price of, say, $1.31 per euro. Suppose further that the Bank represented also that this was the "best available price" at that time—or even that it was making no profit at that price—while in fact the Bank expected to make or made a significant profit. If the customer agreed to the price, the essence of the bargain would be the exchange of currencies at the agreed-upon price of $1.31 per euro and there would be no showing of an intent to harm in the absence of other circumstances.[218] The customer generally has no interest in what profits the Bank actually made so

---

214 *Starr*, 816 F.2d at 99.

215 421 F.2d 1174.

216 816 F.2d 94.

217 *Regent Office Supply*, 421 F.2d at 1182.

218 *See Starr*, 816 F.2d at 99–100 (identifying no contemplated harm where defendant mail service misrepresented to customers underlying prices it paid Postal Service for their deliveries); *Shellef*, 507 F.3d at 108 (concluding that "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid" do not violate fraud statutes).

long as it received what was agreed.[219] But where, as here, the price was decided unilaterally by BNYM and learned by the customer only after the fact, the nature of the bargain is much different. Misrepresentations about the quality of the pricing the service provided tend to show an intent to defraud.

In sum, the SAC adequately alleges that defendants fraudulently misrepresented the standing instruction service in describing it as providing best execution.

### 2. *Generally Reflecting Interbank Rate at Time of Execution*

One section of Nichols' Standard Comment on best execution stated:

> "Since The Bank of New York is one of the largest global custodians, our clients gain the ongoing benefit of aggregation of transactions across our broad customer base; *accordingly, we price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk.* The vast majority of our trades will be priced within the interbank range applicable on trade date. In some instances, pricing may be outside the daily range, particularly for very small trades, because of the addition of a spread to cover the cost of processing and currency risk management."[220]

The SAC alleges that the italicized statement was fraudulent in light of the Bank's actual pricing practice because it suggested that the customer "would be receiving the best available rate at the time the trade is executed," when that was not actually the case.[221] Defendants essentially contend that, read in context with the rest of the paragraph, "generally reflecting the interbank market at the time the trade is executed" meant only that the transaction usually would be priced within the

---

219 *See In re Mexico Money Transfer Litigation*, 267 F.3d 743, 749 (7th Cir. 2001).

220 Laguardia Decl., Ex. 2 at 9; *see* SAC ¶ 60.

221 SAC ¶ 65.

interbank range of that *day*.

The SAC adequately alleges that the statement was misleading by conveying the impression that the pricing at least in some sense was based on the interbank market prevailing at the time at which the trade was executed, when in fact, the time that the trade was executed was irrelevant.[222] The Court rejects defendants' request to equate the reference of "the time the trade is executed" to "the day the trade is executed," based on the paragraph's later statements about pricing within the interbank daily range. Such a conclusion is in sharp tension with the typical understanding of the word "time" in common parlance and is not the only way to read those later statements.[223] In any event, it would resolve a factual issue not appropriately resolved on this motion to dismiss.

The SAC adequately alleges also that defendants intended to deceive in making this statement. It is more than plausible that defendants knew that the reference was misleading, as Nichols and other Bank employees were well aware that a number of the Bank's customers were particularly interested in time stamps precisely so that they could verify that, indeed, the rates "generally reflect[ed] the interbank market at the time the trade is executed."[224] Moreover, given

---

222 To the extent that defendants contend it is not plausible for this statement to be read as saying that the Bank would provide the actual interbank rate itself at that time of day, they attack a strawman. The government need not allege so much to allege that the statement is misleading in light of the Bank's practices.

223 In particular, the statement that the vast majority of trades will be priced within the daily interbank range plausibly can be read to state that, because the trades generally reflect the interbank market at the time of day that the trade is executed and the trades are executed over the course of the day, the trades generally will fall within the daily range.

224 *Id.* ¶ 60; *see* Laguardia Decl. Ex. 2 at 6 (presentation by Nichols discussing how the Bank "as a matter of policy" does not provide time stamps for trades through its trading system).

the close relationship between this representation and whether the Bank was providing "best execution" under the alleged industry understanding, the various reasons set forth above for finding sufficient the intent to deceive allegation in that context generally apply in this context. This is particularly so as to the allegations that the Bank on occasion falsely told clients that poor pricing had been due to "bad timing."[225]

With regard to contemplation of harm, like "best execution," whether the Bank's pricing of the trade generally reflected the interbank market at the time the trade was executed plainly went to the nature or quality of the service provided so as to give rise to the requisite intent to defraud.

