UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

BANK OF NEW YORK MELLON CORP.
FOREX TRANSACTIONS LITIGATION                                    12-md-2335 (LAK)

This document relates to:       All Actions
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

                              Plaintiff,

               -against-                                          11-cv-6969 (LAK)


THE BANK OF NEW YORK MELLON, et ano.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


          Appearances:


                    Pierre G. Armand
                    Lawrence H. Fogelman
                    Jeffrey K. Powell
                    Arastu K. Chaudhury
                    Rebecca S. Tinio
                    Assistant United States Attorneys
                    PREET BHARARA
                    UNITED STATES ATTORNEY

                    *Attorneys for Plaintiff United States of America*

                    Elizabeth J. Cabraser
                    Daniel P. Chiplock
                    Daniel E. Seltz
                    Michael J. Miarmi
                    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

Joseph H. Meltzer
Sharan Nirmul
Shannon O. Braden
Daniel Mulveny
Sekou Campbell
KESSLER TOPAZ MELTZER & CHECK, LLP

*Attorneys for Customer Class Plaintiffs*

Reid M. Figel
Rebecca A. Beynon
David L. Schwarz
Derek T. Ho
Gregory G. Rapawy
Andrew C. Shen
Joshua D. Branson
Andrew E. Goldsmith
KELLOG HUBER HANSEN TODD EVANS & FIGEL, PLLC

*Attorneys for Defendant The Bank of New York Mellon*

Stephen Fishbein
Daniel H.R. Laguardia
Christopher LaVigne
Jeffrey J. Resetarits
SHEARMAN & STERLING, LLP

*Attorneys for Defendant David Nichols*

LEWIS A. KAPLAN, *District Judge*.

The plaintiffs in most of these actions are or were customers of the Bank of New York Mellon ("BNYM" or the "Bank")[1] that contracted with BNYM to execute certain foreign exchange transactions on their behalf.  They now allege that the Bank is liable for breaches of fiduciary duties, contract, and the implied covenant of good faith and fair dealing, as well as

---

[1] "BNYM" and the "Bank" refer collectively to the Bank of New York Mellon and its various predecessors and affiliates.

conversion, unjust enrichment, and certain violations of state business law for assigning fictitious foreign currency exchange rates to the plaintiffs' purchases and sales of foreign securities in violation of contractual guarantees. The Department of Justice and several other groups of private plaintiffs also have sued BNYM for civil penalties or alleged damages stemming from its foreign exchange practices.[2]

The matter now is before the Court on the motion of the Customer Class Plaintiffs ("Plaintiffs") for an order compelling the Bank to produce in unredacted form a document (the "Robeco document") that contains a legal memorandum (the "Groom Memo") originally prepared for BNYM but that the Bank later forwarded to some third-party investment managers, including Robeco Investment Management ("Robeco"), that were associated with BNYM's pension plan.[3] The nub of the dispute is whether the Groom Memo is protected by the attorney-client privilege or the work product doctrine, notwithstanding that dissemination, by virtue of the common interest doctrine.

The Bank argues that the Groom Memo is "protected from disclosure by the attorney-client privilege and work product doctrine" and that "BNYM did not waive the privilege by sharing the Memo with its existing investment managers."[4] Plaintiffs, on the other hand, assert (1) that the Bank forfeited the protection of the attorney-client privilege when it circulated the Groom Memo

---

[2]
    The Court assumes familiarity with previous opinions that set out the nature of the dispute. *See, e.g.*, *In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 991 F. Supp. 2d 479 (S.D.N.Y. 2014); *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438 (S.D.N.Y. 2013); *Se. Pa. Transp. Auth. v. Bank of N.Y. Mellon Corp.*, 921 F. Supp. 2d 56 (S.D.N.Y. 2013).

[3]
    *See* Plaintiffs' Mot. to Compel [DI 515].

[4]
    Defendants' Brief in Opp'n [DI 504], at 1.