*3. Free of Charge and Minimizing Costs*

The SAC alleges that BNYM's website until late 2009 stated, "Operationally simple, *free of charge*, and integrated with the client's activity on the various securities markets, FX standing instruction is designed to help clients *minimize* risks and *costs* related to the foreign exchange and concentrate on their core business."[226] This statement was made also in a number of RFP responses.[227] The SAC alleges that the italicized portions of the above statement were

---

225 The government argues that the last two sentences of the paragraph at issue include further false statements supporting an inference of intent to deceive. In particular, the government contends that those sentences strongly suggest that smaller trades receive worse pricing "because of the addition of a spread to cover the cost of processing and currency risk management." The SAC alleges, however, that BNYM later admitted that it priced its trades at the ends of the interbank range, "'regardless of trade size.'" SAC ¶ 141. The Court agrees that these two sentences do not support defendants' motion at this stage.

226 SAC ¶ 67 (emphasis added).

227 *Id.* ¶ 68.

fraudulent.

The Court is not persuaded that the reference to minimizing costs, standing alone, was fraudulent. Particularly in light of the statements "[o]perationally simple" and "concentrat[ing] on their core business," this reference on its face spoke principally to the ways in which standing instruction trading had the potential to reduce costs by reducing the administrative overhead entailed when a client was obliged to negotiate directly. To whatever extent this reference could have been misleading, the SAC fails to allege facts giving rise to a strong inference that the Bank intended to deceive its clients when it said that the service was designed to help clients minimize their costs.

The reference to "free of charge" is a separate issue because, on its face, it speaks only to the costs or charges associated directly with the standing instruction service itself. Defendants contend that the statement was neither false nor misleading because "free of charge" plainly meant that there was no supplemental per-transaction fee to the customer. To support this contention, defendants cite a number of cases that suggest that a currency exchange spread is not a fee, charge, or commission for purposes of certain California disclosure statutes.[228] But the status of a spread under California law is entirely beside point given the question at issue here—whether, in light of the Bank's actual pricing practices, the statement "free of charge" was false or misleading to the Bank's customers.[229]

---

228 *See* BNYM Mot. Dismiss 26 n.35 (citing *In Re Mexico Money Transfer Litigation (Western Union & Valuta)*, 164 F. Supp.2d 1002, 1024 (N.D. Ill. 2000), *aff'd* 267 F.3d 743; *Sanchez v. Giromex, Inc.*, No. D042459, 2004 WL 2750332, *11–14 (Cal. Ct. App. Dec. 2, 2004) (unpublished and not citable); *McCann v. Lucky Money, Inc.*, 29 Cal. Rptr. 3d 437, 442 (Cal. Ct. App. 2005)).

229 Indeed, one of the cases on which defendants rely recognized exactly this point. In *Sanchez*, the court concluded that the spread need not be disclosed under the statute but then noted "there remains the question whether defendants' advertisements were likely to deceive

The SAC at least plausibly alleges that calling the service "free of charge" was misleading. While the Court is sympathetic to defendants' contentions that the Bank's customers must have known that some spread would be charged, the contention presents factual issues not properly decidable at this stage. Whatever the implausibility of believing that the Bank actually would provide the currency at the interbank rate itself, it is at least plausible that this statement conveyed the impression that the Bank would offer the currency at a price no worse than the bid/offer spread that it might have had to pay to acquire the currency in the first place or no more than what the customer would have obtained in a negotiated transaction executed at the same time.[230]

To the extent that such an impression would have been essentially equivalent to the impression allegedly conveyed by the reference to "best execution," the SAC adequately alleges a strong inference of intent to deceive for the same reasons discussed above. Indeed, the Bank's alleged attempts to mislead clients who complained about poor pricing may be viewed as deceiving them about "free of charge" just as much as about "best execution." Moreover, the SAC alleges that Bank employees often discussed internally the spreads earned in standing instruction trades as a "fee" or "charge."[231] While other inferences might be drawn from these allegations—after all, Bank employees' use of shorthand in internal conversations is not necessarily dispositive of an intent to deceive—these allegations weigh against dismissal. Finally, while BNYM ultimately may prove

---

consumers by representing that only a small flat fee would be charged for defendants' money transmission services." 2004 WL 2750332 at *13. The court ultimately found that this claim failed for entirely separate evidentiary deficiencies.