4

to third parties with whom it shared no common legal strategy,[5] and (2) that the Groom Memo is not work product because there is no evidence that it was prepared "in connection with active or contemplated litigation."[6]

*Facts*

On June 10, 2009, Andrée St. Martin, an attorney at the Groom Law Group and thus among the Bank's outside counsel, sent the Groom Memo to BNYM.[7]  In broad strokes, the memo discusses the Bank's standing instruction foreign exchange ("FX") transactions business – the business at the heart of this litigation – vis-a-vis compliance with the Employee Retirement Income Security Act of 1974 ("ERISA").[8]  On July 1, 2009, a BNYM employee named Nicholas Rotunno sent the Groom Memo to representatives of four of the BNYM pension plan's investment management companies, including Robeco.[9]  He asked the recipients to review the Groom Memo, to confirm that their companies "can comply with the[] conditions" therein and to understand "that compliance with this memo is your responsibility," not the Bank's; he cautioned also that the Bank

---

[5]     *See* DI 515, at 2-3; *see also* Plaintiffs' Reply [DI 508], at 1.

[6]     DI 515, at 3; *see also* Fed. R. Civ. P. 26(b)(3).

[7]     *See* DI 515, Ex. A, at 4.

[8]     *See* DI 504, at 1.  Plaintiffs ask the Court to "undertake an *in camera* review of the Robeco document (and the Groom Memo contained therein) in connection with its consideration of this matter," and the Bank agreed to such a review.  DI 515, at 5.  The Court has done so.

[9]     *See* DI 515, Ex. A, at 2-3.

"would expect full indemnity and compensation for any breach."[10]

Years later, after the initiation of these actions, BNYM issued a subpoena to Robeco, which produced 91 documents to the Bank, including those at issue here.[11]  On March 11, 2014, BNYM produced those documents, including an unredacted copy of the Robeco document and the Groom Memo it contained, to Plaintiffs and to the United States Attorney's Office.[12]  Six months later, Plaintiffs submitted the Robeco document to the Court in support of a different discovery motion.[13]  At that point, the Bank "clawed back" the Robeco document on the ground that the Groom Memo contained "information that BNYM believes is likely protected by the attorney-client privilege and was inadvertently produced to Plaintiffs."[14]

## Discussion

### The Attorney-Client Privilege and the Common Interest Doctrine

The attorney-client privilege, which had its origins in the 16th century, is among the oldest common law privileges.[15]  The "privilege recognizes that sound legal advice or advocacy

---

[10]

Letter from Daniel P. Chiplock, Partner, Lieff Cabraser Heimann & Bernstein, to the Court (Sept. 9, 2014) [DI 462], Ex. A, at 2.

[11]

See DI 504, at 4; DI 515, at 4.

[12]

See DI 515, at 1.

[13]

See DI 515, at 1, 4; DI 462.

[14]

Letter from Reid M. Figel, Partner, Kellogg, Huber, Hansen, Todd, Evans & Figel, to the Court (Sept. 9, 2014) [DI 464], at 1.

[15]

See Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); In re von Bulow, 828 F.2d 94, 100 (2d Cir. 1987).

serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client."[16]  It encourages the candid and complete exchange of facts and advice between lawyer and client by shielding from disclosure certain confidential communications between them and "thereby promote[s] broader public interests in the observance of law and administration of justice."[17]   To this end, the privilege protects not only the advice an attorney gives his client, but also the information a client gives his attorney to enable the latter "to give sound and informed advice."[18]   Nonetheless, because the focus of the privilege is the protection of attorney-client confidences, the voluntary disclosure of confidential material to a third party "eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege."[19]

The common interest doctrine is a notable exception to this waiver rule.[20]  Generally speaking, it brings within the ambit of the attorney-client privilege confidential communications

---

[16]

*Upjohn*, 449 U.S. at 389; *see also Trammel v. United States*, 445 U.S. 40, 51 (1980) ("The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out.").

[17]

*Upjohn*, 449 U.S. at 389; *see also Fisher v. United States*, 425 U.S. 391, 403 (1976) ("The purpose of the privilege is to encourage clients to make full disclosure to their attorneys.").

[18]

*Upjohn*, 449 U.S. at 390.

[19]

*In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973); *see also Schanfield v. Sojitz Corp. of Am.*, 258 F.R.D. 211, 214 (S.D.N.Y. 2009). In the context of waiver, the attorney-client privilege is something of a misnomer.  The privilege "belongs solely to the client and may only be waived by him.  An attorney may not waive the privilege without his client's consent."  *In re von Bulow*, 828 F.2d at 100.