230 The Standard Comment's discussion of when the Bank adds "a spread to cover the cost of processing and currency risk management" may be relevant also to whether the Bank fostered a misleading impression on this point. Laguardia Decl., Ex. 2 at 9. The appropriate inferences to draw from this statement cannot be determined at this time.

231 SAC ¶¶ 70, 128.

correct that no customer of ordinary prudence could have believed that "free of charge" meant anything other than no commission and that this defeats an intent to deceive, the argument cannot be resolved at this stage.

Finally, like best execution, whether the service was free of charge goes directly to the quality of the pricing that the customers reasonably anticipated. Hence, the sufficient allegations of intent to deceive supports an inference of intent to defraud.

*4. "Best Rate of the Day"*

Defendants allegedly stated the following in RFP responses and a question and answer document designed to guide Bank employees' response to client inquiries:

> "How do you ensure custody clients consistently receive fair prices for their trades?
>
> "Clients benefit from our attractive rates because we aggregate all client income in any given currency to obtain the '*best rate of the day*.' That 'best rate of the day' is applied to all of the income conversions that we execute for that day, regardless of the amount."[232]

The SAC alleges that the reference to "best rate of the day" is fraudulent because, in fact, clients received virtually the worst interbank rate of the day. The Court is not persuaded, however, that this statement can be read plausibly as representing that the Bank provided clients with the best interbank rate of the day, as the government contends. Even best execution under the SAC's definition would have required only that the Bank provide the best available rate at the time of execution. Moreover, as defendants point out, the use of quotation marks around the phrase undermines the government's claim that the phrase could be read literally.

---

232 *Id.* ¶ 44 (emphasis added).

The statement appears only to have touted the benefits that the Bank claimed to provide through the aggregation of small trades and potentially suggested that all clients receive the same pricing. Perhaps these suggestions are problematic; certainly there is tension between this statement and the Standard Comment's suggestion that very small trades received worse pricing. The SAC does not allege that this statement was misleading on either of these grounds, however.

The Court concludes that the SAC fails plausibly to allege that this statement was misleading on the grounds it advances.[233]

*C. Netting*

The SAC alleges that the Bank (but not Nichols) fraudulently stated on some occasions that it offered aggregation and netting of trades, when in fact only the London and Brussels trading desks, but not the Pittsburgh trading desk, did so. In particular, the SAC alleges that the Bank's website stated that clients benefitted from "[a]ggregation and netting based on guidelines tailored to client needs,"[234] that a BNYM predecessor set forth procedures stating that "'Currency purchases and sales effected pursuant to these Procedures in the same currency and having the same trade and value date may be netted for pricing purposes within a customer

---

233 The Court does not read the SAC nor the government's brief as alleging that the reference to "best rates for our clients" discussed above is an independently actionable fraudulent statement. *See id.* ¶ 39; Opp. Mot. Dismiss 52–55. Rather, the Court understands the government to argue that it further reinforces the allegedly misleading impression conveyed by best execution. Thus, the Court does not independently assess any contention that this statement itself was fraudulent, but notes that the government may invoke it as part of the contention that the Bank fraudulently misrepresented their services as providing the best available rates at the times of execution.

234 SAC ¶ 74.

account,'"[235] that the Standard Comment said that "we offer a variety of services" one of which was "aggregating or netting trades," and that a BNYM predecessor based in Pittsburgh represented to one particular client, FRTSF, in September 2004 that "'[o]ur system automatically nets foreign exchanges when trades are routed to our trading desk.'"[236]

The Bank's principal contention is that these representations show only that netting was available and that the service, if provided, would have been "based on guidelines tailored to client needs"—i.e., that customers were invited to discuss the possibility of arrangements under which netting would have occurred. But while this argument may persuade a trier of fact, it for present purposes does not defeat the plausible allegation that these representations were misleading and conveyed an impression that the netting would be automatic. Certainly it does not do so with respect to the alleged misrepresentation to FRSTF.

Nevertheless, that does not get the government where it wants to go as to most of these alleged misrepresentations. The problem for the government is in alleging a strong inference of an intent to deceive. Whether the trades always were netted is quite a different issue than whether the trades were priced under the SAC's alleged definition of best execution, and so the allegations supporting an intent to deceive in the latter context do not assist the government here. The SAC supports the inference that Bank employees were aware that there was a discrepancy between the practices of the Pittsburgh trading desk and those of London and Brussels. At the same time, with the exception of the alleged representation to FRSTF, all of the representations regarding netting reasonably could have been understood to mean that netting was a service the Bank offered, without

---

235. *Id.*

236. *Id.* ¶ 78.

necessarily guaranteeing that netting always would occur.[237] The most that can be said as to them is that the Bank wrote a description of the service that could have been clearer, not that it did so with intent to defraud.