[20]

*See Fox News Network, LLC v. U.S. Dep't of Treasury*, 739 F. Supp. 2d 515, 563 (S.D.N.Y. 2010).

between a client and the client's attorney that are divulged by the client to a third party if the client and the third party are engaged in some form of common enterprise.[21]

The Bank contends that disclosure of the Groom Memo to Robeco (among others) did not waive the attorney-client privilege because BNYM originally shared the document "to promote the common legal interests" of the Bank, its pension plan, and its investment managers with respect to ERISA compliance.[22]  Disclosure of the Groom Memo to those investment managers, the Bank argues, fell "squarely within the common interest exception to the waiver doctrine" because BNYM and its investment managers "had a common legal interest in ensuring the [standing instruction FX] transactions complied with the new [ERISA] exemption."[23]

Plaintiffs insist that the common interest doctrine is inapplicable, in large part because the Bank, they contend, did not conceive of the Groom Memo as an attorney-client communication when it circulated the document to its investment managers.[24]  This is clear, according to Plaintiffs, from the Groom Memo itself, which contemplated that the document would be shared with the Bank's investment managers, but warned that no "party other than the Bank . . . is entitled to rely on the analysis provided herein and such other party should consult with its own counsel familiar with these matters."[25]  Such a disclaimer, Plaintiffs maintain, "fatally undermines

---

[21]

See *Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 415 (S.D.N.Y. 2004).

[22]

DI 504, at 1.

[23]

*Id.* at 1-3.

[24]

*See* DI 515, at 2.

[25]

DI 462, Ex. A, at 4-5.

8

any argument that Robeco and Groom were in anything amounting to an attorney-client relationship, or that the Bank and Robeco shared a 'common' or 'joint defense' privilege."[26]  Moreover, Plaintiffs note that Mr. Rotunno made clear when he sent the Groom Memo to the Bank's investment managers that compliance with the document was the responsibility of the investment managers alone, not the Bank, and that BNYM's pension plan "would expect full indemnity and compensation for any breach."[27]  This arrangement, Plaintiffs say, was "manifestly inconsistent with a 'shared legal interest' giving rise to a common privilege."[28]

In resolving this dispute, the Court recognizes that the outer limits of the common interest doctrine – as far as the nature of the interest that must be shared by the client whose attorney communication is at issue (here BNYM) and the non-party to whom the communication has been divulged (here the pension plan investment managers) – are not clear.

The weight of the rather limited authority on this issue suggests that the common interest doctrine is narrow – that it shields from discovery confidential attorney-client communications voluntarily disclosed to a third party only if that third party shares with the disclosing party some identifiable and concrete *legal* interest.[29]  Under this formulation of the

---

[26]    DI 515, at 2.

[27]    DI 462, Ex. A, at 2.

[28]    DI 515, at 3.

[29]    *See, e.g.*, *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1172 (D.S.C. 1974) ("A community of interest exists among different persons or separate corporations where they have an identical legal interest with respect to the subject matter of a communication between an attorney and a client concerning legal advice.").

doctrine, a common *commercial* interest is insufficient to trigger its protections.[30]  So, too, is a shared goal[31] or "concerns about potential litigation."[32]  In fact, a party seeking the protection of the common interest doctrine in a court that adheres to what appears to be the majority view of that doctrine must show that it developed with the relevant third party an agreement, formal or informal, "embodying a cooperative and common enterprise towards an *identical legal strategy*."[33]

On the other hand, some courts have taken a more expansive view of the common interest doctrine – one that protects confidential attorney-client communications voluntarily disclosed to a third party even if that third party shares only a *commercial or financial* interest with the disclosing party.[34]

This case falls somewhere along the spectrum between the poles represented by the views thus summarized.  Certainly the Bank and its pension plan's investment managers had more

---

[30]

See id. ("The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial."); *see also, e.g.*, *Fox News Network*, 739 F. Supp. 2d at 563 ("The interest must be a common legal interest, not merely a common commercial interest."); *Bank of Am., N.A. v. Terra Nova Ins. Co.*, 211 F. Supp. 2d 493, 497 (S.D.N.Y. 2002) ("The mere fact that the parties were working together to achieve a commercial goal cannot by itself result in an identity of interest between the parties.").