Further undermining an inference of fraudulent intent with respect to these statements is the absence of a plausible allegation that the Bank's netting practices were hidden from customers. The SAC alleges that the customers were told the exchange rates for their trades,[238] and it thus appears that a customer readily could have determined from the information the Bank provided that its purchases and sales of the same currency on the same day were not being priced at the same rate.[239] At a minimum, there are no allegations that a customer was unable to do so. The ease by which they could have determined whether their trades were netted belies an inference that the representations were calculated to deceive.[240] The SAC therefore fails to allege that these

---

237 That this actually was the Bank's understanding is supported by Nichols' internal presentation, which stated:

"Does the Bank of New York aggregate and net trades prior to execution?

"Yes, *based on instructions from the client*, we will execute trades as received; or, we will hold trade requirements until the end of the day and net buys against sells prior to execution."

Laguardia Decl., Ex. 2 at 5 (emphasis added).

238 SAC ¶ 100.

239 *See id.* ¶ 79 (BNYM representative stating that London and Brussels customers would object if they no longer received netting).

240 *Thomas*, 377 F.3d at 242–43.

representations were made with fraudulent intent.[241]

The same cannot be said, however, with respect to the representation made to FRSTF. The SAC permits the inference that FRSTF's trades at least in part were routed through the Pittsburgh trading desk, that the Bank did not provide netting to such trades, and that nevertheless the Bank represented that such netting occurred "*automatically*" through the Bank's system.[242] The Bank does not attempt to explain how this statement could have been accurate in its briefing; indeed, it does not address this representation at all. The clarity of the alleged falsity supports a strong inference that the Bank employees making the statement did so with the requisite *scienter*.[243] Moreover, the circumstances in which it was made, in the Bank's response to FRSTF's formal "Invitation to Negotiate"[244] undermines at this stage any contention that the representation was merely the product of inadvertence or negligence. While FRSTF may have been able to verify on its own whether it had been receiving netting—indeed, the SAC alleges that FRSTF did just that in

---

241

The Court rejects also the government's reliance on motive and opportunity. The Second Circuit has held that "[m]otives that are common to most corporate officers" are not sufficient under this prong. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Officer compensation, including discretionary bonuses, is not sufficient to allege motive. *See Dobina v. Weatherford Int'l Ltd.*, No. 11 Civ. 1646 (LAK), 2012 WL 5458148, *4 (S.D.N.Y. Nov. 7, 2012) ("The point is not whether such pay packages provide, in at least some sense of the word, 'motive' to commit fraud, but rather, whether the mere fact that an executive is paid well provides a motive sufficient to permit a case to go to discovery without any further allegations that would support an inference of *scienter*.").

242

SAC ¶ 78 (emphasis added).

243

*See United States v. Raymond & Whitcomb Co.*, 53 F. Supp.2d 436, 447 (S.D.N.Y. 1999) ("The clarity of the falsity supports the United States's position that a failure to know of the falsity was at least reckless.").

244

SAC ¶ 78.

2010—any negligence on its part would not negate the inference that the Bank intended to deceive.[245] Finally, because whether the Bank provided netting went to the nature and quality of its standing instruction services, the SAC adequately alleges that the Bank contemplated harm against FRSTF, giving rise to an inference of fraudulent intent.

In sum, the SAC's allegations regarding netting are insufficient except with respect to the representation made to FRSTF.[246]

*D. Same Pricing*

The SAC alleges that defendants made representations to the effect that all standing instruction clients received the same pricing. In particular, for clients that were ERISA plans, the Bank of New York (predecessor to BNYM) had a policy that "'terms of FX transactions with any [ERISA plan] shall not be less favorable to the [ERISA plan] than the terms offered by BNY to unrelated parties in a comparable arm's length FX transaction.'"[247]

As noted above, this policy was identical to a statutory requirement necessary to permit transactions between the Bank and ERISA plans.[248] The statement set forth in this policy was

245 *Thomas*, 377 F.3d at 242–43.