[31]

*See, e.g.*, *SEC v. Wyly*, No. 10-cv-5760, 2011 U.S. Dist. LEXIS 72573, at *9-10 (S.D.N.Y. July 5, 2011).

[32]

*Denney*, 362 F. Supp. 2d at 415.

[33]

*Id.* (emphasis added) (internal quotation marks omitted).

[34]

*See, e.g.*, *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 309 (N.D. Cal. 1987) (determining that one party's voluntary disclosure of an attorney's opinion letter to a non-party with which it was attempting to negotiate the sale of a business "should not constitute a waiver of the attorney-client privilege"); *see also La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 310-11 (D.N.J. 2008) (discussing, agreeing with, and applying the reasoning in *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*); *Rayman v. Am. Charter Fed. Sav. & Loan Ass'n*, 148 F.R.D. 647, 653-55 (D. Neb. 1993) (same).

than a simple commercial interest in the subject addressed by the Groom Memo.  The Bank was concerned with ensuring that its pension plans complied with ERISA, it obtained legal advice on that issue, and it communicated that legal advice to the investment managers who invested plan assets. It did so coupled with the imperative that the managers ensure compliance in circumstances where it was reasonable to suppose that both the Bank and the investment managers would encounter liability in the absence of compliance with the statute.  On the other hand, the Bank and the investment managers did not face existing or imminently threatened litigation.  They did not enter into a joint defense agreement, certainly not explicitly and probably not implicitly.  And the Bank's threat to seek indemnity from the investment managers if they failed to comply with ERISA coupled with the Bank's disclosure of the advice it received laid down a marker that was in some degree commercial in nature – it effectively told the investment managers that the Bank would hold them responsible if they did not handle the compliance issues in at least as exacting a manner as the Groom Memo had recommended.

In the last analysis, the resolution of this problem must consider whether application of the common interest doctrine on these facts would serve the policies that underlie the attorney-client privilege better than a different conclusion.  On the one hand, extension of the common interest doctrine here would do nothing to protect the ability of the Bank to engage in full and candid communication with its attorneys about the subject in question.  That communication took place when the Bank received the Groom Memo in the first instance.

On the other hand, we live in a very complex society.  The Bank and its pension plans are obliged to comply with ERISA, a very complicated statute, and to do so in the context of a complicated investment world.  The division of functions that characterizes every sector of our economy is reflected by the Bank's delegation of at least some investment responsibilities to the

investment managers. And society in general has an important interest in ensuring that those involved in such heavily regulated and complicated activities act in the fullest possible knowledge of the legal implications of what they do. Indeed, the Supreme Court adverted to this interest in *Upjohn Co. v. United States*,[35] as one of the bases for rejecting the so-called "control group" test as defining the outer limits of the attorney-client privilege in the corporate context:

> "The narrow scope given the attorney-client privilege by the court below . . . threatens to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law. In light of the vast and complicated array of regulatory legislation confronting the modern corporation, corporations, unlike most individuals, 'constantly go to lawyers to find out how to obey the law,' particularly since compliance with the law in this area is hardly an instinctive matter."[36]

The same considerations are at work here. Accordingly, this Court holds that the Bank's disclosure of the Groom Memo to its pension plan's investment managers, aimed as it was at securing compliance with the requirements of ERISA, was protected by the common interest doctrine and the attorney-client privilege.[37]

---

[35]

449 U.S. 383 (1981).

[36]

*Id.* at 392 (citation omitted).

[37]

This conclusion renders the parties' disagreement concerning the work product doctrine academic. Further, the Bank stoutly maintains that its March 11, 2014 production of an unredacted copy of the Groom Memo to Plaintiffs and the United States Attorney's Office production was inadvertent, and there is no evidence to the contrary. Accordingly, that production did not waive the privilege.

*Conclusion*

Plaintiffs' letter motion [DI 515] is denied in all respects.

SO ORDERED.

Dated:          November 10, 2014

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)