246 Because the inference of *scienter* as to FRSTF relies on the clarity of that particular alleged representation, the Court declines to conclude that the strong inference of intent to deceive may be carried over from this representation to the Bank's other representations regarding netting.

247 SAC ¶ 84.

248 *See* 29 U.S.C. § 1108(b)(18)(B).

included in "'[w]elcome'" packages provided to a number of clients.[249] In addition, BNYM told one client, White Mountain Advisors, that "'all clients in our SI [standing instruction] program are executed at the same rate (We are required to do this to fulfill ERISA requirements).'"[250] Nichols told another, Fidelity, that "'all clients receiv[ed] the same spot price.'"[251] The SAC alleges that these representations were false because a number of standing instruction clients in fact received special treatment through benchmarking arrangements.

*1. Non-ERISA Clients*

The Court first addresses these representations to the extent that they were directed to clients that were not ERISA plans or investment managers of such plans. Defendants argue that there was no false statement in the above representations because benchmarking clients were not considered standing instruction clients and benchmarking transactions were not "comparable" to standing instruction transactions. The contention is unpersuasive. In fact, the SAC alleges that the Bank specifically discussed internally benchmarked transactions as part of standing instructions.[252] Moreover, the SAC permits the inference that the only difference between the services received by benchmarking and traditional standing instruction clients was that the former received much better

---

249 SAC ¶ 85 (BNYM informing one client that "'[t]he terms of FX transactions with any Plan shall not be less favorable to the Plan than terms offered by The Bank of New York to unrelated parties in a comparable arm's length transaction.'").

250 *Id.* ¶ 83.

251 *Id.* ¶¶ 83, 88.

252 *Id.* ¶¶ 91–92.

pricing.

The problem for the government is intent to harm. Whether a client receives the same price as another does not generally go to the nature and quality of the services provided to it; "[t]he mail and wire fraud statutes were not meant to protect consumers against the irritation of learning that others may have gotten a better deal."[253] The Court is mindful that, in certain circumstances, a representation that all clients receive the same price might become an "essential element of the bargain" so as to give rise to the contemplation of harm.[254] Such a representation directed to an ERISA client may rise to this level, as such clients may be entitled to honest representations about whether statutory requirements regarding their transactions are being followed.[255] But there is nothing in the SAC to permit the inference that same pricing was an essential part of the bargain for non-ERISA clients.

*2. ERISA Clients*

The government has a different problem as to ERISA clients. None of the specific clients that the government alleges received any of these representations is alleged to have been an ERISA plan, or an investment manager of an ERISA plan. The SAC alleges that the Bank had a "policy" that the terms provided to ERISA plans should not be less favorable than terms offered to

---

253 *Litwin v. American Express Co.*, 838 F. Supp. 855, 859 (S.D.N.Y. 1993).

254 *Shellef*, 507 F.3d at 108.

255 *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991). Thus, in *Schwartz*, our Circuit recognized that defendants defrauded a seller of goods when they represented that they would comply with export regulations regarding their purchase. While the seller received full price for the goods, defendants' compliance with the regulations was an explicit part of the bargain between the parties.

unrelated parties in a comparable transaction. But it does not allege that this policy was disseminated to ERISA clients. Nor does it allege any particular ERISA client receiving such a representation. It alleges only that the statement set forth in this policy was put in "welcome" packages to certain clients who are not alleged to have been ERISA plans.[256]

The SAC as it currently stands fails to satisfy Rule 9(b) with regard to this allegation of misrepresentations made to ERISA clients. While courts have held that in setting forth a "complex and far-reaching scheme" the government need allege only "representative samples" of fraudulent conduct to satisfy Rule 9(b),[257] the government here has not provided a single example of an ERISA client allegedly being defrauded, and an example of a non-ERISA client is not "representative" of ERISA clients when that distinction is essential to a finding of fraud.[258]

### *E. Fraudulent Omissions*

Finally, the SAC alleges that defendants are liable for fraudulent omissions in that they did not disclose their pricing practices or profits to their customers despite an alleged legal duty

---

256 After describing the "same rate" representation made to White Mountain Advisors, the SAC alleges that "BNYM made this false representation [presumably referring to the "same rate" representation] systematically." It then noted that the Bank had a policy with respect to ERISA plans. SAC ¶ 84. This is insufficient to allege with particularity that the Bank directed the statement of its ERISA policy to ERISA clients.

257 *United States ex rel. Bledsoe v. Community Health Sys., Inc.*, 501 F.3d 493, 511 (6th Cir. 2007).

258 The Court need not decide whether representative examples need not be pled if the SAC were adequately to allege that a representation was disseminated to ERISA clients through a particular mechanism. The SAC fails to make such allegations here.

to do so.[259] The government's brief contends that such a duty arose from three independent sources: defendants' allegedly false or misleading statements, their superior knowledge, and their representations inviting a heightened level of trust. The government's claim that a duty arose from false or misleading statements is best considered part and parcel of its claims of fraud with respect to those statements. Thus, in this section the Court considers only whether the other two sources imposed a duty to disclose that is entirely independent of any false or misleading statements.

*1. Superior Knowledge*

The government first relies on a New York law principle that, even in the absence of a fiduciary relationship, a party may have a duty to disclose when it "possesses superior knowledge, not readily available to the other, and knows that the other party is operating under a mistaken perception of material fact."[260] This duty arises "where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair."[261] Put differently, a party has a duty to disclose "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of a relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of these

259 *Autuori*, 212 F.3d at 118 (recognizing that there may be liability for mail fraud where defendant omits information it has duty to disclose).

260 *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995) (internal quotation marks omitted).

261 *Jana L. v. West 129th Street Realty Corp.*, 22 A.D.3d 274, 277, 802 N.Y.S.2d 132, 134 (1st Dep't 2005) (internal quotation marks omitted).

facts."[262]

Assuming *arguendo* that fraudulently failing to abide by this common law duty to disclose could give rise to liability for mail fraud, and further assuming that the SAC adequately alleges that defendants knew that the customers were operating under a mistaken impression, the SAC fails to allege any customs of the trade or other objective circumstances permitting the conclusion that the Bank's customers reasonably would have expected disclosure of the Bank's pricing practices, profits, or any other information so as to have rendered the transactions inherently unfair. As this Court recognized in *SEPTA*, commercial merchants generally are under no obligation to disclose their underlying costs or profits.[263] Indeed, there are perfectly legitimate reasons for a merchant not to provide transparency to its customers as to underlying aspects of its operations. Where a merchant chooses not to provide such transparency, a customer is free to take its business elsewhere. If the customer chooses to remain and the merchant does not mislead or lie, there typically is no basis for finding fraud. The SAC fails to allege any particular circumstances here that would justify deviating from these general principles.

*2. Heightened Level of Trust*

The government contends in the alternative that a duty to disclose arose from representations defendants made that "signif[ied] a heightened level of trust."[264] Courts have

---

262 RESTATEMENT (SECOND) TORTS, § 551(2)(e).

263 *SEPTA*, 2013 WL 440628 at *18 n.186 (citing *In re Mexico Money Transfer Litigation*, 267 F.3d at 749).

264 *Remington Rand*, 68 F.3d at 1483.

recognized that otherwise arm's-length transactions can create fiduciary duties in circumstances where trust is justifiably reposed.[265]

Here, the government relies only on defendants' statement in the Standard Comment, "'Understanding the fiduciary role of the fund manager, it is our goal to provide best execution for all foreign exchange executed in support of our clients' transactions.'"[266] The Court is not persuaded that the SAC plausibly alleges that this statement alone gave rise to a fiduciary relationship between the Bank and its customers.

Finally, the government notes in passing that the Bank did have fiduciary relationships with some of its custodial clients. But as this Court concluded in *SEPTA*, such a relationship is not necessarily sufficient to have created a duty on the part of the Bank to have disclosed information about its standing instruction pricing.[267] While the precise duties that flowed from any particular fiduciary relationship may depend on the facts of the case, the SAC's allegations here are wholly insufficient to found a claim of fraud on any fiduciary relationships the Bank may have had.

*Conclusion*

For the foregoing reasons, defendants' motions to dismiss Counts One and Two of the SAC [DI 37; DI 40] are granted to the extent that so much of that pleading as premises claims of mail and wire fraud on fraudulent omissions or on alleged representations as to "minimiz[ing]

---

265 *SEPTA*, 2013 WL 440628 at *15 & n.156.

266 SAC ¶ 55.

267 *SEPTA*, 2013 WL 440628 at *18 n.186.

costs," "best rate of the day," same pricing, or netting (except with regard to the representation to FRSTF) are dismissed. The motions are denied in all other respects.

Dated: April 24, 2013

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)